b. **Application of HQS.** The following is a discussion of the standards and the determinations to be made by the PHA and the tenant:

(1) **Sanitary Facilities.** (See Paragraph 5-5 for Congregate Housing and Independent Group Residence modifications.)

(a) **Summary of Standards.**

<u>1</u> The bathroom must be located in a separate room and have a flush toilet in proper operating condition.

<u>2</u> The unit must have a fixed basin with a sink trap and hot and cold running water in proper operating condition.

<u>3</u> The unit must have a shower or a tub with hot and cold running water in proper operating condition.

<u>4</u> The facilities must utilize an approvable public or private disposal system, including a locally approvable septic system.

(b) **PHA Determination.** The sanitary facilities must be contained within the dwelling unit to be leased and be available for the exclusive use of the occupants of that dwelling unit (i.e., outhouses or sanitary facilities which are used by occupants of other dwelling units are not acceptable). In determining "proper operating condition" of the sanitary facilities, the PHA must be satisfied that the facilities are free of hazardous conditions. An example of a hazardous condition is a damaged or broken fixture that endangers the user or which may result in severe leakage or flooding around pipes, the base of the toilet, wash basin, and bathtub or shower area. (See also subparagraph (8)(b), below.) The public or private disposal system must be approvable by any State or local agency that has such responsibility. The PHA must determine that the sanitary facilities of at least one bathroom meet the minimum requirements in subparagraph (1)(a) above. However, the PHA must also determine that additional bathrooms have an openable window or other adequate exhaust ventilation, a permanent light fixture, a proper sink trap and meet the requirements for security in subparagraph (3)(a)<u>3</u> below. In addition, the PHA must also check the condition

PHA 011827

7420.7 CHG 3

CHAPTER 5

of windows, ceilings, walls and floors, and
ensure that no unsanitary condition or electrical
hazards exist.

(c) Tenant Preference. The tenant may determine
acceptability of the cosmetic condition and
quality of the sanitary facilities, including the
size of the basin and shower or tub, condition of
faucets, minor leaks, scratches, worn enamel, and
the location of the sanitary facilities within
the dwelling unit.

(2) Food Preparation and Refuse Disposal. (See Paragraph 5-5
for Congregate Housing and Independent Group Residence
modifications.)

(a) Summary of Standards.

1 The unit must have a cooking stove or range and
refrigerator of appropriate size for the unit
(i.e., family), all in proper operating condition.
This equipment may be supplied by either the
owner or tenant.

2 The unit must have a kitchen sink in proper
operating condition with a sink trap and hot
and cold running water which drains into an
approvable public or private system.

3 The unit must provide space for the storage,
preparation, and serving of food.

4 There must be facilities and services for the
sanitary disposal of food waste and refuse,
including temporary storage facilities where
necessary (e.g., garbage containers).

(b) PHA Determination. Hot plates are not acceptable
substitutes for stoves or ranges. In determining
"proper operating condition" of the equipment and
facilities listed in 1 and 2 above, the PHA must
insure that these work and are free of hazardous
conditions including a damaged or broken stove,
sink, or refrigerator that endangers the users,
or evidence of gas or water leakage that presents
the danger of fire or electrical shock. The PHA
should also insure that the stove and refrigerator
are free of potential hazards due to improper hook-
up and that the sink is free of major leaks which
will result in substantial water loss and damage

PHA 011828

to the unit. The PHA must also determine that the refrigerator is of appropriate size for the family (i.e., a table-top compact refrigerator would be clearly inappropriate for a family of four). Facilities and services for the temporary storage and sanitary disposal of food wastes (in 4 above) must include a waste disposal system which is sanitary and approvable by any local agency that has such responsibility or which is consistent with local practice.

(c) Tenant Preference. The tenant may determine acceptability of the size of the stove or range, the amount of space for storage, preparation and serving of food and the cosmetic condition and quality of these facilities, as well as the location of the kitchen within the dwelling unit. The tenant may also determine the acceptability of the size of the refrigerator unless it is clearly inappropriate. If the PHA believes that the food preparation area and food storage space are not adequate for the size of the family, or the facilities for disposal of trash and garbage are not adequate, these concerns should be discussed with the prospective tenant prior to leasing. Nonetheless, the tenant has the freedom to select the unit despite these concerns (other than as required under (b) above).

(3) Space and Security.

(a) Summary of Standards.

1 The unit must have a minimum of a living room, kitchen area, and bathroom.

2 The unit must contain at least one sleeping or living/sleeping room for each two persons.

3 The unit's windows which are accessible from the outside, such as basement, first floor and fire escape windows, must be lockable (e.g., window units with sash pins or sash locks, and combination windows with latches). Windows which are nailed shut are acceptable provided that they are not needed as an alternate means of exit in case of fire.

4 The unit's exterior doors (i.e., those that provide access to or egress from the unit) must be lockable.

PHA 011829

7420.7 CHG 3

CHAPTER 5

(b) <u>PHA Determination</u>.  The PHA must be satisfied that the doors and component parts are free from damage (e.g., splits, cracks, and holes) that would seriously affect their use and ability to be locked.  The PHA must ensure the adequacy of locking devices on all exterior doors (e.g., a chain lock must be accompanied by another properly working lock; a bolt lock is adequate only when there is another door which can be locked from outside the unit).

(c) <u>Tenant Preference</u>.  The tenant may determine the acceptability of the location of the living room, kitchen area, and bathroom within the dwelling unit as well as the appropriate size of these rooms and all sleeping and living/sleeping rooms.  The tenant may also determine the acceptability of the types of locks provided on windows and doors except as discussed in (3)(b) above.

(4) <u>Thermal Environment (Heating and Cooling Systems)</u>

(a) <u>Summary of Standards</u>.

<u>1</u> The unit must contain a safe heating system (and safe cooling system, where present) which is in proper operating condition and can provide adequate heat (and cooling, if applicable), either directly or indirectly, to each room in order to assure a healthy living environment appropriate to the climate.

<u>2</u> The unit must not contain unvented room heaters which burn gas, oil, or kerosene.  (Electric heaters are acceptable.)

