Minutes
Business Meeting
Board of Commissioners

Date:  July 26, 2000              Time:  9:07 a.m.              Place:  Agency

Chair convened the meeting at 9:07 a.m.

    I.   ROLL CALL

        Commissioners Present:   A.Boss, K.Hadley, B.Fletcher, K.Lindsey, S.Kane, R.Willits
        Commissioners Absent:   S.Yang

        Staff Present:  J.Gutzmann, A.Hester, O.Vang, D.Lang, K.Lindgren, J.MacDonald,
                  M.McMurray, H.Petro, J.Pichelman, K.Keena, C.Toavs, N.Franzen, Y. Zhang,
                  C.Sheppard, M. Driscoll, P. Doncits, T. Her, D. Williams, O. Rocha, C. Kline

        Others Present:  Kristen Larson, Law Clerk of City Attorney (For Michael F. Driscoll)

  II.   INTRODUCTION OF PHA STAFF:  Spolinsky Jacox, Executive Assistant

 III.   APPROVAL OF MEETING MINUTES

        MOTION:   Approve meeting minutes of June 28, 2000.
        Moved:      Commissioner Willits.  Seconded:  Commissioner Kane.
        Vote:        Ayes-6.  Nays-0.

  IV.   REVIEW OF BILLS AND COMMUNICATIONS

        Bank register for June was available for review.

   V.   UNFINISHED BUSINESS:  None

**VI.A.**  **NEW BUSINESS CONSENT ITEMS**
The following items were considered to be routine or non-controversial and were approved with one
motion, without discussion.

  A.1.  APPROVAL OF NEW POSITION – MAINTENANCE SENIOR MANAGER

        Staff requested Board approval of a new position in the Supervisory and Confidential
        employee group to be named Maintenance Senior Manager and placed in pay grade
        D61.

**PHA  021735**

Thompson Associates will continue to meet with the three remaining families, all of whom hope to complete their home purchases later this summer or early this fall. The meetings at this time are directed at helping them complete their work plans and prepare for their loan applications. In the meantime, PHA staff members are working to troubleshoot any necessary repairs to the properties so that up-coming closings can occur as smoothly as possible.

I.   EMERGENCY SHOWER REPAIRS AT IOWA HI-RISE

Staff plans to execute an amendment to emergency purchase order (#15106) to Harrison Tile Co. Inc. that will increase the amount of the purchase order from $143,350 to $224,400.  Staff executed the original purchase order on May 8, 2000.  Copies of the purchase order and a staff memo explaining the need to begin the work quickly to correct recently discovered mold and mildew problems in the showers at Iowa Hi-Rise were attached to a May 24, 2000 Information Board Report.  Approximately ¼ of the showers included in this purchase order have been completed.

The $81,050 (57%) increase in the amount of this purchase order is due to the following additional work that was not included in the original bid:

1.   The removal and replacement of the concrete shower floor, waterproof membrane and shower drain in each apartment as recommended by the PHA's structural engineer, Building Consulting Group.  This work was added when it was discovered that the membranes were brittle and had sheetrock screws through them, and that the drains were higher than the membrane which prevents proper drainage.

2.   The installation of additional wall studs and extra ceramic tile to the ceiling and surrounding walls in each apartment.  The shower walls were opened from the specified six feet height to the ceiling to allow the installation of additional wall studs to properly brace the walls and provide adequate anchorage for grab bars as recommended by the PHA's structural engineer due to the light gauge and wide spacing of the existent steel studs.

3.   The construction of temporary enclosures around each bathroom and the use of pressure within each bathroom as recommended by the PHA's environmental engineer, HEPA vacuums to catch and remove mold and mildew dust and to create a negative McGinley and Associates.  Workers were required to wear protective clothing during demolition work and to properly bag and dispose of mildewed shower debris, which increased the cost.

4.   The removal, disposal, repair and repainting of adjacent sheetrock walls in apartment closets and kitchens that showed evidence of mold or mildew growth as directed by the environmental engineer.

Staff and the consultants believe that these extra costs are reasonable. There are adequate 99 Comprehensive Grant Program funds available for the work. Staff has added budget amounts to the new FFY2000 Capital Fund budget for recaulking the apartment windows, sheetrock repair under toilets, sheetrock repair above and below apartment windows and reconstruction of the 62 showers that were not included in this purchase order because they had been worked on previously. Staff and consultants believe that the other 62 showers need to be rebuilt because they were not properly repaired to prevent future leakage. Staff plans to bid this additional work.

This problem came to light on March 8, 2000 at a public hearing on the PHA's Capital Fund plan, when some Iowa Hi-Rise residents reported poor indoor air quality and mold in their units. Staff hired McGinley & Assoc. (an indoor air and mold expert) and Buildings Consulting Group (a building exterior expert) to investigate and make recommendations. On April 14, 2000 McGinley & Assoc. submitted their investigation report on the seven apartments where concerns had been expressed. The report stated that one apartment had high levels of potentially toxic *Stachybotrys Chartarum* mold in the wall between the bedroom closet and the shower. The report also indicated that one apartment had surface *Stachybotrys Chartarum* mold on the sheetrock above the bedroom window and suggested that leaking shower walls and floors throughout the building may be causing the growth of mold and mildew.

Shower leaks have been reported and corrected periodically at Iowa Hi-Rise in the past; 62 of the showers were rebuilt on an as needed basis over the last few years. Based on the recent consultant's report and the history of shower leakage at the building, staff determined that it was necessary to repair the showers in the rest of the units as soon as possible, to eliminate this potential source of mold and mildew growth. Rather than take another 90 days or more to follow the formal competitive bidding process (publicly advertise, accept and open sealed bids, request Board approval), staff declared that an emergency existed and quickly solicited several bids and then executed this purchase order to the lowest responsible bidder. The PHA's Purchasing Policy permits this process.

Staff informed the Board on May 24, 2000 that initial work by Harrison Tile in two vacant units confirmed that the sheetrock walls behind the ceramic tile walls were deteriorating and moldy and that the original waterproof membranes under the concrete shower floors have been leaking at points where sheetrock screws went through the membrane. Staff reported the anticipated need to negotiate an amendment to the purchase order to Harrison Tile for the complete replacement of the concrete shower floors, which were initially to be left in place.

J.     JOBS-PLUS

As approved by the Board last month, staff signed HUD documents for up to $900,000 of funding for *Jobs-Plus* rent revenue losses incurred for the period October 1, 1999 through December 31, 2003, or until the $900,000 is expended, whichever occurs first. As soon as HUD countersigns the documents, staff will

PHA 021752

work and is a minority owned business.  Copies of the Employer Information Reports for Booker Construction/Flannery Construction and the second low bidder Minnesota Construction were attached.

Booker Construction / Flannery Construction's bid is within staff's estimate and there are sufficient 1999 Comprehensive Grant Program funds available for the work.

A.7.   CERAMIC TILE SHOWER REPLACEMENTS AT IOWA HI-RISE, CONTRACT    NO. 01038

Staff requested Board approval to award the contract for ceramic tile shower replacement work at Iowa Hi-Rise to the lowest responsible bidder, BNM Construction, Inc., for the bid amount of $150,800.  A copy of the bid tab data was attached.

This contract is for replacing the showers in the 62 units that were not included in the emergency purchase order (#15106) issued on May 8, 2000.  This contract will complete the work to correct any mold, mildew and leakage problems in the showers.  The total cost of all of the shower work will be almost $400,000.

BNM has performed satisfactorily on previous PHA contracts.  BNM is a minority-owned business enterprise.  Copies of the Employer Information Reports for BNM and the second low bidder, Cy-Con Inc., are attached.

BNM's bid is within staff's estimate and there are sufficient 2000 Capital Fund Program funds available for the work.

A.8.   FFY 2000 COMPREHENSIVE GRANT PROGRAM PERFORMANCE AND EVALUATION REPORT, PHASES MN46-P001-706-97, 707-98 & 708-99

Staff requested Board approval of Resolution 00-9/27-1 authorizing submittal of the PHA's Comprehensive Grant Program (CGP) Annual Statement/Performance and Evaluation Report for FFY2000.  These documents show the PHA's progress in obligating and expending the CGP funding which became available in May 1997 ($7,836,207), July 1998 ($8,372,321), and August 1999 ($9,611,393).

The following table shows how much of each grant was obligated and expended by June 30, 2000.

|  | 1997 CGP Funds | 1998 CGP Funds | 1999 CGP Funds |
|---|---|---|---|

Minutes
Business Meeting
Board of Commissioners

Date: October 24, 2001                Time:  9:00 a.m.                Place:  Agency

I.  ROLL CALL
Commissioners Present:  A. Boss, S. Kane, K. Hadley, K. Lindsey, S. Yang, R. Willits
Commissioners Absent:  None

Staff Present:  J. Gutzmann, A. Hester, T. Auger, K. Keena, D. Lang, K. Keena, J. Pichelman, H. Petro, M. McMurray, M. Hang, B. Sporlein, K. Lindgren, B. L. Authier, D. Lang, B. Levitan, K. White, j. erolin, N. Montpetit, M. Kallenback, M. Davis, S. Jacox.

Others Present:  Michael Driscoll, Assistant City Attorney; Dan Vandenberghe, McGladrey & Pullen; Joy Suoboda, McGladrey & Pullen; Tom Emison, McGladrey & Pullen.

II.  INTRODUCTION OF PHA STAFF:  Me'Shell Davis, Administrative Support Assistant.

III.  APPROVAL OF MEETING MINUTES

MOTION:   Approve meeting minutes of September 26, 2001
Moved:      Commissioner Kane.  Seconded:  Commissioner Yang.
Vote:         Ayes-6.  Nays-0.

IV.  REVIEW OF BILLS AND COMMUNICATIONS

Bank register for October and Monthly Management Report for September were available for review.

