City Council Research Report

# A Study of Remedies for

# Chronic Problem Properties

Saint Paul City Council
City Council Research Center
Saint Paul, Minnesota
(612) 266-8560

040004

# A STUDY OF REMEDIES FOR

## CHRONIC PROBLEM PROPERTIES

March 1995

Saint Paul City Council
City Council Investigation & Research Center
Saint Paul, Minnesota  55102
(612) 266-8560

Credits:

Gerry Strathman, Director
Marcia Moermond, Policy Analyst
Patryk Drescher, Policy Analyst
Thomas Boraas, Policy Analyst

# TABLE OF CONTENTS

*INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*THE NATURE OF PROBLEM PROPERTIES* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    THREE CASE STUDIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        7XX East Sixth Street . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        3XX South Saratoga Street . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        7XX Third Street East . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    THE RANGE OF PROBLEMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    OWNERSHIP CHARACTERISTICS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    CRIMINAL AND BEHAVIORAL CHARACTERISTICS . . . . . . . . . . . . . . . . . . . . 10
    PROPERTY AND NEIGHBORHOOD DYNAMICS . . . . . . . . . . . . . . . . . . . . . . 10
    PROJECTIONS FOR THE FUTURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*CURRENT CITY POLICIES AND PROCEDURES* . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    PHASE I: IDENTIFICATION OF PROBLEM . . . . . . . . . . . . . . . . . . . . . . . . . 14
    PHASE II: CITY VERIFICATION OF CODE VIOLATION(S) . . . . . . . . . . . . . . . 14
        Public Health . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        Fire Prevention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        Police Department/ FORCE Unit . . . . . . . . . . . . . . . . . . . . . . 17
        Informational Exchange Group . . . . . . . . . . . . . . . . . . . . . . . 18
    PHASE III: CODE ENFORCEMENT OPTIONS . . . . . . . . . . . . . . . . . . . . . . . 19
        The Legislation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        Owner Warning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        Correction Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        Summary Abatement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        Citation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        Condemnation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    PHASE IV: OUTCOMES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        Housing Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        Revocation Of Certificate Of Occupancy . . . . . . . . . . . . . . . . . . 25
        Registered Vacant Buildings . . . . . . . . . . . . . . . . . . . . . . . . 25
        Case Managing/Ongoing Monitoring . . . . . . . . . . . . . . . . . . . . 25
        Problem Remains . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    PREVENTION TOOLS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
        Rental Tax Equity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        Houses to Homes Program . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        This Old House . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        Housing Information Office Programs . . . . . . . . . . . . . . . . . . . . 28

Community Stabilization Project ................................... 28
Neighborhood Sweeps .......................................... 29

*POLICY OPTIONS* .................................................. 30
    RENTAL PROPERTY-SPECIFIC OPTIONS ............................ 30
        Rental Registration ............................................ 30
        Landlord Licensing ............................................ 31
        Expansion Of Certificate Of Occupancy Process ...................... 32
    ENHANCED ENFORCEMENT OPTIONS ............................. 33
        Increased Certificate Of Occupancy Reinspection Fees .................. 33
        Graduated Fine Structure ............... *.*...................... 33
        Graduated Fee Structure ....................................... 33
    PROCEDURAL OPTIONS ....................................... 34
        Increased City Agency Communication ............................. 34
        Registration of Contracts for Deed by Seller ......................... 35
        Point System for Certificate of Occupancy Inspections ................... 35
        Landlord Education Classes ..................................... 36
        Tenant Education Classes ...................................... 37

*RECOMMENDATIONS* ............................................ 38
        #1 Implement Rental Registration ................................ 38
        #2 Develop a Plan to Require Certificates of Occupancy
        for All Rental Property ........................................ 38
        #3 Strengthen Interdepartmental Communication on Problem Properties ..... 39
        #4 Support a Graduated Fine Structure ............................ 39
        #5 Expand Case Management of Problem Properties—
        Pending Further Study ........................................ 40
        #6 Support Landlord and Tenant Education Efforts .................... 40

*ADDENDUM ON HOME IMPROVEMENT-GENERATED PROBLEM PROPERTIES* ..... 41

*RESOURCES* ...................................................... 44
    INTERVIEWS ............................................... 44
    TECHNICAL ASSISTANCE ...................................... 44
    DOCUMENTS ................................................ 45

# *INTRODUCTION*

The existence of problem properties in the City of Saint Paul significantly affects the way citizens view their neighborhoods and the City. A problem property next door, or down the block, reduces citizens' enjoyment of their own property, as well as their sense of safety of security within their homes and neighborhoods. The swiftness and effectiveness of City efforts to eliminate such problems has the potential to bolster civic and neighborhood pride, or reduce hope for the future.

