Public Health listed in Table 9, 60% required City clean-up. The average cost of the clean-up was $306.

Table 9. 1994 Summary Abatements

| Number of Summary Abatements Issued | Number of Properties |
|---|---|
| 1 | 948 |
| 2 | 120 |
| 3 | 31 |
| 4 | 6 |

City costs for the abatement procedures are assessed to the property owners real estate taxes. These costs are generally recouped through the use of this mechanism. In 1994 the City spent $331,000 for summary abatement clean-ups. These expenses are based on the summary abatement of the following violation categories:

- 1,498 nuisance and hazard
- 317 snow shoveling
- 6 broken sewer lines
- 211 vehicles towed

Currently an owner will be assessed $115 per hour for grass cutting, based on the City's contract with the Thomas-Dale Block Club. The owner will also be assessed $25 for processing by the Finance Division, and a $15 service charge from the Public Health Division.

## Citation

Citations are one of the strongest tools available to inspectors to achieve code compliance. Typically other enforcement options are tried, or consciously rejected before an inspector issues a citation. Most citations are based on violations of the building , housing and zoning chapters of the Legislative Code. Table 10 shows the number of citations issued by Fire Prevention and Public Health from 1992-1994.

Table 10. Citations

| Year | Public Health | Fire Prevention* |
|------|---------------|------------------|
| 1992 | 232 | 189 |
| 1993 | 574 | 66 |
| 1994 | 405 | 66 |

Table includes FORCE citations.
* These figures are for residential structures only.

A review of Public Health logs of citations issued in 1994 indicates that 354 properties received 412 citations. Thirteen percent of the properties cited received two or more citations in 1994. This figure is similar to the 15% of properties which were summary abated two or more times in 1994.

## Condemnation

Condemnations are used as an enforcement option in cases where the inspector finds the housing unit is unfit for human habitation. Chapter 34.23 of the Legislative Code outlines the reasons why a dwelling may be condemned. These reasons include lack of basic facilities, such as heat or water, or severe rodent infestation. Any residential structure or residential unit which has been condemned or placarded as unfit for human habitation must be vacated by the date specified in the condemnation order and on the placard.

Condemnations of this sort are grounded in the police powers which protect the health, safety and welfare of citizens.[13] City condemnations are usually pursued based on Legislative Code Chapters 43, 45, the Building Code or Fire Code. Data on condemnations over the past three years appear in Table 11.

---

[13]   Often, the use of the eminent domain is referred to as condemnation. Eminent domain is a different concept. Its use is based on the Fifth Amendment, and it requires compensation. In both cases the City is acting in the public interest.

Table 11. Condemnations

| Year | Public Health | Fire Prevention* |
|------|---------------|------------------|
| 1992 | 247 | 138 |
| 1993 | 364 | 99 |
| 1994 | 299 | 100 |

Table includes FORCE citations.
* These figures are for residential structures only.

## PHASE IV: OUTCOMES

There are a number of outcomes possible after City uses any of its enforcement options. Clearly the best outcome is to have the property brought into code compliance. However, there are often other outcomes, and further City action required. These outcomes are discussed below.

### Housing Court

Ramsey County Housing Court was started as a pilot project with state support in 1990. Since that time it has been made permanent, and has maintained its state support. Approximately 95% of Housing Court cases are from the City of Saint Paul.[14] Housing Court referees hear three types of cases: 1) conciliation court cases-generally tenant/landlord disputes; 2) Evictions-through the unlawful detainer process; and 3) housing code violation cases. A breakdown of cases heard by housing court over the last five years appears in Table 12.

---

[14]     Joseph Gockowski, Ramsey County Civil Division Court Administrator.

Table 12. Housing Court Cases Filed in Ramsey County, 1990-1994

| Year | Number of Housing Court Cases Filed | | |
|------|-------------------|-----------|---------------------------|
|      | Conciliation Court | Evictions | Housing Code Violations |
| 1990 | 490 | 4,527 | 576 |
| 1991 | 699 | 4,976 | 672 |
| 1992 | 518 | 4,487 | 620 |
| 1993 | 795 | 4,239 | 795 |
| 1994 | 422 | 4,348 | 658 |

Housing Code violations are prosecuted in Housing Court by the City Attorney. The goal of the City Attorney's office for these cases is swift accountability for violations —housing code compliance is viewed as a result of this accountability. Violations of the Housing Code are criminal cases, and are prosecuted as petty misdemeanors or misdemeanors, based on a determination of the City Attorney. The City Attorney may also make recommendations about appropriate fine levels, or in rare cases, imprisonment. Fines are collected by Ramsey County for code violations, and are generally perceived to not cover the cost of operating the Housing Court. Table 13 shows the revenues generated by fines over the last four years.

Table 13. Revenues from Housing Court Fines

| | |
|------|----------|
| 1991 | $17,531 |
| 1992 | $15,276 |
| 1993 | $9,690 |
| 1994 | $17,833 |

A person charged with a housing code violation will have a pre-trial conference with the City Attorney and housing inspector. Violators also have the option of opting out of Housing Court and going to district court, although most choose Housing Court. There are no statistics or studies available as to the effectiveness of housing court at eliminating future violations.

