## CITY COUNCIL RESEARCH REPORT

# Chronic Problem Properties in Saint Paul: Case Study Lessons



Saint Paul City Council
Council Investigation and Research Center
Saint Paul, Minnesota

040007

# Saint Paul City Council

## Council Investigation & Research Center

# Chronic Problem Properties in Saint Paul: Case Study Lessons

**March 2002**

**Director**
Gerry Strathman

**Team Leader**
Marcia Moermond

**Policy Analysts**
David Godfrey
Kathryn Krile
Kenneth L. Smith

**Questions?**
If you have questions regarding this, or other Council report please contact

Gerry Strathman at
651.266.8575 or
gerry.strathman@ci.stpaul.mn.us

Chronic Problem Properties in Saint Paul: Case Study Lessons

**Council Investigation & Research Center**
**Saint Paul City Council**
**15 W. Kellogg Blvd., Rm. 310**
**Saint Paul, Minnesota 55102**

651.266.8560
www.ci.stpaul.mn.us/council/circ.html
City Council Research Report

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . 1
Study Goals . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Research Methods . . . . . . . . . . . . . . . . . . . . . 4
    Sample Selection . . . . . . . . . . . . . . . . . . . . 4
        Nominations . . . . . . . . . . . . . . . . . . . . . 5
        Selection Process . . . . . . . . . . . . . . . . . . 5
        Problems with the Selection Process . . . . . . . . 8
        Population Est.of Chronic Problem Properties  8
    Creation of the Case Studies . . . . . . . . . . . . . . 10
Theoretical Foundation . . . . . . . . . . . . . . . . . 10
Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    Causation Analysis . . . . . . . . . . . . . . . . . . . 11
    Case Study Narratives . . . . . . . . . . . . . . . . . 12
    Quantitative Analysis . . . . . . . . . . . . . . . . . 12
        Financial Calculations . . . . . . . . . . . . . . . 13

HOW CHRONIC PROBLEM PROPERTIES
COME INTO BEING . . . . . . . . . . . . . . . . . . . 15
Who Fails . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Why Do They Fail . . . . . . . . . . . . . . . . . . . . . 16
    Deviance . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        Symbolic Interaction . . . . . . . . . . . . . . . . 16
        Structural Functionalism . . . . . . . . . . . . . 17
        Conflict Theory . . . . . . . . . . . . . . . . . . . . 19
Unable/Unwilling . . . . . . . . . . . . . . . . . . . . . . 19
Ring Concept . . . . . . . . . . . . . . . . . . . . . . . . . 23
Predisposition . . . . . . . . . . . . . . . . . . . . . . . . 25
    Poverty . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    Property Conditions . . . . . . . . . . . . . . . . . . . 29
    Surroundings . . . . . . . . . . . . . . . . . . . . . . . 31
    Vacant Buildings and Abandonment . . . . . . . . 33
    Personal and Behavioral Factors . . . . . . . . . . 33

LIVING WITH THE PROBLEMS        . . . . . . . . 36
Who's Harmed? . . . . . . . . . . . . . . . . . . . . . . . 36
    Neighbors and Government Agencies . . . . . . . 36
    Tenants and Occupants . . . . . . . . . . . . . . . . 37
When Are People Actually Harmed? . . . . . . . . . 41
What's the Problem? . . . . . . . . . . . . . . . . . . . 43
    What the Experts Think . . . . . . . . . . . . . . . . 43
    Broken Windows, Incivility and Disorder . . . . 43
    Differing Impact Depending on Neighborhood
        Stability . . . . . . . . . . . . . . . . . . . . . . . . 46
    Neighborhood Cohesion & Collective Efficacy . 47
What the Case Studies Tell Us About Conditions . . 48
    Ratings . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
    Exterior Conditions . . . . . . . . . . . . . . . . . . . 49
    Interior Conditions . . . . . . . . . . . . . . . . . . . 53
    Crime . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
    Nuisance Crime . . . . . . . . . . . . . . . . . . . . . 57

Property Crime . . . . . . . . . . . . . . . . . . . . . . . 59
    Violent Crime . . . . . . . . . . . . . . . . . . . . . . 60
How the Problems Interact . . . . . . . . . . . . . . . . 61

DEALING WITH THE PROBLEMS . . . . . . . . 63
Police Department . . . . . . . . . . . . . . . . . . . . . 65
    Patrol . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
    Police Patrol Services . . . . . . . . . . . . . . . . . 67
    Cost of Police Patrol Services . . . . . . . . . . . . 69
    FORCE Unit . . . . . . . . . . . . . . . . . . . . . . . 69
    FORCE Unit Services . . . . . . . . . . . . . . . . . 69
    Cost of FORCE Unit Services . . . . . . . . . . . . 71
Fire Department . . . . . . . . . . . . . . . . . . . . . . . 75
    Fire Suppression & Emergency Medical Serv's  75
    Fire Prevention - Certificate of Occupancy . . . . 77
Citizen Services Office . . . . . . . . . . . . . . . . . . 79
    Correction Notices . . . . . . . . . . . . . . . . . . . 79
    Abatements . . . . . . . . . . . . . . . . . . . . . . . . 81
    Orders to Remove or Repair . . . . . . . . . . . . . 81
    Citations . . . . . . . . . . . . . . . . . . . . . . . . . . 83
    Condemnations . . . . . . . . . . . . . . . . . . . . . 83
    Rental Registration . . . . . . . . . . . . . . . . . . . 85
    Problem Properties 2000 . . . . . . . . . . . . . . . 85
    Good Neighbor Notices . . . . . . . . . . . . . . . . 86
    Problem Properties Task Force . . . . . . . . . . . 87
Other City Enforcement Agencies . . . . . . . . . . . 88
Animal Control . . . . . . . . . . . . . . . . . . . . . . . 88
Zoning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
Licensing . . . . . . . . . . . . . . . . . . . . . . . . . . . 89
Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

CURING THE PROBLEMS . . . . . . . . . . . . . . 92
Unable and Unwilling . . . . . . . . . . . . . . . . . . . 92
Actor Interventions . . . . . . . . . . . . . . . . . . . . 93
    Government . . . . . . . . . . . . . . . . . . . . . . . . 93
    Improvement of Existing Tools & Approaches  93
    Improvement Using New Tools & Approaches   97
Owners . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103
Social and Personal Problems . . . . . . . . . . . . . 103

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 107

APPENDIX A: Reference of Cases Studies . . . . . A 1
APPENDIX B: Bibliography and References . . . A 3
APPENDIX C: Glossary of Terms . . . . . . . . . . A 8
APPENDIX J: Age of Residential Structures, Pre- and
    Post- 1939 Map . . . . . . . . . . . . . . . . . . . . A 21
APPENDIX K: Robbery Map 2000 & 1999 . . . A 22

City Council Research Report

Chronic Problem Properties in Saint Paul:
Case Study Lessons

# Tables & Diagrams

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . 1
Diagram A. Map of Chronic Problem Property
    Case Study Locations . . . . . . . . . . . . . . . . . 6
Table 1. Building Ward Location . . . . . . . . . . . 7
Diagram B. Saint Paul Ward Map . . . . . . . . . . 7
Table 2. Building Occupancy . . . . . . . . . . . . . . . 8
Diagram C. Chronic Problem Properties as a
    Proportion of All Properties in Saint Paul . . . . 9
Table 3. Cost Calculations . . . . . . . . . . . . . . . . 14

HOW CHRONIC PROBLEM PROPERTIES
COME INTO BEING . . . . . . . . . . . . . . . . . . 15
Diagram D. Ring Concept . . . . . . . . . . . . . . . . . . 24
Table 4. Actor Failure Analysis . . . . . . . . . . . . . 24
Table 5. Market Value Averages Information . . 27
Table 6. Tax Delinquency . . . . . . . . . . . . . . . . . . 27
Table 7. Utility Shut-Offs . . . . . . . . . . . . . . . . . 27
Table 8. Chronic Problem Property Status Prior to
    Study Period (1994-98) . . . . . . . . . . . . . . . . 29
Table 9. Building Age . . . . . . . . . . . . . . . . . . . . . 31
Table 10. Registered Vacant Building Status 1994-
    2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

LIVING WITH CHRONIC PROBLEM
PROPERTIES . . . . . . . . . . . . . . . . . . . . . . 36
Diagram E. To Whom Is A Property A Chronic
    Problem . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
Diagram F. Multi-Unit Apartment Buildings, Calls
    for Police Service for Individual Units . . . . . 39
Table 11. Examples of Physical and Social
    Incivilities . . . . . . . . . . . . . . . . . . . . . . . . . . 45
Diagram G. Wilson and Kelling's (1982)
    Incivilities Theory . . . . . . . . . . . . . . . . . . . . . 46
Table 12. Interview Ratings of Chronic Problem
    Property Housing and Safety Conditions . . . 48
Table 13. Exterior Structural Problems . . . . . . . 51
Table 14. Garbage/Yard Exterior Problems . . . 51
Table 15. Interior Structural Problems . . . . . . . 53
Table 16. Interior Systems & Utilities Problems 55
Table 17. Interior Public Health Problems . . . . 55

Table 18. Nuisance Crimes . . . . . . . . . . . . . . . . 59
Table 19. Property Crimes . . . . . . . . . . . . . . . . 59
Table 20. Violent Crime/Crimes Against
    Persons . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
Table 21. Summary of Conditions, Aggregate . . 61
Table 22. Summary of Conditions, by Property . 62

DEALING WITH THE PROBLEMS . . . . . . . . 63

Table 23. Police Calls for Service Load Change, 1999,
    2000 and 2001 . . . . . . . . . . . . . . . . . . . . . . . 66
Table 24. Police Calls for Service: Dispositions
    During Study Period (1999-2000) . . . . . . . . . 68
Table 25. Police Interventions (Aggregate) . . . . . . 71
Table 26. Properties Requiring Interventions
    Aggregate . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
Table 27. Citation Summary Table for Code
    Enforcement (CE), Certificate of Occupancy
    ( C of O) Program and Animal Control (AC) . . . 82
Table 28. Property Interventions . . . . . . . . . . . . . . 86
Table 29. Average and Median Costs . . . . . . . . . . 87
Table 30. Chronic Problem Properties Total Costs by
    Category . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 107