(b) <u>PHA Determination</u>.  The PHA must insure that the heating system is capable of providing adequate heat, either directly or indirectly, to all rooms used for living.  In determining "proper operating condition" of a heating or cooling system, the PHA must be satisfied that it is free of hazardous conditions.  Such hazards include any damage to the system, ducts, or fixtures so that heating or cooling is non-existent, inadequately distributed to the unit, or there is a potential for fire or other threats to safety.  Escaping gases from disconnected or broken vent pipes are also hazardous.  Portable electric room heaters or kitchen stoves or ranges must not be accepted as a primary source of heat for units located in areas where climatic conditions require

PHA 011830

regular heating. The PHA should also insure that the heating device is free of major leaks in radiators or duct work which may affect its capability to provide satisfactory heat to all habitable rooms in the unit and to prevent heat loss.

(c) Tenant Preference. The tenant may, at its option and with the owner's permission, close off any heating ducts to specific areas it does not choose to heat and may also determine the acceptability of the amount of weather stripping and insulation to prevent inadequate heat distribution and excessive air infiltration. The tenant may also determine if storm doors and windows are important. If the PHA believes that weather stripping and insulation for the unit are inadequate, this concern should be discussed with the tenant or owner. This is particularly important in situations where the tenant will pay for utilities, because inadequate weather stripping and insulation may lead to utility bills in excess of the applicable utility allowance.

(5) Illumination and Electricity.

(a) Summary of Standards.

1 There must be at least one window in the living room and in each sleeping room.

2 The kitchen area and the bathroom must have a permanent ceiling or wall-type light fixture in working condition. The kitchen area must also have at least one electrical outlet in operating condition.

3 The living room and each bedroom must have at least two electrical outlets in operating condition. Permanent overhead or wall-mounted light fixtures may count as one of the required electrical outlets.

(b) PHA Determination. In determining electrical safety, the PHA must be satisfied that the electrical system is free of hazardous conditions including exposed, uninsulated, or frayed wires; improper connections, insulation, or grounding of any component of the system; overloading of capacity such that there is the hazard of electrocution or fire; or wires lying in or located near standing water or other unsafe places. The PHA must also be satisfied that the

PHA 011831

system is free from insulated wires indicating fraying or wear, improper splicing of wires, or missing cover plates on outlets and switches. The PHA must also be satisfied that the windows are free of hazardous conditions such as missing or broken panes. (NOTE: Cracked window panes are not a violation unless they are a potential safety problem or cause drafts.)

(c) Tenant Preference. The tenant may determine whether the location of outlets and fixtures is acceptable, and whether cracked window panes are acceptable, unless the PHA has determined that they allow drafts to enter or represent a safety hazard.

(6) Structure and Materials.

   (a) Summary of Standards.

   1 Ceilings, walls, and floors must not have any serious defects such as severe bulging or leaning, large holes, loose surface materials, severe buckling, missing parts or other serious damage.

   2 The roof must be structurally sound and weather-tight.

   3 The exterior wall structure and surface must not have any serious defects such as serious leaning, buckling, sagging, large holes, or defects that would result in air infiltration or vermin infestation.

   4 The condition and equipment of interior and exterior stairways, halls, porches, walkways, etc., must not present a danger of tripping and falling. Broken or missing steps and loose boards are examples of potential hazards.

   5 Elevators must be working and safe.

   6 Manufactured homes shall be equipped with at least one smoke detector in working condition. Manufactured homes must be securely anchored by a tiedown device which distributes and transfers the loads imposed by the unit to appropriate ground anchors so as to resist wind overturning and sliding (unless the Field Office has approved

PHA 011832

a variation to the Acceptability Criteria
because the units are in a low-wind zone area).

(b) PHA Determination.  In making determinations with
respect to the criteria listed in (a) 1, 2, 3, and
4 above, the PHA must be satisfied that the unit
is free of hazardous conditions including:

1 foundations with severe structural defects or
that are penetrable by water so that the struc-
tural safety of the building is threatened;

2 exterior walls, other exterior surfaces, roofs,
chimneys, gutters, or downspouts with serious
defects so that there is a danger of struc-
tural collapse or of significant damage from
the elements to the interior of the structure;

3 stairs, porches, balconies, or decks with severe
structural defects such as broken or missing
steps; absence of a handrail when there are
four or more consecutive steps; or absence of
railings around a porch or balcony which is
approximately 30 inches or more above ground; or

4 interior walls, ceilings, and floors with such
serious defects that a potential exists for struc-
tural collapse or other threats to safety.

With respect to (a)5 above, an elevator with a current
inspection certificate may be considered working
and safe.  If an elevator does not have an inspec-
tion certificate or the certificate is outdated, the
PHA must determine whether the elevator is working
and safe.

(c) Tenant Preference.  Tenants may determine whether
minor defects, such as lack of wallpaper or paint
or worn flooring, will affect the livability
of the unit.

(7) Interior Air Quality.

(a) Summary of Standards.

1 The unit must be free from dangerous levels of air
pollution from carbon monoxide, sewer gas, fuel
gas, dust, and other harmful pollutants.

2 The unit must have adequate air circulation.

PHA 011833

CHAPTER 5

        <u>3</u>  Bathroom areas must have one openable
           window or other adequate exhaust ventilation.

        <u>4</u>  Any room used for sleeping must have at least
           one openable window, if the window was so designed.

(b)  <u>PHA Determination</u>.  The PHA must be satisfied that
air pollutants are not consistently present in
amounts that would pose a continuing health hazard
to the tenants.  Air pollutants may result from the
unit being too close to industrial sources, or heavy
traffic, or from malfunctioning gas appliances.
In evaluating the air quality, the PHA should
also ensure that the air circulates adequately
throughout the unit.  Also, PHAs should ensure
that each bathroom has either an openable window
or other adequate means of ventilation such
as wall or ceiling mounted electric fan vents or
gravity flow/chimney effect vent pipes or shafts.
The PHA must check the windows in any room used
for sleeping to determine that at least one window
is openable if it was designed to be opened.

(c)  <u>Tenant Preference</u>.  Tenants may determine if screens,
filters, fans, or other devices for proper ventilation
are adequate to meet their needs.  The PHA may advise
the tenant whether, due to insect conditions in the
area, screens for windows and doors would be desirable.

(8)  <u>Water Supply</u>.

    (a)  <u>Summary of Standards</u>.

        The unit must be served by an approvable public or
        private water supply which is sanitary and free from
        contamination.