V.  UNFINISHED BUSINESS – 480 CEDAR STREET; SALE AND LEASE BACK; AMENDMENT TO THE PUBLIC HOUSING AGENCY PLAN FISCAL YEAR 2002

Staff recommended that the Board ratify the purchase agreement for the sale of the 480 Cedar Building to Minnesota Public Radio (MPR) and approve the terms and conditions of the lease for the PHA's offices on the third and sixth floors.  The terms of the sale and lease are described below.  The PHA will amend its Agency Plan for the

PHA  022029

current year (FY 2002), as required to obtain HUD approval of the sale and release of the declaration of trust held by HUD.  Staff published notice of the proposed Agency Plan amendment on October 14, 2001, and the public hearing will be held on November 28, 2001 as part of the regular Board meeting.

Purchase Agreement
On January 24, 2001 the Board approved a sale price of $7.9 million for the 480 Cedar Building.  With that authorization, staff executed a purchase agreement with MPR for that amount on October 16, 2001, with the closing to occur on or before December 31, 2001.  Staff is asking the Board to ratify that action, due to the length of time since the original authorization.

Lease Back
In 1999 the PHA purchased property on 10th Street to allow the Agency to relocate its offices there in the event 480 Cedar Street was sold.  To allow the PHA to continue operating without disruption while the new building is designed and constructed, MPR agreed that the PHA could lease its current office space on the third and sixth floors at 480 Cedar for up to two and a half years after the closing on the sale.  The gross rent will be $14 per square foot for up to 24 months, with an additional six months at $15 per square foot, at the option of the PHA.  There will be no rent adjustment for changes in operating costs.  Staff is requesting Board approval of these lease terms, which will be explained further at the meeting.

HUD Requirements
The purchase agreement with MPR is conditioned on HUD approval.  To allow the PHA to use HUD Comprehensive Grant or Capital Fund funds to make improvements on the 480 Cedar Building, the property was added to HUD Development Project No. MN 1-33 (MN46P001033) and a declaration of trust was filed in favor of HUD. Consequently the PHA must comply with all of HUD's requirements for the disposition or demolition of property in order to sell the property with clear title.

Staff is now pursuing the following actions to obtain HUD approval and release of the declaration of trust before the closing:

1)   Amend the approved Agency Plan for FY 2002
     (a) Publish public notice – done on October 14th.
     (b) Give notice to the Resident Advisory Board and residents of the MN 1-33
         scattered sites – sent on October 15th.
     (c) Hold public hearing 45 days later, at November 28, 2001 Board meeting.
     (d) Submit amended Plan via Internet to HUD, for approval at HUD Minnesota
         office (Staff have already asked HUD staff to expedite the approval, once the
         amended Plan is submitted.  Staff will send the amended plan for HUD's
         review before the public hearing.)

2)   Submit Property Disposition Application to HUD's Special Applications Center
     (SAC) in Chicago, including the items listed below.  (Staff has discussed the

application with the SAC director and requested expedited approval, once the application is submitted.)

(a) Certification that the proposed property disposition is specifically authorized in the approved Agency Plan.

(b) A showing that the sale (and sale price) is in the best interests of the PHA, which requires evidence that the PHA publicly solicited bids for the sale of the building.
(This was noted in the purchase agreement, and the PHA published a solicitation of bids on October 19, 2001. Sealed bids, which must be in excess of $7.9 million and allow the PHA to lease back the third and sixth floors, are due by November 2, 2001.)

(c) Evidence that an environmental review has been conducted, or approval from the City or HUD to waive the review.

(d) A request that HUD waive repayment of any outstanding development or modernization debt connected with the property. The PHA will confirm that the sale proceeds may be used to develop the 10th Street site.

Once the Special Applications Center approves the disposition application, the local HUD office will be authorized to release the declaration of trust.


### RESOLUTION NO. 01-10/24-2
### SALE OF 480 CEDAR BUILDING

WHEREAS, the Public Housing Agency of the City of Saint Paul (PHA) owns the office building at 480 Cedar Street in Saint Paul, Minnesota (the "480 Cedar Building") and maintains its Central Administrative Office and Rental Office as well as commercial office space and a parking ramp; and

WHEREAS, a declaration of trust has been recorded in favor of the U.S. Department of Housing and Urban Development (HUD) relating to the title of the 480 Cedar Building in connection with HUD Development Project No. MN 1-33 (MNP46001033); and

WHEREAS, the Minnesota Public Radio (MPR) desires to purchase the 480 Cedar Building for $7.9 million, a price which was previously approved by the PHA Board of Commissioners on January 24, 2001 as reflecting the replacement value of the property; and

WHEREAS, the PHA and MPR signed a Purchase Agreement on October 17, 2001 which is subject to HUD's release of its declaration of trust on the property ; and

WHEREAS, MPR and the PHA have tentatively agreed that the PHA will lease its office space on the third and sixth floors of the 480 Cedar Building from MPR on terms and conditions which have been presented to and fully considered by the Board at this meeting; and

WHEREAS, the Board of Commissioners finds that this sale and leaseback of 480 Cedar Street are in the best interests of the Public Housing Agency;

NOW, THEREFORE, BE IT RESOLVED by the Board of Commissioners of the Public Housing Agency of the City of Saint Paul as follows:

1. After review and consideration of the Purchase Agreement for the sale of the 480 Cedar Building to Minnesota Public Radio (MPR) at the price previously approved by the Board of Commissioners, the Purchase Agreement is hereby ratified, subject to HUD's approval and release of the declaration of trust; and

2. After consideration of the terms and conditions of the Lease Agreement for the PHA to lease the third and sixth floors of the 480 Cedar Building from Minnesota Public Radio (MPR) after the sale closing, the Lease Agreement is hereby approved and the Executive Director or his designees are hereby authorized to execute any related documents which are necessary; and

3. The Executive Director or his designee are authorized to seek HUD approval to amend the PHA's Agency Plan for Fiscal Year 2002 to describe the disposition of the 480 Cedar Building; and

4. The Executive Director is authorized and directed to execute and submit a property disposition application to HUD along with all further documents and information as required by HUD respecting approval of the sale of 480 Cedar Building.

MOTION:   Approve Resolution Number 01-10/24-2
Moved:      Commissioner Willits.  Seconded:  Commissioner Kane.
Vote:         Ayes-6.  Nays-0.


### VII.A. NEW BUSINESS CONSENT ITEMS
The following items were considered to be routine or non-controversial and were approved with one motion, without discussion.

A.1. PUBLIC HOUSING ADMISSIONS AND OCCUPANCY POLICIES REVISION; LATE RENT PAYMENTS

Staff recommended Board approval to revise the section on lease terminations due to late rent payments in the Public Housing Admissions and Occupancy Policies.  The change clarifies the policy for both residents and staff and conforms the language to current state statutes.  The proposed new policy language was attached.

The Board approved a major revision of the Admissions and Occupancy Policies on February 23, 2000.  One significant change was to allow the PHA to terminate a

resident's lease if the rent was paid late four or more times in a twelve month period. However, the wording of that late rent policy has confused some residents and managers, who focused on whether the resident received a termination notice or late rent letter, not whether the PHA received the rent late.

Rent is considered late when it is received later than 4:30 P.M. on the 10th of the month. Because the PHA does not send out late rent notices via certified mail, there is no way of tracking whether or when the resident received the late rent notice. The proposed language change clarifies that the rent must be received by the PHA when it is due. It is the receipt of rent before the cut-off date and time, and the not sending of a late rent notice, that determines whether payments are considered late.

Staff sent notices of the proposed language change to Resident Council leaders and other Resident Advisory Board (RAB) members and to Southern Minnesota Regional Legal Services, Inc. (SMRLS). Staff met with SMRLS attorneys at their request, to discuss the proposed language and to explain the rent collection procedures. After hearing the many "due process" steps described below, the SMRLS attorneys agreed that the language changes are appropriate and would not adversely impact residents.

The PHA's policies and procedures reinforce the basic lease requirement that all residents must pay rent in full and on time.
- If rent is received after 4:30 PM on the tenth of the month, a $20 late charge is assessed.
- Housing Managers send out "late rent letters" after a resident has paid rent late twice, and again after the third late payment.
- Human Services Coordinators also contact residents who have paid rent late for the third time in a 12-month period. They try to schedule a home visit and to refer residents for financial counseling and budgeting if needed. During the home visit they also warn residents that their lease may be terminated if their rent payment is late a fourth time.
- Lease termination notices are sent to residents who pay rent late four times in a 12-month period after these corrective measures have been taken. Eleven households have been evicted for non-payment of rent since April 1, 2001, the beginning of our fiscal year. Twenty-seven other terminations have been withdrawn with signed stipulations that the residents would take specific corrective action to pay rent on time, such as agreeing to budgeting assistance.

The other proposed language change replaces the term "Unlawful Detainer" with "eviction action", conforming to current Minnesota Landlord-Tenant statutes.

Notices to resident leaders and to Legal Aid were sent out earlier in the month about the proposed language change to the late rent policy and other minor lease termination language changes. Staff met with Legal Aid in response to proposed language changes to clarify procedures related to terminations for non-payment of rent. Legal Aid agreed that language changes are appropriate and would not adversely impact residents.

### RESOLUTION NO. 01-10/24-1
### REVISIONS TO THE ADMISSION AND OCCUPANCY POLICIES
### FOR PUBLIC HOUSING;
### LATE RENT POLICY

WHEREAS, the Public Housing Agency of the City of Saint Paul (PHA) has in effect Public Housing Admission and Occupancy Policies, dated February 23, 2000, as amended; and

WHEREAS, there has been presented and considered at this meeting of the Board of Commissioners a revision to those policies to clarify the late rent policy and change language related to terminations to conform to current statutes;

NOW, THEREFORE BE IT RESOLVED by the Board of Commissioners of the Public Housing Agency of the City of Saint Paul as follows:

> The Public Housing Admission and Occupancy Policies, dated February 23, 2000, are hereby amended as proposed, effective November 1, 2001.