The City Council directed Council Research to conduct a study of the City's efforts to reduce the number of chronic problem properties. In order to fully address Council questions, this report has been divided into three sections:

- Nature of Chronic Problem Properties
- Current City Policies and Procedures
- City's Policy Options.

*The Nature of Problem Properties* will discuss the potential sources of problems affecting these properties, as well as the factors that may contribute to the creation of problem properties. *Current City Policies and Procedures* will outline how problem properties are identified, the role of the code enforcement agencies, the enforcement options available to them, the possible outcomes of the City's interaction with these problem properties and programs that act to prevent problem properties. *Policy Options* presents an array of policy alternatives targeted at further reducing the number of problem properties in Saint Paul, based on the policy's potential effectiveness, cost, efficiency, and equity. This study is intended to be comprehensive, and provides a systematic overview of the topics covered. It is primarily focussed on occupied residential chronic problem properties.

Clearly, a chronic problem property is a property with which the neighborhood and City have struggled over a long period of time. However, the character of the problems encountered can be extremely varied. To further complicate the issue, what may be viewed as a problem property by one neighbor, tenant, or landlord, may not be viewed as a problem by others. Additionally, a property defined as a chronic problem in one neighborhood, may not be a problem in another. For purposes of this study a *problem property* is one which

   1)    disrupts or threatens the peace, health and safety of the community, or

2)      constitutes a nuisance or an eyesore and is dilapidated or deteriorated, or

3)      creates an attractive nuisance which is an abode for criminal activity, or

4)      is not maintained adequately and does not conform to minimum health and housing laws.

And, therefore, a *chronic problem property* is one which does any of these on a "regular" basis, or repeatedly.

This is a somewhat vague definition of a phenomenon affecting many neighborhoods and properties in Saint Paul. The types of code violations for these properties may be the same time and again, or they may vary. However, it is important to acknowledge that these problems are most appropriately defined by those directly affected.

Based on this definition it is difficult to assess the number of chronic problem properties in the City. On the narrow end of estimates are those ten to fifteen properties identified monthly for interdepartmental action by the Informational Exchange Group.[1]  Toward the upper end are estimates based on a sample of one month's activity from the Information and Complaint database where 6%, or 162, of the properties for which the City received calls for service had four or more such calls over the course of a year. In addition, the Police Department's FORCE Unit estimates there are approximately 250 problem properties it is aware of at any given time. It is clear from the research conducted in the preparation of this report that chronic problem properties are located throughout the City. However, there does seem to be a tendency for these properties to cluster in some areas. Other statistics which help to gauge the scope of chronic problem properties in the City are discussed throughout this study.

## Methodology

Several types of research methods were used in the preparation of this study. These include:

●       extensive interviews with City staff working both directly and indirectly with chronic problem properties;

●       literature searches of professional and legal journals, and newspapers;

---

[1]      A group of City staff and community agency representatives which meets monthly to share information on problem properties, and devise strategies to confront those problems.

- reviews of City codes, policies, and procedures affecting chronic problem properties;
- interviews with national experts in the field of existing housing inspection;
- statistical analysis of a sample from the City's Information and Complaint database;
- reviews of Public Health, Fire Prevention and Police Department/FORCE unit policies, procedures, and lists of problem properties;
- site visits to case managed problem properties City-wide;
- case studies of three chronic problem properties; and
- reviews of City documents describing housing and housing conditions in Saint Paul.

# THE NATURE OF PROBLEM PROPERTIES

The reasons chronic problem properties develop are varied. If a property becomes a chronic problem to its tenants, neighbors or others, it typically has more than one dynamic in action. This section will focus on sources of problems associated with chronic problem properties, and the factors that contribute to their creation. An extensive review of available literature on the topic of chronic problem properties and on repeat housing code violations yielded little insight into why properties become chronic problems. Therefore, this section is based largely on local data, wisdom and perceptions.

In order to adequately outline the elements that describe and give rise to chronic problem properties, this section is divided into six subsections. The first provides three brief case studies describing the history of the City's interaction with three chronic problem properties.

## THREE CASE STUDIES

### 7XX East Sixth Street

This property, located in the neighborhood of 3rd and Maria, is a two-story home with a detached garage. It has been a rental property since the current owners purchased it in the mid-1980s. The owners bought this property as an investment, with the intention of remodeling it and later selling it. The first tenants rented the house for less than a year, and moved out owing rent. The next tenant, remained for five years, was a middle-aged man whose adult daughter lived with him periodically.