## Revocation Of Certificate Of Occupancy

If a building is required to have a Certificate of Occupancy (C of O),[15] and is found to be repeatedly or consistently in violation of the applicable sections of the Legislative Code, the Fire Marshall may revoke the building's C of O. Because a building covered by the C of O requirement must have one in order to be habitated, such a revocation would close a building for use. There were ninety-one revocations of Certificates of Occupancy for residential buildings in 1994. This figure is down from past years, as there were 130 such revocations in 1993, and 270 in 1992. The decreasing numbers of revocations are reportedly due to increased code compliance for this type of structure.

## Registered Vacant Buildings

The registered vacant building program established in 1991 provides a mechanism whereby abandoned, condemned or otherwise vacant buildings may be tracked and monitored. Chapter 43 of the Legislative Code specifies that owners must register vacant buildings within thirty days of their having become vacant. There is a $200 annual fee for registration of a vacant building.[16] The owner is responsible for keeping the building secure, and providing the City a plan and timetable for returning the building to suitable occupancy or use, and/or for the demolition of the property. If an owner wishes to rehabilitate the building, a $2,000 deposit is required before a building permit will be issued. There were 485 registered vacant buildings in 1994, 69 of which were demolished, and 230 of which were rehabilitated.

## Case Managing/Ongoing Monitoring

Public Health identifies and case manages problem properties for compliance to codes and elimination of neighborhood eyesores. The program's goal is to proactively address problematic properties which generate multiple and repeat neighborhood complaints through a coordinated program of enforcement with the Police Department, other agencies and neighborhood associations. The inspector works closely with the owner and, if applicable, the tenants, in order to bring the property into compliance with the City's property maintenance codes.

The case managed properties program is staffed by one inspector. This inspector reviews case histories, inspects the properties, formulates action plans to eliminate

---

[15]    Certificate of Occupancy is required for residential buildings with three or more units.

[16]    This fee generated $60,800 in 1994; $59,459 in 1993; $67,333 in 1992.

current and probable future violations, meets with the owner, and performs follow-up enforcement actions. There has been no evaluation of this program to determine its effectiveness, but anecdotal information favors this approach.

## Problem Remains

Regardless of the enforcement option applied, it is always possible that a property will remain a problem by not correcting the code violation. In such cases, the City must pursue more or different code enforcement tools. For example, if the owner does not abate the code violation after having received a correction notice, a citation would be issued. This dynamic is common to chronic problem properties. Typically such properties remain in "the system" until the violation is corrected.

A more insidious problem is presented by owners who correct the code violation when notified, but allow the problem to recur. In such cases the affected neighbors or tenants must once again initiate action by calling the City for service. Chronic problem properties often fall into a pattern of repeat violations over the course of months or years. Consequently, the City's staff end-up making inspections of a property time and again for the same or similar code violation problems.

# PREVENTION TOOLS

The City has many programs that may fall into the category of "property maintenance code violation prevention." Indeed, the issuance of a citation may fall into this category. The programs described in this section address legal action, community action, proactive enforcement, and financial incentives to do repairs.

An ongoing problem in the correction of code violations is the overall lack of money to do the necessary repairs. In the case of rental property, there may be insufficient cash flow generated by the property to economically justify the necessary improvements. In the case of owner-occupied property, a combination of neighborhood dynamics[17] and low income may prevent repairs. Because of these issues, most of the prevention tools discussed are targeted at financing the repairs necessary to bring properties into compliance with the applicable codes.

The programs and initiatives described below are not a comprehensive listing of code violation prevention efforts. They represent a selection of those perceived to be key in the City's efforts to reduce and eliminate the potential creation of problem

---

[17]    See discussion of neighborhood dynamics on page 10.

properties. While most of the programs are City initiatives, state and community-based efforts are also included.

## Rental Tax Equity

Rental Tax Equity is a program which provides owners of single family and duplex rental properties with a lower homestead tax rate in exchange for improvements in their properties. It is administered by the City's Housing Information Office. Rental Tax Equity was a pilot program in 1994, and the City Council requested the Minnesota Legislature to continue the program for another year. The program certified 433 rental properties to receive this tax credit, 90% of which made repairs. The average estimated tax credit per property was $1,160, and the average amount spent on repairs was $1,138.

## Houses to Homes Program

The Houses to Homes program targets vacant houses for improvement, as well as vacant lots for new construction. This program is administered by the Planning and Economic Department's Housing Division. Properties are improved and resold for home ownership after they are acquired, and rehabilitated. The program also calls for houses to be demolished when necessary.

The Planning and Economic Department has expended $4,237,670 to address 143 properties over the last four years. Values of vacant houses, before rehabilitation or demolition ranged from $12,000 to $35,000. After rehabilitation values increased from $57,000 to $85,000. Values on vacant lots ranged from $3,000 to $8,000. Development of new single family homes increased the values from $68,000 to $85,000.