APPENDIX A: Chronic Problem Property Case
    Study Reference List . . . . . . . . . . . . . . . . . . . A 1
APPENDIX D: Calls to City, by Violation, by
    Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 13
APPENDIX E: Calls to City, Totals and Averages,
    by Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 14
APPENDIX F: Property Code Interventions, by
    Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 15
APPENDIX G: FORCE Interventions, by
    Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 17
APPENDIX H: Costs for Complaints, Calls for
    Service and EMS/Fire Runs, by Case . . . . . . A 18
APPENDIX I: 2000 Tax Information, by Case . A 19
APPENDIX J: Age of Residential Structures,
    Pre- and Post- 1939 Map . . . . . . . . . . . . . . . A 21
APPENDIX K: Robbery Map 2000 & 1999 . . . A 22

City Council Research Report

Chronic Problem Properties in Saint Paul:
Case Study Lessons

# List of Case Studies

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**HOW CHRONIC PROBLEM PROPERTIES COME INTO BEING** . . . . . . . . . . . . . . . . . . . . . 15
The Brothers Grim . . . . . . . . . . . . . . . . . . . . . . . 18
Motel California . . . . . . . . . . . . . . . . . . . . . . . . 20
Cash Cow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Cracking Up . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
Errant Investor I . . . . . . . . . . . . . . . . . . . . . . . . 28
Errant Investor II . . . . . . . . . . . . . . . . . . . . . . . 30
Gangster Boyfriend . . . . . . . . . . . . . . . . . . . . . 32
Over the Edge . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**LIVING WITH CHRONIC PROBLEM PROPERTIES** . . . . . . . . . . . . . . . . . . . . . . . . 36
Through the Cracks . . . . . . . . . . . . . . . . . . . . . 38
Home Alone . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Cultural Conflict . . . . . . . . . . . . . . . . . . . . . . . 42
Down 'n Out . . . . . . . . . . . . . . . . . . . . . . . . . . 44
Fear Factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
Weird Neighbor . . . . . . . . . . . . . . . . . . . . . . . 52
Old and Ugly . . . . . . . . . . . . . . . . . . . . . . . . . . 54
Empty Promise . . . . . . . . . . . . . . . . . . . . . . . . 56
Dirty Dealing . . . . . . . . . . . . . . . . . . . . . . . . . . 58

**DEALING WITH THE PROBLEMS** . . . . . . . . 63
Double Trouble . . . . . . . . . . . . . . . . . . . . . . . . 64
La Cucaracha . . . . . . . . . . . . . . . . . . . . . . . . . 70
Dog House . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
Misplaced . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
Watering Hole . . . . . . . . . . . . . . . . . . . . . . . . 76
Alligator Alley . . . . . . . . . . . . . . . . . . . . . . . . 78
Danger Island . . . . . . . . . . . . . . . . . . . . . . . . 84
Bad Boys . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

**CURING THE PROBLEMS** . . . . . . . . . . . . . . 92
Double Gross . . . . . . . . . . . . . . . . . . . . . . . . . 94
Dirty Business . . . . . . . . . . . . . . . . . . . . . . . . 96
Overwhelmed . . . . . . . . . . . . . . . . . . . . . . . . . 98
Career Criminals . . . . . . . . . . . . . . . . . . . . . . 100
Nasty Four . . . . . . . . . . . . . . . . . . . . . . . . . . 102
Fight Club . . . . . . . . . . . . . . . . . . . . . . . . . . . 104
Case Case . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . 107

**APPENDIX A:** Reference of Cases Studies . . . . . A 1

# INTRODUCTION

Most urban residents are very concerned about their surroundings. Not only do they want their homes and businesses to be safe, clean and attractive — they expect their neighbors' homes and business to be orderly and well-maintained as well. The fact not everyone acts in accord with these values is a major problem for cities. Some share these values but fail to act on them; such as when people want snow cleared off sidewalks but neglect their own. A few do not share these values at all; such as people who see no problem with storing junk cars in their backyard. The dissonance between these widely shared public expectations and the actual behavior of some creates tensions that City government is expected to resolve.

Most cities spend a great deal of time, energy and money trying to maintain an environment that meets community expectations. These efforts are based on the need of elected officials to respond to citizen expectations and on the belief that failure to maintain high standards will lead to disinvestment and out-migration.

Happily, for the most part, the efforts of the City of Saint Paul to maintain community living standards are successful. The City's cadre of code inspectors, police officers, building inspectors, animal control officers, fire officials and attorneys engage in a never-ending struggle to ensure community standards for property maintenance and acceptable behavior are upheld. They conduct inspections, issue corrective orders, conduct abatements, provide advice, cite or arrest wrong-doers and prosecute offenders. These tactics work most of the time. Most property owners comply with directives from City staff and most miscreants straighten-up (at least for a while) when confronted by the police.

Unhappily, there are times when City interventions do not work. Some property owners are unresponsive to directives from City officials, some offenders continue to violate despite interventions by the police. At first blush, this may seem a trivial problem. One might suggest that since most citizens comply, that ought to be good enough. Others might say we just need to "get tough" with those who continue to offend. Unfortunately, neither of these glib answers produce acceptable results.

The suggestion that we simply accept some level of deviance does not fully recognize the effect these offenses have on the surrounding neighborhood. If the effects of violations were limited to the property upon which the offenses occur, then it might be possible to simply tolerate them. This is not, however, the case. The effects of non-compliance are toxic. The appearance of one building affects the appearance of the entire neighborhood. The unsafe practices of some tenants affects the safety of all tenants in the building. Criminal behavior in one house undermines the safety of the entire neighborhood.

Most people are unwilling to accept even one property that is not in compliance with community expectations. This intolerance of deviance, while understandable, creates a serious challenge for City government as it is nearly impossible to achieve 100 percent compliance with any standard. It is relatively easy to achieve 80 percent compliance with any reasonable standard. It is much more difficult, and far more expensive, to achieve 90 percent compliance. It is extraordinarily difficult and extremely expensive to achieve 99 percent compliance. Since there are probably fewer than 300 chronic problems properties among the more than 80,000 properties in Saint Paul, we are, in effect, seeking to move from 99.75 percent compliance to 100 percent compliance. Both theory

and practice suggest that this will be difficult. Nonetheless, because of the profound toxic effect of these properties on the community and the widespread intolerance for the violation of minimum community standards, nothing less than 100 percent compliance is acceptable.

The idea that we should just "get tough" with chronic offenders underestimates the resilience of offenders and overestimates the efficacy of government. While most citizens are socialized to respond to government directives – a few, however, are not. While, in the final analysis, government has the power to coerce compliance with community standards, there are numerous safeguards that circumscribe how and when government power may be used against citizens. These safeguards, such as due process of law, create unintended consequences and give violators an opportunity to evade or avoid government sanctions. The clever, or simply stubborn, can resist compliance and avoid sanctions for a very long time before the full force of possible government sanctions can be brought to bear. Such resistance tends to either exhaust the attention span of enforcement officials or makes effective enforcement so time-consuming and expensive that the government, in effect, gives-up. Even when the City "hangs tough" in the face of resistance, the processes of law can take a very long time.

So! What to do? If we can't tolerate chronic violations of community standards and "getting tough" is expensive and slow, how do we deal with these vexing problems? We believe the answer is that government must act smarter. By acting smarter we mean learning what *causes* these behaviors and addressing the *causes*, not just the *effects*. Moreover, we must be sure we are looking at all of the symptoms, not just those that a particular agency of government is capable of handling. When usual interventions do not work, we need to turn our focus from *symptoms* to *causes*. So long as dealing with symptoms works, which it usually does, it is not necessary to try to understand and address the underlying causes. This study is intended to begin the process of understanding why some properties have violations of community standards that are serious, repetitive and enduring, while others have violations which are remedied relatively easily. We call such properties "chronic problem properties." We believe that once we understand causes and *all* of the symptoms in the case, then we can begin to fashion strategies and tactics to address and resolve the underlying problems. We are convinced that this approach holds great promise. Just as understanding the causes of diseases lays the foundation for developing cures, understanding the causes of chronic problem properties will lay the foundation for designing effective government interventions that will work.

To begin to understand chronic problem properties, we must eschew the tendency to see only some symptoms and begin to think deeply about causes. To this end, we have conducted extensive investigations into 32 current chronic problem properties. We have gathered, organized and reviewed City files and County property records for each of these properties. We have conducted in-depth interviews about each property with City staff and community organizers. These efforts have created, we believe for the first time, an extensive cross-agency record of everything we know, or think we know, about each of these properties. We believe that these stories, or case studies, hold the key to understanding chronic problem properties. We invite you to join us in a descriptive visit to each of these properties. From the richness of this experience we believe that you, along with us, will begin to understand the complex tapestry of people, property and public interest that constitutes the chronic problem property world. From this visit, we believe that together we will begin the understand the causes of these problems and therein find the seeds for solutions.

# STUDY GOALS

Although chronic problem properties are an ongoing problem for most cities, few researchers have attempted to specifically examine the underlying reasons for their existence or analyzed what interventions are effective in correcting them. In this study, a number of questions have been posed to help us come to a better understanding of chronic problem properties and how to better deal with them. Throughout the study process, we have sought to confirm our wide-spread assumptions, and come to a deeper, richer understanding based on the experience of Saint Paul's neighborhoods with chronic problem properties.

The chapter, *How Chronic Problem Properties Come Into Being*, poses perhaps the largest and most difficult set of questions to answer:

- ❏ How are chronic problem properties created?
- ❏ Who causes them? and
- ❏ What factors make it more likely a chronic problem property will develop?