    (b)  <u>PHA Determination</u>.  The PHA should be satisfied that
the water supply is approvable by the appropriate State
or local agency, and that hazardous conditions do not
exist.  The PHA must be satisfied that clean water
and waste are distributed effectively to and from all
fixtures in the unit.  The plumbing must be free of
broken pipes, improperly sealed joints, and other
defects that cause leakage and threats to health and
safety.  The PHA must also be satisfied that water
heaters supply hot water to the unit and are free of
hazardous conditions.  Such conditions include:  gas
leakage, flooding danger, seriously cracked or broken

PHA 011834

vent pipes on gas-fired water heaters which allow unexpended gases to escape into the unit, improper venting from exhaust gases, lack of temperature-pressure relief valve and discharge line, or tagging by the utility company indicating an unsafe condition. The PHA should also be satisfied that gas water heaters are vented and are not located in bedrooms or other living areas where safety hazards may exist unless safety dividers or shields are installed.

(c) <u>Tenant Preference</u>. The tenant must determine whether the water heater provides a sufficient supply of hot water to the unit.

(9) <u>Lead-Based Paint</u>.

(a) <u>Summary of Standards</u>.

The regulation at 24 CFR Part 35, which implements the Lead-Based Paint Poisoning Prevention Act, requires the following:

<u>1</u> All interior surfaces must be either free of cracking, scaling, peeling, chipping, and loose paint <u>or</u> be adequately treated (as discussed in <u>3</u> below) to prevent the exposure of the occupants to such immediate hazards.

<u>2</u> All exterior surfaces such as stairs, decks, porches, railings, windows, and doors which are accessible to children under seven years of age must be free of cracking, scaling, peeling, chipping, and loose paint <u>or</u> be adequately treated (as discussed in <u>3</u> below) to prevent the exposure of such children to immediate hazards.

<u>3</u> All surfaces to be <u>treated</u> must be thoroughly washed, sanded, scraped, wire brushed or otherwise properly cleaned to remove all immediate hazards on applicable surfaces before repainting with at least two coats of a suitable nonleaded paint, <u>or</u> be covered with a suitable material such as gypsum wallboard, plywood, drywall, plaster, wallpaper, or other suitable material. If the paint film integrity of the applicable surface cannot be maintained so that new paint or materials such as wallpaper will adhere, the old paint must be <u>completely</u>

PHA 011835

7420.7 CHG 3

CHAPTER 5

removed before any repainting or covering is undertaken. Simply painting over affected surfaces is not an acceptable means of compliance.

(b) PHA Determination. If the owner is required to treat any interior/exterior surface, the PHA must ensure that the unit is in full compliance prior to the execution of any Housing Assistance Payments (HAP) Contract, and obtain the owner's certification that the work has been done in accordance with such requirements. However, if an exterior surface requires repainting and the weather conditions at the time make painting temporarily impractical, the following actions must be taken:

<u>1</u>  The owner must remove all defective paint conditions (as instructed in subparagraph (9)(a)<u>3</u> above) before the HAP Contract and lease are executed or renewed.

<u>2</u>  The owner must sign an agreement to repaint with two coats of a nonleaded paint or otherwise properly cover the affected surface by a specified date when weather conditions would be more favorable.  If the owner will not sign an agreement, the HAP Contract shall not be executed or renewed.

<u>3</u>  The agreement to repaint with two coats of a nonleaded paint or otherwise properly cover the affected surface by a specified date must be attached to the HAP Contract.

<u>4</u>  Within 30 days after the specified date, the PHA must reinspect the unit to ensure that the owner has complied with the agreement.

<u>5</u>  If the owner has not complied with the agreement, the PHA must stop making housing assistance payments to the owner, as instructed in Paragraph 5-10 below.

(10)  Access.

(a)  Summary of Standards.

<u>1</u>  The unit must be used and maintained without unauthorized use of other private properties.

PHA 011836

2  The building must provide an alternate means of
exit in case of fire (such as fire stairs or exit
through windows, with the use of a ladder if win-
dows are above the second floor).

(b)  PHA Determination.  The PHA must determine that
the unit has private access without unauthorized
passage through another dwelling unit or private
property and that the alternate means of emergency
exit from the building (not from the unit) is
appropriate for the tenant family and considered
adequate by the appropriate local officials.

(c)  Tenant Preference.  The tenant should assist the
PHA in determining whether the type of emergency
exit (e.g., window exit or fire escape) is acceptable.

(11)  Site and Neighborhood.

(a)  Summary of Standards.

The site and neighborhood must be reasonably free
of serious conditions which would endanger the
health and safety of residents.

(b)  PHA Determination.  The PHA must determine whether
there are any site and neighborhood conditions
which would seriously and continuously endanger
the health and safety of the residents (e.g., fire
hazards; abnormal air pollution or smoke which
continues throughout the year and is determined to
endanger health seriously; continuous and excessive
vibration or vehicular traffic; or regular occurrence
of septic tank back-up or other sewage).

(c)  Tenant Preference.   The type of neighborhood (e.g.,
commercial usage, racial or economic mix) in which
a tenant wishes to live is the tenant's determination.

(12)  Sanitary Condition.

(a)  Summary of Standards.

The unit and its equipment must be free of serious
vermin and rodent infestation.

(b)  PHA Determination.  The PHA must insure that the unit
is free from rats and heavy accumulations of trash,

PHA 011837

garbage, or other debris that may harbor vermin. The PHA must also insure that the unit has adequate barriers to prevent infestation.

(c) <u>Tenant Preference</u>. The tenant must determine whether the unit is in an acceptable sanitary condition, provided the unit meets minimum standards to be determined by the PHA (see (b) above). Such tenant preferences might include whether the unit meets their requirements for cleanliness or whether any minor problems such as occasional roaches or mice would affect livability.

5-5. <u>REQUIREMENTS FOR CONGREGATE FACILITIES AND INDEPENDENT GROUP RESIDENCES.</u>

a. <u>Units Located In Congregate Housing Projects.</u>  All criteria listed above in Paragraphs 5-4(b)(1) and 5-4b(3) through (12) apply to congregate housing. In addition, the following criteria must be met:

(1) <u>Summary of Standards</u>.

(a) The unit must contain a refrigerator of appropriate size for the unit.

(b) The sanitary facilities described in Paragraph 5-4b(1) must be contained within the unit.