A.2.  SECTION 8 ADMISSIONS AND OCCUPANCY POLICIES REVISION; CONDITIONS FOR DENIAL OR TERMINATION OF ASSISTANCE

Staff recommended Board approval to revise the Section 8 Admissions and Occupancy Policies to state that the PHA must deny or terminate assistance to a participant who is required to register under a state's lifetime sex offender registration program.

The Public Housing Reform Act of 1998 (QHWRA) prohibited PHA's from providing public housing or Section 8 assistance to lifetime registered sex offenders. At that time Minnesota did not have a lifetime registration requirement, but it does now. The proposed change to the Section 8 policies reflects the corresponding change in Minnesota law that now requires certain convicted sex offenders to register for life. Staff and legal counsel believe that no change is needed in the Public Housing Admission and Occupancy Policies.

The PHA still has the authority to deny or terminate assistance to Section 8 participants who have committed violent criminal activity, including sexual offenses that do not require lifetime registration under the state's program.

PHA  022034

**RESOLUTION NO. 01-10/24-3**
**REVISION TO THE SECTION 8**
**ADMISSION AND OCCUPANCY POLICIES;**
**CONDITIONS FOR DENIAL OR TERMINATION OF ASSISTANCE**

WHEREAS, the Public Housing Agency of the City of Saint Paul (PHA) has in effect Section 8 Admission and Occupancy Policies, dated February 23, 2000 as amended; and

WHEREAS, there has been presented and considered at this meeting of the Board of Commissioners a revision of policy language related to denial or termination of assistance for sex offenders subject to a State lifetime registration requirement; and

WHEREAS, the proposed revision is necessary to comply with federal and state statutes;

NOW, therefore be it resolved by the Board of Commissioner of the PHA that the Section 8 Admission and Occupancy Policies, dated February 23, 2000 as amended, be amended as proposed effective immediately.

A.3. FIRE ALARM SYSTEM REPLACEMENT; FRONT HI-RISE; CONTRACT NUMBER 02064

Staff requested Board approval to award a contract to replace the fire alarm system at Front Hi-Rise to the lowest responsible bidder, Electric Resource Contractors, Inc. (ERC), for the bid amount of $177,140.  A copy of the October 16, 2001 bid tabulation is attached.

The contractor will completely replace the existing fire alarm system.  The new system will comply with all applicable codes and has been reviewed by the Saint Paul Fire Department.

ERC has not previously performed any work for the PHA.  However several references checked by staff were satisfactory.  Copies of the Employer Information Reports for ERC and the second low bidder, Merit Electric, are attached.  ERC intends to subcontract 5 percent of the contract work to minority and/or women-owned businesses (MBE/WBE).

ERC's bid is within staff's estimate and there are sufficient 2000 Capital funds available for the work.

7821

**FIRE ALARM SYSTEM REPLACEMENT AT FRONT HI-RISE, CONTRACT NO. 02064. Time of Bid Opening 2:30 P.M. Local Time October 16, 2001.  Place of Bid Opening 480 Cedar Street, Suite 600, Saint Paul, Minnesota.**

### TABULATION OF BIDS

| Name & Address of Bidders | Bid Amount | Nature & Amount of Bid Security |
| --- | --- | --- |
| Electric Resource Contractors Inc<br>4024 Washington Avenue N<br>Minneapolis MN 55412 | Lump Sum Amount<br>$177,140 | 5% Bid Bond<br>Non Collusive Affidavit: Yes<br>Rep/Certification of Bidders: No<br>EEO Form: Yes<br>Addenda: Yes |
| Merit Electric Company<br>751 Payne Avenue<br>St Paul MN 55101 | Lump Sum Amount<br>$177,757 | 5% Bid Bond<br>Non Collusive Affidavit: Yes<br>Rep/Certification of Bidders: Yes<br>EEO Form: Yes<br>Addenda: No |
| Systems By Design Inc<br>1588 Peltier Lake Drive<br>Centerville MN 55038 | Lump Sum Amount<br>$186,093 | 5% Bid Bond<br>Non Collusive Affidavit: Yes<br>Rep/Certification of Bidders: Yes<br>EEO Form: Yes<br>Addenda: Yes |
| Laughlin Electric Co<br>400 Selby Avenue, Suite E<br>St Paul MN 55102 | Lump Sum Amount<br>$227,572 | 5% Bid Bond<br>Non Collusive Affidavit: Yes<br>Rep/Certification of Bidders: Yes<br>EEO Form: Yes<br>Addenda: Yes |
| Peoples Electrical Contractors<br>277 East Fillmore<br>St Paul MN 55107 | Lump Sum Amount<br>$233,900 | 5% Bid Bond<br>Non Collusive Affidavit: Yes<br>Rep/Certification of Bidders: Yes<br>EEO Form: Yes<br>Addenda: Yes |

PHA  022036

7822

| Phasor Electric Company<br>15300 25th Avenue N #400<br>Plymouth MN 55447 | Lump Sum Amount<br>$239,000 | 5% Bid Bond<br>Non Collusive Affidavit: Yes<br>Rep/Certification of Bidders: Yes<br>EEO Form: Yes<br>Addenda: No |
| --- | --- | --- |
| Honda Electric Inc<br>5075 Nielsen Circle Box 236<br>Loretto MN 55357 | Lump Sum Amount<br>$383,500 | 5% Bid Bond<br>Non Collusive Affidavit: Yes<br>Rep/Certification of Bidders: Yes<br>EEO Form: Yes<br>Addenda: Yes |

A.4.   FIRE SPRINKLER ADDITION; FRONT HI-RISE; CONTRACT NUMBER 02063

Staff requested Board approval to award a contract to install fire safety sprinklers at Front Hi-Rise to NewMech Companies, Inc., for the bid amount of $208,513. NewMech submitted the second low bid, but the apparent low bidder, Superior Fire Protection, asked to withdraw their bid due to demonstrated miscalculations of labor rates.  Staff recommends that Superior be allowed to rescind their bid and receive their bid security back.  A copy of the October 16, 2001 bid tabulation is attached.

The contractor will install fire safety sprinklers throughout the building, including all dwelling units.  The new system will be constructed with steel piping and will comply with all applicable codes.  The plans have been reviewed by the Saint Paul Fire Department.

NewMech Companies has performed satisfactorily for the PHA.  Copies of the Employer Information reports for NewMech and the next low bidder, Viking, are attached.  NewMech intends to subcontract 7 percent of the contract work to minority and/or women-owned businesses (MBE/WBE).

NewMech's bid is well within staff's estimate and there are sufficient 2000 Capital funds available for the work.

PHA  022037

7823

<u>FIRE SPRINKLER ADDITION AT FRONT HI-RISE, CONTRACT NO. 02063.  Time of Bid Opening 2:00 P.M. Local Time October 16, 2001.  Place of Bid Opening 480 Cedar Street, Suite 600, Saint Paul, Minnesota.</u>

<u>TABULATION OF BIDS</u>

| Name & Address of Bidders | Bid Amount | Nature & Amount of Bid Security |
|---|---|---|
| Superior Fire Protection Inc<br>1500 NE Jackson Street<br>Minneapolis MN 55413 | Lump Sum Amount<br>$148,282 | 5% Bid Bond<br>Non Collusive Affidavit: Yes<br>Rep/Certification of Bidders: Yes<br>EEO Form: Yes<br>Addenda: No |
| NewMech Companies Inc<br>1633 Eustis Street<br>St Paul MN 55108-1219 | Lump Sum Amount<br>$208,513 | 5% Bid Bond<br>Non Collusive Affidavit: Yes<br>Rep/Certification of Bidders: Yes<br>EEO Form: Yes<br>Addenda: No |
| Viking Automatic Sprinkler Co<br>1301 L'Orient Street<br>St Paul MN 55117 | Lump Sum Amount<br>$217,900 | 5% Bid Bond<br>Non Collusive Affidavit: Yes<br>Rep/Certification of Bidders: Yes<br>EEO Form: Yes<br>Addenda: No |
| Summit Fire Protection<br>7301 Apollo Court<br>Lino Lakes MN 55014 | Lump Sum Amount<br>$249,300 | 5% Bid Bond<br>Non Collusive Affidavit: Yes<br>Rep/Certification of Bidders: Yes<br>EEO Form: Yes<br>Addenda: Yes |
| Simplex Grinnell<br>2730 Nevada Avenue<br>North Minneapolis MN 55427 | Lump Sum Amount<br>$329,700 | 5% Bid Bond<br>Non Collusive Affidavit: Yes<br>Rep/Certification of Bidders: Yes<br>EEO Form: Yes<br>Addenda: No |

MOTION:   Approve Consent Items A-1 through A-4
Moved:     Commissioner Hadley.  Seconded:  Commissioner Lindsey.
Vote:        Ayes-6.  Nays-0.

7824

## VI. NEW BUSINESS DISCUSSION ITEMS

B.1.  CONSULTING SERVICES; FEASIBILITY STUDY; CONTRACT NUMBER 02072

Staff recommended approval to award a contract to RSM McGladrey, Inc., Minneapolis for consulting services related to this Agency Goal for FY2002:

Explore the feasibility of managing non-PHA property on a fee basis, including developing guiding principles, assessing opportunities and threats, researching costs and benefits, and related issues.

For a fee not to exceed $53,700 plus actual expenses (typically 10% of contract costs or less, according to RSM McGladrey) the consultant will advise the staff and Board on the feasibility of expanding PHA organizational operations and services to include property management and possible development and/or ownership of non-public housing rental housing units.  Staff expects the consulting services to be completed four to five months after the contract is executed.