The City first became aware of problems at the property in 1990 when neighbors requested the City look into a problem of used tires and debris littering the yard. Over the course of the next several years the City responded to numerous complaints on the property, resulting in at least 12 orders to remove debris from the yard. The property was cleaned up to the satisfaction of the inspectors many times, only to become garbage and debris-ridden again. The tenant appeared in district court, charged with failure to maintain the exterior of the property, and was fined $700, of which $500 was suspended with the stipulation the yard be cleaned up.

The resulting contacts by the Public Health Division with the owner led to little improvement in the situation. The owner had several contacts with the tenant regarding the tires and other debris in the yard. The tenant maintained that the debris was related to his livelihood as he was a scrap-metal recycler, salvaging parts from old refrigerators, stoves and the like.

The City's scrutiny of the property increased during the summer and fall of 1993 when it finally became a case-managed property. In July 1993, the electricity was shut off and the building was subsequently condemned. However, the condemnation was soon lifted when the electrical bill was paid by the tenant. In September, the owner was tagged for failure to maintain the exterior of the property and failure to post ownership. This tag resulted in the owner appearing in housing court, paying $25 in court costs, and being assessed a $100 fine suspended on the condition there would be no "same or similar" episodes for one year.

In December of 1993, the owner was tagged once again for failure to maintain the exterior of the property, not only for yard debris, but also for the condition of the exterior of the house. The owner was summoned into Housing Court again in January 1994. Because of the problems associated with squirrels in the attic a six-month continuance was allowed to provide time to fix the property. The owner was also fined $200, of which $100 was suspended. The owner was not asked to pay the $100 suspended fine assessed two months earlier.

The insurance company inspected the property in February of 1994 and canceled the owner's policy, stating it would not reinsure the property until the current tenant vacated. At this point, the owner became convinced of the need to enter the property for inspection, not only because of the insurance issue, but also because the tenant was delinquent in rent payments. Operating on information the owner reportedly received from a tenants' organization and the county sheriff's office, the owner felt prevented from legally entering the property.

With assistance from the Public Health inspector, the owner was able to gain entry

into the house. It was immediately apparent that the debris and garbage removed from the exterior of the property over the years, had simply been relocated into the house. It was also clear the tenant had not been there for some time. Most of the rooms were impassable because of the accumulation of old motors, tires, cat feces, cans, diapers from the daughter's baby, and other garbage. The house was condemned and posted on the spot.

The house became a registered vacant building, and the owner endeavored to clean and fix the property. In all, some 200 cubic yards of garbage was removed. Thousands of dollars in damage was done to the walls, floors and carpeting. The house is now remodeled and rented out to a new tenant.

## 3XX South Saratoga Street

This property was a small one story house, located on the back of the parcel adjacent to the alley, in the Randolf and Snelling neighborhood. It was occupied by the owner for over 20 years.

The City began interacting with this property as a result of complaints by neighbors of garbage piling up. In May of 1990, the situation was summary abated (for discussion of summary abatement see page 20). Neighbors filed several police reports from January through March of 1991 because of the owner's behavior. They said the owner would become inebriated, and verbally abuse them, yelling obscenities. The owner is also reported to have stood on the roof of the house to yell.

During the summer of 1993, the City received numerous complaints of ongoing problems with junk cars, brush and garbage piles on the property. These problems were also summary abated, and finally cleaned up. In October, Public Health inspectors explained to the owner the roof, foundation, and floor joists were unsound, and in need of repair. Inspectors noted, although the owner was cooperative, he was vague and noncommittal about cleaning up and repairing the property. He also consistently did the minimum required to pass inspection. Inspectors were not admitted into the house, so no assessment of internal conditions was possible. This property began to be case managed by Public Health in January of 1994.

Behavioral problems continued throughout the spring and summer of 1994. Neighbors described how the owner terrorized them by repeatedly blocking their garage with his truck, verbally abusing them, and urinating on their garage.

Exterior property violations also continued, and he was again summary abated for brush and garbage piles. Inspectors continued to talk to him about the unsound

condition of the house, and the owner relayed plans for rehabilitating it. In one such discussion in mid May, the inspector gained entry to the house while the owner was showing him how he was going to fix it. The inspector found numerous code violations as the house was filled with garbage, plumbing fixtures were broken or inadequate, and floor boards in the bedroom had broken, leaving the ground exposed. The house was immediately condemned, and ordered vacated by June 1, 1994.

Problems continued until the owner moved, and in late May, the Fire and Police Departments responded to neighbors' calls for service to put out a bonfire started by the owner in a brush pile. In late June, the structure became a registered vacant building. It was demolished in late 1994.

## 7XX Third Street East

This five-unit building shows progressive deterioration typical of many chronic problem properties. Reviewing the complaints on this property reveals safety and health violations over the years, but does not explain why they occurred. In fact, many of the problems arose as a result of one tenant's reported drug-dealing activities.