## This Old House

This Old House is a statewide program which is aimed at preventing or reducing property tax increases resulting from home improvements. This Old House legislation excludes all, or a portion of, the increase in a property's estimated market value due to improvements from the taxable value of the property. The program is targeted at homes which are at least thirty-five years old at the time of rehabilitation, and assessed at less than $300,000. Owner-occupied duplexes and triplexes are also eligible.

This Old House allows for a 50% tax break on the increased value due to improvements for homes thirty-five to sixty-nine years old, and a 100% tax break on those more than 69 years old. The tax break lasts for ten years. The program has

*A Study of Remedies for Chronic Problem Properties*

been in effect since January 1993, and is administered by the County Assessor's Office.

## Housing Information Office Programs

The Housing Information Office (HIO) acts as a central contact point for housing information, education, counseling, and advocacy. The HIO has a number of initiatives which address issues common to many chronic problem properties. These are outlined below.

- *Tenant/Landlord Education*: basic information provision about the rights and responsibilities of tenants and landlords. (625 Saint Paul households reached in 1993.)

- *Code Enforcement Information*: assistance in obtaining inspections, and follow-up. (161 Saint Paul households reached in 1993.)

- *Relocation Assistance*: assistance to households displaced due to code condemnations. (511 Saint Paul households reached in 1993.)

- *Utility Shut-Off Assistance*: assistance to households to negotiate payment with utilities, and location of emergency funding. (58 Saint Paul households reached in 1993.)

- *Rehab/Home Improvement Information*: basic information provision on home improvement loans and deferred grants through the City, State, and private sector for landlords and owner-occupants. (67 Saint Paul households reached in 1993.)

## Community Stabilization Project

The Community Stabilization Project (CSP) is a Saint Paul community-based nonprofit organization which assists tenants in getting necessary repairs to their homes. The main tools used by CSP are outlined below.

- *Legal notification to landlords*

- *Tenant/landlord negotiations* represent about 80% of the work done by CSP. CSP believes it has a high success rate with this option because of the existence of Tenant Remedies Actions as an option (described below). Further, CSP has leveraged $600,000 in landlord

repairs through negotiation, because of the possibility of a Tenant Remedy Actions.

- *Tenant Remedies Action* is a legal mechanism whereby the court appoints an administrator for a property, removing ownership from the landlord, a process also known as receivership. The court administrator makes the necessary repairs to the property using money from one of several sources of money: URAP funds,[18] mortgages taken out on the property by the court-appointed administrator, or rental income generated by the property. The Community Stabilization Project has used the Tenant Remedy Action process on 21 properties.

- *Rent Escrow* is a mechanism whereby the court allows tenants to pay rent into court administered escrow account. The rent is withheld from the landlord until repairs are made.

- *Rent Abatement Process* is a mechanism whereby the court orders a landlord to pay back a tenant a percentage of rent based on the substandard condition of the rental property. Substandard property determinations are made based on code violations.

- *Legal rent withholding* is the process were a tenant (as an individual, and not through court action) withholds rent based on the substandard condition of the rental housing, as determined by code violations.

- *Facilitation with the City's code enforcement departments.*

## Neighborhood Sweeps

Neighborhood Sweeps are systematic exterior inspections of a small targeted area performed by the Division of Public Health in cooperation with the affected neighborhood. They often happen in conjunction with neighborhood "Clean-Up Days," and provide a mechanism for the proactive inspection and identification of code violations. As such, Neighborhood Sweeps are both a prevention and enforcement tool used by the City. From 1992-94 there have been 22 to 24 Neighborhood Sweeps annually.

---

[18]  URAP (Urban Revitalization Action Program) funds are state grant monies targeted for redevelopment activities. The activities and accounts are administered by the City of Saint Paul. The Community Stabilization Project has used $130,000 in URAP funds in the last four years.

# POLICY OPTIONS

There is a clear perception in Saint Paul that there are too many chronic problem properties. This chapter will explore some of the policy options available to the City to address its current chronic problem properties, and prevent the creation of future chronic problem properties. The ideas presented below are organized into the following categories.

- Rental property-specific options
- Enhanced enforcement options
- Procedural options
- Education options

These options will be discussed in terms of their concept, potential effectiveness, and estimated cost.

## RENTAL PROPERTY-SPECIFIC OPTIONS

Rental property-specific options are considered to be important because of the high levels of calls for service the City receives on rental properties. There are approximately 55,000 owner-occupied single-family homes and duplexes in Saint Paul, and 9,000 rental single-family homes and duplexes. However, rental properties account for 50% of the calls for service to these types of properties.

Rental property-specific options are popular because they target properties which account for a disproportionate share of City services. However, in terms of all chronic problem properties, one and two-unit buildings, are estimated to comprise half of the problems. Thus, rental property-specific solutions will only target a part of the problem.