The basic assumption underlying these questions is that not all chronic problem properties have the same causes and that by identifying the causes of the chronic problem properties, the City would be able to more accurately target interventions to correct the problems. However, the more we learned, the clearer it became that the issue of causation of chronic problem properties, as with most other types of social phenomena, is too complex and multi-layered to identify one specific cause.

The next chapter, *Living with Chronic Problem Properties*, examines the experience of living with chronic problem properties; and it explores:

- ❏ Who is harmed by the existence of chronic problem properties?
- ❏ What kinds of code violations and crimes happen at chronic problem properties? and
- ❏ How is the City, or agencies of other levels of government, alerted about the conditions at these properties?

*Dealing with the Problems,* is the chapter of the study which discusses the steps government and others can take to decrease the level of problems being experienced at a property. The focus is on how we deal with the symptoms, rather than efforts to explicitly target underlying causes.

- ❏ What enforcement methods are the most useful in resolving each type of chronic problem property situation?
- ❏ Are we effectively using the tools we currently have in addressing chronic problem properties?
- ❏ Are we effectively coordinating the activities of various agencies involved with chronic problem properties?
- ❏ Do inspectors, police, social services and the courts have the tools they need to deal with the complex issues presented by chronic problem properties, or are more or different types of efforts needed?

*Curing the Problems* moves beyond the steps taken to address individual problems at a property. This chapter goes deeper to examine how we can take into account the cause of the problem to make our attempts at intervention more effective. At the simplest level, we are talking about moving beyond sending a City crew to pick up garbage repeatedly. Here we are trying to get at the

circumstances of why garbage continues to be a problem at a particular property and then using that information to solve the underlying problems. Key in this chapter is the examination of the questions:

- ❑ Who is empowered to solve the underlying problems at a property and how can we get them to do it?  and
- ❑ What tools do the individuals and organizations need to solve the problems at a chronic problem property?

*Preventing Chronic Problem Properties* summarizes the learning that has occurred in the study and applies it to prevention. It asks:

- ❑ How can the key actors be persuaded to take the actions necessary to prevent the creation of chronic problem properties?
- ❑ What risk factors should be targeted to decrease the likelihood of chronic problems from developing? and
- ❑ What additional tools should be made available to help the key actors prevent chronic problem properties from coming into being?

# RESEARCH METHODS

The research questions posed in the previous sections are many, and each of them is complex in its own right.

- ❑ How are chronic problem properties created?
- ❑ What do they look and feel like?
- ❑ What can be done to fix them and prevent them from happening?

Clearly, no research method exists to unequivocally answer these questions about chronic problem properties. What we have attempted to do, is to scratch the surface by examining the experiences of 32 such properties in Saint Paul.[1]  The stories these case studies tell, together with basic statistics and lessons from theories of criminal justice, neighborhood planning and urban sociology, form the foundation of the research for this study.

## Sample Selection

The selection of properties that would serve as case studies of chronic problem properties began with an assessment of the number of these in Saint Paul, as well as the definition of "chronic problem property." These questions—how many are there ? and what, exactly, are they? – are intertwined. With respect to the first question, "what are they?" Council Research *initially* concluded that

> Chronic problem properties are properties with **serious** *(founded and substantial), repetitive (at least 3 instances of problems in 18 months) and enduring (active as a problem property for at least 18 months)* problems which **adversely affect** *their neighbors and/or the community as a whole.*

---

[1] Our original goal was to have 25 complete case studies. However, our elimination process left us with 32, and we felt there were no objective criteria we could apply to our group to narrow the case study list again.

Unfortunately, this definition does not, on its face, take into account the complexity of the issues presented by chronic problem properties by way of the character of the problems, who is responsible for the problems, or who is affected by them. This is something we will explore throughout our study.

As to the second question, "how many are there?" we began with the assumption that not all the problems experienced were reported to a single agency or authority. Some problems are reported to the City's Code Enforcement Division, such as garbage, broken windows, or "no heat." Similar problems found at commercial or residential buildings with 3 or more units are reported to the City's Certificate of Occupancy Program. Animal-related problems are reported to Animal Control. Finally, behavioral and criminal problems are reported to the Police Department. To date, there is no central database of City records to analyze to determine which and how many properties meet the criteria presented in our definition. Additionally, the City may or may not have been contacted about the problems being experienced at a specific property. We, therefore, decided it was most appropriate to ask the people who worked with these properties on a daily basis for nominations.

## Nominations

Council Research solicited nominations of chronic problem properties by letter and follow-up phone call to the City's Code Enforcement Division, Certificate of Occupancy Program, City Council Ward Offices and District Councils. Through this process occurring in the summer of 2000, 275 addresses were received as suggestions for our "list." It was apparent in our conversations with staff from these agencies and organizations that they did not always nominate all of their potential candidates.[2] There were also several cases where we did not receive nominations from district councils because of a lack of staffing. Of those nominations we did receive, only some of the same addresses were offered by more than one of the agencies. Altogether, 11 percent of the nominated addresses were identified by two or more agencies or organizations as chronic problem properties. Interestingly, multiple nominations did not occur at a higher rate for those properties with the worst code and criminal violations.

## Selection Process

For all of the 275 addresses nominated, we determined their City Council Ward, district council, the basic type of problem(s) experienced and basic information on building use. From this list, we selected 100 addresses. At this time, we were trying to develop a "representative" group by maintaining geographic distribution throughout the City, as well as ensuring a variety of building uses and problems experienced. We then looked at various City computer records to find:

- ❑ Number and type of Code Enforcement calls and actions;
- ❑ Number and type of Certificate of Occupancy ( C of O) Program calls and actions;
- ❑ Number and type of Animal Control calls and actions;
- ❑ Number of Police calls for service, reasons for the calls and their outcomes;
- ❑ Commercial or residential use;
- ❑ Rental or owner-occupied; and
- ❑ Number of housing units if multi-family.

_____

[2] For example there were many instances where we received follow-up phone calls with additional addresses. In other cases, staff clearly indicated that they were giving us one or two addresses on a particular block, or owned by a particular party, but there were more which could have been suggested.

Using these records we were able to determine if the property *superficially* met our definition as a chronic problem property, based on the whether the problems experienced were repetitive (at least 3 instances of problems) and *enduring* (active over 18 months). Among those eliminated in this step were two types of problem properties worth mentioning:

1) those with some animal-related issues, such as too many animals, or the build-up of animal waste inside or in the yard of the property—these properties tended not to be "active" on City files for the requisite 18 months; and

2) neighborhood (repair) garages which move old, broken-down cars around, thus evading City parking restrictions, but giving the effect of disorder in these neighborhoods. These properties tended to have just this as a problem and the City licensing process for such facilities gave the City additional leverage to solve the problem sooner.

This comparison process of looking at the properties and our definition helped us eliminate 40 properties, leaving us with 60 properties on our list. For the list of 60 remaining properties, we put together complete files with "every piece of information we could get our hands on" in County, court, and City records. For this list of 60, we then determined if the problems were *serious*, meaning the problems were significant and serious to the City, and to the neighborhood. Using this criteria we eliminated those properties which had:

**Diagram A. Map of Chronic Problem Property Case Study Locations**



- ❏ A "single major" problem(s) which was slow in resolving (major rehabilitation projects sometimes fall in this category);
- ❏ Repetitive, but relatively minor violations (doesn't mow the lawn, few and infrequent police service calls for low level offenses); and
- ❏ A tight geographic cluster with other chronic problem properties and may have been experiencing similar problems.

We tried to focus on those properties which had complex or worsening problems, and were therefore the most likely to continue to cause the City and the neighborhood serious headaches over a longer period of time. This elimination process left us with 38 properties. The last 6 properties were eliminated because we were not able to sufficiently document reported problems, interview relevant staff, or otherwise complete case study files for analysis.

The 32 completed case studies are, in our judgement, reflective of the population of chronic problem properties nominated. They are located throughout the City in six of the City's seven wards, as shown in Table 1. The case studies tend to be more concentrated in the older neighborhoods of the City, as is shown in the map on page six. These case studies are made up of 14 owner-occupied properties, 14 rental properties, and four businesses. This breakdown is shown in greater detail in Table 2.

**Table 1. Building Ward Location.**          **Diagram B.  Saint Paul Ward Map**

| Properties in Group | 32 |
|---|---|
| Ward 1 | 6   *(18.8%)* |
| Ward 2 | 4   *(12.5%)* |
| Ward 4 | 5   *(15.6%)* |
| Ward 5 | 4   *(12.5%)* |
| Ward 6 | 5   *(15.6%)* |
| Ward 7 | 8   *(25.0%)* |



## Problems with the Selection Process

There are two basic problems we noticed in our selection process. The first problem was that we assumed the number of calls for service to the Police Department or inspectors would show the severity and complexity of problems at a particular property. They did not necessarily do this. The only measure we observed that could be used as a proxy for severity and/or complexity of problems is "action" police calls.[3] However, it was apparent in our review of the data that there was a wide variation in the proportion of founded calls. We believe there are three likely scenarios to account for this: 1) excessive complaints by over-sensitive neighbors; 2) a "normal" rate of calling given the situations the property is experiencing; and 3) under-reporting, where only the

---

[3] We defined "action" police calls as those calls for service to the Police Department which required a police officer to take action. These are recorded in Police Department records as "advised," "report written" and "detox." See Table 24 on page 68 for further details.

most serious situations elicit a call for service from an occupant of, or neighbor to, the property experiencing problems.  This dynamic is discussed more thoroughly in the chapter, *Living with Chronic Problem Properties* beginning on page 36.