(c) The requirement for "Kitchen Area" in Paragraph 5-4b(3)(a)<u>1</u> is not applicable. The central dining facility and central kitchen must be located within the building or housing complex and must:

<u>1</u> be accessible to the occupants;

<u>2</u> contain suitable space and equipment to store, prepare, and serve food in a sanitary manner;

<u>3</u> be sufficient in size to accommodate the occupants;

<u>4</u> be for the primary use of the occupants;

<u>5</u> provide a food service operated by other than the occupants; and

<u>6</u> have adequate facilities and services for the sanitary disposal of food waste and refuse, including facilities for temporary storage where necessary (e.g., garbage cans).

PHA 011838



CITY OF SAINT PAUL
OFFICE OF THE CITY COUNCIL

RECEIVED
OCT 1  1994
PHA
Central Office

**MARIE GRIMM**
Councilmember

CED COMMITTEE MEMBERS:
**Marie Grimm, Chair**
Jerry Blakey
Roberta Megard
Marcia Moermond, Policy Analyst

HELEN WELTER
Legislative Aide

VICKI SHEFFER
Executive Assistant

## COMMUNITY & ECONOMIC DEVELOPMENT COMMITTEE

AGENDA & MEETING NOTICE

Date:   Wednesday, October 26, 1994
Time:   10:00 - 12:00
Place:  City Council Chambers, 3rd Floor

**PURPOSE:** Housing Issues, the use of Section 8 housing assistance; enforcement and residential property standards. PED Business Policies/Practices, newly established unified lending and credit process and procedures.

| EST. TIME | ITEM | PRESENTING COUNCILMEMBER/STAFF |
|-----------|------|-------------------------------|
| 10:00 | Introductions; Approval of Minutes from March 30 and August 24 meetings | Chair Grimm |
| 10:05 | Section 8 Housing Assistance | Gary Peltier, PED<br>Al Hester and Mary Ahern, Public Housing Agency |
| 10:35 | Residential Property Standards and Enforcement | Gary Peltier, PED<br>Chuck Votel, Housing Code<br>Steve Zaccard, Fire Prevention |
| 11:05 | Unified Lending Process and Approval of Guidelines (referred from HRA on 10/12/94) | Gloria Bostrom, PED<br>Curt Miller, PED |
| 11:45-12:00 | November 23 CED Agenda & Staff Assignments; Adjournment | Chair Grimm |

CED Informational Packet for October 26 Meeting:
1.   Minutes of March 30 and August 24, 1994 meetings
2.   Overview of Section 8
3.   Residential Property Standards
4.   Unified Lending Process and Approval Guidelines

**\*\* OVER FOR UPDATED CED COMMITTEE SCHEDULE \*\***

PHA 011877

**1994 COMMUNITY & ECONOMIC DEVELOPMENT COMMITTEE SCHEDULE**

| | |
|---|---|
| **OCTOBER 26** | • Rental Housing - Section 8, Property Standards, Management, Registration<br>• Unified Lending Process and Approval of Guidelines (referred from HRA 10/12/94) |
| **NOVEMBER 23** | • Housing Code Compliance (Tentative) |
| **DECEMBER 28 AND 1995** | • Comprehensive Plan Chapters - Begin Discussion<br>   Libraries (Tentative - December)<br>   Parks (Tentative - January/February 1995)<br>   Land Use, Downtown Urban Design (1995)<br>• Grand Avenue Growth<br>• Design Review<br>• Riverfront/MNRRA Report<br>• Small Area Plan Process |

**PENDING**

| | |
|---|---|
| December 28 | • Communication Plan For/With Housing Stakeholders (Laid over 8/24/94 CED) |
| November 23 | • Tasks Unlimited Lodge Proposal, HOME Fund (referred from HRA 5/25/94; Laid over 6/22/94 CED) |

---

On March 16, 1994, at the first meeting of the 1994 Saint Paul City Council Community and Economic Development Committee, a schedule for future committee meetings was established, in order to plan how the City Council might best formulate policy for the crucial issues facing the city. The schedule will be adjusted as necessary. The entire year has been included to help to assess the effectiveness of this plan:

| | |
|---|---|
| **MARCH 30** | ● "Citywide Economic Agenda" Report - Special meeting of the CED Committee for presentation |
| **APRIL 20** | ● Regional Planning and Development (Full Discussion)<br>● "Citywide Economic Agenda" Report (Follow-up)<br>● One-half Cent Sales Tax Report (Brief update from the April 6 Finance Committee meeting) |
| **MAY 25** | ● Enterprise Communities Proposal & Application (Full Discussion)<br>● Housing: Background Presentation and Discussion to Prioritize Issues for future CED committee meetings<br>● Transportation Policy (Overview/Presentation) |
| **JUNE 1** | ● Metropolitan Council's "Regional Blueprint" - Special CED Committee meeting to prepare the Mayor and City Council's official response. |
| **JUNE 22** | ● Housing: Background and history of city and regional housing trends; current programs and practices; begin discussion about the City's Housing Action Plan; plan for Housing discussions at future CED Committee meetings.<br>● Tasks Unlimited Lodge Proposal/HOME Fund (laid over to 11/23/94) |
| **JULY 27** | ● Transportation Policy/Comprehensive Plan Chapter (Discussion continued from 5/25/94 CED)<br>● Housing Issue: Housing Action Plan |
| **AUGUST 24** | ● Housing: Housing Action Plan (continued); Housing Coordination Team, Stakeholders, and Communication<br>● Andersen Consulting/Economic Development Study Recommendations: Implementation, Action, Partners |
| **SEPTEMBER 28** | ● Citywide Economic Agenda Report: Mayor's Report Back on Public Comments, Assignments of Action Steps<br>● Business Outreach Group<br>● Business Climate Survey and Methodology |

PHA 011878

Revised 10/12/94





**PUBLIC HOUSING AGENCY**
S A I N T   P A U L

# I.   OVERVIEW OF SECTION 8

**A.   Different forms of Section 8 -**

    1.    Certificates vs. Vouchers

    2.    Tenant-Based Assistance

    3.    Project-Based Assistance; Management Setasides

    4.    Section 8 Existing Housing

    5.    Section 8 New Construction (discontinued)

    6.    Section 8 Moderate Rehabilitation (discontinued)

**B.   PHA Section 8 Programs**

    1.    2445 tenant-based certificates

    2.    148 moderate rehabilitation certificates (project-based)

    <u>3.    490 tenant-based vouchers</u>

    4.    3083  Total

**C.   Turnover:  22 certificates/vouchers per month; 270 per year**

**D.   Waiting List: 3089 households on 9/30/94; no new applications accepted now**

**E.   Length of Wait: 3-5 year wait for most recent applicants with preference points.**

**F.   Tenant Eligibility**

    1.    Income Limits: Households with income below 50% of the area's Median Family Income ($25,500 for family of four) can apply when waiting lists are open, but only those with preference points will ever reach the top of the waiting list.