In response to the Request for Proposals (RFP) issued on August 22, 2001, staff received two proposals, one from RSM McGladrey Inc., and one from KPMG.  A staff proposal review team ranked each proposal using the following rating criteria stated in the RFP.

| POINT VALUE | CRITERIA |
|---|---|
| 40 | Contractor's background and experience in providing organizational development and expansion services. |
| 30 | Cost for services and timetable for completion as described in the Proposal. |
| 20 | Contractor's overall response to RFP and plan for providing desired services. |
| 5 | Contractor's familiarity and experience in working with diverse low-income populations, and housing industry knowledge. |
| 5 | Status as Minority/Women's/Disabled Business Enterprise or demonstrated efforts toward affirmative employment opportunity. |
| 100 | Total Possible Points |

Staff also conducted interviews with both firms.  RSM McGladrey, Inc. received the highest rating from each reviewer.  Equal Employment Opportunity (EEO-1) forms from both firms are attached.

RSM McGladrey, Inc. is affiliated with McGladrey & Pullen, LLP, which has performed the PHA's annual audit for nine years and provided other consulting services.

RSM McGladrey proposes to use the following study design:

1. Phase One:  Research, Planning Team Alignment, and Opportunity Assessment.

2. Phase Two:  Market Research, Analysis, and Feasibility Study.

3. Phase Three:  Optional Strategic and Operational Planning Retreat.

Tom Emison, a Senior Manager in RSM McGladrey's Construction and Real Estate Division, will serve as the Project Manager for this contract and will make a presentation to the Board at the meeting.  The full RSM McGladrey project team also will be present. There are sufficient Building Fund funds available for the contract.

MOTION: Approve Contract to RSM McGladrey, Inc.
Moved:    Commissioner Lindsey.  Seconded:  Commissioner Kane.
Vote:       Ayes-6.  Nays-0.

## B.2.  MEDICAL AND DEPENDENT CARE EXPENSE REIMBURSEMENT; AMENDED PLAN

Staff requested Board approval of the Amendment and Restatement of the PHA's Medical and Dependent Care Expense Reimbursement Plan, effective January 1, 2002. The primary change would be raising the maximum withholding for medical expense reimbursement from $1,500 to $3,000 per year.  Although there is no direct cost to the PHA, there is some increase in potential liability.  As explained below, the Agency might have to reimburse the Plan Administrator (Stanton Group) for payments to an employee who terminated employment before contributing that amount.  Another proposed change in PHA policy would allow the PHA to apply unused amounts withheld to offset plan losses.  Employee contributions in excess of reimbursements and plan losses would continue to be donated to charities.

The medical and dependent care reimbursement plan allows employees to set aside wages on a pre-tax basis to pay for allowable out-of-pocket medical and dependent care expenses.  The PHA has offered this plan to staff since 1989.  Since then there have been minor changes to IRS regulations that need to be reflected in our plan document.  In addition, the attached document incorporates changes in federal law that will go into effect on January 1, 2002.

ENROLLMENT
Currently 36 staff are enrolled in this plan.  Twenty-eight are enrolled only in the medical reimbursement plan, which allows an employee to set aside up to $1,500 a year in pre-tax

earnings to pay for allowable out-of-pocket medical expenses.  (Most employees pay their portion of health insurance premiums through pre-tax withholding, but those funds do not go through the medical reimbursement plan.)  Another six employees are enrolled only in the dependent care reimbursement plan, which allows an employee to set aside up to $5,000 a year in pre-tax earnings to pay for dependent daycare expenses.  Two staff members are enrolled in both the medical and dependent care reimbursement plans.

MEDICAL PLAN CHANGE

The attached Plan Document reflects an increase in the annual dollar cap for the medical expense reimbursement plan from $1,500 to $3,000.  Staff believes this increase is appropriate due to increasing out-of-pocket medical expenses that employees may incur because of higher co-payments for office visits and other limitations in health insurance coverage.  No change is recommended in the dependent care reimbursement cap, which is already at the statutory maximum of $5,000.

PHA LIABILITY

An employee who elects to participate in this type of pre-tax reimbursement plan is entitled to claim reimbursement for the full amount at any time during the year, even before that amount has been withheld from the employee's paychecks.  However, IRS regulations stipulate that, if an employee terminates employment after incurring and being reimbursed for more expenses than the amount that they have contributed to their account up to the time of their termination, the employer is liable for the difference.  Example:  On January 1, an employee elects to have $1000 in pre-tax earnings contributed to their Health Care Reimbursement Account for the year.  The funds are deducted in equal amounts from each paycheck throughout the year ($1000 ÷ 26 = $38.36 per pay check).  Between January 1 and March 1, the employee incurs and is reimbursed for allowable medical expenses totaling $550.  The employee terminates their employment on March 18.  Up to this point, there have been 5 pay periods in the year.  The employee has had $192.30 in pre-tax dollars deducted from their check and credited to their medical reimbursement account ($38.36 x 5 = $192.30).  The employer is responsible for the remaining $337.70 ($550 - $192.30 = $337.70).

By increasing the medical reimbursement maximum to $3,000, there is some increase in PHA's liability.  Over the last 10 years, this situation has occurred only once (in 1990) for a total cost to the PHA of approximately $700.  Based on this track record, it is unlikely the PHA will be required to pay in much money.  If the PHA is ever required to pay in the difference, these costs are offset by the following factors:

- Under this plan, participants must use or forfeit the amount they contribute each year.  Participant forfeitures are returned to the employer and may be used to offset any losses experienced by the employer or in any other fashion the plan administrator deems appropriate, in accordance with applicable law.

- The PHA saves 7.65% (the employer's share of FICA) on money participants put into the reimbursement plan.

PHA  022041

UNUSED CONTRIBUTIONS DONATED TO CHARITIES
In 1988 when the PHA adopted the Medical and Dependent Care Expense
Reimbursement Plan (then called the Flexible Spending Account program), the Board
approved donating all unused employee contributions to the United Way and the
Cooperating Fund Drive (now called Community Solutions Fund).  A copy of the
December 14, 1988 Board resolution is attached.  Approval of the proposed resolution
and the Amended and Restated Plan will modify that by allowing the PHA to apply
excess contributions to offset any losses under the plan, then any remaining funds will be
contributed to the United Way and Community Solutions Fund.

If approved, these changes will take place on January 1, 2002 and a new Summary Plan
Description will be distributed to all participating staff.

**RESOLUTION NO. 01-10/24-4**
**MEDICAL & DEPENDENT CARE EXPENSE**
**REIMBURSEMENT AMENDED PLAN**

WHEREAS, the Public Housing Agency of the City of St Paul previously adopted the
Public Housing Agency of the City of St Paul Medical and Dependent Care Expense
Reimbursement Plan on January 1, 1989;

WHEREAS, THE Public Housing Agency of the City St Paul desires to amend and
restate such Plan as presented to the Board of Directors;

NOW, THEREFORE, BE IT RESOLVED, that the Public Housing Agency of the City of
St Paul Medical and Dependent Care Expense Reimbursement Plan be and the same is
amended, restated and adopted in the form presented to the Board of Directors, effective
as of January 1, 2002;

BE IT FURTHER RESOLVED, that any authorized person of the Agency are hereby
authorized to make such contribution from the funds of the Agency as are necessary to
carry out the provision of said plan at any time; and

BE IT FURTHER RESOLVED, that in the event any conflict arises between the
provision of said Plan and the Employee Retirement Income Security Act of 1974
(ERISA) or any other applicable law regulations (as such law or regulations may be
interpreted or amended), the Company shall Resolve such conflict in a manner which
complies with ERISA or such law or regulation.

MOTION: Approve amendment and restatement of the PHA's Medical and
Dependent Care Expense Reimbursement Plan.
Moved:      Commissioner Kane.  Seconded:  Commissioner Yang.
Vote:       Ayes-6.  Nays-0.

## VII.   INFORMATIONAL ITEMS

### A.  FSS UPDATE

Since the Family Self-Sufficiency (FSS) plan was designed in May 2001, progress has
been made in all areas.

Program Background
The purpose of the FSS program is to reduce dependency on welfare and other public
assistance, and to help families receiving Section 8 assistance, or living in public housing,
achieve economic self-sufficiency.  Typically, a family enrolls for five years, finds
employment or moves up a career ladder to better employment, and gradually ends
dependency on welfare cash assistance.  A financial award in the form of an escrow
account is established for working families, capturing increases in rent due to wage
income increases.  Families who meet their goals and successfully complete the program
are rewarded with their escrow funds.

Program Size
HUD requires that the program size be equal to the number of new public housing units
and Section 8 subsidies awarded to the Agency since 1992, minus the number of program
graduates since 1998.  Since the start of FY02, a total of 50 families have participated in
the program.  Because of graduations and other terminations, the program currently
serves 39 participants.

|  | Section 8 | Public Housing | Combined |
|---|---|---|---|
| Original FSS Requirement | 545 | 35 | 580 |
| FSS Graduates | 30 | 4 | 34 |
| Current Requirement | 515 | 31 | 546 |
|  |  |  |  |
| Current Participants | 32 | 7 | 39 |

Under SEMAP (Section 8 Management Assessment Program), the Agency annually
reports FSS program progress.  To receive the maximum number of points under
SEMAP, 80% of the Agency's FSS mandatory slots need to be filled, and at least 30% of
participants must have escrow accounts.  Staff is working to balance these two criteria, as
increases in enrollment typically mean delayed starts with escrow accounts.  Rents are

PHA  022043

usually adjusted annually for Section 8 participants, so escrow accounts may not start for a year or more after FSS enrollment.

Over the last five months, staff have actively marketed the program: targeted mailings, distribution of information at the pubic housing family sites and during Section 8 annual reviews, expanding connections with providers serving PHA residents who are on welfare, and, recently, streamlining the enrollment process by coordinating meetings with annual rent review appointments. In the past month, interest has soared, with as many as ten informational meetings scheduled each week with potential participants. Although appointments are frequently cancelled by potential participants, staff is hopeful that a new approach ultimately will result in increased enrollment.