This property has required a high level of City service over at least the last five years. Records indicate complaints about the property included the lack of smoke detectors, fire extinguishers, and poor heating and lighting. As time went on, the interior of the building began to deteriorate. Peeling paint, chipped and dilapidated plaster, broken windows, and a general lack of cleanliness, were cited through 1993. At this time the ceiling was falling through, garbage was prevalent throughout the units, and insects had infested the interior. In all, there have been twenty complaints about this property since 1988 — about three per year. The building was inspected twenty-three times between 1988 and 1995.

By 1994, a suspected drug dealer moved into the building. Over the course of several months, tenants in the other four units left the building one by one because they were afraid of the illegal activities, and potential violence. The owner had long neglected the property, failed to screen tenants, and made very minimal repairs. The end result was a deteriorated building that, in all likelihood, housed criminal activities.

On August 31, 1994 as a result of inspection for the renewal of a Certificate of Occupancy, the building was condemned and ordered vacant. It has been a registered vacant building since September 1, 1994. In late 1994, the owner donated the building to a neighborhood housing group which resold the property to a local developer. The developer is rehabilitating the property into a single family home.

## THE RANGE OF PROBLEMS

In the course of research for this study, many different reasons for the creation of problem properties came to light. Professionals in the field who interact with chronic problem properties on a regular basis emphasize the variety and interplay of the dynamics at work. These issues can generally be broken into the categories listed below.

**Social Issues:**
chemical dependence, and alcoholism
poor parenting skills
decline of family structure
despair/depression
poverty/lack of living wage jobs
concentration of race and income groups geographically
aging-in-place population

**Prevention & Property Maintenance Issues:**
lack of financial resources to do necessary repairs
incompetence of owner-occupant, landlord/management, or tenant
poor housekeeping skills
poor or no tenant screening
lack of individual responsibility
overcrowding

**Neighborhood Dynamics Issues:**
increasing sophistication of both tenants and landlords at "beating the system"
changing urban population and expectations
interplay of housing conditions and property values
affect of one problem property on a nearby "borderline" property ("broken
          window" theory of urban decay)
age and condition of housing stock generally
absentee landlords

**Crime & Violence Issues:**
violence
drug activity
domestic abuse
owner loss of control to gangs, and illegal activities
vandalism

The City has a limited ability to influence many of these causes of problem properties. Therefore, the remainder of this section will focus on expanding the discussion of those issues which both characterize chronic problem properties and may influence City policy discussions.

## OWNERSHIP CHARACTERISTICS

The ownership characteristics of chronic problem properties give insights into the types of problems City agencies must respond to, and the types of policy options that are most appropriate to handle these problems. '

Overall, interview and sample data indicate that problems associated with these properties may be attributed to owner-occupants, tenants and landlords, in roughly comparable proportions. Tables 1 and 2 show the source of problems by ownership and structure type. Public Health, which is responsible for single family and duplex structure compliance with property maintenance codes, indicates the chronic problem properties they handle are roughly equal in terms of owner occupied property to rental property. Generally in the case of rental property, the landlord is responsible for property maintenance, although there is a perception tenants are responsible in equal measure for property maintenance code violations. This concept is reinforced by Fire Prevention perceptions of problem sources.

Table 1. Source of Problem based on Ownership Pattern: Estimates from Interviews

|  | Owner Occupant | Landlord | Both Landlord and Tenant | Tenant |
|---|---|---|---|---|
| Case Managed Properties[2] | 50% |  | 50% |  |
| Public Health | 55% |  | 45%[3] |  |
| Fire Prevention |  | 60-70% | 20-25% | 5-10% |
| Citizen Services | 10% | 10% | 70% | 10% |
| Housing Information Office |  | 25% | 60% | 15% |

[2]   Based on an actual count of case managed properties.

[3]   Of which 90% is landlord responsibility, but actual cause of problems is estimated to be closer to 50/50.

Table 2. Source of Problem Based on Structure Type

|  |  | One Unit Building | Duplexes | 3+ Unit Bldg. |
|---|---|---|---|---|
| I & C[4] | N=162 | 72 | 59 | 31 |
| IEG[5] | N=12 | 1 | 2 | 9 |

It appears that rental property accounts for a somewhat disproportionate share of chronic problem properties.. Data on the number of housing structures, by type appear in Table 3.