### Rental Registration

Rental registration is a concept which has been discussed on and off in the City for many years. Rental registration would provide a mechanism which would require rental properties to be registered with the City. Because rental properties with three or more units are already covered by the Certificate of Occupancy Program, rental registration is usually thought of as applying to one and two-unit properties. Such a registration would provide the City with more accurate information about the property's management, or owner. Moreover, it would provide an additional enforcement option since the registration for a rental property could be revoked for

repeated code violations, in much the same manner that a Certificate of Occupancy may be revoked.

Rental registration could be constructed to require inspection prior to registering a building with the City, and also inspection on a periodic basis.[19] Alternatively, rental registration could be granted automatically, and inspections of these properties would take place based on a complaint basis, as it does now.

The cost of requiring rental registration for one and two-unit rental properties would vary based on whether proactive inspection[20] is required. If inspection is a requirement for registration, it would substantially increase the workload for the Division of Public Health. An estimated 9,050 rental properties[21] would be covered by this policy. Public Health estimates the cost for such a program to be approximately $70 per unit. These properties would require an initial, as well as ongoing periodic inspections. The advantage of this option is that rental properties would be much more likely to be in compliance with the codes. However, the cost for the City in additional inspectors could be prohibitive.

If inspection of registered rental properties is on a complaint basis, the City's costs will be limited to the administration of such a program. These administrative costs may be mitigated by rental registration fees. This option has the advantage of adding another enforcement tool—the revocation of registration, without the disadvantage of significantly higher inspection costs.

## Landlord Licensing

The idea of licencing landlords is similar to rental registration in many respects. Landlord licensing also applies to one and two-unit rental properties. The City would still need to consider whether proactive inspections or complaint-based inspections are more appropriate—and thus cost considerations are similar. Finally, landlord licensing also provides an added enforcement tool.

---

[19]    For the first several years, this would require "provisional" registration pending inspection. Inspection staff would be overwhelmed if all properties required inspection upon enactment of such a program. In Minneapolis where this type of requirement was enacted, over 80,000 units require registration. Since the program was enacted in 1991, just over 10,000 units were inspected.

[20]    Proactive inspection is regular, scheduled inspection, as opposed to complaint-based inspection.

[21]    Based on 1990 U.S. Census data.

Landlord licensing differs from rental registration in that it would require the licensing of landlords in order to conduct business in the City of Saint Paul. The implication is that repeat code violations would lead to a revocation the of a license to conduct business in the City—not just the loss of registration for one building. According to Public Health and Police Department staff, there are an estimated 30 landlords who cause the majority of problems, and these landlords control almost 1,000 units. This option has the advantage of targeting landlords who are negligent in maintaining their properties at City code standards.

A potential difficulty of this policy option is the confusion and administrative difficulty of targeting such a program only at the landlords of one and two-unit rental properties. Clearly, many landlords own this type of property, in addition to property covered by the City's Certificate of Occupancy process. A landlord licensing requirement, therefore, has the potential to create more onerous requirements for those landlords. Finally, there is the issue of equitable treatment of all properties. Using landlord licensing, the City would be taking a philosophically different approach to inspection by focussing as much on owners, as on the specific code violations of individual properties.

## Expansion Of Certificate Of Occupancy Process

An expanded Certificate of Occupancy (C of O) program would apply to one and two-unit rental properties, as does rental registration and landlord licensing. It would, by definition, involve proactive inspection of one and two-unit rental properties. Expansion of the C of O program is the most straight forward approach, should the City wish to institute a proactive inspection process for one and two-unit rental properties. This is because the City already has in place the C of O program. Additionally, recent rules changes in the State Building Code would allow one and two-unit dwellings to be covered by Certificates of Occupancy. These changes take effect March 20, 1995.

Costs are estimated to be similar to those of the rental registration program option requiring proactive inspection, i.e. $70 per unit. Again, the fee for the C of O would partially offset the added costs. As mentioned earlier, current estimates indicate that 40% of the costs of running the C of O program are recouped by C of O fees.

An advantage to using the C of O program is that it would treat all rental property in the same fashion. Disadvantages would have to do with the use of the proactive inspection approach, which is costly for both the public and private sectors.

## ENHANCED ENFORCEMENT OPTIONS

### Increased Certificate Of Occupancy Reinspection Fees

Increasing the cost of reinspection on C of O covered properties from 10% of the C of O fee (page 17) to a fee more accurately reflecting the actual cost to the City of conducting reinspections is a policy option. Current fees at the 10% rate translate to a fee of $7.50 to $25.00. An increase in fees could result in faster code compliance with correction orders, and fewer necessary reinspections. Relatedly, although no fee is attached to complaint-based inspections for C of O properties, fees could be considered for reinspections following a compliant-based inspection. Again, the fee would act as an incentive for faster code compliance, and would probably result in fewer reinspections. Notably, any fee established for complaint-based reinspections for C of O covered properties should also be considered for one and two-unit properties.