**Table 2. Building Occupancy.**

|  |  | Residential | |  |
|---|---|---|---|---|
|  | Total | 1-2 Unit | 3+ Unit | Commercial |
| **Properties in Group (N=)** | **32** | **19** | **9** | **4** |
| Owner Occupied | 11<br>*34.4%* | 11<br>*52.9%* | *N/A* | *N/A* |
| Owner Occupied Rental | 3<br>*9.4%* | 3<br>*15.8%* | 0<br>*0.0.%* | *N/A* |
| Rental | 14<br>*43.8%* | 5<br>*26.3%* | 9<br>*100%* | *N/A* |
| Lease (Commercial) | 1<br>*3.1%* | *N/A* | *N/A* | 1<br>*25.0%* |
| Owner Operated  (Commercial) | 3<br>*9.4%* | *N/A* | *N/A* | 3<br>*75.0%* |

The second problem we observed in our selection process was that some types of chronic problem properties consistently did not "qualify" as such using our definition.  As mentioned earlier, cuts were made which had the effect of substantially decreasing the number of properties which were: animal-related; repair garages; and in clusters of chronic problem properties or owned by the same owner.[4]

## Population Estimate of Chronic Problem Properties

It is difficult to determine how many chronic problem properties there are in Saint Paul.  However, throughout the research process, we have been able to develop an informed opinion about this question.  As to number of chronic problem properties, we believe at any given time, there are at least 225-275 in Saint Paul.  We deduced this in the following manner:

- ❑   50-60 percent of those we examined (100 of the 275 nominated) met our definition; therefore, 138 - 165 of the nominated addresses likely met our definition;
- ❑   Not all district councils had sufficient staff and were able to respond to our request; therefore, we likely had an "incomplete" list, so we add 20 - 30 ➝ giving us 158 - 195
- ❑   There are chronic problem properties that were not nominated because they are located in a "cluster" of these types of properties, and are not looked at as individual properties, but parts of a "bad area;"[5] therefore, we need to add 15 percent to the total of those nominated ➝ giving us 192-247;

---

[4] We chose 1 or 2 representative properties for an area or owner—although we selected cases from these "clusters," we may still be under-representing the "cluster effect."

[5] There were several incidences where City or district council staff indicated, "you could pick any one (property) on that block (or between these streets, or in this complex of buildings), but I'll just give you this (or these) addresses."

❏ There are chronic problem properties that are not identified as such by City and district council staff because they do not receive complaints on them, usually because of apathy or fatigue on the part of neighbors and occupants; therefore, add another 15 percent → giving us 220-284.

**Diagram C.  Chronic Problem Properties as Proportion of All Properties in Saint Paul**



**Area A.** This area represents the 79,000 properties in the City of Saint Paul based on Ramsey County tax data.

**Area B.** This area represents the 24,000 properties the Pioneer Press defined as "active" based on an analysis of 5 ½ years of City Code Enforcement computer records.  Being "active," and therefore, according to their analysis a problem property, was determined using 2 dates, the first and the last the City interacted with the property.  If those dates were more than 2 years apart, the Pioneer Press determined it was a problem property.

Of these, approximately 16,000 properties had their problems resolved in 1 year (**Area C**), and 18,000 (an additional 2,000) within 2 years (**Area D**).  The balance of properties (the gray area within Area B), approximately 6,000, were presumed to be chronic problem properties.

**Area E** represents the chronic problem properties Council Research estimates exist in Saint Paul at any given time, approximately 250.

Because of the inadequacies of the City's information system, the newspaper's analysis did not include any information as to whether the complaint(s) the City received were founded, whether a code was violated, or the severity of the Code violation alleged.  Therefore, it seems very likely that 24,000 is an over-representation of the problem properties in Saint Paul. [Article from the Pioneer Press series on Problem Properties"St. Paul Inspection Data Proves Hard to Track." 5 December 1999.]

## Creation of the Cases Studies

The thirty-two case studies were developed using information from a variety of sources for a 24-month study period. First, we examined computerized records and files from the City's Code Enforcement Division, Citizen Services Office, Certificate of Occupancy Program, the Police Department's FORCE[6] Unit, the City Attorney's Office, Police Department, Fire Department, Animal Control, Department of Planning and Economic Development, and Office of License, Inspections and Environmental Protection. We also gathered information from Ramsey County Department of Property Records and Revenue, IRIS (Integrated Reality Information System), the Polk Directory, and the U.S. Census. Second, we conducted structured interviews with all of the City and district council staff who worked with owners and occupants of the chronic problem properties, as well as the neighbors affected by it. Notably, we have had the opportunity to accompany various inspectors and enforcement agents "in the field" on numerous occasions. During this research process, we are also able to accompany the FORCE unit in the execution of search warrants.

Based on our interviews and field experience, we developed the narrative component of the case studies and conducted follow-up interviews to clarify irregularities in our findings. Unfortunately, not all inconsistencies have been, or can be, rectified. In other cases, we have not been able to verify information we suspect may be true based on other facts we reviewed. Finally, we pointedly asked our interview subjects *why* the property in question became a chronic problem property. These statements were often insightful, but, were subjective reviews of the situations. In essence, we were trying to look at the proverbial elephant, where each interviewee saw only a part of the animal.

*Because of these concerns, we have chosen to use code names, in addition to not using property photos, to protect the identity of owners, occupants and neighbors.*

It is our contention, the telling of these stories is just as important as relaying facts and figures surrounding their situations as chronic problem properties — and only in putting these putting these together is one able to get a comprehensive view of the situation.

# THEORETICAL FOUNDATION

Throughout the research process, we encountered the need to interpret our findings using some sort of a theoretical framework. We, therefore, sought out journals and other academic work that could give insight into the creation of chronic problem properties, as well as suggest possible courses of action for their elimination. We looked at planning, housing, sociology and criminal justice and specifically examined theoretical work in the following areas:

- ❑ Broken Windows Theory;
- ❑ Incivilities Thesis;
- ❑ Neighborhood Cohesion;
- ❑ Social Capital;
- ❑ Collective efficacy;
- ❑ Neighborhood planning; and
- ❑ Deviance Theory.

_____
[6] FORCE is the acronym for the Focusing Our Resources on Community Empowerment program.

Information and references from our review of these theories appears throughout our work.  A resource list of materials may also be found in Appendix B.

# ANALYSIS

Our original goal was to analyze information from case studies which speak to:

- ❑ The causes of chronic problem property status— which includes the statistical and anecdotal information;
- ❑ The likelihood of specific problems occurring individually or in combination with each other—which will assist enforcement and social service agencies in assessing the probability of specific problems occurring; and
- ❑ The likelihood for specific enforcement strategies to be successful given the problem or mix of problems at the property—which will assist policy maker, enforcement and social service agencies in assessing the probability of specific problems occurring.

In order to do this, we conducted three types of analyses, in addition to reviewing our data in the context of the theories discussed in the previous section.  These areas included a causation analysis, the development of case study narratives and a quantitative analysis of data from our case studies.

## Causation Analysis

The first of our analyses, we titled the "causation analysis."  Here, we literally tried to determine the primary, secondary and contributing causes to the case's chronic problem property status.  This was done by researchers reviewing all facts in the files, and then consulting to develop an informed opinion as to cause.  As mentioned earlier, we had asked our interviewees to hypothesize why a particular property has become a chronic problem.  Examples of the types of reasons we heard include:

- ❑ Landlord exploitation of tenants ;
- ❑ Criminality of tenants;
- ❑ Property owner recalcitrance towards City orders;
- ❑ Financial distress of owner or landlord;
- ❑ Alcohol/chemical dependency of owner or landlord; and
- ❑ Disability of owner or landlord.

Our conclusions tended to be based heavily on the impressions of those we interviewed, and tended to look like this:

- ❑ Primary cause: alcoholic owner occupant, secondary cause: uncontrolled children, contributing cause: financial distress; or
- ❑ Primary cause: exploitive landlord, secondary cause: drug use of tenant, contributing cause: criminal companion of tenant; or
- ❑ Primary cause: incompetent landlord, secondary cause: domestic violence of tenants, contributing cause: financial distress of landlord.

Of course, there were significant problems with this analysis. First, there are the biases of researchers and the interview subjects. Second, the determinations were subjective: there was no definitive way to sort out, among the many problems we found present in our cases, which actually causes the chronic problem property status. Whose to say it was alcoholism or financial distress that tipped the balance? And when can an outsider, in our case— researchers, validly "diagnose" alcoholism or financial distress? A few drinks to some would be alcoholism to others, and we were in no position to judge. Financial distress may have been brought on by frivolous spending, and some may believe there were adequate resources, were it not for foolish spending. Third, it was nearly impossible to separate the cause and effect of these different problems, and the stories surrounding each situation were fluid. Fourth, it became very clear that many of the problems which lead to chronic problem property status exist in many households and businesses—that are not chronic problem properties. This last finding helped lead to the development of section of this report dealing with predisposing factors to chronic problem property status. Because of the problems encountered with this analytical approach, we did not use this analysis in developing specific findings relating to cause.

## Case Study Narratives

Throughout the research process, it became apparent to us that some of our greatest learning was coming from the stories associated with each of our case studies. This seemed to hold true whether we were talking about how a neighborhood experienced an incident of child neglect, or how a bar failed to make timely payments to the City to maintain the appropriate licenses. We, therefore, decided to split our analysis of the cases to include both a narrative, story-telling approach, as well as a quantitative approach. In developing this narrative approach, we had to make determinations about which way to tell a particular story when we had conflicting versions, but by and large, the information we gathered from different sources came together in a consistent and coherent fashion. This approach also gave us the opportunity to discuss in more depth the perceptions of those involved, not only about the property, but also the dynamics of the households and neighborhoods. One example of this is the case of racism and cultural bias, where we do not have "quantitative indicators," but only people's impressions of what is going on in a particular area. The use of case study narratives throughout this report has helped to clarify and give life to some of the issues addressed. It also gives us a coherent structure for organizing the vast amount of information we gathered.