PHA  011879



    2.    Preferences

        a)    *Federal: Displaced; or paying >50% of income for rent; or living in substandard housing*

        b)    *Local: Live or work in City; veteran/member of armed services or dependent family members of same.*

**G.**    ***Amount of Subsidy***

    1.    Household pays 30% of adjusted income (same as in public housing)

    2.    HUD pays the difference between tenant's payment and FMR

**H.**    ***Dollars***

    1.    Average subsidy per unit: $380 per month

    2.    Average administrative cost/fee: $49 per month

    3.    Total annual HUD payment for St. Paul PHA Section 8 programs:
            $17 million per year

**I.**    ***"Portability": Tenant can use the Section 8 subsidy in another jurisdiction.***

    1.    "Ins" - Saint Paul PHA administers 512 certificates and vouchers which were issued elsewhere (as of 10/1/94).

    2.    "Outs" - 330 certificates and vouchers issued by Saint Paul PHA are used elsewhere, primarily in Twin Cities suburbs

**II.**    **REQUIREMENTS FOR PARTICIPATION**

**A.**    ***UNIT***

    1.    Willing Tenant (Certificate or Voucher Holder)

    2.    Willing Owner

    3.    HUD's "FAIR MARKET RENT" limit ("FMR").

SECTION 8 OVERVIEW
SAINT PAUL PHA
PAGE 3

      a)     *FMRs:  Rent including utilities cannot exceed*

              *One-bedroom unit:  $474 per month*
              *Two-bedroom unit:  $604 per month*
              *Three-bedroom unit:  $819 per month*
              *Four-bedroom unit:  $926 per month*

      b)     *Higher or lower limits can be approved in individual cases, based on reasonable rents in the neighborhood for comparable units.*

      c)     *Voucher holders have the option to rent a more expensive unit and pay the higher cost themselves.*

    4.    The unit must meet HUD's "Housing Quality Standards" ("HQS").

**B.   TENANT**

    1.    Top of waiting list

    2.    Income eligible

    3.    No illegal drug activity (convictions) within last 1 year

    4.    NO OTHER RESTRICTIONS

      a)     *No screening for prior conduct, rental history, "expected" behavior*

      b)     *PHA does not "guarantee" tenant's suitability*

**III.   MORE ON HOUSING QUALITY STANDARDS (HQS)**

    **A.   *NATIONWIDE MINIMUM STANDARDS FOR UNIT HABITABILITY***

    **B.   *LOCAL VARIATIONS TIGHTLY LIMITED:  HUD DOES NOT WANT LOCAL JURISDICTIONS TO "UNREASONABLY RESTRICT" THE SUPPLY OF DWELLING UNITS AVAILABLE TO SECTION 8 PARTICIPANTS BY SETTING STANDARDS HIGHER THAN HQS.***

    **C.   *UNITS ARE INSPECTED INITIALLY, THEN AT LEAST ANNUALLY, OR MORE FREQUENTLY IF THERE ARE COMPLAINTS BY TENANTS ON THE CONDITION OF THEIR UNIT.***

PHA  011881

SECTION 8 OVERVIEW
SAINT PAUL PHA
PAGE 4

     D.     *MOST IF NOT ALL SERIOUS HEALTH AND SAFETY VIOLATIONS OF LOCAL CODE ARE ALSO VIOLATIONS OF THE HQS. THE PHA CONTACTS THE CITY HOUSING CODE AND INSPECTIONS OFFICE WHEN HEALTH AND SAFETY VIOLATIONS ARE APPARENT. (SEE BELOW.)*

IV.    TENANT BEHAVIOR PROBLEMS.

     A.     *IF THE PHA RECEIVES COMPLAINTS FROM NEIGHBORS OR NEIGHBORHOOD ASSOCIATIONS REGARDING TENANT BEHAVIOR, PHA OFTEN REFERS THEM FIRST TO THE PROPERTY OWNER. THE LEASE AGREEMENT IS BETWEEN THE OWNER AND TENANT, SO THE OWNER, NOT THE PHA, CAN ENFORCE IT.*

V.    INTERAGENCY REFERRALS

     A.     *THE PHA REFERS COMPLAINTS ABOUT TENANT BEHAVIOR TO THE SAINT PAUL POLICE DEPARTMENT, ESPECIALLY THE <u>FORCE</u> UNIT, IF THERE IS SUSPECTED DRUG-RELATED ACTIVITY.   THE <u>FORCE</u> UNIT INFORMS THE PHA WHEN THEY RAID A UNIT BELIEVED TO BE SUBSIDIZED UNDER SECTION 8, OR WHEN THEY ARREST INDIVIDUALS BELIEVED TO BE SECTION 8 PARTICIPANTS. IF A SECTION 8 UNIT IS CONDEMNED FOLLOWING A <u>FORCE</u> RAID THE PHA IMMEDIATELY STOPS PAYMENTS TO THE OWNER.*

     B.     *THE PHA CONTACTS THE CITY HOUSING CODE AND INSPECTIONS OFFICE WHEN HEALTH AND SAFETY VIOLATIONS ARE APPARENT.*

     C.     *THE PHA ALSO CONTACTS THE RAMSEY COUNTY CHILD PROTECTION UNIT WHEN CHILDREN ARE IN A UNIT WITH SERIOUS HEALTH AND SAFETY VIOLATIONS.*

VI.    COMING CHANGES IN SECTION 8

     A.     *HOMEOWNERSHIP. IN THE FUTURE SOME FIRST-TIME HOMEBUYERS MAY BE ABLE TO USE SECTION 8 SUBSIDIES FOR HOME MORTGAGE PAYMENTS INSTEAD OF RENTAL ASSISTANCE. HUD PUBLISHED ONE PROPOSED RULE IN AUGUST 1994 AND IS NOW REVISING THE RULE BASED ON COMMENTS RECEIVED.*