Program Coordination
A Program Coordinating Committee (PCC) was established to serve in an advisory capacity and assist in securing and identifying resources for program operations. The PCC includes participant representatives, PHA staff, and a cross section of local service providers: Salvation Army, Lifetrack Resources, Lao Family Community, St. Paul Urban League, Hmong American Partnership, Ramsey Action Programs, and *Jobs-Plus*/STEP. The PCC spent their first meeting identifying many community resources that help to address common barriers to economic self-sufficiency, including affordable car repairs or car purchases, tested training opportunities, educational assistance, and child care options.

PCC input also has been valuable as staff work on guidelines for participants' access to their escrow accounts before graduation. These interim disbursements are allowed under certain circumstances, but are not required by the program. In addition, staff is checking with several local FSS program coordinators on their procedures regarding disbursements and other operational procedures.

Administration
Staff has started drafting a manual for program operations that includes the following sections: enrollment procedures, escrow accounts, marketing and outreach, monitoring/tracking, the PCC, and case management.

Current FSS participant files have been reviewed for HUD compliance. Based on recent staff training, new procedures are now in place to ensure adherence with FSS enrollment regulations regarding timeliness of income and family information.

Staff is working on the development of a special FSS database to provide comprehensive and simplified access to information, as well as a better checks-and-balances system for the program. Other refinements include revising forms, including the quarterly status update, and, with the help of Accounting staff, designing an Excel worksheet, to assure accuracy in completing the calculations needed for enrollment and subsequent escrow changes.

PHA 022044

<u>Staffing and Funding</u>
In August, three PHA staff successfully completed HUD endorsed training and testing on the FSS program:  MayKao Hang, Director of Resident Services, Joanne MacDonald, Program Manager of Resident Initiatives, and Kaohnou Yang, FSS Program Coordinator. Spolinsky Jacox, FSS Program Coordinator (temporary through December 2001), was already certified.

HUD recently announced a $60,000 award to the PHA to cover the cost of a FSS Coordinator for work related to Section 8 participants.  Staff submitted this grant request last spring.

Staff continues to look at best practices for the program.  One additional activity that staff will be undertaking in the near future is a request to the new HUD administration to consider a waiver for the size of the PHA's program.  Although past attempts for waivers were not granted, changing HUD regulations, including earned income disregards and staffing limitations at the PHA, among other reasons, justify another appeal.


B.  BOARD OF COMMISSIONER APPOINTMENT LETTERS FROM MAYOR

Mayor Norm Coleman reappointed Commissioners Shirley Kane and Soua Yang, whose terms had expired.

The mayor also appointed Assistant Police Chief Tom Reding to a 5-year term, succeeding Sheriff Bob Fletcher on the Board.

C.  JON GUTZMANN'S REMARKS AT PRESS CONFERENCE ON SALE OF THE 480 CEDAR BUILDING

D.  AGENCY PLAN FY 2003 – DECONCENTRATION OF POVERTY ANALYSIS; REVISIONS TO DRAFT PLAN

Staff is preparing for the November 20th public hearing on the Agency Plan for the next fiscal year, which begins April 1. 2002.  The draft Agency Plan has been available for public review since October 1.  The hearing will be held on November 20th at the Central Hi-Rise, 4:30 PM.  Residents, members of the public and staff are invited to comment on the draft Agency Plan, including the Capital Fund Plan and the Plan for PHDEP (Public Housing Drug Elimination Program).

HUD also requires the Agency Plan to include a "deconcentration of poverty" analysis.  As in previous years, staff found that after adjusting average incomes based on average sizes at the four developments and the "development" of scattered sites, there is very little difference in average incomes.  Therefore the PHA does not have to take any steps to "deconcentrate poverty" by changes in admissions or transfer policies or otherwise.

PHA  022045

Minutes
Business Meeting
Board of Commissioners

Date:  May 22, 2002                    Time:  9:00 a.m.                    Place: Agency


I.      ROLL CALL

        Commissioners Present:   A. Boss, S. Kane, K. Lindsey, R. Willits, T. Reding

        Commissioners Absent:  S. Yang, K. Hadley

        Staff Present:  J. Gutzmann, T. Auger, A. Hester, N. Semmelroth, K. Keena, J. Pichelman,
                H. Petro, j. erolin, O. Mattison, M. McMurray, B. Sporlein, C. Toavs, K.
                Lindgren, K. White, C. Kline, C. Montantes, T. Beard, S. Borndale, B.
                Levitan, P. Tepley, A. Evans, S. DeValerio, M. Virnig.

        Others Present:  Michael Driscoll, PHA Legal Counsel and Assistant City Attorney; Mike
                Jost, Presidents Council; Roberta Starks, Presidents Council.

II.     INTRODUCTION OF NEW STAFF:  Crystal Sroga, Network Administrator; Ana Matos,
        Administrative Support Assistant; Sheila Robinson, Inspections Specialist.

III.    APPROVAL OF MEETING MINUTES

        MOTION:  Approve meeting minutes of April 24, 2002
        Moved:      Commissioner Reding.  Seconded:  Commissioner Kane.
        Vote:        Ayes-5.  Nays-0

IV.     REVIEW OF BILLS AND COMMUNICATIONS

        Bank register for May and Monthly Management Report for April were available for review.

V.      UNFINISHED BUSINESS – None

site to allow future redevelopment of the 40 acre site. Groundwater samples will be collected from the wells between two and four times a year for a period of approximately five years.

Staff believe that the location of the wells, above ground access pipes, and the work to install and monitor the wells will have a minimal impact on the residents of the PHA's single family home. The equipment will be installed near the property line at the rear of the lot. Photos of typical installations are attached. At the completion of the groundwater-monitoring program the wells will be sealed according to Minnesota Department of Health codes and all aboveground features associated with the wells will be removed.

> MOTION:  Approve Consent Items A.1. through A.4.
> Moved:      Commissioner Kane. Seconded: Commissioner Reding.
> Vote:          Ayes-5. Nays-0

## VII.B.  NEW BUSINESS DISCUSSION ITEMS

B.1.  PUBLIC HOUSING ASSESSMENT SYSTEM (PHAS); MANAGEMENT OPERATIONS CERTIFICATION FOR FY 2002

Staff requested Board approval of Resolution number 02-5/22-1 authorizing the Executive Director to execute the certification of the Agency's performance under the Management Operations component (Indicator #3) of HUD's Public Housing Assessment System (PHAS) for the PHA's Fiscal Year 2002, which ended March 31, 2002. Staff estimates that the Agency's FY 2002 score on this indicator is 93.3 percent (the same as last year) and the overall PHAS score is also 93 percent. That would rate the PHA a "High Performer" agency again and achieve Agency Goal #1. The PHA has earned the "high performer" rating for the last eleven years of HUD's PHMAP and PHAS assessment systems.

Last year HUD used the score for Management Operations as the PHA's official "assessment" score, with the other three PHAS indicators (Physical Condition, Financial Condition and Resident Satisfaction) considered advisory only. This year all four indicators will be combined for the official score. Only the Management Operations indicator requires Board approval.

The Management Operations Indicator covers six areas of PHA operations:

1. **Vacant Unit Turnaround Time.** The PHA's average turnaround time of 33.12 days (excluding modernization days) scores two out of four points.

   Calculated from vacancy days and the total number of unit-days available, the PHA's occupancy rate for the year was 98.04%, or 98.19% after excluding

vacancy days related to modernization work.  The average month-end occupancy rate was 99.0%.

2. **Capital Fund (Modernization)**.
   The PHA scores "A"s on all components.

3. **Maintenance work orders** (emergency and non-emergency).  The PHA completed all 6,573 emergency work orders within 24 hours, and all 28,577 non-emergency work orders in an average of 3.6 days.

4. **Annual inspection of units and major systems**.
   The PHA inspected all units and major systems during the year.

5. **Security**.
   The PHA scores "A"s on all components.

6. **Economic Self-Sufficiency**.
   The PHA scores "A"s on all components.

Following is a brief explanation of the other three PHAS indicators:
**Indicator #1:  Physical Condition**.  The PHA's score for FY 2002 is 26 points out of 30 (88%), based on the inspections for FY 2001 which were conducted from June 11 through July 18, 2001.  (A score of 24 points or above puts the PHA on a biannual inspection schedule, so the score from the FY 2001 inspections is used for FY 2002 also.)

**Indicator #2:  Financial Condition**.  Staff will submit the required forms electronically to HUD when all of the year-end data is finished.  Board certification is not required, but staff will provide an informational report in June.  Last year the PHA scored 30 out of 30 points on this indicator.

**Indicator #4:  Resident Satisfaction Survey (RASS)**.  The Resident Satisfaction score is based on both the PHA's notification to residents of the annual REAC survey and the residents' actual responses to the survey.  Last year the great majority of residents who responded reported that they were "Satisfied" or "Very Satisfied" on all five survey categories.

A notice on HUD/REAC's Internet site says, "The on-line information required for the 12/31/01, 3/31/02, and 6/30/02 RASS survey cycles is currently on-hold. . . . When the RASS system becomes available for these assessment cycles, your PHA will be informed."  Since REAC conducted the RASS survey for FY 2001 during FY 2002, staff has suggested that REAC use those results for the PHA's FY 2002 score also.

The PHA's PHAS scores for this past year (FY 2002) and previous years are summarized below.

| PHAS INDICATOR | FY 2002 SCORE | | FY 2001 SCORE (*ADVISORY*) | | FY 2000 SCORE (*ADVISORY*) | MAXIMUM SCORE |
|---|---|---|---|---|---|---|
| Physical | 26 | 88% | 26 | 88% | 23.6 | 30 |
| Financial | 30 | 100% | 30 | 100% | 28.1 | 30 |
| Management | 28 | 93% | 28* | 93% | 28.0* | 30 |
| Resident | 9 | 92% | 9 | 92% | 9.1 | 10 |
| Totals | 93 | 93%* | 93 | 93% * | 88.8* | 100 |

\* In FY 2000 and 2001 the PHA's "high performer" designation was based on the Management Component alone.