Table 3. Saint Paul Housing Units, 1990

|  | Owner Occupied |  | Rental |
|---|---|---|---|
| Single family detached[6] | 52,036 |  | 3,683 |
| Single family attached[7] | 1,513 |  | 1,793 |
| duplex | 3,243 |  | 7,145 |
| three+ units | 2,292 |  | 37,489 |
| mobile home | 15 |  | 12 |
| other | 372 |  | 656 |
| Total | 59,471 |  | 50,778 |
| Total Occupied Residential Units |  | 110,249 |  |
| Total Vacant Residential Units |  | 7,344 |  |
| Total Residential Units |  | 117,583 |  |

Source: 1990 U.S. Census

---

4     I&C sample is the listing of properties from January 1994 which had four or more different complaints logged during the course of 1994. The sample was drawn from the I&C database at Citywide Information Services.

5     Informational Exchange Group property sample is its February 1995 list of properties. See page 18 for discussion of Informational Exchange Group

6     A detached family home does not share a parcel.

7     An attached single family home shares a parcel with other single family homes, such as a condominium.

## CRIMINAL AND BEHAVIORAL CHARACTERISTICS

It is apparent that there is significant overlap between properties identified as problems by those responsible for property maintenance code enforcement and properties that require multiple calls for service from the Police Department. The case studies at the beginning of this section describe behavioral and criminal problems that complicated and exacerbated the already existing housing code violations. Table 4 provides data on those chronic problem properties which have had five or more calls for service from the Police Department during the course of 1994. Overall, 6,867 properties Citywide (including residential, commercial and industrial addresses) had five or more Police calls for service during 1994.[8]

Table 4. Police Calls for Service in Selected Problem Properties

| | Number Properties | Number and Percentage 5 or More Police Calls for Service | |
|---|---|---|---|
| I&C Sample | 162 | 88 | 54% |
| IEG Sample | 12 | 9 | 75% |

The fact that there is such a high proportion of overlap demonstrates that a relatively small number of properties use a high level of City resources. It also gives insight into the character of chronic problem properties, and the policy options and enforcement techniques that are most appropriate to combat the problems.

## PROPERTY AND NEIGHBORHOOD DYNAMICS

There are several levels of dynamics at work in neighborhoods which can act to prevent or encourage the creation of chronic problem properties. At the first, most basic level, is individual responsibility for maintaining property. Responsibility for the proper upkeep of a property is key. Typically, by the time a property becomes a chronic problem, the owner-occupants, landlord, or tenant is aware of what the pertinent code violations are. They have, however, willfully chosen to ignore it, or are willing to repeat it through their own inaction. This is the single characteristic common to all chronic problem properties.

---

[8] Of those properties having five or more calls for service, the average number of calls per property was twenty.

Another level of neighborhood dynamics is the role of "peer pressure." This plays itself out in both positive and negative ways. For example, if your neighbors paint their house, you are much more likely to reflect on whether your house or fence needs painting. Similarly, investments in neighborhood infrastructure, such as improved streets and lighting, can spur the clean-up of a neighborhood. However, if there is a problem property next door or down the street, you are much less likely to view your own property's upkeep as a priority.

Existing research suggests there is a strong connection between housing conditions and market perception of increasing or decreasing property values in neighborhoods. This connection was outlined by research on an extensive survey of Boston housing conditions and property sales prices. It concluded that there is a definite need to tailor city and neighborhood strategies to a specific neighborhood's dynamics. An example of this theory is that a home owner located in a neighborhood with declining property values, and properties needing moderate repairs will likely act on some of these concerns:

- Home sales based on fear of change;
- Arterial or industrial blight; and/or
- Racial fears.

Further, the research suggests that appropriate strategies for revitalization of such neighborhoods are to:

- Special home loan funds;
- Tax incentives for repairs;
- Thorough code enforcement;
- Demolish excess housing;
- Procure value insurance;[9]
- Enforce quotas on occupancy; and/or
- Provide neighborhood housing services if requested.

It is important to note that the City of Saint Paul currently has policies in place which address most of the strategies outlined.

---

[9] A provision whereby buyers are insured if their property drops in value from the time of purchase to the time of sale.

## PROJECTIONS FOR THE FUTURE

Returning again to the list of factors that may contribute to the creation of chronic problem properties from page 7, we see that many of these factors are on the rise. Staff in Planning and Economic Development state that it is difficult, if not impossible, to gauge the influence of each of the factors, on the number of chronic problem properties. However, given the incremental changes in homestead/rental property, slight decreases in property values, aging housing stock, crime rates, and so on, we may conclude that the City will be facing a stable or slightly greater number of chronic problem properties in years to come. Therefore, it is critical that the City use the resources available to it in the most efficient and cost-effective way possible.