### Graduated Fine Structure

A graduated fine structure for use in Housing Court has been proposed on several occasions. In practice, a system of minimum fines would need to be established, and a graduated system would require higher fines for multiple offenses. Currently fines are determined at the discretion of the Housing Court referee, although the City Attorney proposes suggested fine levels in many cases. A graduated fine structure would replace the discretionary system with a mandatory one. Such a proposal could be made by the City, but would require support of the Housing Court.

### Graduated Fee Structure

Like a graduated fine structure, a graduated fee structure depends on the establishment of a system of minimum fees. Graduated fees would be an add-on the original fee charged. Fire Prevention already has in a place a system of minimal fees for the Certificate of Occupancy program. Fees for reinspections are based on 10% of the fee paid for the C of O, and as mentioned earlier, this reinspection fee could be raised. However, Fire Prevention does not charge for complaint-based inspections of C of O properties, nor does it charge for reinspections based on the original complaint. In the case of Public Health, almost all inspections are complaint-based, and there are no fees associated with either inspections or reinspections.

There are two issues that must be taken into account in contemplating a graduated fee for service. First, any fees established must reflect no more than the City's cost for provision of the inspection service. So within a graduated fee structure, the highest

fee could not be higher than City cost. Second, the City should consider treating properties inspected by Public Health and those inspected by Fire Prevention in the same fashion. For example, if there is a charge for a complaint-based reinspection for Fire Prevention, there should be a similar charge levied by Public Health.

## PROCEDURAL OPTIONS

Improving procedures for dealing with chronic problem properties is largely a communication and a "priority" issue. City Council has maintained a long-standing concern over the effectiveness of City policies addressing chronic problem properties. Additionally, in the Mayor's State of the City address, the Mayor mentioned the establishment of a strike force to deal with problem property issues. This discussion will focus primarily on communication measures that address the issues of chronic problem properties.

### Increased City Agency Communication

Having the right information at the right time is key in dealing effectively with chronic problem properties. Many City departments and agencies can be involved in different roles with the same property simultaneously. Coordinating their efforts is very important. There are currently three cross-departmental groups, which are largely vehicles for improved communication, and do not have authority as a group for action. They are:

- the Housing Coordination Team which deals with a broad range of housing concerns;
- the Informational Exchange Group which deals specifically with problem properties; and
- the Enforcement Coordination Committee (formerly Fire-BID group) which deals with coordination of enforcement efforts.

Despite the existence of these groups to facilitate interdepartmental communication, there are some areas for which information sharing could be improved. The first such area is intra-departmental communication. There is currently no fast and efficient way to ascertain the City's history of interaction with a property, outside of pulling the individual department's paper file on the property and reviewing it. Moreover, day-to-day communication between departments is somewhat haphazard with regard to actions on specific properties. There is no centralized database file system which gives indications of individual department actions on a property. Much of the communication that does occur is because an experienced inspector will know who to ask what questions and when.

Currently the City's Information and Complaint database system offers the closest match to current enforcement department needs in a database system. However, the Information and Complaint database system was constructed to follow a complaint through the City "system," not to facilitate cross-departmental communication on enforcement efforts to mitigate problems.

The lack of a shared source of information on enforcement efforts makes it extremely difficult to determine which properties need more careful attention because they have the makings of a problem property. And it is exactly these properties the City needs to target with its toughest enforcement options early on. Early identification of problem properties gives the City the opportunity to approach them with a cross-departmental strategy that will eliminate the problems.

The current City groups working on housing and enforcement issues may provide answers on how to improve cross-departmental communication in areas such as uniform computerization and data basing for information sharing.

## Registration of Contracts for Deed by Seller

For chronic problem properties the issue of ascertaining ownership is often problematic. In many cases determining the ownership of a property is cumbersome, if not impossible, because contracts for deeds may not be registered. Currently, buyers are required to register their contract for deed, but because of the problematic nature of these properties, there is an incentive not to do so. It is believed that by requiring the seller to register the contract for deed, there will be more reporting of sales. This issue is on the City's current state legislative agenda.[22]

## Point System for Certificate of Occupancy Inspections

Implementing a point system for the Certificate of Occupancy (C of O) process refers to the concept of changing the current inspection schedule (every two years for residential properties) to a system that inspects properties more or less frequently based on its past inspection history. For example, a tri-plex with a history of many code violations would be inspected on an annual basis. Conversely, a four-plex with a history of only occasional minor code violations would be inspected every three years. The point system would be applied to a several year history of violations to determine how frequently a property's C of O should be renewed. A similar determination is currently made in determining is commercial structures should be on a one or two-year inspection cycle, based on whether they are high or low-fire hazard.

---

[22]     It is anticipated that this bill, House File # 1098, will be introduced on March 13, 1995.