## Quantitative Analysis

The third type of analysis used in the development of this study is a quantitative analysis of the data gathered in the case studies. Although we are unable to draw definitive conclusions because our sample of case studies was not randomly drawn,[7] we can use the information to form credible hypotheses about what the likely dynamics are. For the 32 case studies, a broad array of information was gathered. The actual data items include items related to the following areas:

❑   Property ownership and tenancy;
❑   Property valuations;
❑   City enforcement and housing loan services;
❑   City Code Enforcement and License actions;

[7] Recall that the concept of chronic problem properties is largely a self-defined and, therefore a subjective phenomenon, so it is impossible to know the "true" population from which a statistically valid sample can be drawn, and that estimates have been used. Although we tried very hard to use cases we believed to be representative of those nominated, there is no definitive way to confirm this.

❑   Police Patrol data;
❑   Police FORCE Unit activity;
❑   Call levels to various City agencies; and
❑   Property and crime conditions.

It should be noted that although we were able to document conditions, call levels and enforcement actions, the City information systems available did not allow for analysis of these pieces of information in a "chronological" fashion. We were, therefore, unable to make definite "cause and effect" determinations about given conditions leading to particular call levels and enforcement actions. What we can, and do, discuss is the propensity of each of these pieces of information to be associated with one another. It is our belief that an analysis of the quantitative information and the narrative stories of each of our case studies, taken together, will provide a comprehensive picture of chronic problem properties in Saint Paul and very likely in other urban environments, as well.

## Financial Calculations

In the course of conducting the quantitative analysis for this study, it became obvious that almost all of the interactions the City had with our chronic problem properties had costs attached to them. The City, as a government entity, collects taxes to provide to the community-at-large the services discussed in this report. There is little debate that provision of police, building and health inspection, fire suppression and emergency medical services ensures the health, safety and welfare of all of the residents of the City. However, the high level of services required at the chronic problem properties we studied— and the expenses associated with those services— deserve special attention.

Therefore, we set about to establish two dollar figures associated with each of our case studies. The first figure we established the municipal portion of the property taxes owed for 2000 using Ramsey County property tax information systems. The second figure we calculated was the costs associated with the City services provided to each property. In order to establish costs, we multiplied the number of visits City staff made to a property by the average cost by visit. Table 3 provides a summary of our estimates and the basis for those calculations. In the case of some of the services of the FORCE Unit, very conservative estimates were used with respect to staff involvement. It is also expected that these numbers would differ widely by property and situation.

It is important to consider that property taxes make up about one-third of the City's general fund budget. The balance of the City budget is financed with money the City receives from the State of Minnesota and several other sources. Throughout the study we present information on the City property taxes owed by each of our case studies, and compare this to the expense of the services provided. When looking at these figures, it is important to keep in mind the City's other revenue sources finance two-thirds of the costs for the services we describe. In essence, for every $300 worth of police services provided, $100 is covered by property taxes and $300 from other sources.

In addition to these quantifiable costs, there are also a number of "indirect" or other costs. For example, when a Code Enforcement citation is written, there is not only additional time invested on the part of the inspector (not captured as a part of the visit), but also on the part of the City Attorney's Office which is prosecuting the citation. The same may also be said of Police for arrests, citations, and search warrants. Another type of staff cost involves City employees who work on these chronic problem properties, but whose time is not logged in our dispatch or complaint management information systems. These people include staff in the Council and Mayor's Offices who handle constituent concerns about these properties. Time spent in meetings

and at the desk trying to work on these problems is not captured by these information systems. Neither is the time spent proactively monitoring chronic problem properties, as is the case with staff for the City's registered vacant building program.  Finally, we did not attempt to quantify costs associated with the negative effect these properties have on their neighborhoods, such as potentially decreased property values.

**Table 3.  Cost Calculations**

| Dept./Division | Cost Estimate | Basis for Calculations |
|---|---|---|
| Code Enforcement, Zoning, Licensing, Animal Control and Certificate of Occupancy Complaints | $150 per Complaint | Average of 1 initial visit and 1 follow-up. $75/visit calculation made by City Council fiscal staff for Code Enforcement Excess Consumption ordinance amendments. 2 visits at $75/visit is $150. This is the base number used for several types of City complaints in this study, as they require similar staffing levels. |
| Emergency Medical Services (EMS) and Fire Services | $457 per Run | Using 2000 budget figures and all Fire and EMS runs made by the department, the unreimbursed cost to the City is $457 / run on average. |
| Police Call for Service | $130 per Call | City Council fiscal staff analysis of cost from 2000 for the Excess Consumption of Police Services Ordinance. |
| FORCE Unit Knock & Talk | $130 per Visit | Estimate same staff involvement as responding to call. |
| FORCE Unit Buy/Surveillance | $325 per Buy / Surveillance | Estimate 2.5 X staff involvement as responding to call (2.5 x $130). *(Very likely a substantial underestimate.)* |
| FORCE Unit Arrest | $520 per Arrest | Estimate 5 X staff involvement as responding to call (5 x $130). |
| FORCE Unit Warrant Execution | $1,300 per Warrant | Estimate 10 X staff involvement as responding to call (10 x $130). *(Very likely a substantial underestimate.)* |

# HOW CHRONIC PROBLEM PROPERTIES COME INTO BEING

Chronic problem properties are characterized by ongoing and enduring social and physical problems, otherwise referred to as incivilities, disorder, or nuisance crime and conditions. Why these problems persist while others cease upon intervention is puzzling. In order to better understand this phenomenon we looked at who was involved in perpetuating or fixing the chronic problems at our properties. For the purpose of this study, we refer to them as actors.

## WHO FAILS?

The four actors we identified with chronic problem properties. The first is the owner who has the legal right to the property in question. Owners can be individuals who live at the property, otherwise referred to as owner occupants. However, 56 percent of our case studies have non-resident owners, landlords or property managers who act on their behalf. We observed that owners are ultimately responsible for the physical upkeep of the property and are, therefore, the main point of contact and inquiry when a property is in disrepair. Owners play an important role in fixing and preventing chronic problems by ensuring that properties are up to code and criminal activity does not occur.

The occupant is the actor who dwells or resides within the property in question. They could be owner-occupants or tenants. Occupants are important in this discussion because they alone are likely to alert government agencies to interior property code violations in rental properties. Occupants were also the primary source for crime and behavior problems found at the property. Not surprisingly, it is more difficult to ameliorate social problems or incivilities, such as drug dealing, when it is condoned or perpetuated by the owner, as tenants can be evicted.

The neighborhood is the third actor group we are considering and we consider it the distinct area, residents or organizations surrounding the property in question. It is made up of individuals in the vicinity of the property and the organizations that work within, or represent, that particular area. It may not appear neighborhoods have a direct impact on chronic problem properties, but they do in a number of ways. We see this in the role neighbors and neighborhood organizations play in providing both a sense of community and in perpetuating community standards of behavior— social cohesion and community efficacy. (Social cohesion and community efficacy are discussed in Living with Chronic Problem Properties on page 47.) How well these neighborhood systems are functioning will determine whether the neighborhood can prevent the creation of chronic problem properties and mitigate their problems. If these systems are not functioning, neighborhoods can actually work to perpetuate or facilitate the creation of chronic problem properties. For example, if junk cars in a neighborhood are commonplace or loud music is the norm, the neighborhood incorporates the problems of the property into the fabric of the community. Government depends on the neighbors or neighborhood organizations to call the police or notify Code Enforcement of social and/or physical incivilities in their neighborhood.

Government is the final actor which plays a major role when thinking about chronic problem properties. For the purpose of this study, the term government primarily refers to the City of Saint Paul, Ramsey County and the court system. Government is the entity that regulates, enforces codes and laws and provides services relating to residents' public health and safety. It sets the

minimum standard for property maintenance and behavior through the legislative process. These standards are enforced by inspectors and the police. In Saint Paul, the Code Enforcement Division is responsible for enforcing property maintenance standards at all one- and two-family units. This division also enforces exterior code standards for all Saint Paul properties. Buildings with three or more units are inspected at least every two years through the City's Certificates of Occupancy Program in the Fire Department. Government also establishes programs to assist residents, including problem property owners. It also uses many tools to clean, abate, try to eliminate and prevent problem properties. These steps often ameliorate any code-related problems that arise. Although, if an owner or occupant is unwilling to maintain these corrections, it often becomes a chronic problem property. Another City service that is highly used to correct chronic problem properties is the Saint Paul Police Department. Phenomenally, one hundred percent of our case properties had police visits during the study period resulting from calls for service. Although the City of Saint Paul is not directly responsible for social service activities within the City, we do know that social services are an important complement to police initiatives.

# WHY DO THEY FAIL?

Chronic problem properties are multi-causal and complex. Each chronic problem property is idiosyncratic in nature and has individual and environmental forces that perpetuate its problems. Through analyzing our case studies, we found there is not one cause or formula we can apply to determine what creates problem properties, or even more so, why they perpetuate.

After studying the cases and the actors, we noticed a pattern of deviance from mainstream society. Typically, problem properties are abated effectively upon intervention. However, some problem properties persist undeterred by fines, correction orders, police interventions or drug raids. In order to better understand this phenomenon, we chose to look at several sociological frameworks to clarify how deviance manifests itself and how it works in the creation of chronic problem properties.

## Deviance

Deviance is defined as behavior that differs from accepted social or moral standards. The following three sociological paradigms explain patterns of behavior that may be considered deviant by mainstream society, which are in conflict with established norms and laws. These patterns of behavior have been a prevalent throughout our case studies. We will look to identify why these patterns exist and even more importantly, why they persist.

### Symbolic Interaction

Symbolic Interaction is a theory that attempts to explain the development of one's identity through one's interaction with others and how one acts in response to others. According to the theory, one develops a sense of self based on the idea that "I am what I think you think I am." If an individual interprets that "others" perceive him or her as deviant, he or she may continue to participate in this self-fulling prophecy. Symbolic Interaction theory suggests the important piece is how the actor interprets his/her role based on how he/she perceives and models other people's beliefs about this role. How do the "others" in this case influence and perpetuate the deviance at chronic problem properties? How do they encourage the persistence of social and physical incivilities?