**PHA 011882**

SECTION 8 OVERVIEW
SAINT PAUL PHA
PAGE 5

**B.** **ADMINISTRATIVE CHANGES.  SOME ADMINISTRATIVE ASPECTS OF THE SECTION 8 CERTIFICATE AND VOUCHER PROGRAMS ARE CHANGING, UNDER HUD REGULATIONS RECENTLY ISSUED AND OTHERS IN FINAL DRAFT STAGE. HOWEVER, NO CHANGES ARE EXPECTED IN THE HQS REQUIREMENTS.**

FAH 10/11/94

PHA  011883

## Residential Property Standards

Following is a summary overview of information and issues related to residential property standards. These items will be discussed by the City Council's Community and Economic Development (CED) Committee at its October and subsequent meetings.

**Property Standards**

The City of Saint Paul has certain property standard requirements and enforcement powers as expressed in applicable sections of the City legislative and State building codes. These codes relate to the requirement of owners to maintain property and buildings to certain acceptable conditions.

Additionally, a variety of Federal, State and City/HRA (including the Public Housing Agency) programs and initiatives come with regulatory requirements related to minimum property standards.

Attached is a list of summary definitions of property standards requirements and applicable enforcement entities. Also attached is a table outlining various residential standards, based on unit type, along with information related to their enforcement agencies.

Furthermore, the City has other enforcement powers to deal with behavior-related matters which are primarily police-related and are not necessarily specific property-related matters.

**Recent/New Enforcement Initiatives**

Following are recent or new initiatives that relate to property and behavior matters.

<u>F.O.R.C.E.</u>

Focusing Our Resources on Community Empowerment (F.O.R.C.E.) was initiated in September 1992, as a community policing unit within the Saint Paul Police Department. F.O.R.C.E. is dedicated to working in partnership with residents to combat the problems of street level narcotics, problem properties and disruptive behavior at the neighborhood level. The 17 officers and 4 supervisors of the F.O.R.C.E. unit work closely with block clubs, civic and church groups, the Public Health Housing Code Enforcement Division, Fire Inspectors, civilian crime prevention coordinators and social workers to identify and seek long term solutions to recurring problems.

<u>Housing Court</u>

Housing Court is presided over by a Referee who hears matters on a case-by-case basis in arraignment, pretrial, and trial court settings. The City Attorney's Office is enforcing Saint Paul's minimum housing standards through the Housing Court with special emphasis on the following:

> ►recommending to the Court a firmer attitude as to sentencing, especially as to more

PHA 011884

serious offenses and/or repeat-offender situations
►requiring inspectors' attendance at pretrial settings to ensure veracity of citations and
accountability by citing officers
►tracking repeat offenders and refusing to recommend lighter sentences in those cases
►trying cases in an effort to send the message that minimum standards will be enforced

Information Exchange Group

This newly-formed group is comprised of enforcement personnel, and includes representatives
from the Police, Fire, L.I.E.P., City Attorney's Office, Public Health, Housing Information
Office, PED, Public Housing Agency and the Mayor's Information and Complaint Office.  The
Information Exchange Groups focuses on recurrent problem properties to see how to best
coordinate resources to address these problem properties.

Enforcement Issues

The following enforcement issues were identified in a workshop with stakeholders held February
23, 1994:

►Lack of adequate incentives for good maintenance of rental property.

►Too much inconsistency in inspections--inconsistency between inspectors inspecting for
the same code and inconsistency among agencies responsible for enforcement of
different codes.

►Need for definition of standards for responsible behavior on the part of both tenants
and landlords.

►Tenant-landlord laws are not equitably enforced.

►Inadequate focus for action on serious problem properties.

►Need for greater consequence for irresponsible behavior.

►Need for integrated data base to support improved inter-agency cooperation and timely,
coordinated response to problems.

►Rehabilitation assistance resources either unavailable or unknown to owners.

Ideas for Discussion

Some ideas that have surfaced for discussion include:

►Mandatory inspections of one and two family rental dwellings.  In 1988 the City
Council approved a Rental Registration Program, but later withdrew the legislation four
months after passage due to concern over the cost of such a program and the likelihood

2

PHA 011885

that it would increase the number of vacant houses in the city.

►**Focusing enforcement efforts on serious problem properties and areas of concentration.** Improved targeting of limited public resources would be one way to more effectively enforce existing standards. Such targeting efforts would require an enhanced capacity to share data between enforcement agencies.

►**Explore linking Section 8 and City inspections.** Rental units requesting a Section 8 inspection might be made subject to a City code inspection at the same time.

3

**PHA  011886**

## City Property Standards

Residential properties shall comply with provisions of the Saint Paul Legislative Code (Title VI, Building and Housing, Chapters 32-54; and Title VII, Fire Code, Chapter 55-59). The Legislative Code incorporates the State Uniform Building Code and the State Fire Code.

A summary of the major City of Saint Paul requirements is as follows:

**Saint Paul Building Code (Chapter 33):**

- incorporates the **Uniform Building Code (UBC)**, a national code or building standard, that forms the basis of the Minnesota State Building Code
- incorporates the **Minnesota State Building Code**, which is the national UBC, with additional state requirements for building standards
- applies for new construction, housemoves, and additions to/rehabilitation of existing buildings
- the UBC covers framing, concrete and masonry work, roofing, windows and doors, energy conservation, plumbing, heating, electric, sprinklers
- establishes fees and process for obtaining building permits
- permit inspections performed by various trade inspectors from the City Building & Design Division
- requires certificate of occupancy to be issued by fire marshal prior to initial occupancy
- requires reinspection of 3+ unit rental properties every two years to renew certificate of occupancy; this reinspection is performed by the Fire Department

**Saint Paul Housing Code (Chapter 34):**

- establishes minimum housing standards for existing properties, including minimum life, safety and health requirements, also known as "property maintenance standards"
- authorizes inspection of dwellings by City enforcement personnel
- authorizes condemnation of dwellings as unfit for human habitation
- enforcement by Public Health and Fire

**Vacant Buildings (Chapter 43):**

- establishes a program for identifying and registering vacant buildings
- provides for penalties and monitoring
- enforcement by Public Health