After Jon Gutzmann gave an overview of PHAS, Al Hester explained more details using a PowerPoint presentation.

RESOLUTION NUMBER 02-5/22-1
PHAS "MANAGEMENT OPERATIONS" CERTIFICATION
FISCAL YEAR ENDING MARCH 31, 2002

WHEREAS, the U. S. Department of Housing and Urban Development (HUD) has established a "Public Housing Assessment System" (PHAS) set forth in 24 CFR Part 902 which requires the Public Housing Agency of the City of Saint Paul (PHA) to submit HUD Form 50072 certifying its performance during its Fiscal Year Ending March 31, 2002 on the Management Operations Indicator and Sub-Indicators listed in the PHAS Rule; and

WHEREAS, the PHA has assembled and reviewed the available information required by the PHAS Rule to the best of its staff's ability; and

WHEREAS, the completed certification in the form required by HUD and supporting documentation has been presented to the Board and considered at this meeting;

NOW, THEREFORE, BE IT RESOLVED by the Board of Commissioners of the Public Housing Agency of the City of Saint Paul that the attached report of the PHA's performance under the PHAS Management Operations Indicator is approved, and the Executive Director or his designee is authorized to execute the required certification on behalf of the PHA and to submit the same to HUD electronically or otherwise, with such supporting documentation as HUD may require.

## VIII.   INFORMATIONAL ITEMS

A. PRESIDENTS COUNCIL VERBAL PRESENTATION

Roberta Starks and Mike Jost spoke on behalf of the Presidents Council.

They update the Board on improvements in the Peer Problem Solvers Program, and invited all PHA staff and Board of Commissioners to the Hi-Rise Picnic on June 15, 2002 at Phalen Park  Pavilion from 11:00 – 1:00 PM.

B. AFFIRMATIVE ACTION ACCOMPLISHMENTS FOR FY 2002 AND AFFERMATIVE ACTION GOALS FOR FY 2002

This report summarizes the PHA's progress toward meeting its affirmative action goals for Fiscal Year 2002 and sets hiring goals for Fiscal Year 2003.  It is based on the PHA's staffing as of March 31, 2002.  The Agency's affirmative action plan, developed in April 1989, requires an annual report to the Board.  The plan is based on the equal employment opportunity policy statement approved by the Board.

C. HOME

D. HOMEWARD

E. TERMINATION OF TENANCY; FY 2002 REPORT

During FY 2002, 68 resident households (individual or families) moved out of public housing because the PHA terminated their leases "for cause", excluding non-payment of rent.  This number is lower than last year's total of 74 and represents only about 1.6 percent of all households in public housing.  Staff believes the decrease resulted from a combination of efforts including thorough applicant screening, new resident orientation procedures, uniform lease enforcement and lease termination.

The attached terminations reports count all cases in which a Housing Manager formally terminated the household's lease and the resident(s) moved out, either before or after a grievance hearing or court action.  The report does not include 57 additional terminations initiated by Housing Managers which had other outcomes:
- 33 residents signed stipulations that allowed them to continue occupancy as long as they complied with the stipulations;

- 6 terminations were canceled because the resident complied with lease requirements before the termination effective date, such as providing information required for eligibility and rent determination; or the termination was cancelled and re-issued due to other violations;

- 2 terminations were grieved and won by the resident; and

- 16 more were still pending at the end of the fiscal year.

**Hi-Rise Terminations**:  During FY 2002 there were 35 hi-rise move-outs resulting from lease terminations, as compared to 38 during the previous 12-month period.  Serious disturbances, drug and other criminal activity, and unauthorized persons living in the unit accounted for 19 of the 35 terminations.

- 7 involved residents age 62 or older;
- 9 involved residents with disabilities under the age of 62; and
- 19 were single, non-disabled, non-elderly residents.

Separated by age categories, the hi-rise terminations were as follows:

| Age | 18-25 | 26-40 | 41-50 | 51-62 | 62+ | Total |
|---|---|---|---|---|---|---|
| Number of Terminations | 10 | 7 | 6 | 5 | 7 | 35 |

Terminations related to illegal drugs and criminal activities dropped sharply, from 20 during the previous year to seven this past year.  Staff believes this is a direct result of the increased police presence in our buildings with ACOP and the Officer in Residence program.

**Family Terminations**:

In family units, there were 33 move-outs resulting from terminations during FY 2002, compared to 36 during the previous fiscal year.  Drug-related and criminal activity, unauthorized persons and serious disturbances accounted for 18 of the 33 family move-outs or 55% of all family move-outs due to terminations.  In the previous fiscal year these lease violations accounted for 78% of all family terminations.  "One strike" terminations (for illegal drugs and other criminal activity) dropped from 23 to 16 last year.  Staff believes the decrease is due to the implementation of a more detailed and intensive orientation for new move-ins, management intervention efforts with residents in units identified by ACOP as "problem properties", and continued extensive screening of applicants.

Lease terminations for chronic late rent payments increased from a total of nine to seventeen (family areas and hi-rises combined).  Under an April 1, 2000 policy change, the PHA can terminate a lease if the resident pays rent late four times in a 12-month period.  During FY 2002 staff initiated 63 termination actions for chronic late rent payment.  Of those, 37 residents signed stipulations which allowed them to stay in public housing on the condition that they would vacate upon notice if they pay their  rent late one additional time during the next twelve months.  Four of the seventeen households who vacated because of terminations for chronic late rent payments had signed the stipulation and then violated it.  Two more terminations for chronic late rent were pending at the close of the fiscal year.

Residents who pay rent late more than once receive a series of warning notices.  Staff also offers them a meeting with a Human Services Coordinator to assist with issues that may be impacting timely rent payment, and referrals for budgeting counseling and financial assistance before their lease is terminated.  The PHA now contracts with a financial/budget counseling consultant who will work directly with residents to help them build financial management skills and avoid termination because of chronic late rent payment.

The percentage of uncollected tenant rents and other charges has decreased since implementation of this policy.  "Tenant accounts receivable" amounted to only 1.3% of charges at the end of FY 2002, compared to 2.4% at the end of FY 2001 and 3.5% at the end of FY 2000.

F. CLPHA ALERT – PUBLIC HOUSING STUDY

April 26, 2002 CLPHA alerted Public Housing Officials to a new academic research report highlighting the beneficial effects of Public Housing tenancy on Self-Sufficiency.

G. LEAD-BASED PAINT ABATEMENT AT ROOSEVELT HOMES; PHASE IV; CONTRACT NUMBER 02040

A second change order to the contract for the Lead Based Paint Abatement at Roosevelt Homes, Phase IV was executed on April 24, 2002.  This second change order brings the dollar amount for changes to this contract to $18,543.47, which is approximately 27% above the original contract amount of $67,500.

Under the PHA's Procurement Policy, the Board of Commissioners must be informed of changes or amendments to contracts that (cumulatively) result in the addition of $100,000 or more, or 25% of the original contract amount, whichever is less.

Change Orders Nos. 1 and 2 included removal and disposal of exterior lead based paint containing components impacted by the major modernization project at Roosevelt Homes. These wood components were not identified in the original abatement contract scope of work, as they were enclosed in aluminum and not tested for lead content.  Upon removal of the aluminum enclosure, the painted wood components were tested for lead and found to be at or above the regulatory standard.  Current HUD regulations and State rules require the components to be removed by a licensed lead abatement contractor during the modernization project.

The chart below provides an overview of the change order history of this contract to date.

| Original Contract Completion Date | | | | | November 8, 2002 |
|---|---|---|---|---|---|
| Original Contract Amount | | | | | $67,500.00 |
| **Change Order Number:** | **Amount of Add or Deduct:** | **New Total** | **Percent Increase in Contract** | **Change in Time** | **New Completion Date** |
| 1 | +  $13,485.00 | $80,985.00 | 20% | None | N/A |
| 2 | +  $5,058.47 | $86,043.47 | 27% | None | N/A |

Staff believes the cost for the change order work is reasonable and was necessary for regulatory compliance.  There are sufficient 2001 Capital Funds available for this extra work.   Staff anticipates no additional change orders to this contract through its completion.

Minutes
Business Meeting
Board of Commissioners

Date:  May 28, 2003                 Time:  9:00 a.m.                 Place: Agency


Commissioner Kevin Lindsey chaired the meeting.  The meeting was convened at 10:02 a.m.

I.      ROLL CALL*

Commissioners Present:  K. Lindsey, S. Kane, J. Wilking, S. Slaton, T. Reding.
Commissioners Absent:  A. Boss, K. Hadley.

Staff Present:  J. Gutzmann, T. Auger, A. Hester, D. Lang, K. Keena, J. Pichelman, j. erolin,
          B.L. Authier, O. Mattision, M. McMurray, B. Sporlein, C. Toavs, R. Ander, J.
          Wright, J. Johnson, M. Porter.

Others Present:  Mike Driscoll, PHA Legal Counsel and Assistant City Attorney; Craig
          Helmstetter, Wilder Research Center; Mike Jost, Presidents Council; Dennis
          Sohlstrom, Presidents Council; Beverly Caroll, Presidents Council.


The Chair stated that the Board had just concluded meeting as the Personnel
Committee, a committee of the whole, for purpose of reviewing the Executive
Director's performance over the past fiscal year.  During that session Mr. Gutzmann
had summarized the Agency's accomplishments orally and in an extensive written
report.

Several Board members made individual comments for the record regarding Mr.
Gutzmann's performance.  All Commissioners thanked Mr. Gutzmann for his effective
and sustained leadership of the PHA.

The Chair and Commissioners thanked Mr. Gutzmann and the entire staff for their
exceptional performance during the year.  The Chair then recommended that the Board
accept and file the written report.