# CURRENT CITY POLICIES AND PROCEDURES

The City has a number of policies, laws, procedures and departments that come into play on chronic problem property issues. This section will divide these into the following components, or phases of activity:

| | |
|---|---|
| Phase I: | Identification of Chronic Problem Properties |
| Phase II: | City Verification of Code Violation(s) |
| Phase III: | City Action |
| Phase IV: | Outcomes |

The diagram on the following page provides a schema for the reader. Notably, the City also has programs in place which act to prevent the creation of chronic problem properties. These will be discussed at the end of this chapter.

## Saint Paul Property Maintenance Code Violation Policies and Procedures



1995 Council Research Graphics

## PHASE I:  IDENTIFICATION OF PROBLEM

The initial identification of a problem usually happens long before a property may be considered a chronic problem.  This initial identification of a problem on or in a property almost invariably falls to neighbors and tenants.  Although they may not be aware that the problem they are experiencing is a code violation, they are the voices that alert the system to look more closely at a property or situation.  Often one person calls on behalf of several.  There are several contacts these people can make in order to relay information to appropriate City staff.

At the neighborhood level, people may first contact their Block Club, District Council, or neighborhood association.  This contact allows information to be shared about City procedure, and any past experiences the organization may have had with that property or situation.  These organizations also often have staff or volunteers who are familiar with "the system" and can alert the appropriate City staff of a potential code violation.

At the City level, this type of call for service will typically go to the Office of Citizen Services, or to an enforcement department.  Of the estimated 40,000 calls Citizen Services receives annually, there are approximately 25,000 are calls for service, more than half of which (14,000-15,000) are housing and nuisance code-related. Information gathered in calls is routed to the appropriate enforcement agency, either Public Health for one and two-unit structures, or Fire Prevention for three or more unit structures.  The Information and Complaint database used by Citizen Services and the enforcement departments allows the City to track a number of variables, including the number of calls for individual properties, and the inspector's findings. The enforcement agencies may also identify problems, either through direct knowledge or citizen input directly to them.

Chronic problem properties are identified through a combination of the enforcement department's history with a property, and ongoing neighborhood concern.

## PHASE II:  CITY VERIFICATION OF CODE VIOLATION(S)

The City must verify that complaints received are actual code violations, which in almost all cases requires an inspection.  Response time to individual complaints varies based on the enforcement department's current work load and the type of complaint. For example, a life-safety complaint, such as "no heat" will under almost all circumstances elicit a same-day response from the enforcement department.  Other complaints are generally handled in two to three working days, although for less

serious issues, such as "tall grass and weeds," there may be up to a five day response time.

The City does receive housing and nuisance-related complaints that: 1) are not code violations; 2) were corrected before an inspector reviewed the situation; or 3) were unfounded. In such cases, a note is made in the file and in the Information and Complaint database which explains the circumstances, and that no action was required at the time.

Both Public Health and Fire Prevention work with the goal of maintaining minimum health and safety standards for housing. Their main goal is overall code compliance. Code compliance may be gained by simply informing the owner of the code violation, or it may require the use of correction notices, citations or summary abatement procedures. The choice of the best enforcement option for any given situation is usually left to the discretion of the individual inspector, although both enforcement divisions have policies which provide guidelines on most of the issues encountered.

## Public Health

The Code Enforcement Section of the Division of Public Health enforces minimum housing and health requirements on all one and two family homes, and on all exterior residential property. Public Health also issues correction notices, summary abatement actions, violation citations, and condemnations/orders to vacate. These procedures are described on pages 19 through 22.

The Code Enforcement Section of Public Health currently operates with 15 inspectors in three functional areas: interior, exterior, and vacant building inspections.[10] Staff responded to 12,290 calls for service in 1994, which is up from the past two years, when there were just under 11,000 calls for service. In 1994 they also conducted 36,492 inspections and reinspections. This is up significantly from the past two years. There were 31,900 inspections and reinspections in 1992, and 22,920 in 1993.

Table 5. Public Health Staffing and Inspections, 1994

|                       | Staffing | Number of Inspections |
|-----------------------|----------|-----------------------|
| Interior and Exterior | 8        | 28,363                |
| Vacant                | 4        | 8,129                 |
| Total                 | 12       | 36,492                |

---

10    Staff assignments fluctuate based on workload.

## Fire Prevention

The Fire Prevention Division enforces minimum housing and health requirements, and fire code requirements on all commercial property, and residential buildings which are three units or larger. All buildings in these categories must have a Certificate of Occupancy (C of O) verifying that minimum code requirements have been met. There are currently 8,037 structures with Certificates of Occupancy. Of these, 3,200 are residential and 470 are mixed use. Fire Prevention also issues correction notices, violation citations, and condemnations/orders to vacate.