There are both advantages and disadvantages to using this system. An advantage would be that inspection resources would be retargeted to the properties most likely to have serious code violations. A disadvantage would be the need to add an administrative procedure which determines appropriate inspection cycles for properties. Additionally, this system presumes that past code violation behavior is an indication of future behavior. This assumptions will not be true in many cases. However, the current system of complaint-based inspections for properties required to have a C of O would still be in place.

## Landlord Education Classes

There are many landlords in the City of Saint Paul, a great percentage of whom entered into the business with little or no management skills. The current degree of misunderstanding about what landlords can and cannot do to prevent problems, and to act once a problem is discovered is estimated to be very high. A landlord education program would help landlords more fully understand their rights and responsibilities for the properties they rent to others.

The cities of Portland, Oregon and Milwaukee, Wisconsin have instituted landlord education programs. Milwaukee secured a grant from the state, which was supplemented by local funding. The programs have the following components.

- code compliance and correction orders
- applicant screening
- rental agreements
- ongoing management
- the eviction process
- warning signs of drug activity
- crisis resolution
- the role of the police
- rental assistance programs

There are currently property management courses available at some local technical schools, as well as through Minnesota Multi Housing Association. However, these courses do not tend to have the property maintenance code enforcement, or the drug activity awareness components of the city programs.

The Housing Information Office (HIO) provides one-on-one assistance for landlord questions. Additionally, the Saint Paul Association of Responsible Landlords (SPARL) sponsors monthly discussions. However, none of these offers a comprehensive approach to landlord training needs.

Another source of landlord education is being developed by the Family Housing Fund of Minneapolis and Saint Paul, known as the Rental Housing Training Program. This program is based on the idea that buildings are currently certified, but there are no qualifications to become a landlord. As a result, many who assume ownership of rental properties are not qualified or suitable to handle the job responsibility. This problem was demonstrated by the case study of the chronic problem property on East Sixth Street. The program's goal is to provide training for landlords, or those considering becoming landlords, hopefully weeding out those with irresponsible motives and inadequate capacities to be responsible landlords.

A final consideration for this option is its potential to be used as a sentencing tool in housing court. Although it may be quite effective at eliminating future violations, pursuing such an option would require support of many stakeholders, including the Housing Court, City Attorney's Office, and elected officials.

## Tenant Education Classes

Tenant education is a relatively new idea, and is just beginning to be discussed in Minneapolis and Saint Paul. Its concept is relatively straight-forward: provide a program which teaches tenants their rights and responsibilities. It would be targeted at tenants who have a problematic rental history, because of payment, behavior, or other problems. The incentive for tenants to go through such a program could be either a rent subsidy, or a cleared rental record.

Given that slightly over half of the City's chronic problem properties are rental, and that approximately half of the problems of the problems encountered on those properties are tenant-related, such a program would fill a void in current educational efforts. Discussions are currently underway SPARL, the Tenants Union, the Family Housing Fund, Legal Aid, and the Housing Information Office on how such a program could operate.

# *RECOMMENDATIONS*

Chronic problem properties are typically properties with many code violations, and complicated circumstances. Collaboration among City agencies, as well as between the City and the neighborhoods, is necessary to identify these problems, and formulate workable solutions. There are a number of specific measures the City could implement to reduce or mitigate the difficulties presented by chronic problem properties. These findings and recommendations are based on the research presented in this study, which can generally be divided into two categories: those that strengthen the City's current enforcement tools; and those that are new tools.

## #1 Implement Rental Registration

A rental registration program, which requires one and two-unit rental properties to register with the City is desirable. This registration would not involve proactive inspection of the properties, but continue the current practice of inspecting one and two-unit rental properties on a complaint basis. There should be a modest fee required to register these properties, which would closely reflect added administrative costs. The registration could be revoked, however, based on code violations. The revocation would be made based on the determination of the director of the registration, and could be appealed to the City Council. Such a revocation would mean the property could not be habitated.

## #2 Develop a Plan to Require Certificates of Occupancy for All Rental Property

It is recommended that Rental Registration be this first step in a phased-in process of moving toward a Certificate of Occupancy (C of O) for all rental buildings. Because a certificate of occupancy would, by definition, require proactive inspection of one and two-unit rental property, a phased-in approach would be the most practical without adding more inspection staff. Related to this, a number of measures could mitigate the cost of additional buildings requiring inspection. These include:

a.   Increase the reinspection fee for Certificate of Occupancy covered buildings from 10% of the C of O fee to one more accurately reflecting actual cost.

b.   Charge a fee for reinspections which follow a complaint-based inspection. A parallel fee should be considered for non-C of O residential properties.

c.   Increase the fee scale for multiple unit buildings, so owners of buildings with 28 or more units pay a fee more reflective of actual cost of the C of O inspection process. (See page 17, table 7 for Certificate of Occupancy fee schedule.)

d.   Institute a point system to determine the most appropriate length of time between inspections, so well maintained properties are inspected less frequently, and poorly maintained properties are inspected more often.

e.   Conduct a study of the implementation considerations for these Certificate of Occupancy-related policy options.