The idea of "other" encompasses the influences an individual uses to identify themselves in relation

to the world around them. "Other" can be defined in two ways; first is known as the "Significant Other". This includes people who are close to you, such as family, friends or colleagues. The individual holds in high esteem what they think the "significant other" thinks about them. Therefore, the individual tries to act in a way that is consistent with how he or she perceives how the significant other thinks about his or her role.[8] Whereas, the second other is referred to as the "Generalized Other," and it includes the rest of society. For example, individuals interpret how society views them to act or through stereotypes in the media. Or, if they grew up in a neighborhood where their family was treated in a certain way by the neighbors, they may continue that pattern. Individuals may try to "be" what they think others expect them to be or they may refuse to conform to values or perceived values of the society. Symbolic Interaction helps to explain some of the dynamics in *Watering Hole* and *Fight Club*, where customer perception and expectation become reality for the owners.

Expanding on this basic theory, some symbolic interactionists would explain that an individual has difficulty maintaining their property because of their affiliation with a particular group, whether it is ethnically or economically based. This aspect of the theory incorporates the concept of the "pluralized" other. The theory of the "pluralized" other states that one's affiliation or identification with a particular group of people -- whether it be a racial, ethnic or economic group -- may greatly influence a person's perception of how society views them. For these theorists, the "pluralized" other is just as important as the "significant" other in shaping the individual's view of the world.

A low-income person, for instance, may perceive the rest of society believes that low-income neighborhoods are not tidy. This may be confirmed by everyday experience as the residents drives through his or her neighborhood and sees that, indeed, the neighborhood is disorderly. In that residents mind being a low-income becomes associated with not maintaining a high level of maintenance on one's home. Moreover, the low income resident may also perceive that others in the low income group may think that maintaining a home at high standards is a sign of uppity or show-off behavior that is inconsistent with the norms of the group. If the resident strongly desires to continue his or her identification with this group, he or she will conform to this interpretation of the groups norms and values. For these reasons, he or she may be less likely to address issues on their property which others in society may think are important. The important point here is that it is not that person's character which explains their inability to maintain their property. Rather it is their identification with a particular group or class of people that reinforces their perceptions of the world and shapes their decisions regarding property maintenance.

## Structural Functionalism

The theory of Structural Functionalism holds that a society functions best when individuals share the same norms and values because it promotes solidarity. The theory also maintains, however, that because a society has established norms and values, that society will also have deviance because the rules of the society will not be agreed to or shared by everyone. In other words, while it is beneficial for society to reduce deviance, a society will never be able to truly and completely eliminate it.

---

[8] Although family is not outright mentioned or referred to in this study, it could by hypothesized that family might play a role in halting or preventing chronic problem properties. One way is through socialization. If a family raises a child in an environment that adheres to social norms and standards regarding conditions of property, the child will emulate this behavior with their home. However, if the family does not follow these norms, then the children are more likely not to participate accordingly. The second way family might be considered influential is through peer pressure or observance. If a family member notices the decline of a property, most likely they will intervene, either monetarily to ease the cost of maintenance, or to address other incivilities.

# Case Study: The Brothers Grim

- ■ Owner Occupied Single Family Home Built in 1924.
- ■ MV: $119,000
- ■ City Taxes: $471
- ■ Cost for Annual Calls to City: $5,891
- ■ Problems: Drug-Addicted Brothers, Garbage, Sewer Line Break in Basement.

"The Brothers Grim" is a cute house in an attractive area of the City. The home has no mortgage and was the recipient of a forgivable rehabilitation loan for $7,092 in 1991. Until 1997 this was the home of a older woman, who was thought to be an eccentric character by her neighbors, and her two adult sons. The mother died in 1997 and the has spiraled down ever since. The ownership was somewhat uncertain during the study period as the mother's estate was in probate; however, the sons continued to occupy the home. They did not, however, bother to pay the property taxes which had been delinquent since 1998 for $9,517. In the summer of 2001, the property was taken by the County as a tax forfeiture. While we are focusing on the years of 1999 and 2000, problems involving dog fighting and drugs extend back further. In recent years, the property seems to experience waves of problem activities for three to six months at a time, with brief one to three month lulls in between.

This house has experienced both interior and exterior code violations. The most specular interior violation involved a broken sewer line in the basement. The brothers attempted to continue to live in the home despite this situation until complaints from neighbors about rats and odor brought City inspectors to the scene. As a result, in July of 1999, the City condemned the building for one month for being unfit for human habitation. Interestingly, the "Brothers" approached the District Council for financial help with the sewer problem, but were unsuccessful with that effort. They did, nonetheless, get the sewer repaired and resumed occupancy. Other, less serious, code violations resulted in summary abatements and citations for tall weeds and grass, garbage and broken stairs. A warrant is still outstanding for failure to appear in court in response to a tag issued for the broken sewer line.

The "Brothers" are widely considered to be heavy drug

users involved in a variety of criminal behavior. The police responded to this address 46 times during the study period. Besides drug issues, they responded to calls involving fighting, domestic assault, disorderly boys, auto theft and burglary. These calls and subsequent investigation led to at least one FORCE raid on the property. Convictions for drug possession and operating a disorderly house resulted from this. The domestic assault charges were leveled following a violent fight between one brother and the other brother's girlfriend, where she was attacked with a chair and a knife. Neighbors reported a variety of instances where domestic situations have spilled out of the house and onto the street. People, including minors, come and go at all hours. There have also been arrests for selling narcotics and child endangerment. The child endangerment resulted from a resident girlfriend leaving her child unattended. Criminal activity went largely unabated through the summer of 2001, as is reflected in 38 percent increase in calls for police service over the previous year.

Despite the fact neighbors organized to deal with this problem through the FORCE unit and other police units, it has been to little avail as the problems continue to re-emerge. The brothers calm down their activities for a time, perhaps because they are in jail, or because they are genuinely trying to clean up their act. However, they seem to be so immersed in the drug culture that their criminal behavior begins again, and the property continues to deteriorate. Many of the staff involved with this property believe the brothers are probably too far gone for any effective intervention and may actually have become unable to maintain this property. They are, however, a neighbor's nightmare. The violent and drug-related crime, together with the lack of maintenance, led to the physical decline of this otherwise nice home in a nice neighborhood. Clearly, the government either lacks the tools to deal with such a difficult problem or is simply unwilling to do what it would take to resolve this problem.

In the end, the government taken control of this property for non-payment of taxes. Given that the house was owned outright, it seems particularly surprising that the brothers lacked the where-with-all to refinance the property to pay the back taxes. According to the last reports we received, one brother periodically tries to get back into his lifelong home for someplace to stay, although it was boarded and secure. The other brother's

Structural functionalists attribute deviance to a lack of assimilation by some into the rest of society, thus producing a sub-culture that is different, or in conflict with, "mainstream society." In turn, this subculture creates an environment that supports and reinforces certain norms and values that may be considered deviant. The dominant culture, or mainstream society, does not have rewards or sanctions that overcome the rewards and satisfaction of remaining in the comfort and stability of the sub-culture they grew up in. Thus, these individuals do not participate in the same opportunity structures as those who follow established mainstream norms. By not participating, they may be excluded from having the same educational opportunities, subsequently leading to disadvantages and possible discrimination in the workplace or in competing for traditional jobs. Therefore, structural functionalists believe that it most desirable to get those in this particular sub-culture to assimilate into mainstream society.

In the context of chronic problem properties, a particular subculture may socialize an individual to adhere to norms and values that may be considered deviant to the dominant culture. For instance, storing cars on your property. Some may think this is acceptable to do in order to use the parts in other automobiles, thus saving them money. However, it may be against the law according to the dominant culture. In this example, the dominant society may not have the resources to overcome the benefit from storing your own car parts in your yard, so some would naturally continue to do it. In *Misplaced,* the owner and proprietor was aptly described in an interview as being "misplaced in time and location," alluding to his lack of connection with prevailing community standards on how the auto towing and repair business should, and should not, be run.

## Conflict Theory

This theory is based in Marxist thought and finds the source of deviance in social and economic inequalities. Conflict theorists believe deviance is created by unequal access to wealth. These theorists view that society is continual conflict to access wealth. It is the source of stratification in society. Deviance comes from those who do not have wealth and try to access it through alternate means, which are often in conflict with the wealthy. Those in power, often the wealthy, create the rules to protect their interests. Therefore, those who differ or do not agree with these rules are considered deviant. Defining those in the lower classes as deviant is a way to exercise power over them and maintain control.

This theory also identifies how this view manifests class distinctions. Those who are defined by classes identify with that particular class and those within that class and view themselves as separate from other classes. This develops and strengthens class identity and class affiliation which is, more often than not, stronger than affiliating with other classes. So it is in the best interest of the upper class to maintain their power distinctions over the lower classes by limiting the opportunity structures of the lower class. Thus, lower classes may have limited access to education and lack access to capital. They may be arrested more because they are not of the power class or participate in their way of doing things, which helps the wealthy class maintain its class boundaries. Under this theory, drug dealing may be seen as an alternative means of earning a living when other opportunities do not present themselves— and even sometimes if they do. Prostitution may be interpreted in this school of thought similarly. These situations present themselves in the case studies *Career Criminals, Cracking Up, Motel California,* and *Dog House,* among others.

## Unable and Unwilling

Deviance manifests itself as individual actors that are unable or unwilling to effectively address and eradicate problems at their properties, thus becoming chronic problem properties. Similarly, neighborhood organizations and government may also be considered unable and/or unwilling to

# Case Study:  Motel California

- Commercial Motel.
- MV: $303,400; MV per Room: $2,408.
- City Taxes: $3,028
- Cost for Annual Calls to City: $34,534
- Problems: Uncaring and Possibly Corrupt Management, Code Violations, Crime.