**Nuisance Abatement (Chapter 45):**

- establishes a procedure to eliminate public nuisances
- provides for abatement process and penalties
- enforcement by Public Health

**Fire Code (Chapter 55):**

- incorporates the Minnesota Uniform Fire Code regulating conditions hazardous to life and property from fire or explosion

PHA 011887

**Hard-Wired Smoke Detectors (Chapter 58):**

-       requires one hard-wired smoke detector in each single family dwelling built prior to
        January 1, 1973
-       enforcement through Fire Department review of truth-in-housing disclosure reports

**Snow and Ice on Sidewalks (Chapter 113):**

-       requires removal of snow and ice from public sidewalks
-       enforced by Public Health

**Abandoned Vehicles (Chapter 163):**

-       prohibits storage of abandoned vehicles
-       enforced by Public Health

**Truth-in-Sale of Housing (Chapter 189):**

-       requires a disclosure report for sale transactions
-       evaluation performed by certified evaluator (may NOT be City employee)
-       provides information only
-       based on Chapter 34 standards

PHA 011888

## Standards due to Funding/Regulatory Requirements

**Tax Equity (Council File No. 94-892):**

- establishes a pilot program for property tax reductions to one and two family rental buildings meeting certain standards
- evaluation performed by certified evaluator (NOT City employee)
- standards contained in Council Resolution
- Public Health reviews inspection report
- Housing Information Office provides program administration

**"Health and Safety":**

- inspections performed by PED Housing Rehab Advisors as part of regulatory requirements of City and State housing rehab loan programs
- code violations of a more immediate or urgent nature which affect the health and safety of residents
- combination of uniform building code and property maintenance standards (Chapters 33 and 34) applied to existing buildings, single family owned and rental property.
- inspections involve assessing the quality of completed work ("workmanship" standard) based on knowledge and experience of work being inspected

**HUD Housing Quality Standards (HQS):**

- established by Federal Department of HUD, with emphasis on structural soundness, light and ventilation, kitchen and bath facilities, as well as absence of garbage, debris, vermin and loose paint
- one application is the Section 8 rental assistance program
- inspections performed by Public Housing Agency for Section 8 program
- PED Rehab Advisors also ensure compliance with HQS as a minimum for housing rehab loan programs

**HUD Minimum Property Standards (MPS):**

- incorporates the Housing Quality Standards (HQS) and parts of the UBC
- required by the Federal Department of HUD for certain federally funded programs
- one application is FHA single family mortgage insurance, where limiting mortgage risk is an important consideration in the inspection
- compliance inspection ensures compliance with contract documents and the MPS

PHA 011889

## Residential Property Standards

| Unit Type | Applicable Standard | Enforcement Agency |
|---|---|---|
| **Single Family/Duplex Owner-Occupied** | | |
| New Construction Subst. Rehab/Addition | Chapters 33-59 | L.I.E.P |
| Existing | Chapter 34 | Public Health |
| Minor Rehab, no city financing | Chapter 34 | L.I.E.P. |
| Minor Rehab, city financing | Chapter 34 Health and Safety | L.I.E.P. PED Rehab Advisors |
| **Single Family/Duplex Rental** | | |
| New Construction Subst. Rehab/Addition | Chapters 33-59 | L.I.E.P. |
| Existing | Chapter 34 | Public Health |
| Minor Rehab, no city financing | Chapter 34 | L.I.E.P. |
| Minor Rehab, city financing | Chapter 34 Health and Safety | L.I.E.P. PED Rehab Advisors |
| Section 8 | HUD Housing Quality Standards | Public Housing Agency |
| **Multi-Family Owner-Occupied** | | |
| New Construction Subst. Rehab/Addition | Chapters 33-59 | L.I.E.P. Fire Department for C.O. |
| Existing | Chapter 34 | Fire Dept. every 2 years |
| Minor Rehab, no city financing | Chapter 34 | L.I.E.P. |
| Minor Rehab, city financing | Chapter 34 Health and Safety | L.I.E.P. PED Rehab Advisors |
| **Multi-Family Rental** | | |
| New Construction Subst. Rehab/Addition | Chapters 33-59 | L.I.E.P. Fire Department for C.O. |
| Existing | Chapter 34 | Fire Dept. every 2 years |
| Minor Rehab, no city financing | Chapter 34 | L.I.E.P. |
| Minor Rehab, city financing | Chapter 34 Health and Safety | L.I.E.P. PED Rehab Advisors |
| Section 8 | HUD Housing Quality Standards | Public Housing Agency |

PHA 011890

SECTION 8 OVERVIEW
SAINT PAUL PHA
PAGE 3

    a)    *FMRs:  Rent including utilities cannot exceed*
            *One-bedroom unit:  $474 per month*
            *Two-bedroom unit:  $604 per month*
            *Three-bedroom unit: $819 per month*
            *Four-bedroom unit:  $926 per month*

    b)    *Higher or lower limits can be approved in individual cases, based on reasonable rents in the neighborhood for comparable units.*

    c)    *Voucher holders have the option to rent a more expensive unit and pay the higher cost themselves.*

    4.    The unit must meet HUD's "Housing Quality Standards" ("HQS").

**B.    *TENANT***

    1.    Top of waiting list

    2.    Income eligible

    3.    No illegal drug activity (convictions) within last 1 year

    4.    NO OTHER RESTRICTIONS

        a)    *No screening for prior conduct, rental history, "expected" behavior*

        b)    *PHA does not "guarantee" tenant's suitability*

**III.    MORE ON HOUSING QUALITY STANDARDS (HQS)**

    **A.    *NATIONWIDE MINIMUM STANDARDS FOR UNIT HABITABILITY***

    **B.    *LOCAL VARIATIONS TIGHTLY LIMITED:  HUD DOES NOT WANT LOCAL JURISDICTIONS TO "UNREASONABLY RESTRICT" THE SUPPLY OF DWELLING UNITS AVAILABLE TO SECTION 8 PARTICIPANTS BY SETTING STANDARDS HIGHER THAN HQS.***

    **C.    *UNITS ARE INSPECTED INITIALLY, THEN AT LEAST ANNUALLY, OR MORE FREQUENTLY IF THERE ARE COMPLAINTS BY TENANTS ON THE CONDITION OF THEIR UNIT.***

**PHA  011881**



## UL BRIEFING
▼

### ıhl House, e, panel says

sk force has recom-
he historic William
downtown St. Paul
ock north of its cur-
'mothballed" while a
of its reuse poten-

uilt in 1858 and now
state, is located at
, near Regions Hos-
been vacant for
: is listed on the Na-
r of Historic Places
st house still stand-
ntown area.

ce was appointed
re raised that the
demolished to
a new Minnesota
rtment building be-
d on the site.
en, state adminis-
ssioner, is expected
ision on the house's
he next few weeks.
is moved, the task
ends that another
named to "establish
reservation plan
levelopment and
f the property."