MOTION:   Accept and file the Executive Director's report of Agency
          accomplishments during fiscal year 2003.
Moved:    Commissioner Reding.  Seconded:  Commissioner Kane.
Vote:     Ayes-5.  Nays-0

**PHA  022440**

## VIII.   INFORMATIONAL ITEMS

A. PRESIDENTS COUNCIL VERBAL REPORT; MIKE JOST

President Council member, Mike Jost, described the residents' actions to help hi-rises raise money in light of the current budget struggles.  Mr. Jost invited Commissioners to attend an upcoming Arts & Craft Show, November 28th – 30th at the Armory  near Roosevelt Homes.  They hope to raise $5,000 to help support and continue hi-rise events, programs, and services paid for by the Council.

Mike Jost said the Presidents Council Members are grateful for the Board's strong support of resident programs, especially during times of tight budgets.

Beverly Carroll, President Council member and member of the Mayor's Senior Advisory Committee, invited Commissioners and staff to attend the Annual Hi-Rise Picnic scheduled for June 21, 2003, 11:00 a.m. to 12:00 p.m., at Phalen Park Pavilion.  There will be golfing, gifts, food, and lots of dancing.

B. WILDER PHDEP EVALUATION VERBAL REPORT; CRAIG HELMSTETTER

- Craig Helmstetter, Wilder Research Center, described their evalution of the Public Housing Drug Elimination Program (PHDEP).  The evaluation concluded the following:

- Crime rates in and around public housing sites are lower than the crime rate level in the City of Saint Paul, and public housing residents feel safe.

- Public housing is a safe environment for children that provides positive influences and activities that support personal development.

- Families will have skills for successful living in public housing residences.

C. 2002 ANNUAL REPORT

D. NEWSPAPER ARTICLES; ANDREW BOSS

E. NEWSPAPER ARTICLES; KATHERINE HADELY

F. PHADA ADVOCATE ARTICLE; JON GUTZMANN TESTIMONY

G. MINORITY, WOMEN AND DISABLED BUSINESS OWNERS QUARTERLY REPORT

H. TERMINATIONS OF TENANCY; APRIL 1, 2002 – MARCH 31, 2003

During FY 2003, 66 resident households (individual or families) moved out of public housing because the PHA terminated their leases "for cause", excluding non-payment of rent.  This number is slightly lower than last year's total of 68 and represents only about 1.5 percent of all households in public housing.  Staff lease termination prevention efforts include thorough

**PHA  022475**

applicant screening, intensive new resident orientation procedures, and uniform lease enforcement.

The attached lease terminations reports count all cases in which a Housing Manager formally terminated the household's lease and the resident(s) moved out, either before or after a grievance hearing or court action.  The report does not include 70 additional lease terminations initiated by Housing Managers which had other outcomes:

- 39 residents signed stipulations that allowed them to continue occupancy as long as they complied with the stipulations;

- 14 lease terminations were canceled because the resident complied with lease requirements before the lease termination effective date, such as providing information required for eligibility and rent determination; or the lease termination was cancelled and re-issued due to other violations; and

- 17 more were still pending at the end of the fiscal year.

**Hi-Rise Lease Terminations**:  During FY 2003 there were 35 hi-rise move-outs resulting from lease terminations, the same numbers as in the previous 12-month period.  Serious disturbances, drug and other criminal activity, and unauthorized persons living in the unit accounted for 26 of the 35 lease terminations.

- 6 involved residents age 62 or older;
- 11 involved residents with disabilities under the age of 62; and
- 18 were single, non-disabled, non-elderly residents.

Hi-rise lease terminations related to illegal drugs and criminal activities increased, from seven during the previous year to fifteen this past year.  In several of those cases ACOP officers and the Officers in Residence provided staff with the documentation of illegal activities needed to successfully terminate the leases.

**Family Lease Terminations**:  In family units, there were 31 move-outs resulting from lease terminations during FY 2003, compared to 33 during the previous fiscal year.  Drug-related and criminal activity, unauthorized persons and serious disturbances accounted for 15 of the 31 family move-outs or 48% of all family move-outs due to lease terminations.  In the previous fiscal year these lease violations accounted for 55% of all family lease terminations.  "One strike" lease terminations (for illegal drugs and other criminal activity) dropped from 16 to 10 in FY 2003.  Staff believes the decrease is due in part to the detailed and intensive orientation for new move-ins, management staff's early intervention efforts with residents in units identified by ACOP as "problem properties", and continued extensive screening of applicants.

Lease terminations for chronic late rent payments decreased from 17 the previous year to 10 in FY 2003 (family areas and hi-rises combined).  The PHA can terminate a lease if the resident pays rent late four times in a 12-month period.  During FY 2003 staff initiated 47 termination actions for chronic late rent payment (18 hi-rise, 29 family).  Of those, 39 residents signed stipulations which allowed them to stay in public housing on the condition that they would vacate upon notice if they paid their rent late one more time during the next twelve months. Six of the ten households who vacated because of lease terminations for chronic late rent payments had signed the stipulation and then violated it.  Six more lease terminations for chronic late rent were pending at the close of the fiscal year.

**PHA 022476**

8645

Minutes
Business Meeting
Board of Commissioners

Date: February 23, 2005          Time:  9:00 a.m.          Place: Agency


I.      ROLL CALL

        Commissioners Present:   A. Boss, S. Kane, T. Reding, K. Hadley, O. Yang, M. Strub.
        Commissioners Absent:   K. Lindsey.

        Staff Present:  J. Gutzmann, A. Hester, N. Semmelroth, D. Lang, L. Schumann, J. Pichelman, j.
                        erolin, B.L. Authier, K. Conery, M. McMurray, C. Toavs, R. Ander, K.
                        Lindgren, J. Wright, K. White, M. Das-Sulc, A. Huckleby, S. Long.

        Others Present:  Mike Driscoll, PHA Legal Counsel and Senior Assistant City Attorney.

II.     INTRODUCTION OF NEW STAFF:  None.

III.    APPROVAL OF MEETING MINUTES

        MOTION:   Approve meeting minutes of January 26, 2005.
        Moved:        Commissioner Reding.  Seconded:  Commissioner Lindsey.
        Vote:         Ayes-6.  Nays-0.

V.      REVIEW OF BILLS AND COMMUNICATIONS

        Bank register and Monthly Management Report for January were available for review.

VI.     UNFINISHED BUSINESS

PHA  022803

Staff believes the HOME Program continues to be successful and warrants the PHA's ongoing commitment.  Much of the program's success can be attributed to the generous financial support from the FHF, the effective counseling and education services of Thompson Associates, and the hard work of the residents who prepare their families for the responsibilities of homeownership.  Staff will continue to work with FHF and Thompson Associates to identify strategies to address market barriers.

Tristy Auger presented statistics from HOME's first 15 years.  Sue Didier from Thompson Associates told heartwarming stories about public housing residents and Section 8 participants who bought homes through HOME.

MOTION:    Approve contracting with Family Housing Fund for Year 16 of the HOME
                     Program.
Moved:      Commissioner Hadley.  Seconded:  Commissioner Reding.
Vote:         Ayes-6.  Nays-0.


B.2.     ACOP CONTRACT AND BUDGET FOR FY 2006

Staff requested Board approval to contract with the City of Saint Paul, through its Police Department (SPPD) for community policing services under ACOP (A Community Outreach Program) beginning April 1, 2005.  Under the one-year contract the PHA will pay SPPD $431,425 and SPPD will provide the services of one Sergeant, six Officers, and two Civilian Liaison Officers.  As shown on the attached budget, the City/SPPD will provide $245,046 toward ACOP, by paying for the Sergeant and employee benefits such as health insurance.  The Police Department will continue to provide squad cars and other equipment for use by the ACOP unit staff.

ACOP will continue to provide services that are "above and beyond" the baseline traditional policing services which the SPPD provides citywide.  The ACOP services will continue to be focused in the PHA's four family developments (Mt. Airy, McDonough, Dunedin, and Roosevelt Homes), and three hi-rises in or near the family sites (Mt. Airy, Dunedin, and Valley Hi-Rises.)

Staff recommended that the Board approve drawing funds from the Capital Fund to support the ACOP program in the next fiscal year.  Capital Fund money has been earmarked in the PHA's FY06 Agency Plan to pay for this program.


MOTION:    Approve contracting with the City of Saint Paul for ACOP Services.
Moved:      Commissioner Reding.  Seconded:  Commissioner Kane.
Vote:         Ayes-6.  Nays-0.

B.3.    DISPOSITION APPLICATION; GOODRICH PROPERTY

Staff recommended Board approval for the resolutions and actions listed below, all related to selling and replacing a four-bedroom public housing scattered site rental home at 1232 Goodrich Avenue.  As explained below, staff's recommendation to sell is based on the high cost (currently estimated at $72,200) to repair and renovate the home to correct moisture problems and bring it up to the PHA's standards for scattered site homes.

1.  Approve Resolution 05-2/23-3, requesting HUD approval for the Disposition of 1232 Goodrich and the purchase of a replacement home.

2.  Approve Resolution 05-2/23-4, authorizing the Executive Director or his designee and the Controller to execute all documents related to the HUD approvals and the sale and purchase, including submitting a Development Proposal to HUD.

3.  Approve using the proceeds from the sale of 1232 Goodrich to purchase or construct a suitable replacement home in the same general geographic area as the home being sold, or if that is not possible, in another suitable location.  The replacement home might be provided by direct acquisition of an existing single family dwelling or through a collaboration with Twin Cities Habitat for Humanity or another community organization.

4.  Exempt the purchase of this replacement home from the previously-approved location restrictions.  As explained below, due to the scarcity of affordable homes for sale in the immediate area, the PHA may have to purchase a replacement home closer to another PHA scattered site home than would be permitted under our current acquisition guidelines.

The current Agency practice is to renovate each scattered site home, if needed, when it becomes vacant due to normal turnover.  In this case the family was transferred to another scattered site home because staff determined that the moisture problems in the Goodrich house should be addressed sooner.  After inspecting the empty home closely, staff began formulating this recommendation to sell and replace the property rather than renovate it.