The Saint Paul Legislative Code Chapter 33.05 requires every building or structure, other than one and two-family dwellings, to have a Certificate of Occupancy issued by the Division of Fire Prevention and posted on the premises. Certificates have been required on newly constructed buildings since 1953. In 1956 the City Council passed Ordinance No. 13436 requiring Certificates on existing buildings. Before a building can be certified, it must be inspected by the Division and found to conform to the requirements of the Fire Code, the Zoning Code, the Housing Code, and the Building Code at the time of construction or at the time of conversion to its present use.

Certificates of Occupancy for residential structures are renewed on a two-year cycle; commercial structures are renewed on a one or two-year cycle based on whether the building and its use are considered to be a high or low fire hazard. Smaller structures are inspected in their entirety, while larger residential buildings will have at least 25% of their units inspected.

There are currently 16 inspectors in the Division of Fire Prevention, about 13 of whom conduct C of O inspections. In 1994 staff conducted 6,100 inspections and reinspections, which is down from previous years. A breakdown of these inspections appears in Table 6. Fire Prevention also conducts a significant number of inspections for permits and licenses.[11]

---

[11]     The numbers of inspections and reinspections in this table are not readily comparable to the Public Health figures on page 15. C of O inspections are substantially different in character, as they are comprehensive in nature.

Table 6. 1994 Certificate of Occupancy Building Inspections

|  | Residential | Commercial | Total |
|---|---|---|---|
| C of O Inspections | 1,116 | 1,562 | 2,678 |
| C of O Reinspections | 1,833 | 1,589 | 3,422 |
| Complaint-Based Inspections | 2,318 | 1,472 | 3,790 |
| Total | 5,267 | 4,623 | 9,890 |

The City charges a fee for the service of C of O inspections, which ranges from a minimum of $75.00 to a maximum of $250.00. Reinspections are charged at a rate of only 10% of the C of O fee, and range in cost from $7.50 to $25.00. There is no charge for complaint-based inspections. C of O fees cover approximately 40% of the cost of conducting the inspections, and in 1994 generated $338,000.

Table 7. Fee Schedule for Certificates of Occupancy

|  |  | Minimum | Maximum |
|---|---|---|---|
| Residential | $9.00 per unit | $75.00 | $250.00 |
| Commercial | $7.00 per 1,000 square feet | $75.00 | $250.00 |
| Reinspections | Add 10% | $7.50 | $25.00 |

## Police Department/ FORCE Unit

Much Police Department work, and many calls for police service pertain to problem properties. This is demonstrated by the large number of properties which have multiple calls for service over the course of a year. In 1994, 6,867 properties (includes residential, commercial, and industrial) in Saint Paul had five or more calls for service. The FORCE (Focusing Our Resources on Community Empowerment) Unit of the Police Department maintains an organized/formalized relationship between Public Health, Fire Prevention, and the Police Department.

The mission of the FORCE Unit is to organize and work with block clubs, neighborhood groups and the Patrol Division to identify their concerns about crime prevention and public safety issues and work in concert to develop strategies for long-term solutions.

The main goals of the FORCE Unit, in addition to cultivating community-based solutions to crime and safety concerns, are to:

- work with the community to reduce the level of drugs, narcotics, and disruptive behavior at the neighborhood level; and
- eliminate the use of substandard housing as a base for drug dealers and other illegal activities through the coordinated enforcement efforts of the FORCE officers, and the housing inspector.

This is partially accomplished through the aggressive enforcement of housing code violations against drug dealers and "crack houses" to eliminate cheap and substandard housing as a haven for drug activities in neighborhoods, and work with landlords to better screen tenants and eliminate disruptive behavior.

The FORCE Unit is staffed by approximately 24 officers, 6 crime prevention coordinators and officers, 3 sergeants, and one housing inspector. There were 138 properties inspected in conjunction with FORCE activities in 1994, and of these 78 had condemnation procedures associated with these FORCE warrants in 1994.

## Informational Exchange Group

The Informational Exchange Group (IEG) is a cross departmental group of City staff and community representatives who meet monthly to share information on problem properties. Included in these discussions are representatives from:

- Fire Prevention
- Public Health
- Police Department/Crime Prevention Staff & FORCE
- Public Housing Agency
- Citizen Services
- LIEP/Zoning
- Planning and Economic Development
- Community Stabilization Project
- Tenant's Union

The IEG provides a forum where contacts in other departments can be established. The group discusses approximately 12-15 properties monthly, and the individual departments share their experiences and history with the properties.

## PHASE III: CODE ENFORCEMENT OPTIONS

### The Legislation

The code enforcement options available to the City of Saint Paul are based on the City's Legislative Code, or on Minnesota Statutes and regulations. Most enforcement actions taken by the City are based on the police powers which allow the City to enact laws to protect the health, safety and welfare of its citizens. A summary of the laws and regulations which guide the inspection process appears in Table 8.