## #3   Strengthen Interdepartmental Communication on Problem Properties

Strengthening interdepartmental communication on problem properties, and potential problem properties must be a priority. This is predicated on the notions that the City needs a more "automatic" identification process of these properties, and that once they are identified, stronger, more coordinated enforcement options should be applied. Enhanced communication would involve modification of the Information and Complaint database system, or the development of a new code enforcement information system. This could provide up-to-date information to all inspectors and other City staff working with a property what other City staff are doing with the property, as well as the City's history in working with the property. Additionally, one or all of the cross-departmental groups working on housing and enforcement issues should be requested to develop other recommendations for improved communication and action coordination.

## #4  Support a Graduated Fine Structure

A graduated fine structure may act as a deterrent for future violations. Data in this study indicate that a very small percentage (13%) of properties receive more than one citation in a year. However, these properties pose huge drains on City resources. A graduated fine structure would provide a stronger punitive message. Support of the Housing Court and the City Attorney's Office would be necessary to implement this recommendation.

### #5  Expand Case Management of Problem Properties—Pending Further Study

Case managing problem properties intuitively looks like an effective approach for dealing with chronic problem properties. It operates recognizing the multiple problem nature of these properties, and proactively inspects those properties that have a history of repeated code violations. However, there has never been an evaluation of this approach to determine if it does indeed act to reduce the number of chronic problem properties. Such a study is recommended. If this approach is shown to be positive, program expansion would be recommended as the budget allows.

### #6  Support Landlord and Tenant Education Efforts

Although one-to-one assistance is available from several agencies and organizations including the City's Housing Information Office, little is available in terms of formal training. It is recommended that the City support landlord and tenant education projects as developed by the Family Housing Fund. Further, as the Family Housing Fund's programs become established, it is recommended that the City explore the use of landlord and tenant education as a sentencing tool for use by Housing Court.

# ADDENDUM ON HOME IMPROVEMENT-GENERATED PROBLEM PROPERTIES

In the process of conducting research for this report, it has become clear that there are many factors that contribute to the creation of problem properties. One example of problems that did not fall clearly within the parameters of the research presented is the problem of unfinished home improvement projects. There are cases throughout the City of home improvement projects that have gone on for years with little or no progress, and create a continuous eyesore for the neighborhood. Some of the reasons for not completing projects are running out of money or ambition, or the death of the person responsible for the project.

The City's interaction with these properties is limited typically to issuing the building permit allowing the home improvement work to occur. The City has little discretion over the length of time a building permit remains valid. The rules governing expiration of building permits are outlined in the state's Uniform Building Code. It provides that if work begins within 180 days of the issuance of the permit, and if work is continued in intervals not exceeding 180 days, the building permit remains valid. In essence, there is no set length of time for expiration of permits.

> Every permit issued by the building official under the provisions of this code shall expire by limitation and become null and void if the building or work authorized by such permit is not commenced within 180 days from the date of such permit, or if the building or work authorized by such permit is suspended or abandoned at any time after the work is commenced for a period of 180 days. Before such work can be recommenced, a new permit shall be first obtained to do so, and the fee therefor shall be one half the amount required for a new permit for such work, provided no changes have been made or will be made in the original plans and specifications for such work; and provided further that such suspension or abandonment has not exceeded one year. In order to renew action on a permit after an expiration, the permittee shall pay a new full permit fee.

> Any permittee holding an unexpired permit may apply for an extension of the time within which work may commence under that permit when the permittee is unable to commence work within the time required by this section for good and satisfactory reasons. The building official may extend the time for action by the permittee for a period not exceeding 180 days on written request by the permittee showing the

.٠, 1 .٠

· circumstances beyond the control of the permittee have prevented
action from being taken. No permit shall be extended more than once.
(Section 106.4.4 of the 1994 Uniform Building Code)

Although the City is limited in its range of options because building permits are
governed by state, rather than local law, it still has several options available for
consideration. The first such option is a more vigorous monitoring of building
projects to ensure work is progressing at a rate satisfactory to meet the requirements
set forth in the building code. This may be done by building inspectors, or by building
inspectors in cooperation with neighborhood organization or district councils. The
end result of such monitoring may be sufficient pressure to ensure completion of the
project, or the revocation of the building permit. However, the revocation of the
building permit does not correct the original problem of long-term unfinished housing
improvement projects. The work would still be incomplete, and the owner would
have no permit to finish the project.

A second option available to the City is the use of the Housing Code to cite the owner
for failure to maintain the exterior of the property. Using this option, the Public
Health Division would work with building inspectors to identify and monitor this type
of problem property. Public Health would need to establish a pattern of inaction by
the owner to rectify the ongoing problem the incomplete project presents in order.to
issue a citation. There are several advantages to using this option. The City can issue
housing code violations even while the building permit is valid. This option can also
be implemented by procedural changes, and will not require ordinance changes. Like
the first option, this course of action does not ensure the completion of the project,
but it does increase the stakes for these owners as they must then appear in Housing
Court and may have a fine imposed.