"Motel California" is a 100+ unit motel that rents rooms on a daily and weekly basis for approximately $65 and $215 respectively.  The people who rent here tend to fall into several categories: individuals and families near homelessness; migrant and seasonal workers; along with some drug dealers and prostitutes.*  The motel has a "seedy" reputation and it has been suggested it attracts bad tenants because no one else would want to stay there.  The surrounding neighborhood is largely light industrial, offices and some retail.  This property has been considered a problem by neighbors and the City for a long time, and it has been on the problem properties task force list for years.  The motel continues to maintain a high occupancy rate probably due to the current shortage of affordable housing in Saint Paul and surrounding areas.

Maintenance of the motel has long been a serious problem.  The property has received many correction orders for overcrowding, sanitation, rodents, lighting, smoke detectors, extension cords, exposed wiring, fencing, stairways, roof, exterior walls and abandoned vehicles.  It has, however, maintained its Certificate of Occupancy by making corrections when required by the City.  The owners are considering reopening a restaurant in the building and are engaging in a unit-by-unit rehabilitation effort which has extended over a long period.

Crime has been a continuing source of concern with this property.  The police were called to this address 296 times during the study period—which is an average of three police calls per week.  The reported crimes have included: public drinking; narcotics; prostitution; child abuse; disorderly boys; domestic assaults; disturbances; fights; thefts; assaults; aggravated assault; vandalism; sex offenses; auto theft; obstruction of legal process; burglary; robbery; runaways and stalking.  Sexual assaults are reported by neighborhood activists to be frequent, which may be related to prostitution and transient residents.  *(In 2001 calls were up slightly over the previous two years and there continues to be much reported violence and nuisance crime here.)*  It has been suggested this high level of criminal activity is not unusual for

a building of this type, which may partially explain the very high number of 31 Fire and 30 EMS runs to this address, as well as the high number of "transports to detox" (11) which resulted from a variety of calls.  These Fire and EMS calls may be duplicate calls, as both types of units are routinely dispatched in response to emergency medical service calls.  Even if this is the case for all of the calls, fire units were still called to this property at least once each month.

Neighborhood organizations, neighboring businesses and police have articulated a number of chronic problems at this motel, almost all of which relate to the behavior and criminal activity of its occupants.  One might suspect that these concerns were born out of a "not-in-my-backyard" mentality, given the types of residents who stay at this motel.  However, the long record of code and criminal problems documents the real and serious nature of the ongoing problems.  The extremely high level of "visible" nuisance , violent and property crime, coupled with the "invisible" problems lurking within the motel's rooms, spurred concerned neighbors to meet with motel management.  Although motel management has come to a few meetings to discuss these concerns, many believe their follow-through has been inadequate.  For example, given the high level of crime, the need for private security was pointed out.  Management did follow through and provide one security guard for an 8-hour night shift.  However, reported crimes remained largely unchanged, even increased, in the year following our study period.  In another case, a notorious "swinger's club," which is banned in at least one Minnesota county, met for a weekend night at the motel— even though the neighbors had some previous bad experiences with this group meeting at this location.  It was thought to be inconsiderate, at best, of management to book them for another event.  After being confronted about the group's background, management did, however, respond by canceling the group's future bookings.

Many see the manager as the root of the problem with this property, and it was noted that the advent of serious problems with this motel seems to coincide with his tenure as manager.  He is said to not often be present and not care about managing the building, as he seems to have other business interests that occupy most of his time.  Some even believe he is actually facilitating criminal activity at the motel by renting units to out-of-town gang members and visiting drug dealers.  Some staff we interviewed also suspect that he helps drug dealers— knowingly or inadvertently— to conceal their criminal activities by moving them around in the building which thwarts police surveillance activities.  He is thought to generally cooperate with criminals, drug dealers and prostitutes.  The owners seem little interested in the manager's activities so long as the business remains highly profitable.  Given its current rates and occupancy, it is undoubtedly, very profitable.

---

* "No national—or even reliable local—statistics are available, but apparently more and more of the poor have been reduced to living in motels.  Census takers distinguish between standard motels, such as those tourists stay in, and residential motels, which rent on a weekly basis, usually to long-term tenants.  But many motels contain mixed populations or change from one type to the other depending on season.  Long-term motel residents are almost certainly undercounted, since motel owners often deny access to census takers and the residents themselves may be reluctant to admit they live in motels, crowded in with as many as four people

effectively address chronic problem properties, not because they themselves are deviant *per se*, but because of their inability or unwillingness to respond to these chronic problems. For purposes of this study, being "unable" is to lack the necessary power, authority or means to halt problem properties. As we see in our case studies, there are numerous individuals identified as unable due to mental illness, poverty, drug addiction, etc.

An actor who is "unable" to maintain their property shows up in number of ways. Many of our case studies provide examples of owners or tenants who do not have the capacity to fix the physical or social incivilities at their properties. An individual's mental and emotional capacity may be hindered by mental illness, addiction to drugs or any number of things. In addition, owners or occupants may not have the economic capacity to maintain their property. They may not be able to pay utility bills which will prompt a condemnation from the City if services are shut-off from the property. Tenants may be "unable" to effectively address incivilities because of limited resources and options. Saint Paul's tight housing market may inhibit a tenant's ability to find or afford another place to live. Thus, landlords and owners may continue to exploit them and refuse to keep up the property knowing they will always have tenants, whether or not they keep up the property. A tight housing market is a landlord's market— unfortunately, even for the slum lords.

Lack of knowledge about laws or existing resources is also a piece in the puzzle of chronic problem properties. Owners and tenants may not know what is considered a code violation. For example, owners may not think there is a problem with storing mattresses in their backyard. Therefore, they may choose not to comply with correction notices because they feel that the government and/or their neighbors are simply overreacting. On the other hand, if a chronic problem property emerges because of a lack of resources, owners and tenants may be unable to mitigate the problems because they may not know about government or community programs that would help them solve the problems they are facing.

Government may also be unable to mitigate behavioral and physical incivilities. By the time a problem property becomes a chronic problem property, the government is almost always aware of it. However, the problems at the property may be too complex for a standard government intervention to fix. The "underlying" problems at a property, such as economic distress or domestic violence, may need to be resolved before the "surface" problems of uncollected garbage, broken windows and uncontrolled children can be successfully engaged.

For purposes of this study, being "unwilling" is to be reluctant to fix problem properties. As we have seen in our case studies, there are numerous individuals identified as unwilling due to greed, hopelessness, indifference, antagonism towards government, their neighbors or tenants. Our case studies suggest landlords or owners will often remain unwilling to cease the physical or social incivilities because of the financial benefits of those actions. For example, several of our case studies outlined how owners exploit the precarious financial situation of tenants. For example, in *Double Trouble,* the landlord keeps the units substandard and demands first and last month's rent from desperate families. Then when families are forced to move because of the horrible living conditions, the owner keeps all of the deposits and then seeks the same from the next tenant. Owners or tenants may also profit from illegal activity occurring at the property. For owners, the benefit may be direct, in that they are involved in illegal activity. More often than not, however, the benefit is indirect. The landlords rents to people involved in illegal activities because they are more likely to accept poor living conditions without complaint— *quid pro quo.* Government may also be perceived as unwilling to deal with chronic problem properties. The main reason for this is that government lacks the financial resources and capacity to effectively deal with the complexity of most chronic problem properties. Because of these limited resources, government often focuses on what it can fix at a reasonable cost, thus prioritizing other enforcement and service provisions.

# Case Study: Cash Cow

- 69 Unit Rental Built in 1971.
- MV: $1,260,000; MV per Unit: $18,261.
- City Taxes: $4,573
- Cost for Annual Calls to City: $34,821
- Problems: Incompetent Managers, Criminal Activity, Code Violations.

"Cash Cow" is an apartment building with nearly 70 units in a complex consisting of this and a similar adjoining building. There are also several large apartment buildings immediately adjacent to this complex. These are all relatively new buildings, which are somewhat secluded by woods in an area of the City which has almost a "suburban feel" to it, with many single family homes and large yards. Given its size and layout, the building is really a neighborhood within the neighborhood in which it is located. Not surprisingly, there are a variety of people who live here, and indications are that the majority of them are law-abiding and decent people to have as neighbors. The problem is that this complex is in decline in much the same way we think about some older neighborhoods in major cities. The physical conditions are getting worse. It is getting more crowded, and poorer people—many of whom rely on Section 8 to pay their rent—are moving in. Finally, a few "bad actors" are scaring away those decent tenants with the means to leave and find another place to live.

Beginning with the physical decline of the building, we see a pattern of neglect with respect to basic maintenance and needed periodic rehabilitation projects. The City has issued many correction orders some including as many as 218 items. Two citations were issued for improper building maintenance. Both citations were unsuccessfully challenged by the owners in District Court. The Certificate of Occupancy was also revoked, but was eventually reissued because the City did not want to displace the occupants of this large building. Major deficiencies have involved heat, electricity, overcrowding, holes in walls, infestations, paint and torn carpeting. The exterior has also experienced maintenance problems involving paint, roof, doors, windows and screens. The City's Problem Properties Task Force has addressed the property on several occasions and there was also a Tenant's Remedy Action, which turned out to be mostly unsuccessful, as only a few of the needed repairs were completed. One effect of this action was the eviction of a tenant leader shortly afterwards, in what was widely believed to be management retaliation. Management of this building are reported to only make basic repairs in the units when they have no other option—and in those cases, they charge the tenants exorbitant fees for doing so.