### s arena work

City Council agreed
spend $375,000 on
k for the $130 mil-
ıned for a National
e team.
demolition is sched-
for the existing are-
itre, formerly called
vic Center, City
ır Joe Reid said
adlines required
ry design work
ion. The new arena
open in September

bers Bobbi Megard
ey wanted to post-
of the $375,000 pre-
ture. Megard noted
day before the Min-
ure would take up
putting $60 million
illion project.

### rial won't move

ıty District Judge
n Wednesday de-
ıdquist's request to
er trial out of the

, is accused of kill-
man during a
ıg on Interstate 94
ugust. He has been
scond-degree mur-
ive-by shooting and
stand trial in De-

equested that the
t of the area be-
ıas received exten-
ıat they believe
ifficult to seat an
The judge said the
rought up again
ction if it appears
s been tainted by
licity.
nied Lundquist's
the Minnesota
s review the con-
the Minnesota
ıg second-degree
ı drive-by shoot-

# St. Paul council delays action on rented houses and duplexes

**ANN BAKER** STAFF WRITER

**T**he St. Paul City Council de-
layed action Wednesday on a mea-
sure to provide city inspections of
rented houses and duplexes.

The proposed ordinance, which
calls for certificates of occupancy
like those required at larger rental
buildings, underwent detailed
scrutiny by the city's lawmakers.

Council Member Mike Harris
called it overly bureaucratic.
Council Member Jerry Blakey said
it might increase homelessness.
Council President Dave Thune
said he wants to make sure it ad-
dresses the city's most neglected
properties first.

"We're not here to punish any-
one," said Council Member Bobbi
Megard, who introduced the pro-
posal. "We're here to bring these
rental properties into compli-
ance."

She said it's contradictory for
the city to have routine inspec-
tions at buildings with three or
more units but not duplexes or
single-family houses. Stressing
that her goal is to save deteriorat-
ing houses, she noted that earlier
in the day the council voted to
demolish two that are beyond re-
pair.

Council Member Dan Bostrom,
the ordinance's co-sponsor, said,
"It's one of the major issues af-
fecting the quality of life in the
city." He urged his colleagues to
adopt the rule quickly so it could
become effective in March.

Mayoral aide Roger Curtis,
however, argued for a three-
month delay. He disputed Council
Research Center estimates that in-
creased inspections would cost
$74,000 the first year and by 2000
would be covered by the $80 to
$90 certificates. Curtis said the
mayor's budget analysts project a
cost three to seven times higher.

A memo from St. Paul Planning
and Economic Development Di-
rector Pamela Wheelock and hous-
ing specialist Gary Peltier sup-
ported Curtis' plea for extra time.

They said they needed to study
which city housing programs could
release parts of their budgets for
the inspections, as well as possible
impact on increased rents, dis-
placement of tenants and reduc-
tion of low-cost housing.

Harris objected, saying if the
rule follows the checklist for larg-
er buildings, it would require
handrails on front steps and locks
on every window. "And if someone

has a broom hanging in a back
hallway, it's against the code. I
have a problem with that."

Megard replied that those were
pesky details that would be ironed
out after the policy was set in

place. "If there are parts we don't
agree with we can take them off. I
believe there shouldn't be a code
for deadbolt locks. Take them off.
The details need to be worked out
after we make our decision."

### Girl, 14, returns to St. Paul;



# Announcin
# Grand Op
## of two new **AT&T**

**(one stop shoppin**
**twi**

Stop by an AT&T Store and you'll find the latest in technol

And when you stop by the Grand Opening of our two new



between Thursday and Saturday,     November 13th thr

food, register to win prizes and explore everything from wir

distance. We can even help you prepare ✚ **Am Re**

with some tips from the American Red Cross. And pick u



filled with a flashlight, snacks and all you ne

It's free with every activation and brought to you in part by

PHA 012054

# SAINT PAUL PUBLIC HOUSING AGENCY

## Memo

**RECEIVED**

**DATE:**  January 17, 1995

**TO:**  Vicki Scheffer,
Councilmember Marie Grimm's Office

**FROM:**  Al Hester for Jon Gutzmann

**RE:**  Comparison of City Codes and HQS

**JAN 17 1995**

COUNCILMEMBER
MARIE GRIMM

In the interests of time, please send out the Fire Department's draft comparison of City Codes and the Section 8 Housing Quality Standards as is, without comments by the PHA.

The Fire Marshal's staff did yeoman service on the first draft of the comparison in the two months they have been working on it. We received their draft late Friday afternoon, January 13, and you need materials by noon today at the latest to send to members of the Community and Economic Development (CED) Committee. Monday January 16 was a holiday.

Obviously that does not allow enough time for PHA staff to do more than a cursory review of the draft.

On first reading, we note that the Fire Department staff determined that HQS was "less stringent" than City Codes in almost every respect. It appears some of those gaps may not actually exist, however. That is, some HQS items are interpreted by the PHA's inspectors in a way that also satisfies the City Code. For example, HQS requires a smoke detector on every living level of a dwelling unit, without specifying the exact placement of the detector. The PHA's inspectors usually would require the detector to be mounted as close to the ceiling and wall corner as the City Code requires.

The Fire Department's draft comparison is very useful for laying out the scope of coverage of the City Code and HQS, and it is probably accurate on many or most of the items where HQS is said to be less stringent than City Code. Our staff will continue to review the draft and may have more comments by the time of the CED meeting.

As Jon Gutzmann has said before, the PHA is willing to request HUD approval to completely substitute the City Code requirements for the HQS requirements.

**CC:**  Gary Peltier, Housing Coordination Team
Steve Zaccard, Fire Marshal

PHA 012087