In recent years the PHA has spent about $1 million annually on upgrading scattered site homes and the proposed FY 2006 budget will earmark a similar amount.  The typical renovation cost has been around $15,000, and the maximum spent on any single family home has been about $50,000.  Again, the current estimate for renovating the Goodrich property is $72,200, and that cost may rise if unexpected conditions are discovered when the work starts.  A major part of the cost in this case is for correcting moisture-related conditions, but the sloping terrain will continue to pose moisture problems.  After studying this home's condition, design and site and the estimated cost of renovation, staff has concluded that the PHA's best interests would be served by selling this property and purchasing a replacement.

As was shown on an attached map, the home is in a desirable location (Goodrich Avenue near Ayd Mill Road).  Ramsey County estimates the value of the home for tax purposes to be $221,700, which is consistent with the valuation of neighboring properties.  However, this home might sell for less due to its current condition.  Although the sales proceeds alone might not be sufficient to buy a suitable replacement home in the same area, the PHA would first attempt to do that by drawing on other funds to make up the difference. If that proves impossible or too expensive, staff will seek a suitable replacement home in another part of the

PHA  022807

city, either through direct acquisition or new construction.  The PHA recently purchased two scattered site replacement homes for $168,900 and $200,000.

> **Comment [FAH1]:** Maryland Ave and Worcester Ave properties.  Brimhall was traded for a S Lexington property; asking price was $229,000; actual sale price may somewhat lower.

With Board and HUD approval, this property would be sold on the open market through a realtor.  To facilitate buying a suitable replacement home in the same neighborhood, staff is recommending that the Board exempt this purchase from the PHA's "Guidelines for Acquisition of Family Units".  The guidelines, approved by the Board in 1980 and modified in 1987, state that "No home or duplex is to be acquired within one block, or a 300 foot radius of another PHA owned property."  That guideline has served the Agency and the community well through the acquisition of hundreds of scattered site properties throughout the City.  However, as stated above, staff believes that in the present case it could prevent the PHA from acquiring another home in the vicinity of 1232 Goodrich.

MOTION:   Approve Disposition of Scattered Site Home on Goodrich Avenue.
Moved:    Commissioner Strub.  Seconded:  Commissioner Reding.
Vote:     Ayes-6.  Nays-0.

## VII.   INFORMATIONAL ITEMS

A. HOME PROGRAM REPORT

B. FISCAL YEAR 2005 THIRD QUARTER FINANCIAL REPORTS

Financial Statements for the period ending December 31, 2004 were provided.   These statements show budgeted amounts compared to actual amounts and revenues compared to expenditures.
All programs ended the period under budget.  All programs ended the period with revenues greater than or equal to expenditures excluding depreciation expense.

C. CENTRAL ADMINISTRATIVE OFFICE BUILDING; CHANGE ORDER 9 & 10; CONTRACT NO. 03048

Staff executed Change Order No. 10 (Final) on January 20, 2005 with Lund Martin Construction Inc. for the construction of the PHA's new Central Administrative Office Building at 555 North Wabasha under Contract No. 03048.  Change Order No. 9 had increased the contract by $31,725; and Change Order No. 10 subtracted $2,010, bringing the total dollar amount for changes to this contract to $607,710.  That is approximately 5.1 percent over the original contract amount of $11,925,000.  After reimbursement from the building's commercial tenants for buildout costs and other offsets, the net additional cost of all change orders is $409,720 or 3.4% over the original contract amount.  The chart below provides an overview of the change order history of this contract to date.

PHA  022808

Minutes
Business Meeting
Board of Commissioners

Date:  May 18, 2005                    Time:  9:00 a.m.                    Place: Agency


I.     ROLL CALL

       Commissioners Present:   A. Boss, S. Kane, T. Reding, K. Lindsey, O. Yang, M. Strub.
       Commissioners Absent:   K. Hadley.

       Staff Present:  J. Gutzmann, A. Hester, T. Auger, N. Semmelroth, D. Lang, L. Schumann, H.
               Petro, J. Pichelman, B.L. Authier, K. Conery, M. McMurray, M. Porter, C.
               Toavs, R. Ander, K. Lindgren, J. Wright, M. Das-Sulc, S. Long.

       Others Present:  Terry Garvey, Legal Counsel (for Mike Driscoll, PHA Legal Counsel and
               Senior Assistant City Attorney); Patty Hammel, Wilson HR; Judy Martin,
               Wilson HR.

II.    INTRODUCTION OF NEW STAFF:  Steven Gallagher, Salvation Army.

III.   APPROVAL OF MEETING MINUTES

       MOTION:   Approve meeting minutes of April 27, 2005.
       Moved:     Commissioner Reding.  Seconded:  Commissioner Kane.
       Vote:       Ayes-6.  Nays-0.

V.     REVIEW OF BILLS AND COMMUNICATIONS

       Bank register and Monthly Management Report for April were available for review.

VI.    UNFINISHED BUSINESS


**VII.A. NEW BUSINESS CONSENT ITEMS:**


A.1.   RE-ROOFING OF MCDONOUGH COMMUNITY CENTER GYM; CONTRACT NO. 05092

       Staff requested the Board approve awarding a contract for re-roofing McDonough Community
       Center Gym to the lowest responsible bidder, M&S Roofing Inc, for the bid amount of

**PHA  022850**

## VII.B.  NEW BUSINESS DISCUSSION ITEMS:

B.1.   AGENCY GOALS FOR FY 2006

Staff recommended the Board consider the proposed Agency Goals for Fiscal Year 2006 (April 1, 2005 - March 31, 2006).  The Board-approved goals for FY 2005 were attached.

The proposed FY 2006 goals continue past years' emphasis on the core work of the PHA including public housing property management, maintenance and modernization; and Section 8 Housing Choice Voucher administration.  Staff believes that the PHA's success in administering its programs is the product of constant attention to the "basics," combined with the willingness and ability to adapt to new challenges, and the diligent efforts of an experienced, talented staff and a supportive Board.  The proposed goals also reflect the Agency's continued efforts to promote fair housing, employee and organizational development, safety and security and sound housing policy at the state and national levels.

Commissioners Reding and Lindsey suggested a few changes to the proposed Agency Goals before approval.  Staff will make the requested changes and bring the document to the June meeting for final approval.

B.2.   PUBLIC HOUSING ASSESSMENT SYSTEM (PHAS); MANAGEMENT OPERATIONS CERTIFICATION FOR FY 2005

Staff requested the Board approve authorizing the Executive Director to execute the attached certification of the Agency's performance under the Management Operations component (Indicator #3) of HUD's Public Housing Assessment System (PHAS) for the PHA's Fiscal Year 2005, which ended March 31, 2005.  Staff estimates that the Agency's score on this indicator will be 29 out of 30 points (97%) and the overall PHAS score will be 95, the same as last year's score.  These scores would continue the PHA's "High Performer" status and achieve Agency Goal #1.  The PHA has earned the "high performer" rating for the last fourteen years of HUD's assessment systems (PHMAP and PHAS).

The score for Management Operations is combined with the other three PHAS indicators (Physical Condition, Financial Condition and Resident Satisfaction) to produce the official PHAS score.  Only the Management Operations certification requires Board approval.

The Management Operations Indicator covers six areas of PHA operations:

1.  **Vacant Unit Turnaround Time.**  The PHA's average turnaround time of 26.36 days (excluding modernization days) scores 2.8 out of 4 points.  The previous year's average turnaround time was 26.66 days.

    Calculated from vacancy days and the total number of unit-days available, the PHA's occupancy rate for the year was 98.70% after excluding vacancy days related to modernization work.  The average month-end occupancy rate was 99.3%.  Month-end occupancy exceeded 99% every month during the year.

2.  **Capital Fund (Modernization).**  The PHA scores "A"s on all components.

PHA  022855

The PHA's PHAS scores for FY 2005 and previous years are summarized below.

| PHAS INDICATOR | FY 2005 SCORE (Estimated)) | | FY 2004 SCORE | | FY 2003 SCORE | | MAXIMUM SCORE |
|---|---|---|---|---|---|---|---|
| Physical* | 27 | 90% | 27 | 90% | 27 | 90% | 30 |
| Financial | 30 | 100% | 30 | 100% | 30 | 100% | 30 |
| Management | 29 | 97% | 29 | 97% | 29 | 97% | 30 |
| Resident** | 9 | 92% | 9 | 92% | 9 | 92% | 10 |
| Totals | 95 | 95% | 95 | 95% | 95 | 95% | 100 |

    \* HUD/REAC has not conducted the PHA's physical inspections for FY 2005 yet.  Last year's score is used here as an estimate.

    \*\* The resident survey results for FY2005 have not been released yet.  Last year's score is used here as an estimate.

The Commissioners thanked and congratulated all staff for their outstanding performance which earned this high PHAS score.

RESOLUTION NO. 05-5/18-1
PHAS "MANAGEMENT OPERATIONS" CERTIFICATION
FISCAL YEAR ENDING MARCH 31, 2005

WHEREAS, the U. S. Department of Housing and Urban Development (HUD) has established a "Public Housing Assessment System" (PHAS) set forth in 24 CFR Part 902 which requires the Public Housing Agency of the City of Saint Paul (PHA) to submit HUD Form 50072 certifying its performance during its Fiscal Year Ending March 31, 2005 on the Management Operations Indicator and Sub-Indicators listed in the PHAS Rule; and

WHEREAS, the PHA has assembled and reviewed the available information required by the PHAS Rule to the best of its staff's ability; and

WHEREAS, the completed certification in the form required by HUD and supporting documentation has been presented to the Board and considered at this meeting;

NOW, THEREFORE, BE IT RESOLVED by the Board of Commissioners of the Public Housing Agency of the City of Saint Paul that the attached report of the PHA's performance under the PHAS Management Operations Indicator is approved, and the Executive Director or his designee is authorized to execute the required certification on behalf of the PHA and to submit the same to HUD electronically or otherwise, with such supporting documentation as HUD may require.

PHA  022857