**Table 8.** Legislation Governing Certificate of Occupancy and Public Health Inspections

| Saint Paul Legislative Code Chapters | | Minnesota State Legislation and Regulations |
|---|---|---|
| 18: | Board of Appeals and Review | Uniform Building Code |
| 19: | Powers of Inspectors to Enforce Provisions of Code | Uniform Plumbing Code |
| | | Uniform Mechanical Code |
| 29: | Unlawful Use of City Property | Uniform Fire Code |
| 33: | Building Code and Inspection | National Electric Code |
| 34: | Minimum Housing Standards for Dwellings and | Minnesota State Energy Code |
| | Multiple Dwellings (Housing Code) | Asbestos Hazard and Emergency |
| 35: | Rental Disclosure Posting | Response Act (AHERA) |
| 39: | Smoke Detectors | Dangerous and Nuisance Buildings |
| 42: | Filling of Cesspools and Septic Tanks | State Energy Code |
| 43: | Vacant Buildings | Minnesota Pollution Control Agency |
| 45: | Nuisance Abatement | (MPCA) Regulations |
| 60-67: | Zoning Code | |
| 105: | Care and Maintenance of Boulevard | |
| 113: | Snow and Ice on Sidewalks | |
| 163: | Abandoned Vehicles | |
| 189: | Truth in Sale of Housing | |
| 198: | Keeping of Animals | |
| 290: | Use of Deception to Enter Residence | |
| 292: | Offenses Directed to Religious Beliefs and | |
| | Racial Origins (Graffiti) | |
| 334: | Pest Control | |
| 357: | Solid Waste | |

### Owner Warning

If complaints are substantiated by inspectors, there are a range of options available to encourage correction of code violations. Warning an owner is the least forceful option available, but in some cases it is sufficient to get code compliance. Owners are warned of violations in about 5% of cases.

### Correction Notice

A correction notice is normally issued when a code violation is found. The property in violation of the code will then be reinspected to determine if the violation was corrected. If the violation has not been corrected, the inspector may issue a citation to the property owner.

### Summary Abatement

The Summary Abatement process is outlined in the Nuisance Law, Chapter 45 of the Legislative Code. It works to eliminate public health and safety nuisances such as tall grass and noxious weeds, unshoveled snow on public sidewalks, abandoned motor vehicles, broken sewer lines, dilapidated garages, etc. It also boards up vacant buildings. This process is overseen by the Division of Public Health. The Division of Parks and Recreation conducts the majority of summary abatements, and the Thomas-Dale Block Club conducts the remainder of the abatements.

The process for summary abating a property begins when an inspector issues work orders for a code violation. At that point the owner must clean-up or fix the code violation within a specified number of days[12] or the City will abate the violation. There are new procedures within the Department of Public Health whereby a pre-authorized work order is issued. Using this process, the "clean-up" or abatement crew is sent to the property at the end of the compliance period. The crew will then determine if the code violation was abated, and if it was not, they will do so. Normally the inspector closes the file at the point a pre-authorized work order is issued, unless the property is being monitored as a case managed property.

The summary abatement process is very effective for quick removal of nuisances, but it does very little to prevent or discourage future violations. Of all properties which were summary abated in 1994, approximately 15% were abated two times in the course of the year. Of the 1,105 properties listed in the summary abatement logs at

---

[12]    Four to ninety days based on the type of violation.

Public Health listed in Table 9, 60% required City clean-up. The average cost of the clean-up was $306.

Table 9. 1994 Summary Abatements

| Number of Summary Abatements Issued | Number of Properties |
|---|---|
| 1 | 948 |
| 2 | 120 |
| 3 | 31 |
| 4 | 6 |

City costs for the abatement procedures are assessed to the property owners real estate taxes. These costs are generally recouped through the use of this mechanism. In 1994 the City spent $331,000 for summary abatement clean-ups. These expenses are based on the summary abatement of the following violation categories:

- 1,498 nuisance and hazard
- 317 snow shoveling
- 6 broken sewer lines
- 211 vehicles towed

Currently an owner will be assessed $115 per hour for grass cutting, based on the City's contract with the Thomas-Dale Block Club. The owner will also be assessed $25 for processing by the Finance Division, and a $15 service charge from the Public Health Division.

## Citation

Citations are one of the strongest tools available to inspectors to achieve code compliance. Typically other enforcement options are tried, or consciously rejected before an inspector issues a citation. Most citations are based on violations of the building , housing and zoning chapters of the Legislative Code. Table 10 shows the number of citations issued by Fire Prevention and Public Health from 1992-1994.