A third option available to the City is to require a deposit or bond before a building
permit is issued. Several Minnesota municipalities have used this method with some
success. Under this policy, a person seeking a building permit would be required to
leave a deposit or bond with the City, which would be returned upon completion of
the project. If the project is not completed, the City would then have funds to apply
as a pre-paid fine. The City of Saint Paul currently uses this approach with buildings
in the registered vacant building program. For these buildings, the City requires a
$2,000 deposit before a building permit can be issued. This approach has proven
successful for over 90% of the building permits issued on vacant buildings. One clear
drawback to this policy approach for use with all building permits issued is that it may
act as a disincentive to those wanting to do home repair, but not having sufficient
funds to do both the repair, and pay a deposit to the City.

A final option the City could use would be to institute of a policy whereby once a building permit is revoked for lack of progress, as defined by the building code, a second permit for the same project would require a deposit or bond. This would target those properties and projects least likely to comply with the provisions of the building code, and provide the City the funds to use as a pre-paid fine.

Given the lack of City authority for altering the building code to better address chronic problems presented by these long-term incomplete projects, it is important that it apply those options it has available carefully. Relatively few of the many home improvement projects for which the City issues building permits remain incomplete over the span of many years. Requiring the deposit or a bond with the City for all building permits may hurt the overall home improvement situation by providing a disincentive where the City wishes to encourage activity. However, careful monitoring of those properties where neighbors or City staff have identified a long term lack of progress is in order. Cooperation among the City agencies interacting with the property, as well as cooperation between the neighborhood and City is necessary; as is the use of citations in the case of code violations.

# RESOURCES

## INTERVIEWS

Phil Bennett, Department of Engineering, University of Wisconsin
Gary Briggs, formerly of FORCE Unit, Police Department
Carol Buche, Saint Paul Association of Responsible Landlords
Ann Cieslak, Legislative Aide
Greg DeShon, Summit-University District Council.
Mark Dick, former Dayton's Bluff District Councilmember
Pat Fish, Fire Prevention
Pam Hutton, City Attorney's Office
Katy Lindblad, Housing Division-Planning and Economic Development
Dick Lippert, Code Enforcement-Division of Public Health
Chris Lukesh, Housing Information Office
Roberta Megard, Councilmember
Betty Moran, West Seventh Federation
Neighbor (Anonymous) of 3XX South Saratoga
Ann Norton, Consultant, Family Housing Fund
Molly O'Rourke, formerly of Citizen Services
Gary Peltier, Housing Division-Planning and Economic Development
Sheri Pemberton, Housing Division-Planning and Economic Development
Susan Roakes, City and Regional Planning Department, University of Memphis
Katy Royce, Community Stabilization Project
Maria Somma, Community Stabilization Project
Ella Thayer, Ward 4 Secretary
Charles Votel, Code Enforcement-Division of Public Health
Helen Welter, Legislative Aide
Lucille Widing, owner 7XX East Sixth Street
Steven Zaccard, Division of Fire Prevention

## TECHNICAL ASSISTANCE

Irina Antonovskaya, Citywide Information Services
Beth Bartz, Planning Division-Planning and Economic Development
Paul Hogrefe, Citywide Information Services
Jan Gasterland, Building Inspection and Design, Office of Licensing, Inspection, and
    Environmental Protection
Joseph Gockowski, Ramsey County Civil Division Court Administrator
Laura Klapperich, Research and Development-Police Department

Dick Lippert, Code Enforcement-Division of Public Health
Dan Perlman, National Housing Law Project
Charles Votel, Code Enforcement-Division of Public Health
Peter Warner, City Attorney's Office
Steven Zaccard, Division of Fire Prevention

## DOCUMENTS

City of Milwaukee *Landlord training Program-Keeping Illegal Activity out of Rental Property: A Practical Guide for landlords and Property Managers*

*City of Saint Paul 1995 Budget*

*City of Saint Paul Legislative Code*

Division of Fire Prevention, *Fire Prevention Practices Index*

Division of Fire Prevention, *Standard Operating Procedures*

Division of Fire Prevention, *Code Enforce Policies Index*

Division of Public Health-Code Enforcement, *Catalogue of Code Letters*

Division of Public Health-Code Enforcement, *Housing Code Programs Policy and Procedure Guidelines for Compliance Timelines*

"The Dynamics of Neighborhoods: A Fresh Approach to Understanding Housing and Neighborhood Change," Rolf Goetze and Kent W. Colton in Neighborhood Policy and Planning, edited by Phillip L. Clay and Robert M. Hollister. Lexington: Lexington Books, 1983.

Housing Division-Planning and Economic Development, *Housing Programs* (9/1/93)

Housing Division-Planning and Economic Development, *Housing Conditions 1988 Survey*

Police Department, *FORCE Unit Procedural Manual*

*Rental Tax Equity*, Saint Paul Pilot Project Report to the Minnesota State Legislature

*Uniform Building Code (1994)*

1990 U.S. Census