Crime and the behavior of some tenants has also been a problem for this building, and police continue to be active here. In fact, during the two-year study period, the police responded to over 200 calls, which means they had calls to this building an average of twice each week. The incidents involved public drinking, narcotics, child neglect/abuse, fights, disorderly boys, vandalism, weapons, arson, auto theft, burglary and fraud. Analysis of the police calls shows the property clearly has a mix of good and bad tenants. For example, 43 of the approximately 69 units generated no calls for police services during the two years studied. However, some units had as many as 20 calls. These tenants are often single women who rent a unit and are then joined by problem boyfriends. In one unit we looked at, the calls generated clearly spelled out a difficult family situation: child abuse and neglect; domestic assaults, disorderly boys and warrant arrests. In another unit, a different, but related story is told in its calls: disorderly boys, other assault, vandalism, arson, recovery of stolen property and narcotics. In yet another unit, there are only calls about domestics and narcotics. Amazingly, one-third of the calls to the building were to general areas. The incidents in these parts of the building tended to involve disturbances, domestics and narcotics. The sheer volume of these calls indicates two probable dynamics: first, domestic disturbances and assaults that spill out into, or begin in, the general areas of the building; and second, drug dealing and use that is not limited to the private areas of the building, that is to say, in the tenants' units. Follow-up on the property indicates the behavioral/crime patterns seen during our study period remained largely unchanged in 2001.

The owners claim to screen prospective tenants but some officers do not think they do a very good job of it, if they do it at all. Problems are exacerbated by good tenants leaving as the building deteriorates. Not surprisingly, security at this complex is a continuing problem. Police indicated a complex of this size should have private security on site to maintain order. Although the owners had a security service at one time but dropped it because of the expense.

Perhaps the most amazing thing about this property, from a City perspective, is the extraordinary usage of Fire Department services. Not only has this building required inordinate attention to the Certificate of Occupancy program of Fire Prevention, it also received 51 fire runs and 38 emergency medical services runs in less than two years.

The basic problem with this property is bad management. Furthermore, they make little reinvestment in the property. Given the relatively high rent charged and the high level of occupancy, it is hard to believe that this building would not be a money maker. Indeed, the complex was purchased by its current owners in 1998 for about $3.75 million, but the tax rolls indicate its market value two years later was only $2.5 million. The reason for this major difference in valuation is not known, but it does suggest taxes being collected from this property may be far less than its sales price would suggest.

They only make repairs when forced to do so and then often charge tenants exorbitant fees for making such basic repairs. It seems the owners' objective is to maximize their short-term profits with little regard for the welfare of the tenants or the long-term viability of this apartment building. As a result, they consume an inordinate amount of public services and

Some would argue government does not have the capability to know about all the problem properties. However, in the case of chronic problem properties, the government is almost always aware there are problems, through code inspection, emergency calls, or FORCE surveillance. Notably, a chronic problem property for one agency, such as Code Enforcement, may be just an occasional service user for another, such as the Fire Suppression, or Emergency Medical Services.) The neighborhood could potentially play a larger role in alerting government to problem properties by notifying the police or Code Enforcement before the problems become to overwhelming and complex, thus preventing them from becoming chronic problem properties. What better eyes than a concerned neighbor?

Through this research process, we had difficulty differentiating between individuals being unable or unwilling to address problems with their properties. More often then not, the problem property stems from both an unwillingness and an inability to effectively address the social and physical incivilities at the property. Chronic problem properties present a unique challenge. The causes of chronic problem properties are complex and often unique to each property. It is hard to pinpoint whether physical and social incivilities are due to an unwillingness or inability to participate in mainstream society, or the inability to meet the standards set by a wealthier class. More often then not, our case studies demonstrate how chronic problem properties typically have both physical and social incivilities due to any of the above-mentioned actors being to some extent, both unable and unwilling to effectively deal with the problems located there.

Why are the above-mentioned actors continually unwilling or unable to deal effectively with the social and physical incivilities plaguing a property? One reason may be the continuation of a problem serves a purpose to those who are perpetuating it. For example, the owner may not want to cease exploiting their tenants because they are making a profit off of the high turnover of tenants in a poorly maintained building. An occupant may not want to cease drug dealing because there is a high demand for drugs and they cannot find a better paying source of income. Neighbors may not want to intervene because they are threatened by the residents of a chronic problem property or they wish to continue participation in the social incivilities housed there. Finally, the government may not want to intervene because they do not have the tools available to effectively mitigate the problems and prefer to redirect limited time and resources. In addition, government may not be able to fully intervene due to the laws that protect individuals, such as due process, appeals and rights of property owners.

# Ring Concept

Chronic problem properties, by nature, are toxic to the whole community system. Because they are properties with enduring problems, they affect many levels of society, thus creating a breakdown in these systems we usually depend on to curb problem properties. For a problem property to perpetuate into a chronic problem property, the actors must continually be unwilling or unable to change the situation.

The concept of simultaneous "system" failures at the owner/occupant and government levels is captured in Diagram D which for purposes of this study we are calling "Ring Concept." The way the theory works is that a problem, such as a broken window or uncollected garbage, escapes through each of the "systems" society has in place to correct it. At the core of this diagram is a semi-circle representing ownership, as well as the rights and responsibilities associated with it. A semi-circle is used because the systems society has in place are flexible. The penalties society levies are not so great that there will never be violators. The system failure at this level is that the owner is unable or unwilling to fix the broken window and have the garbage collected.

**Diagram D. Ring Concept**

The next semi-circle represents occupants and tenants. If the property is rental, the tenant has some rights according to both the lease, if there is one, and state law. Accordingly, a tenant has the right to call to the owner's attention the problem, and request that it be fixed. By exercising their rights and responsibilities, tenants can prevent a problem from continuing. The broken window should be fixed and the garbage collected. If these things do not occur, the tenant can often remove himself or herself from the unit. This system does not work when the occupant is either unable or unwilling to pursue corrective action. Of course in many cases, the owner and occupant are one-in-the-same. In these cases, the protections afforded by leases and state law are of no consequence.



Table 4 summarizes who we saw as being responsible for a problem continuing at the owner and occupant levels in our case studies. Clearly, in the vast majority of cases (25 of 32), the owner or landlord is primarily responsible for a problem becoming and continuing to be chronic.

**Table 4. Actor Failure Analysis**

| Actor | Commercial | Owner Occupied | Rental | Total |
|---|---|---|---|---|
| *Properties in Group (N =)* | 4 | 11 | 18 | 32 |
| Owner Occupant | 2  *(50%)* | 9  *(81.8%)* | 0  *(0%)* | 11  *(34.4%)* |
| Landlords | 2  *(50%)* | 0  *(0%)* | 13  *(72.2%)* | 14  *(43.8%)* |
| Tenant | 0  *(0.0%)* | 2  *(18.2%)* | 1  *(5.6%)* | 1  *(3.1%)* |
| Landlord & Tenant | 0  *(0.0%)* | 0  *(0%)* | 4  *(22.2%)* | 6  *(18.8%)* |

The third semi-circle in the diagram represents neighbors and neighborhood organizations. There are basically two options available at this level to help these people who are affected by the still broken window and uncollected garbage. First, they can establish and enforce community standards. Neighbors communicating these standards to the owners and occupants provides informal social control. It may be that a neighbor out raking has the opportunity to voice concerns, or through the maintenance of their own property provide clear expectations of their neighbors. Of course, City ordinances and state laws are meant to codify community standards. The other basic option available to neighbors is to activate enforcement agencies by informing them of the problems and demanding action. It is important to keep in mind that there are many reasons neighbors or neighborhood organizations would be unable or unwilling to pursue either of the options available to them. For example, they may be fatigued from having dealt with similar problems for so long, or they may be afraid of retaliation. In the end, they are reliant upon either the owner or government ultimately taking action to see that the problems are corrected.

The outermost ring represents government enforcement of laws and provision of services. The government can, through its enforcement agencies, mandate that window be repaired and the garbage collected. If it is not, enforcement agents can write a citation and fine the owner for violating the law. The government can also board the broken window, collect the garbage and assess the cost for these services to the property's taxes. However, in order to do these things, the government has to be aware of the problems and agree with the complainant that the problems are indeed violations of the law. There are also limits on government's authority to act and possibly circumscribe individual property rights. Both not knowing about a problem and limits on government's ability to intervene in problems on private property can make government unable to solve the problem. Lastly, government in general, is often quite circumspect in its decision making on when a problem merits government abatement. A City may decide to collect garbage, but not board a broken window. It may choose to condemn a property for certain conditions, but not be willing to make a financial investment in their correction. For example, the government may condemn a house for a large hole in the bathroom floor. It is rather unlikely that the government would actively abate this problem on their own.

In the research process, we have discovered that there need be two system failures for a chronic problem property to develop: the owner and the government must both be unable or unwilling to correct the problems encountered. If the community systems represented in the Ring Concept diagram work when problems arise, those problems will not become chronic. Occupants and tenants, as well as neighborhoods, have some ability to bring about the correction of problems, but they are ultimately reliant upon owners and government to resolve problem situations.

# PREDISPOSITION

In the fields of health and wellness, there is often talk of predisposing factors which make it more likely an individual will develop an illness or disease. In some types of cancer, a family history of the cancer makes it more likely that it will develop. For heart disease, being overweight and a smoker make it more likely. The same may be said of chronic problem properties. Although we know that both the government and the owner must be unwilling or unable to correct the problems which present themselves, we believe there are also a number of circumstances that make it more likely that this will be the case. What follows is a discussion of the factors we have identified as likely playing a role in predisposing a property to becoming a chronic problem. However, it is important to note that predisposition is not destiny— just because a particular cancer runs in the family does not mean that all the family's members will get it.

## Poverty

While we did not attempt to gather information on the income and wealth of the owners and occupants of the chronic problem properties we studied, it was apparent that these people were, in many cases, living in or near poverty. This level of poverty can be seen in *Motel California, Overwhelmed* and *La Cucaracha*. There are several indicators that help in understanding our conclusion on poverty in our case studies. The first of these is the properties' market value. average (mean) market value for the 1- and 2-unit houses we looked at was $62,011, as is seen in Table 5.