# Case Study: Cracking-Up

- Rental Duplex Built in 1893.
- MV: $59,000, MV per Unit: $29,500.
- City Taxes: $214
- Cost for Annual Calls to City: $13,294
- Problems: Slumlords, Criminal Activity, Drug Dealing, Prostitution.

"Cracking-Up" is an upper-lower duplex in a neighborhood in trouble. The area's housing is in generally bad condition and is primarily rental. The residents are a mix of elderly people who have lived in the area for a long time, recent Asian immigrants, poor and uneducated people from a variety of backgrounds and a bunch of rough characters who hang out in the streets intimidating residents and visitors alike. On the surface, it seems that many of the area's residents are these rough characters living a criminal lifestyle. The immediate area where Cracking-Up is located is notorious for drug crime, in particular, crack dealing.

In the course of our research, we were in this neighborhood on a bright fall Friday afternoon. There we saw many young men in the 20's, mostly black, congregating, milling and dispersing. Cars full of passengers would pull up to the groups and one or two of the men would poke their head in the car window for awhile. Then the cars would leave, and new ones full of passengers would take their place. As we sat in our station wagon and watched, we were ourselves approached on two occasions by prostitutes.

Not surprisingly, the owners of Cracking-Up are shady characters themselves. The property has passed from one slumlord to another several times since being rehabilitated in 1996, after being vacant for a period of time. Because of the multiple sales for this property in recent years, establishing a clear sequence of ownership is difficult. It has, however, been owned by several notorious slumlords and is now in the hands of an owner some see as an old-time gangster who lives in the suburbs but seems to enjoy the company of the criminals and marginal characters. Though this property has been problematic for a long time, matters have gotten worse under this most recent owner. There has clearly been more criminal activity at this property since its purchase by the current owner in March 2000, and police calls are up dramatically. This may be in part because of the predilections of the new owner, and in part due to his inability to properly manage his property.

The physical problems with this duplex have been limited. There have been some exterior code violations for such

things as paint, maintenance of outbuildings and mattresses in the yard. In recent years there have been three correction notices for trash, paint and screens. In addition, there have been six summary abatements for trash, vehicles and garbage. There have not been any interior violations possibly because of the rather recent rehabilitation and because no inspectors have seen the interior of the duplex in recent years. Also, the building was not in the City's rental registration program during the study period, though it clearly should have been included.

Behavior problems at this address are extensive and enduring. In fact, police interventions at this address have been little short of amazing. During the study period, the police have been called 164 times for public drinking, narcotics, disorderly boys, disturbances, fights, obstruction of justice, prostitution, aggravated assault, auto theft, liquor law violations and other offenses. Two search warrants were executed for narcotics. In addition, the Fire Departments has responded with four EMS runs and two fire runs.

Occupancy of the duplex is confusing at best. One tenant lives in the downstairs unit with her two children. The upstairs unit was occupied, at least for a while, by a man who was engaged in criminal activity including domestic abuse of the downstairs tenant. The tenant's sister seems to also live in the downstairs unit. The downstairs tenant is "not very bright" according to many of the staff interviewed, and is believed to be incapable of holding a regular job. She and her sister are also reported to be addicted to crack cocaine and are likely not to maintain control of their residence. Drug dealers are known to frequent this house and also "hang out" on the front porch. Her level of complicity in this drug-dealing activities is unclear. Some see her as involved while other see her as a victim of neighborhood criminals.

This is generally a lousy situation with no apparent remedy short of a government intervention. A ranking officer in the Saint Paul Police Department had explored the option of possibly getting this woman into a prostitution prevention, recovery and rehabilitation program— to no avail. We have a drug-addicted prostitute tenant with her prostitute sister living in a building owned by a landlord of questionable competence and even more questionable motives. The neighborhood is full of drug-dealers and other criminals who further contribute to this unsavory situation. The City responds to police and fire calls plus occasional visits by inspectors to deal with specific situations. The core problems remain unresolved and, for the most part, unaddressed. Without a massive intervention by City and County agencies, this problem will continue with only the owners and tenants changing from time to time.

*As a post script, the level of police calls to the property were down slightly in 2001, but the type and seriousness of the calls remained largely unchanged. However, prostitution, auto theft and aggravated assault were not reported; but fraud, robbery and gambling were reported in 2001 and not reported in the study period. Notably, although there were fewer calls to this property in 2001 than in the previous two years, the number of reports written by the police was up*

Table 5. Market Value Averages Information

| | | | Residential | | |
|---|---|---|---|---|---|
| | | Total | 1-2 Unit | 3+ Unit | Commercial |
| *Properties in Group (N =)* | | 32 | 19 | 9 | 4 |
| MV Used by Ramsey County for 2000 Taxes | median | $57,500 | $53,600 | $197,450 | $94,200 |
| | mean | | $62,011 | $446,838 | $139,367 |
| MV *Per Unit* Using Ramsey Co. 2000 Taxes | mean | $39,495 | $48,561 | $20,316 | *N/A* |

A second indicator of the level of poverty at these properties is the level of tax delinquency in our case studies. Table 6 shows that 11 of the 32 properties studied, fully one-third, were delinquent in paying property taxes during our study period. In one case, *Brothers Grim*, the property was seized as a tax forfeiture six months after our study period. In two other cases, *Empty Promise* and *Dirty Dealing*, failure to make payments on contracts for deed led to the house reverting to its original owner.

Table 6. Tax Delinquency

| Tax Delinquency Status | Commercial | Owner Occupied | Rental | Total/Average |
|---|---|---|---|---|
| *Properties in Group (N =)* | 4 | 11 | 18 | 32 |
| Yes | 1 25.0% | 3 27.3% | 7 38.9% | **11** **34.4%** |
| Average Amount Owed | $12,611 | $6,027 | $3,817 | $5,219 |
| Average Years Delinquent | 2 | 2.7 | 1.4 | 1.8 |

A third indicator of the poverty encountered at these properties is the number of utility shut-offs they had. Eleven of the properties, or one-third, had gas, electric or water service shut-off for nonpayment during our study period. Table 7 shows the majority of these were shut-offs of electricity.

Table 7. Utility Shut-Offs

| Code Violation | Commercial | Owner Occupied | Rental | Total/Average |
|---|---|---|---|---|
| *Properties in Group (N =)* | 4 | 11 | 18 | 32 |
| Water Shutoff/Malfunction | 1 25.0% | 3 27.3% | 1 5.3% | 5 15.6% |
| Electricity | 1 25.0% | 2 18.2% | 5 26.3% | 8 25.0% |
| Gas | 0 0.0% | 0 0.0% | 2 10.5% | 2 6.3% |

Taken together, these low property values, delinquent taxes and utility shut-offs lead us to believe that poverty makes it more likely that an owner or occupant will be unable or unwilling to take action. For owners this may mean they lack the financial where-with-all to fix what needs to be fixed. For tenants, this may mean that because of their own financial distress,

# Case Study:  Errant Investor I

- Rental Duplex Built in 1893.
- MV: $53,600 MV per Unit: $26,800.
- City Taxes: $219
- Cost for Annual Calls to City: $2,985
- Problems: Absent Drug-Addicted Landlord, Drug Dealing, Intimidation. Later a Vacant Property.

"Errant Investor I" is a vacant upper-lower duplex in the North End.  This duplex is one of many buildings owned by this investor.  In fact, until recently, this individual owned or co-owned most of the buildings on the entire block.  The owner's family has been prominent and influential in the area for many years occupying a mansion and acting as a kind of feudal baronage for the immediate surrounding area.  Until slipping to addiction in 1998, the owner was viewed as a clever and effective real estate investor and property manager, who was a major asset to the community.  Unfortunately, his increasingly frequent relapses into addiction have resulted in one of the City's best property managers becoming one of the worst.

This property was in terrible physical condition during the study period.  The City condemned it in January 2000 because of problems with all of the major physical systems including plumbing, heat, water, stove refrigerator, toilets, smoke detectors, doors and windows.  Health hazards also involved rodents, insects and garbage build-up inside the building.  The exterior also evidences a myriad of problems ranging from tall weeds and grass to roof, trim, doors and locks.  The City and the community have been very active in trying to do something with this building.   In recent years the City has issued five work orders, seven summary abatement orders and two correction orders on this

property besides the condemnation that led to it becoming vacant.  There have been problems with squatters since the building went vacant and the police and Code Enforcement are monitoring the property for illegal occupancy.

Prior to this building becoming vacant, it was a source of continuing behavioral problems.  The FORCE Unit raided the building in 1995 and again in 1998.  In 1999 alone, the police responded to 22 calls for service involving domestic abuse, assaults and narcotics.  The FORCE Unit also conducted two "Knock and Talks" at this address.  The excessive police calls to this property go back more than five years with a brief hiatus when the "Errant Investor" first acquired the property.

As suggested earlier, the core problem with this property is the owner.  He bought this property, and many others, in 1995 and began managing them quite effectively.  He paid the taxes, cleaned-up the property; screened and managed his tenants.  Then in 1998, he fell victim to drug addiction and ceased caring for his properties.  Some neighbors even believe he began, sometimes, exchanging rent for drugs and sexual favors.  Taxes were no longer paid and the buildings and the quality of tenants deteriorated precipitously.  The City tried to deal with the situation but to little avail.  These matters then went to Housing Court which was also ineffective in addressing the situation.  Eventually the owner was convicted and required to serve a brief period in jail and pay moderate fines.  The Housing Court Referee also provided that a portion of the jail time and fines could be waived provided he participate in a chemical addiction assessment and sell his properties.  For a period of several months, he was missing and eventually was apprehended in the fall of 2001 when a routine traffic stop led to the discovery of the outstanding housing court warrants.  Meanwhile, this duplex has been rehabilitated and sold on a

they cannot afford to lose the "roof over their heads" by complaining. However, not all the chronic problem properties we examined had poverty, and in no case was it the only thing "going wrong" preventing the problems from getting fixed. Finally, although it may seem self-evident, not all those who are poor live in or own chronic problem properties. In fact, given that some 11 percent of the City's population lives in poverty,[9] and less than 1 percent of its properties are chronic problems, it is clear that most do not.

## Property Conditions

The condition of the property at the time its current residents move in is also a factor which may predispose it to becoming a chronic problem. Its age, the quality of the original construction and how it has been maintained play a role in how likely problems are to develop— just as these factors are important in how a used car will probably perform. While we did not assess the quality of these properties' original construction, we do know a lot about their age, how they were maintained in the five years preceding our study period, and their current conditions (which will be discussed in the next chapter, *Living with Chronic Problem Properties*).

**Table 8. Chronic Problem Property Status Prior to Study Period (1994-98)**

|  | Residential | | | |
|---|---|---|---|---|
|  | 1-2 Unit | 3+ Unit | Commercial | Total |
| *Properties in Group (N =)* | 19 | 9 | 4 | 32 |
| Chronic Problem Property | 12<br>*63.2%* | 8<br>*88.9%* | 0<br>*0%* | 20<br>*62.5%* |
| Not Chronic Problem Property | 7<br>*36.8%* | 1<br>*11.1%* | 4<br>*100%* | 12<br>*37.5%* |

As we reviewed files from the Police Department, Fire Department and Code Enforcement, and other City agencies, we made determinations in each case about whether it was a chronic problem property in the five-year time period preceding the study, from 1994 through 1998. Table 8 shows that almost two-thirds of the case studies were chronic problem properties earlier, which suggests these problems are slow in resolving— as is the case with Weird Neighbor because of its long-term incomplete home improvement project. Moreover though, it suggests that the immediate presenting problem, whether it is a broken window, uncollected garbage or out-of-control children, was not what we needed to be examining. In only a few cases were the problems a continuation of the same problems. In most cases, however, the problems seemed not to be a continuation, but rather new problems with the same, or similar, root causes. The underlying problems that created the circumstances that allowed problems to grow and remain uncorrected. A clear example of this pattern is seen in *Double Gross* and also in *La Cucaracha*. Notably, none of the four commercial properties we looked at would have been categorized as a chronic problem property before our study. However, nearly 90 percent of the multi-unit residential buildings would have been, as would over 60 percent of the one- and two-family houses.

In general, the properties we looked at were relatively old, an average of 91 years old. One- and two-unit houses were the oldest, averaging 100 years old, and all of them were constructed before World War II. In the entire population of the City's housing units, approximately 47 percent

---

[9] The eleven percent poverty rate is a "best-estimate," based on information reviewed by the City's Planning and Economic Development Department from the 2000 Census Supplemental Survey.

# Case Study: Errant Investor II

- Rental Duplex built in 1884.
- MV: $39,100; MV per unit: $19,550.
- City Taxes: $163
- Cost for Annual Calls to City: $1,695
- Problems: Absent Drug-Addicted Landlord, Garbage, Vehicles, Occasional Criminal Activity.

"Errant Investor II" is the second of two properties included in this study owned by the same problem landlord. The inclusion of two properties owned by the same person reflects the large number of problem properties owned by this investor. Indeed he owed over 30 properties at on time, including more than half the houses on the City block where our two case studies are located. When he was in his good days, he was seen as a savior for this neighborhood. Since he fell into drug addiction, his personal and financial problems coupled with his large holdings have created a problem of major proportions.

This particular property was built as a single family home in 1884 and later converted into a duplex. It is kind of a cute looking house from the outside, although it is very small for a duplex. The yard has, however, been the major source of problems. During a recent two year period, the City conducted five summary abatements and two vehicle abatements at this address. The owner has received many correction orders to clean-up mattresses, furniture, appliances, vehicles, garbage and tall weeds. Despite these numerous orders and abatements, the property continues to experience general neglect of the exterior. Following our study period, the property was condemned for a time as the water was shut off for nonpayment. It is also apparent that for a number of months, no one was managing the property and the tenants paid no rent.

Because duplexes are not subject to Certificate of Occupancy inspections, City inspectors have never had access to the interior of the building. NEAR did, however, conduct a walk-through of the building when they were considering purchasing it for rehabilitation. This walk-through lead them to conclude the building was not salvageable and they dropped their interest in the property.

The police were called to this property 18 times during our study period. These calls involved narcotics, domestic assault, aggravated assault and warrants.* They wrote reports for about half these calls suggesting the incidents were substantive in nature. One of these calls related to a late summer evening shooting that occurred on the front porch of the house. In this case, a former and current boyfriend of the tenant were involved. Sadly, only one neighbor bothered to call about the shots being fired.

This is among the worst of the many bad properties held by this owner. The City tried just about everything to deal with this situation including attempting to confront the owner through the PP2000 initiative. Nothing the City has tried has worked. In the fall of 2001, this property was sold to a developer who did some minor rehabilitation. It is currently on the market, and the same tenants continue to reside there.

were built prior to World War II. Three- and four-unit tended to follow a similar age pattern, as can be seen in Table 9. However, larger, multi-family buildings were built mostly after World War II. A notable finding in reviewing the data was that all six of the buildings which were vacant during the study period were over 100 years old, including *Dirty Dealing, Empty Promise* and *Errant Investor I.*

### Table 9. Building Age

| Building Age | Residential | | | Total/ Average |
|---|---|---|---|---|
| | 1-2 Unit | 3+ Unit | Commercial | |
| *Properties in Group (N =)* | 19 | 9 | 4 | 32 |
| Average Age | 100 | 75 | 51 | 91 |
| 100+ Years Old (Built Pre-1900) | 11  *(52.9%)* | 4  *(44.4%)* | 0 | 15  *(46.9%)* |
| 62+ Years Old (Built 1900 - 1939) | 8  *(92.1%)* | 0  *(0.0%)* | 0 | 8  *(25.0%)* |
| < 62 Years Old (Built 1940 - Present) | 0 | 8  *(92.1%)* | 1  *(25.0%)* | 5  *(15.6%)* |
| Unknown Age | 0 | 1  *(11.1%)* | 3  *(75.0%)* | 4  *(12.5%)* |

# Surroundings

Several neighborhood, or geographic, factors play a role in the likelihood of a chronic problem property developing. The first of these is the concentration of poverty. As we discussed earlier, the income and wealth of the key individuals involved, namely the owner or landlord and the occupant or tenant, makes it more or less likely that chronic problems will develop. But poverty is also a geographic phenomenon. Although not all poor people live in "poor" neighborhoods, there are neighborhoods which have significantly lower average incomes than other neighborhoods. This lack of resources has the power to predispose not just an individual property, but entire neighborhoods to chronic problem property development.

In addition to poverty having potentially negative impact on individual properties and neighborhoods, so can the presence of blight. Sometimes blight may take the form of physical decline and dilapidation of surrounding buildings. It may also include the crimes and behaviors of people who contribute to the general sense of disorder in the area. Not surprisingly, the existence of other chronic problem properties in the surrounding area has these effects and contributes to the neighborhood's decline. Several of our case studies were so situated. *Errant Investor I and II* are on the same City block, and near other problem, or chronic problem properties. *Cash Cow* is a large apartment building in the midst of other large apartment buildings in similar circumstances. Nasty Four and Down 'N Out are neighbors, as are Career Criminals and Fear Factor. Finally, *Cracking Up* is in a small area of the City known for many kinds of problems. As discussed in the methodology section of the Introduction, many of the properties nominated for the study were a part of a cluster.

# Case Study:  Gangster Boyfriend

- Single Family Rental built in 1888.
- MV: $42,300.
- City Taxes: $150
- Cost for Annual Calls to City: $2,845
- Problems: Criminal Companion, Disorderly Boys, Drugs, Probable Child and Animal Neglect.

"Gangster Boyfriend" is a single family rental property that was registered as a vacant building for 15 months until it was rehabilitated and sold to a property investment company in February of 1998. The current landlords appeared to be buying the property on a contract for deed from the property investment company. They, in turn, rented the property to a woman believed to be a family friend. Interestingly, even though this property is rental, the taxpayers have claimed a homestead exemption for this property. We have advised the County Assessor of this situation and he is investigating for possible fraud. The home is in good physical condition and there are no known violations of City codes with respect to the interior. There have, however, been several exterior violations for such things as garbage, abandoned vehicles, furniture and tires.

The serious problems with this property began in January 2000. In the ensuing ten months there were problems of every sort. The police were called 24 times to deal with disturbances, disorderly boys and noise violations. Drug use and alcohol abuse began to create fear among the neighbors. The FORCE unit, the Gang Strike Force and Family Intervention all worked on this address. The emergence of all these problems coincided with the primary tenant becoming involved with a notorious local gangster who lived there on an intermittent basis. He was believed to have a number of women companions throughout the City, and was said to have moved from one woman's home to another's on a regular basis. The tenant, and perhaps another woman who also lived in this home, seem to be unable to care for themselves and their children. Even their animals suffered from neglect leading to several interventions by Animal Control.

The neighbors were very active and attempted to organize to deal with this situation. The Block Club met extensively and the District Council attempted to be of assistance. Finally the situation came to a head in October 2000. The Gang Strike Force came to the property and arrested, with considerable fanfare, the gangster boyfriend. Shortly afterwards, the landlord evicted the tenant and the property became quiet again, which it has remained through 2001. The evicted tenant has moved to another Saint Paul address and it remains to be seen if problems follow. Currently, the property is reportedly vacant and for sale.

# Vacant Buildings and Abandonment

Another dominant feature in the landscape of chronic problem properties is vacancy and abandonment— both for the chronic problem properties themselves and the surrounding area. Table 10 shows that 6 of our 32 case studies experienced an extended period of vacancy between 1994 and the end of 2000. In a typical year, about 400 of the City's buildings are registered as vacant with the City, representing one-half of one percent of the City's 79,000 properties. In our study, 19 percent were vacant in the seven years we examined. Notably, almost all of the vacant properties in this study are one- and two-unit residences, which were all more than 100 years old. Often these properties were not the only vacant buildings in their neighborhoods. When we were out in the neighborhoods looking a the chronic problem properties in our study, it was clear that some of these areas were checkered with vacant and abandoned buildings.

**Table 10. Registered Vacant Building Status 1994-2000**

|  | Residential | | | |
|---|---|---|---|---|
|  | 1-2 Unit | 3+ Unit | Commercial | Total |
| *Properties in Group (N =)* | 19 | 9 | 4 | 32 |
| Registered Vacant Building | 5  *(26.3%)* | 0  *(0.0%)* | 1  *(25.0%)* | 6  *(18.8%)* |
| Never A Registered Vacant Building | 14  *(73.7%)* | 9  *(100.0%)* | 3  *(75.0%)* | 26  *(81.3%)* |

Abandonment of a property is relatively hard to determine looking at ownership alone. What we can determine is when the owner has not taken steps which to keep the property occupied and useful. What this tended to look like in our review of the property's records were situations where 1) property taxes were in arrears, putting the property in danger of becoming a tax forfeiture (see Table 6); or 2) needed rehabilitation and maintenance were neglected, so that a building remained vacant over a long period of time. Abandonment also involved the "disappearance" of an owner for a currently occupied property, as was the case in *Errant Investor II* and *Old and Ugly*.

Each of the factors— concentrated poverty, clustering of chronic problem properties, vacancy and abandonment— are different. None of them, alone or together, is a predictor of chronic problem property development. They are instead factors that can predispose individual properties and neighborhoods to developing chronic problems. In our research we saw a significant number of chronic problem properties which were not in "poor" areas with high levels of vacant and abandoned buildings. We did, however, note that these factors may predispose properties in some areas to becoming chronic problems.

# Personal and Behavioral Factors

Several personal and behavioral characteristics of the key actors involved, namely the owner or landlord and the occupant or tenant, makes it more likely that problems will become chronic at a particular property. Although these are discussed throughout the study, we will touch on them here as well, because we believe they can make a difference in the likelihood of a chronic problem property developing. Recall our earlier discussion in this chapter of individual actors being unwilling or unwilling to address the problems which they face. In each case, it is our contention that both the owner and the government must be unwilling to correct problems.

# Case Study: Over the Edge

- 3 Unit Rental Built in 1891.
- MV: $56,000; MV per Unit: $18,667
- City Taxes: $305
- Cost for Annual Calls to City: $4,437
- Problems: Baby Death, Narcotics, Doors and Locks, Trash, Possible Racism.

"Over the Edge" is an ugly old house with a former abandoned commercial space attached to its front. It is currently configured as a triplex, although County records show it to be a duplex. The house is an "eyesore" occupied by very poor and "scary" people, reportedly attracted to it because of its relatively low rent and lack of tenant screening. The unit in the front "old commercial" section of the house has been notorious among community and police officials for years for reported drug activity. This triplex is owned by two investors, both of whom own a few other rental properties according to Ramsey County tax data.

The building has passed Certificate of Occupancy inspections except correction orders regarding doors and locks on the inside. The City condemned one unit in July 1999 because of a utility shut-off for nonpayment. The exterior has been more of a problem with many correction orders for doors and locks, garbage, furniture in yard, abandoned vehicles and tall weeds. Animal Control came to the property several times in the fall of 1999 to address dog concerns. The owners have responded to these correction orders, albeit slowly. One tag was issued to the owner in December 2000 for failing to comply with Certificate of Occupancy requirements.

Police have been called to this address 21 times during a two-year period. For a triplex of this type, this is a relatively low number. The police have been called to respond to disturbances, narcotics, disorderly boys, theft, burglary and the death of a child. In addition to these official calls, there have been reports of violence that spills into the street, public drinking, domestic violence, child neglect and drug activity. The FORCE unit investigated this property in the summers of 1999 and 2000. In both cases investigations were conducted into alleged drug use and sales. In 1999 FORCE conducted surveillance on four occasions, attempted a drug purchase and conducted a "Knock & Talk." In June 2000, the FORCE unit executed a search warrant and made several arrests. From August of 2000 through June of 2001 there were no calls for police service to this property. Beginning in July 2001, old patterns re-established themselves, and late in the year a domestic-related aggravated assault occurred here.

The problems at this property suggested the need for social service intervention and the County conducted an assessment. That assessment suggested a large part of the problem was due to the racist attitudes of the neighbors. The neighbors countered this by stating that their concerns were not being taken seriously and they wanted more input into the assessment process, as they were very concerned about what they were seeing at this property. The relatively low number of police calls suggests that the neighbors may have given up on calling the police except for their most serious concerns. They may have just come to tolerate a level of criminal activity at this location. This changed, however, when a tenant's child died in the building from being smothered when a drunken parent rolled-over on the child while sleeping. This tragic event drove neighbors over-the-edge concerning their tolerance of the misbehavior in their midst. Nonetheless, the property continues to be an unresolved problem for the neighborhood and City. It demonstrates how the lines between code violations, nuisance crime, domestic abuse and child neglect can converge. The problems simply become a festering sore which infects the neighborhood with fatigue, hampering residents ability to address problems pro-actively. Additionally, the element of reported racism, whether real or not, worked to drive a wedge between the actors, disheartening those involved.

Chronic problem situations often develop because the owners, occupants and tenants do not take the actions available to them. So, why would someone act this way? In addition to our sociological discussion of deviance, we think it is necessary to point out some of the most common personal and behavioral characteristics we came across that helped create or complicated the problems at these properties.

Alcohol and drug abuse is a dominant feature in our case studies. There are two ways to gauge whether alcohol abuse was a problem for the properties we studied. The first was looking at the reason for, and disposition of, police calls. If there were calls labeled "drunk" as the reason for requesting police service, or calls where the disposition was to take someone to "detox," we could be fairly sure alcohol or drug abuse had reached a critical level.

Table 24 indicates the number of times taking a person to detox was the outcome of a call for police service. We also relied on the people we interviewed to tell us this kind of information. Although we had no specific question relating to drug or alcohol use, when we asked why a property had become a chronic problem, they often volunteered information on the role of drugs and alcohol. *Over the Edge, Misplaced* and *Down 'N Out* all have serious problems related to alcohol and possibly drug use. Thirty-seven percent of the properties had at least one public drinking episode during our study period. The majority of our case studies (59%) had drug or narcotics-related problems. In many cases, the properties were occupied by relatively low-level drug dealers, who used dealing as a way to support their addiction. This type of situation existed in *Errant Investor I, Dirty Dealing* and *Danger Island*.

The presence of domestic violence dominated the landscape of chronic properties we examined. As we discuss more in depth in the next chapter, 88 percent of our case studies had at least one episode of domestic violence during our study period. In almost all cases, the numbers were much higher. Domestic violence was the most prominent feature of all of our case studies. This situation, although altogether too common, is perhaps best discussed in *Overwhelmed and Errant Investor II*.

In each case, we may surmise that alcoholism, drug abuse or violence complicates the problems already present at these properties. Another conclusion we may draw is that these are the underlying problems at these properties, and the other things we see, whether it be uncollected garbage, broken windows or dog fights, are symptoms. Both of these conclusions are valid. Our focus is on the problems propensity to occur together with the other issues surrounding chronic problem properties.

# LIVING WITH THE PROBLEMS

Up to this point, this study has discussed in general terms what chronic problem properties are, and who is affected or harmed by them. In *Living with the Problems*, we will discuss in depth how they look, feel, and even smell to those who are harmed by them. The case studies have numerous instances of health, housing and property maintenance code violations, which we can use, along with other information, to describe the appearance and habitability of these properties. We also use police department call information and FORCE unit materials to describe the crimes occurring at these properties. Equally important, however, is the issue of who is harmed by the existence of these properties, and this is where we begin.

## WHO IS HARMED?

At an abstract level, we can fairly say the entire community is hurt by a chronic problem property. We can surmise that all property values are lowered a little, and the quality of life for all decreases when blight and fear conditions are introduced anywhere. But we all do not live in, next to, or down the street from this type of property— even if we are aware of a few of them. In order to get a better grasp of who is harmed by these properties and what their experiences are, we discuss neighbors, government agencies, tenants and occupants in this context.

### Neighbors and Government Agencies

**Diagram E.  To Whom Is A Property A Chronic Problem**



We began our research process at the neighborhood organization and City level by having neighborhood organizers, elected officials and enforcement staff identify chronic problem properties in their areas of responsibility.  As discussed in the Research Methods, on page 5, not everyone identified the same properties.  Astonishingly, only 11 percent of the properties on our list of nominations were nominated by more than one person.  However, in most cases, even though one person did not nominate a property and another did, there was general agreement that it, too, was a chronic problem property.  In a few cases, we were surprised to find that there was not agreement between our key constituencies as to whether a particular property was a chronic problem.  Diagram E shows, for example, that *Bad Boys* was a chronic problem for the neighborhood and Police, but not for Code Enforcement.  On reflection this makes sense.  *Bad Boys* had no serious exterior code violations, so it passed largely under the radar

of Code Enforcement staff. Similarly, *Misplaced* was a chronic problem for the Certificate of Occupancy Program and the neighborhood, but not for Police.

The lessons to be learned from this are best portrayed in several other case studies. *Empty Promise* began the study period as duplex occupied by a drug addict and his drug using tenants. The property had numerous code violations and ended up being condemned. Following condemnation, it became a registered vacant building and on at least two occasions was occupied by squatters. While it was occupied it was very much a concern of Code Enforcement officials. After it was a secure vacant building and squatters were eliminated, it became only an occasional concern of Code Enforcement, as it monitored the building to ensure it was secure. Similarly, *Empty Promise* was of little concern to Police once it became vacant. However, during the entire study period, it was perceived by the neighborhood to be a chronic problem— first, as an "active" problem with problem occupants, then as a more "passive" problem as a dilapidated building standing as a reminder of problems present in the neighborhood.

In another case, *Down 'N Out*, the neighborhood believed the use of the building to be a chronic problem. Although. The City's Certificate of Occupancy Program and Police Department had a fair level of activity, the thing that made this a chronic problem was its use as a rooming house for marginal "down and out" characters in the midst of a residential neighborhood of mostly one and two-unit residences. In the reverse situation of *Down 'N Out, Danger Island* was seen as a chronic problem by City Certificate of Occupancy Program and Police Department, but not the neighborhood. The geographic isolation of *Danger Island* keeps it from being a serious problem to neighbors to the property. However, the extremely high level of service required of inspectors and police officers signals the depth of problems within this building.

## Tenants and Occupants

The situation at *Danger Island* opens up another level of questions. If the neighbors do not seem to be affected by the problems at this property, to whom is it a problem? The answer is, of course, the tenants who live in the building. Diagram F shows one part of the dynamic. In this diagram, we see what proportion of units generate the most calls for police service in the multi-unit buildings included in our study. In a couple of cases, including *Danger Island*, more than half of the units generate high levels of calls for police service. There are also units which generate almost no such demands. Therefore, we assume that at least in most cases, the individuals in these units are not generating the problems. Instead, these units tend to be occupied by people who experience the problems as victims. They also seem to lack the ability, financially or otherwise, to remove themselves from the chronic problem property. *Danger Island* is the most extreme example of a property which has a majority of units in trouble. Another layer of problems for Danger Island, as with many multi-unit buildings, is the shared space of the building. We consistently found that the general areas of the building generated more calls than any individual unit. In these spaces there were disturbances, drug dealing and use, domestic arguments and assaults, fights and aggravated assaults, among other problems. Problem units, coupled with problem shared space in the building, work to create an atmosphere of fear and intimidation for those who are not a part of generating the problems.

# Case Study:  Through the Cracks

- Rental Duplex built in 1889.
- MV: $49,500; MV per unit: $24,750.
- City Taxes: $180
- Cost for Annual Calls to City: $6,307.
- Problems: Revolving Bad Tenants,
  Tenant Intimidation of Neighbors,
  Garbage, City Dropped Ball.

"Through the Cracks" is a rather unassuming duplex located in the middle of a block among a number of other similar properties. Problems with this property have continued for many years. The current owner, who owns several similar rental properties in the same Saint Paul neighborhood, bought this property in 1987 and has realized a significant appreciation in its value. The complaints to the City about this property are mainly about the failure of the owner to make needed corrections and the behavior of tenants, as the owner did not seem to be screening tenants.

The tenants disturb and, sometimes, frighten their neighbors. There is a lot of drinking, hassling and intimidating behavior. At least one neighbor, a Hmong woman, reported being terrified for herself and her family. Despite concern about the behavior of the tenants, the police have not received many calls about this address. They have been called 15 times during our study period and have written five reports about incidents at this address for aggravated assault, the execution of warrants, domestic assault, narcotics and interfering with 911. The FORCE Unit attempted an unsuccessful drug buy in September 2000 and attempted a "Knock & Talk" in November 2000, only to find the tenants in question in the process of moving

out. In May 2001 an arrest was made for drug law violations.

The City has responded to seven code complaints during the study period by conducting three summary abatements and three vehicle abatements. The summary abatements have primarily involved garbage, glass, a toilet, a bathtub, diapers, old food and overflowing garbage containers. The consistency of the garbage problems suggests the owner does not have a regular garbage pick-up service. The building has also had problems on the interior with heat, electricity and water damage. The exterior has experienced problems with garbage, windows and abandoned vehicles. On at least one occasion a complaint about this property was mishandled by the City. A tenant called Citizens Service in November 1999 to complain about no bathtub, electrical problems, ceiling leaking, inadequate heat and no window glass. Code Enforcement did not respond to this complaint until fully five months later when an inspector finally responded. For some reason, despite the seriousness of the complaint, the matter seems to have been referred to the Dayton's Bluff Initiative rather than being handled directly by Code Enforcement. When the City finally did respond to this complaint, the complaining tenant had long since moved.

This property continues to hover "just below" the City's radar and the conditions that make it likely to remain a chronic problem property are still present. The conditions include poverty, a distinct lack of neighborhood cohesion, no tenant screening, an uninvolved owner and generally bad neighborhood conditions. While things may have improved at this property because some of the worse tenants have moved on, the City clearly "dropped the ball" with

The other key group of tenants or occupants affected by the existence of the problem unit, are those who live within the unit or property. In many cases, those within these problem units or properties are generating the problems being experienced. However, within these units there often lives a family or partner. There are many examples in this case study where all of the family members actively contribute to chronic problems, as is the case with *Bad Boys, Cracking Up* and *Career Criminals*. However, there are also many examples where people within the chronic problem property or unit are also victims. We see this clearly in *Brothers Grim, Errant Investor II* and *Overwhelmed* where domestic violence is present, as it is in 88 percent of our cases. In *Gangster Boyfriend* though, we see a different, but similar situation. In this case study, there is no reported domestic violence *per se*, rather the problem is the boyfriend's other criminal activities, such as drug dealing or dog fighting. In this case study, he introduces the problems into the household.[10]

**Diagram F. Multi-Unit Apartment Buildings, Calls for Police Service for Individual Units**



% = Percent Units in Building

*General Areas of Building Categorized as a "Unit" for this Graphic Presentation*

---

[10] Notably, this was also the case with *Career Criminals* where the nephews introduced criminal activity to the property. In *Career Criminals*, however, there was information to lead us to believe the uncle was a part of the nephews criminal endeavors.

# Case Study: Home Alone

- Owner Occupied Duplex Built in 1906
- MV: $83,800; MV per Unit: $41,900
- City Taxes: $454
- Cost for Annual Calls to City: $1,709
- Problems: Tall Weeds, Domestic Violence, Child Protection

"Home Alone" is an average looking duplex, where one unit is homesteaded, while the other unit is rental. It is located in a relatively stable, but lower income neighborhood, and in many ways, this house is not distinguishable from its neighbors. We have no information regarding the interior of the building other than the gas and electric were shutoff briefly several years ago. However, this duplex is in the rental registration program, and thus inspectors could have gained access. The exterior has experienced some problems in recent years because of problems with windows, tall weeds and grass, vehicles, mattresses and sewer. Code Enforcement has received five calls complaining about this property. Subsequent inspections noting violations of the building maintenance code have resulted in two summary abatements for tall weeds and trash in the yard. A citation was also issued for the exterior and tall weeds.

What really makes this property standout among its neighbors is the sense of fear and unease it brings. The police have been called to this property 17 times during the study period. Many of the calls have been for nuisance violations such as public drinking and disturbances. However, a number of the calls have been for more serious matters such as domestic assault and fraud. Gunshots have also been heard in the backyard. The most serious calls, however, have involved child neglect. In one instance child protection was called in when it was discovered that the parents had left very small children alone in the backyard for many hours. Evidently, the parents were too drunk to notice the children missing, or the passage of time. These neglectful parents greatly concern the neighbors and social service agencies.

It is unclear from the records we reviewed whether this property is owner-occupied. The owner does not accept any responsibility for problems with the tenants. While the property appears to be owner-occupied, from the fact that the property is homesteaded, it is also in the rental registration program, which is not a requirement for owner-occupied duplexes. We believe, for at least some of the study period, a relative of the owner lived in the house, thus meeting state law requirements for homesteading. However, for the majority of the study period, this was not the case.

While there are certainly City issues with the maintenance of this property and some criminal behavior, the most concerning problems are social service and child protection issues. The resolution of these types or problems are matters for the County to address. Beyond police intervention, there is little that the City can do to resolve child neglect concerns. This

# WHEN ARE PEOPLE ACTUALLY HARMED?

When thinking about chronic problem properties, some specific properties, neighborhoods and situations are conjured up in each of our minds. There are conditions out there that "just bug us." That fact alone does not necessarily mean one is faced with a violation of laws or property codes. Part of what happens in neighborhoods today is that people with differing standards of behavior and property maintenance are brought together, into close proximity with one another. For example, experience, past history and upbringing may tell one that certain things are done one way, and another's may say it should be done another way. As cities become increasingly diverse, this situation is likely to continue.

Differing standards and expectations of behavior and property maintenance can be seen between different cities; some would say Saint Paul has a look and a feel that is quite different than Minneapolis. It can be seen between neighborhoods, like Dayton's Bluff— which is one of the older neighborhoods in the City and has a history of working and upper classes living near one another, and Highland— where the residents tend to be middle and upper class and most of the housing was built in the twentieth century, for people moving into their second homes. City's have historically handled the differing standards and expectations of its citizens by building distinctive neighborhoods which were often made up of people who were primarily of one cultural background. But neighborhood characters' have changed over time, often for the better, as with lessening racial geographic concentration and increased housing opportunities. This coupled with immigration makes our neighborhoods, particularly those with affordable housing opportunities, more diverse than ever.

In *Cultural Conflict*, people who have lived in the neighborhood for years, with an established set of values and standards, are confronted with people who are new to the neighborhood and may not share the same set of values. In this case study, the neighboring white residents were O.K. with an outdoor party and drinking, as long as it take place in the backyard. The African American people who lived in *Cultural Conflict*, would have parties and drink on the front porch, where people from inner-cities have more traditionally congregated. The case study evens mentions a case where neighbors called the police because some tenant's children were playing jump rope in the street. *Cultural Conflict* was also a very poorly maintained property with many exterior code violations. The situation at this property brings to light issues inspectors and police officers have to deal with every day: in a complaint-based system of Code Enforcement and law enforcement, we rely on people to notify the authorities when something is amiss. However, people respond to more than just strict violations of laws and codes. They respond to things that are different than what they are accustomed to, and also to those things and people which scare them.

Another case where a chronic problem property triggered reactions from neighbors is *Down 'N Out*. Here, the standards of behavior and property maintenance are noticeably different than the surrounding area. In this case study, it was more the land use than racism or specific cultural differences coming into play. *Down 'N Out* is a single room occupancy apartment building with a high level of drinking and drug use, and from the neighborhood perspective, it is a locally unwanted land use (lulu).

The last type of situation which deserves consideration in this discussion is that of the crazy neighbor. Anyone who has staffed phone lines in an office that takes calls for service, such as the Police Communications Center or the Citizen Service Office can tell you there are some people who call often, but rarely have real and founded concerns about the behavior or property maintenance practices of their neighbors. One such case is *Dirty Dealing*, where a mentally ill

# Case Study:  Cultural Conflict

- ■ Rental Duplex Built in 1883.
- ■ MV: $42,100; MV per unit: $21,050.
- ■ City Taxes: $249
- ■ Cost for Annual Calls to City: $7,709
- ■ Problems: Poor Management, Exterior Violations, Large Outdoor Parties, Cultural Differences.

"Cultural Conflict" is a very old duplex in a highly visible location on a major thoroughfare. Because of its age and condition, it may very well have the lowest value of any duplex in the City. This rental property is owned "contract for deed" and has been a chronic problem for many years.

The physical condition of the building is not good. The exterior has been the source of problems with tall weeds, broken windows and screens. Code Enforcement has received six complaint calls about this property within the two years studied. We know nothing about the interior of the building as no City inspectors have been inside. Gaining access to the interior of rental duplexes is possible under the City's rental registration program. However, this property was not registered during the study period.

The Fire Department has also had an extraordinary level of activity with this address with three fire runs and eight emergency medical runs during the two years it was under study. The Police have been called to this address 73 times in the same time period. This is an extraordinary level of service needed for a two-unit building. The police calls are, however, primarily for nuisance violations, mostly noise. While some neighbors and City staff suspect the residents of drug dealing, there have been no arrests for drug offenses and no FORCE unit activity at this address. Violations are primarily noise and disturbances along with a few

calls for domestic assaults, fights and assaults. The responding police officers have written few actual reports except one major disturbance, which some called a semi-riot. The usual police response to calls at this address is to "advise." There is no particular pattern to the police calls other than they occur on a regular basis. Police calls in 2001 look much like previous years, although there was one reported arson following our study.

This property is a neighborhood nightmare. The owner does not screen tenants and has little concern for what goes on at the property. This is compounded by cultural and race-based conflicts between the white neighbors and the black tenants. The tenants see no problem with moving their furniture and partying in the front yard and sometimes the street. In one instance, couches were placed on the sidewalk as part of an outdoor party. This party ended in four arrests.

Several staff have described this type of situation as the frontyard/backyard syndrome where neighbors are O.K. with an outdoor party and drinking, as long as it take place in the backyard. Neighbors disapprove of parties and drinking on the front porch and in the front yard where people from inner-cities have more traditionally congregated. Some neighbors have pledged themselves to drive these "undesirables" out of the neighborhood and call the police at every opportunity. There seems to be a racist element to the conflict at this property. They have even called the police because some tenants' children were playing jump rope in the street. There is an old lady next door who calls the police upon any provocation. Sometimes the police find a basis for her reports, sometimes not.

The mix of an uncooperative landlord, semi-incompetent and culturally different tenants and picky neighbors generates enduring problems. There is some indication the landlord has recently begun to do some tenant screening and is beginning to learn the business. This may begin to break the cycle of bad tenants being replaced with bad tenants. However, the property and

woman lives next door to a chronic problem property and frequently calls the City about her concerns. Her complaints were founded from time to time, but by and large, they were not.

# WHAT'S THE PROBLEM ANYWAY?

So just what is it about these properties that makes people worry? They do not usually look as good as their neighbors, but a lot of properties are like that. The answer is that chronic problem properties scare us. They scare us not just because of the crime which is too often present, but also because of their chaos. Someone intimately involved with the property is either unwilling or unable to fix the problems there. This is why their impact goes so far beyond the boundaries of their yards. In order to explore the chronic problems at these properties and why they are so harmful, we will first look to experts and their theories; and then move on to what we have learned at a property-specific level.

## What the Experts Think

In the course of doing a comprehensive literature review, we discovered a great deal of work by researchers to determine the affect problem properties have on urban decline, housing markets and crime rates. Although, most of the literature does not specifically attempt to explain the origins of chronic problem properties, much of the research provides information on why chronic problems properties are important to study.

### Broken Windows, Incivility and Disorder

The notion that physical disorder and crime, particularly petty crime, have a negative impact on housing values, increase resident fears of crime and cause increase in future crime, has been developed by a number of prominent urban sociologists and criminal justice scholars over the last two decades. These thinkers have developed a close-knit family of theories linking these property-associated disorders with crime changes and neighborhood decline. These theories, termed broadly as "incivilities theory," have changed the philosophy of policing in a number of police departments. They also provided municipalities with an important justification why close attention should be payed to the blight and crime associated with chronic problem properties, similar to ones in this study. Incivilities, also known as disorders, are defined by researchers as social and physical conditions in a neighborhood that are viewed as troublesome and potentially threatening by its residents and users of public spaces. Social incivilities include such activities as prostitution, drug-dealing, and loitering. Physical incivilities would include such things as broken windows, junk cars, and garbage houses. Table 11 has lists of both social and physical incivilities.

In developing strategies to deal with the issue of neighborhood decline and incivilities, social scientists in the last 20 years have found evidence that correcting physical and social problems associated with properties is one of the most fundamental things that must be done to improve urban neighborhoods. Michael Greenberg, in the article *Improving Neighborhood Quality: A Hierarchy of Needs*, found City residents believe neighborhoods will only improve if crime and physical blight are controlled. In a survey of 306 New Jersey residents, respondents stated the absence of crime and decay is required for neighborhood to be considered excellent. These two factors were far more important than others, such as quality of public services, recreational opportunities, and improving schools, in shaping residents' opinions about livability and neighborhood quality.

# Case Study:  Down 'n Out

- 20 Unit Rental Built in 1867.
- MV: $121,300; MV per Unit: $6,065.
- City Taxes: $440
- Cost for Annual Calls to City: $11,017
- Problems: Tenant Behavioral Problems, Drinking, Disorderly Boys, Intolerant Neighbors.

"Down 'n Out" is a large, old mansion converted into 20 single resident units. It is next door to another case study, the "Nasty Four," in an historic preservation district. The current owner has had the property for 20 years. Most of the residents are on some form of public assistance. The building itself is very depressing and has been described as "a halfway house for people on their way into an institution, rather than on the way out of one."

Not surprising, there are continuing behavioral problems. There is lots of drinking, drug use and low-level criminal activity. During the study period, the police have been called to this address 90 times. Forty of these calls have been to the general areas of the building and 50 have been to specific units. The incidents have included public drinking, narcotics, disorderly boys, domestic assault, fights, theft, aggravated assault, vandalism, burglary and arson. The calls to the general areas of the building have involved narcotics, disorderly boys, domestic assault, fights, assault, "drunk" and burglary. The calls to individual units have been primarily domestic assault and are rather evenly spread over time and units, so there does not seem to be a small number of problem people or units causing the calls to the building. The number of domestic assaults, disorderly boys and family/children calls is puzzling for a single occupancy

rooming house. These calls likely stem from issues related to overcrowding in individual units, among other problems.*

In recent years, physical maintenance of the building has not been a significant problem. While correction orders have been issued for both interior and exterior violations, the owner has taken care of all of them promptly. Exterior orders have been issued for paint, siding, trim, doors, stairs, windows and screens. Interior orders have been issued for rodents, insects, garbage buildup in a unit, water damage, stairs, holes in walls, smoke detectors and a bathroom sink. None of these problems have been particularly serious and all have been resolved quickly. In essence, there are no enduring Code Enforcement problems.

The basic problem with this property is that the neighbors do not want this kind of use in their neighborhood. They consider most of the occupants to be undesirables and wish they would go somewhere else to live. They would prefer to see this building used as housing for students rather than for "down 'n outers." This preference is reinforced by a history of more serious behavioral and maintenance problems. There are, for example, FORCE raids conducted at this property in both 1997 and 1998 and, although there have been none recently, neighbors have a long memory. Although the owner has become much more responsible and effective in recent years, the neighbors still see this as something they do not want in their neighborhood. This is reflected in what is probably an urban myth about drunks at this building trying to lure young children onto the property. It is a locally unwanted land use (lulu), which also begs the question, "where are these people to live, if not here?" Finally, all of the problems this property faces are not helped by the fact that the "Nasty Four" is their next door neighbor, and both are widely considered to be pulling the neighborhood down.

**Table 11. Examples of Physical and Social Incivilities**

*Physical Incivilities*

| | | |
|---|---|---|
| Broken Windows | Garbage/Trash/Litter | Dumping |
| Boarded Vacant Buildings | Tall Grass/Weeds Grown-up | Noise |
| Vacant Buildings | Junk Cars *(Private Property)* | Porno Theaters |
| Abandoned Buildings | Vandalism | Bars |
| Dilapidated Buildings | Abandoned Vehicles *(Public Property)* | Graffiti |

*Social Incivilities*

| | | |
|---|---|---|
| Prostitution | Sexual Harassment on the Street | Robbery |
| Public Drinking | Domestic Disputes that Spill into Public Space | Loitering |
| Unpredictable People | Public Insults | Gunfire |
| Panhandlers | Vagrancy | Weapons |
| Mentally Disturbed | Drug Dealing *(Open Air and Drug Houses)* | Curfew Violations |
| Harassment/Haranguing | Auto Theft | Street Dog Fighting |
| School Disruption | Arguing/Fighting Among Neighbors | Truancy |
| Gang Violence | Lack of Traffic Enforcement | Gambling |
| Rowdy Teens (Feral Youth) | | |

Since chronic problem properties are the source of a disproportionate amount of crime, physical and social problems, Greenberg's findings suggest that cities should prioritize neighborhood redevelopment efforts to address blight and crime at these properties, before investing time and resources into other neighborhood redevelopment efforts.

William Q. Wilson and George Kelling in a seminal article published in *Harpers Magazine*, entitled *Broken Windows*, outlined a thesis which states physical incivilities, are in and of themselves, catalysts for neighborhood decline. How physical disorder lead to this decline, in Wilson and Kelling's broken windows theory, is a multi-step process. The casual model of their thesis is graphical displayed in Diagram G.

The first step in the sequence is the existence of a sign of incivility, such as graffiti or a broken window. It is not important per se that the window is broken. Windows are always getting broken, properties are always deteriorating and some homes are always being abandoned. More important is how long the broken window or other problems remain uncorrected. If the condition is not repaired in a short time, Wilson and Kelling theorize residents will infer that resident-based controls are weak and other residents do not care about what is happening in their neighborhood. When this occurs residents will presume the neighborhood is socially disorganized, which will subsequently lead residents to be become increasingly reluctant to use public spaces or to intervene in disorderly situations. With this withdrawal from the public realm, social and governmental controls weaken and residents become increasingly concerned for their safety.

At the same time, local petty criminals, such as graffiti artists or "taggers" and disorderly teenagers will become emboldened, causing further resident concern and withdrawal. For local petty criminals and at-risk youth, persistent physical disorder symbolizes opportunities for delinquency. After a long period of time, physical incivilities and delinquency will become ingrained in the neighborhood's environment and serious criminals from outside the area will become aware of the neighborhood's deteriorating conditions. These criminals will take opportunities to victimize others because they will perceive their risk of detection or apprehension to be much lower than in other neighborhoods. If the offender motivation is high enough and there are sufficient targets available, they will move into the neighborhood and commit street crimes.

Diagram G. Wilson and Kelling's (1982) Incivilities Theory[11]



Wilson and Kelling provide a strong rationale for why cities should address chronic problem properties and the social disorder they create. The policy recommendations they put forth to prevent or correct this decline focus mainly on encouraging cities to concentrate on enforcement activities on maintaining both physical and social order. In their article, the authors argue that after World War II, Police Departments moved away from maintaining order to devote most of their energy to fighting and solving serious crime. Instead, police and other City enforcement agencies, should spend more time working with residents to correct incivilities by performing such duties as moving rowdy groups out the area and notifying agencies so that landlords are cited for needed repairs or trashed-filled lots are cleaned. Much of the community policing movement of the last 20 years incorporates the essence of the Wilson and Kelling's theory and was the intellectual inspiration for the zero-tolerance approaches undertaken by many cities, such as New York City, which attempt to reduce crime through eradicating disorder.

## Differing Impact Depending on Neighborhood Stability

Kelling and Wilson also discuss in great detail how enforcement activities should be deployed in City neighborhoods. They roughly separate a community into three different types of neighborhoods: stable neighborhoods with a secure population and healthy housing values; neighborhoods that have deteriorated and have experienced prolonged declines in housing values, have a transient population and have experienced a history of incivilities; and neighborhoods in transition which have been stable but are threatened by an uncertain future. Wilson and Kelling suggest this last group of borderline neighborhoods is where incivilities will have the strongest impacts on crime, behavioral and emotional outcomes. Incivilities, have little impact in stable neighborhoods because they are either resolved quickly or residents are confident enough in their neighborhood not to perceive incivilities as a threat. In declining neighborhoods, incivilities have little impact as well, because a relatively large number of incivilities already exist in the community so additional ones have a diminishing impact. Therefore, it is the borderline neighborhoods in

[11]Ralph B. Taylor. "The Incivilities Thesis: Theory, Measurement, and Policy." *Measuring What Matters: Proceedings From the Policing Institute Meetings.* Washington D.C.: U.S. Department of Justice, July 1999.

which remediation efforts should be focused. A number of researchers have followed up on this thesis and have found that, indeed, municipalities achieve the biggest return from dollars invested on reducing incivilities when they focus on borderline neighborhoods.[12]

## Neighborhood Cohesion and Collective Efficacy

Since its initial publication, Kelling and Wilson's theory has generated a tremendous amount of controversy. Critics of the theory have argued repeatedly that, while the phenomena appear to be related, there is little evidence that disorder directly promotes serious crime. For instance, Robert Sampson and Stephen W. Raudenbush have noted that homicide, arguably one of the better measures of violence, was among the number of offenses which they studied for which there was not direct relationship with disorder. Unlike Kelling and Wilson, they believe physical disorder, such as the broken window, is just a proxy for the real causes of decline; namely concentrated poverty and the lack of community cohesion and involvement.[13] This lack of social cohesion and involvement, Sampson and Raudenbush have termed, collective efficacy. They believe by strengthening collective efficacy, neighborhoods can be stabilized and crime reduced.

A number of scholars believe collective efficacy is important element in any discussion of incivilities theory. Not only may strengthening community cohesion and involvement be an important factor in combating disorder, disorder may have a negative effect on efforts to build collective efficacy. As Wilson and Kelling have suggested, disorder leads residents to withdraw from the public sphere. This withdrawal has the potential to cause them to cease organizing and participating in activities which would improve collective efficacy.

Researchers have also found that the presence of incivilities limits the development of social capital.[14] Social capital is defined as the level of civic engagement, the mutual trust between residents and the strength of community institutions through which civic interaction takes place. Physical disorder has also been found to increase the resident's mistrust of local officials and potential investors who are interested in neighborhood redevelopment.[15] It is clear to us from our research that chronic problem properties and the disorder associated with them can have profound effects on the neighborhoods and residents. As we have discussed the problems associated with chronic problem properties can be linked with increased crime and fear of crime.

---

[12] Rolf Goetze and Kent W. Colton. "The Dynamics of Neighborhoods: A Fresh Approach to Understanding Housing and Neighborhood Change." *Neighborhood Policy and Planning*, eds Phillip L. Clay and Robert M. Hollister. Lexington, KY: Lexington Books, 1983, p. 65.

[13] Robert J. Sampson and Stephen W. Raudenbush. *Disorder in Urban Neighborhoods–Does It Lead to Crime? National Institute of Justice, Research in Brief.* Washington D.C.: U.S. Department of Justice, February 2001.

[14] Kenneth Temkin and William M. Rohe. "Social Capital and Neighborhood Stability: An Empirical Investigation. *Housing Policy Debate.* Volume 9, Issue 1, p 65.

[15] Michael Greenberg. "Improving Neighborhood Quality: A Hierarchy of Needs." *Housing Policy Debate.* Volume 10, Issue 3, p. 620.

# WHAT THE CASE STUDIES TELL US ABOUT CONDITIONS

We are in a unique position at this point to delve into how these theories play themselves out in our case studies and how they led to the conditions at these chronic problem properties. In order to do this, we will first examine some of our interviewees "ratings" of the conditions. We will then discuss the specifics of how these properties differ from their neighbors, by looking at both their interior and exterior code violations, and then the criminal activity that occurs there.

## Ratings

The case studies have many references about how these properties do not meet community standards. Many of these observations come from a review of official records, such as inspection and police reports. While these sources give us specific information about the violation of codes and laws, they do not necessarily capture how these properties compare to their immediate neighbors. In the research process, we conducted a large number of interviews— many with community organizers and elected officials. The many stories we heard— and verified to the best of our ability— gave color and context to the official file information we reviewed. In order to get a more precise sense of these people's feelings about the individual properties, we asked them to rate the properties in their area on a scale of one to ten (with one being the worst and ten the best) their perceptions of the housing conditions and sense of property and personal safety. We then asked them to rate the same things for the one-block area surrounding the property. The averages of these ratings appear in Table 12. In all cases, we found that the properties were perceived to be worse than their surrounding neighbors.

**Table 12. Interview Ratings of Chronic Problem Property Housing and Safety Conditions**

| Property Ratings | Residential | | Commercial | Average |
|---|---|---|---|---|
| | 1-2 Unit | 3+ Unit | | |
| *Properties in Group (N =)* | 19 | 9 | 4 | 32 |
| Housing Conditions of Neighborhood | 5.8 | 5.0 | 3.9 | 5.3 |
| Housing Conditions of Property | 4.2 | 3.4 | 2.1 | 3.7 |
| Personal Safety in Neighborhood[2] | 5.9 | 5.0 | 3.7 | 5.3 |
| Personal Safety at/in Property | 3.7 | 3.7 | 2.3 | 3.5 |
| Property Safety in Neighborhood[2] | 5.3 | 4.4 | 3.6 | 5.0 |
| Property Safety at/in Property | 4.1 | 2.9 | 2.5 | 3.6 |

## Housing Conditions

The housing conditions for the area surrounding our chronic problem properties were rated an average of 5.3 on our one to ten scale, while the same rating for our case studies was 3.7. The building conditions of commercial case studies received the worst ratings as a category of properties with an average of 2.1. Interestingly, the starkest differences between case studies and neighborhood were observed for owner-occupied properties, where the immediate area received an average rating of 6.7, but the studies were rated 4.4. Another big discrepancy can be observed in

the case of buildings which are over 100 years old. In this case, the immediate area received an average rating of 5.6, but the studies were rated 3.2.

## Property Safety

Perceptions of property safety for the area surrounding our chronic problem properties were rated and average of 5.0 on our one to ten scale, while the same rating for our case studies was 3.6. In the case of property safety, both commercial and residential properties with three or more units received poor ratings in our case studies with 2.5 and 2.9 respectively. The biggest differences between neighborhood and case studies was again observed with owner-occupied case studies (4.5) compared to their neighborhoods (6.6). A big difference was also seen between multi-unit residential case studies (2.9) and their immediate neighborhoods (4.4).

## Personal Safety

The final category we asked our interviewees to rate was their sense of personal safety at these chronic problem properties and in the surrounding area. In this case, the average rating for a chronic problem property was 3.5, while the surrounding area was rated 5.3. Commercial buildings received the lowest ratings with 2.3. The next lowest ratings were for our chronic problem properties which were more than 100 years old.

# Exterior Conditions

In the earlier discussion of signs of disorder and incivility, the exterior conditions of chronic problem properties were highlighted. Of those signs of disorder that occur on private property, all were reported in some aspect of our case studies, except porno theaters. This is reflected in Tables 13 and 14, as well as in the case studies themselves.

| Physical Signs of Incivility | | |
|---|---|---|
| Broken Windows | Garbage/Trash/Litter | Dumping |
| Boarded Vacant Buildings | Tall Grass/Weeds Grown-up | Noise |
| Vacant Buildings | Junk Cars *(Private Property)* | Porno Theaters |
| Abandoned Buildings | Vandalism | Bars |
| Dilapidated Buildings | Abandoned Vehicles *(Public Property)* | Graffiti |

Because our research involved looking at Code Enforcement records in-depth, we have identified those aspects of the case studies exterior conditions that would qualify them as dilapidated buildings. "Broken Windows" and torn screens were the most common structural problems observed by inspectors at a rate of 44 percent for all of our case studies. In addition to broken windows, the presence and condition of doors, siding, paint, and the roof all contribute to these properties' lack of "curb appeal."

## Case Study:  Fear Factor

- Owner Occupied Single Family Home Built in 1909.
- MV: $53,100.
- City Taxes: $193
- Cost for Annual Calls to City: $1,289
- Garbage, drugs, intimidation.

"Fear Factor" is an older single-family dwelling in the middle of the block in a troubled neighborhood. This home was owned for many years by an angry, belligerent old man with a serious drinking problem. He was known to yell at and berate his neighbors often. In recent years, two grandsons have lived with him. The grandfather died during our study period and the property seems to have been taken over by the grandsons. The house seems to be deteriorating even more rapidly under their control. The neighborhood is not helped by that fact that the house next door (Career Criminals in this study) is also a chronic problem property.

The City has never conducted an inspection of the interior of this house. However, the exterior has been a problem. In 1999 and 2000, the City has needed to conduct three summary abatements for garbage, wood, tall weeds, appliances and rubble. The crumbling retaining wall has also been a problem for years.

The Police have been called to this address on 13 occasions during the study period. These calls have involved theft, narcotics, weapons, disorderly boys, domestic assault, assault and vandalism. Interestingly, no reports have been written in response to any of these calls.* Despite the fact that neighbors believe the grandsons are involved in drugs, there is no FORCE file for this property. The reason may be that drugs are stored, but not sold, here. The grandsons who live here reportedly work in partnership with other nearby houses where they sell the drugs stored at Fear Factor. They also sell drugs from this property on the street. Neighbors report a lot a night time activity at this address; however, it does not seem to involve individual customers for illegal drugs, but rather street-level dealers coming to restock their "merchandise".

The occupants of this house create a great deal of fear in the neighborhood. They have reportedly been threatening toward neighbors, and those who have called the police speak of being subject to retaliation. These threatening behaviors and criminal activities, together with the very poor relationship the older man had with his neighbors, have worked to alienate the neighbors and prevent them from taking action to reclaim their safety and sense of community.

* Following our study period, police were called to this property 14 times in 2001. Five of these incidents resulted in

### Table 13. Exterior Structural Problems

| Code Violation | Residential | | Commercial | Total |
| --- | --- | --- | --- | --- |
| | 1-2 Unit | 3+ Unit | | |
| *Properties in Group (N = )* | 19 | 9 | 4 | 32 |
| Windows/Screens | 9  *(47.4%)* | 5  *(55.6%)* | 0  *(0.0%)* | 14  *(43.8%)* |
| Door Locks: broken/missing | 5  *(26.3%)* | 5  *(55.6%)* | 1  *(25.0%)* | 11  *(34.4%)* |
| Paint: bad condition | 3  *(5.3%)* | 7  *(77.8%)* | 0  *(0.0%)* | 10  *(31.3%)* |
| Siding: bad condition | 4  *(21.1%)* | 4  *(44.4%)* | 0  *(0.0%)* | 8  *(25.0%)* |
| Roof/Fascia/Soffits: holes/ leaking | 2  *(10.5%)* | 2  *(22.2%)* | 2  *(50.0%)* | 6  *(18.8%)* |
| Outbuildings: poor condition | 5  *(26.3%)* | 0  *(0.0%)* | 1  *(25.0%)* | 6  *(18.8%)* |
| Walls: holes, bad condition | 1  *(5.3%)* | 2  *(22.2%)* | 1  *(25.0%)* | 4  *(12.5%)* |
| Stair Condition | 1  *(5.3%)* | 1  *(11.1%)* | 0  *(0.0%)* | 2  *(6.3%)* |
| *Exterior Structural Problems Total* | 14  *(73.7%)* | 9  *(100.0%)* | 2  *(50.0%)* | 25  *(78.1%)* |

### Table 14. Garbage/Yard Exterior Problems

| Code Violation | Residential | | Commercial | Total |
| --- | --- | --- | --- | --- |
| | 1-2 Unit | 3+ Unit | | |
| *Properties in Group (N = )* | 19 | 9 | 4 | 32 |
| Garbage/Trash Buildup | 14  *(73.7%)* | 4  *(44.4%)* | 2  *(50.0%)* | 20  *(62.5%)* |
| Junk Vehicle | 8  *(42.1%)* | 4  *(44.4%)* | 2  *(50.0%)* | 14  *(43.8%)* |
| Tall Grass and Weeds | 10  *(52.6%)* | 2  *(22.2%)* | 1  *(25.0%)* | 13  *(40.6%)* |
| Furniture | 8  *(42.1%)* | 3  *(33.3%)* | 0  *(0.0%)* | 11  *(34.4%)* |
| Mattresses | 6  *(31.6%)* | 2  *(22.2%)* | 0  *(0.0%)* | 8  *(25.0%)* |
| Appliances | 5  *(26.3%)* | 1  *(11.1%)* | 0  *(0.0%)* | 6  *(18.8%)* |
| *Garbage/Yard Total* | 18  *(94.7%)* | 5  *(55.6%)* | 4  *(100.0%)* | 27  *(84.4%)* |

The other major category of exterior code violations we tracked had nothing to do with the buildings' structural character, but rather with the yard or surroundings of the properties. Here the most common problem was an inordinate build-up of household garbage and trash. Given that the City has private, rather than public provision of these services, this situation is not altogether surprising. In many of these chronic problem properties, the relevant actors are either unable or unwilling to maintain this service. Related to the accumulation of regular household garbage, there were also relatively high levels of junk furniture, mattresses and appliances on these properties. In total, 84 percent of our case studies had some kind of garbage or yard exterior code violation during our study period.

# Case Study:  Weird Neighbor

- Owner Occupied Single Family Built in 1920.
- MV: $101,800.
- City Taxes: $395
- Cost for Annual Calls to City: $2,210
- Problems: Long Term Incomplete Exterior Project, Commercial Vehicle Storage.

"Weird Neighbor" is a single family home in a pleasant neighborhood. The owner is described variously as eccentric and arrogant and is reportedly difficult for both neighbors and City inspectors. At least one seasoned City inspector is unwilling to go to the property alone because of the strange and intimidating behavior of the owner. The owner is considered by many to be highly intelligent but mentally ill. His mental illness is sufficiently debilitating so he is unable to work.

The issues at this property revolve around the owners inability, or unwillingness, to maintain the exterior of the property, the keeping of a commercial truck and a dog. The neighbors have been complaining for years about a never-ending home maintenance project. Scaffolding was put up years ago to repair and paint the exterior of the building. Little, if any, home repairs have actually occurred. The neighbors have complained to the City and inspectors have issued

orders to repair the exterior of the building. These orders have been to little effect. The owner was tagged and was ordered in January 2000 to complete the repairs by June 2000. He was tagged again and failed to appear at the most recent court date.

For a few months, a dog also caused a great deal of concern. During that time Animal Control was called seven times for the dog running loose. Citations were issued on two occasions and the owner was also ordered to clean up animal litter. The dog problems ended after this flurry of activity.

A large commercial truck was also being kept on the property much to the displeasure of the neighbors. The City attempted to deal with this situation by ordering it removed based on zoning laws that prohibit the keeping of commercial vehicles within residential districts. The matter went to court and the judge ruled in the owners favor because the truck was not being used for commercial purposes. The City has since revised the City Codes to prohibit this type of storage of commercial vehicles.

There is considerable difference of opinion regarding this situation. Some see the owner as a difficult, arrogant and possibly dangerous individual who enjoys aggravating his neighbors and City inspectors. Others see this as an unfortunate situation where his neighbors are harassing a man with an illness. In the time that has passed following the completion of the study period, the owner's son has taken over the property. Much to the dismay of neighbors, similar problems are

# Interior Conditions

The interior conditions of these properties is more difficult to assess than that of the exterior for two reasons. The first is self-evident. There are simply not as many people who see, and therefore can report on, the interiors of buildings. The second is the City does not have a periodic-systematic inspection process for one- and two-unit dwellings. Rather, the City uses complaint-based Code Enforcement.[16] Therefore, the violations reported in Tables 15, 16 and 17 very likely under-represent the true level of interior code violations in one- and two-unit dwellings. We found that 100 percent of the buildings covered by the City's Certificate of Occupancy program had some type of interior code violation, while the comparable figure for one- and two-unit dwellings was 63 percent. This is generally inconsistent with the level and type of interventions required by inspectors at these properties. For example, the level of correction orders, abatements and citations are similar between these two types of property. This is discussed in the next chapter, *Dealing with the Problems*.

The most common structural problems noted for the interiors of our case studies were floor coverings, such as carpeting or linoleum being excessively worn, filthy or missing. Other relatively common interior structural code violations included doors which were missing or in bad condition, holes in walls and water damage.

**Table 15. Interior Structural Problems**

| Code Violation | Residential | | | |
| | 1-2 Unit | 3+ Unit | Commercial | Total |
| --- | --- | --- | --- | --- |
| *Properties in Group (N = )* | 19 | 9 | 4 | 32 |
| Other (Often Floor Coverings) | 4  *(21.1%)* | 8  *(88.9%)* | 0  *(0.0%)* | 12  *(37.5%)* |
| Doors: Missing, Bad Condition | 1  *(5.3%)* | 6  *(66.7%)* | 2  *(50.0%)* | 9  *(28.1%)* |
| Holes in Walls | 1  *(15.8%)* | 6  *(66.7%)* | 0  *(0.0%)* | 7  *(21.9%)* |
| Water Damage | 3  *(15.8%)* | 4  *(44.4%)* | 0  *(0.0%)* | 7  *(21.9%)* |
| Stairs: Broken, Bad Condition | 1  *(10.5%)* | 2  *(22.2%)* | 0  *(0.0%)* | 3  *(9.4%)* |
| **Interior Structural Problems Total** | **7  *(36.8%)*** | **9  *(100.0%)*** | **3  *(75.0%)*** | **19  *(59.4%)*** |

The same proportion of our properties experienced interior systems or utilities problems, as experienced interior structural problems, in both cases 59 percent. The most common system or utility problem had to do with furnaces and lack of heat, although this was much more common in the multi-unit residential and commercial properties we studied, than in one- and two-unit residential properties. This is likely due to the fact that we do not have periodic-systematic inspection for one- and two- unit rental properties. Another reason could be that one- and two- unit properties are much more likely to be owner-occupied, thus not warranting complaints to the City. Water shut-offs, on the other hand, occurred almost exclusively with one- and two-unit residential properties, where one in five had this occur during our study period. Electricity shut-offs occurred in one-fourth of our case studies. Only occasionally was the refrigerator, water heater or stove cited as problematic.

---

[16] *Complaint-Based Enforcement* is a method of ensuring property, housing, health and building codes are followed throughout the community by responding to specific complaints or concerns citizens or others informed inspection officials about. Complaint-based Code Enforcement – This is considered one of the three basic approaches to ensuring codes are observed in the community. Periodic-systematic inspection is the method where buildings and conditions are comprehensively reviewed on a regular basis. The third approach is a blend of these two, where there are periodic systematic inspections, but inspectors are also sent out to handle specific complaints and concerns as they arise.

# Case Study: Old and Ugly

- 4 Unit Rental Built in 1888.
- MV: $54,000; MV per Unit: $13,500.
- City Taxes: $470
- Cost for Annual Calls to City: $9,575
- Problems: Absent Landlord, Drugs, Interior and Exterior Violations, TRA.

"Old and Ugly" is a four-plex that may be the ugliest building in Saint Paul and is also among the oldest. It is a large and decrepit building that is visually unattractive and painted an ugly color. Unfortunately, it is also in a prominent location making it even more offensive to the neighborhood. This neighborhood, a mix of residential and commercial, is already in distress and is just beginning a revitalization process. "Old and Ugly" has a history of serious problems and is seen to be a huge problem for the area.

Both the interior and the exterior of the building have experienced major problems. Within the studied two years alone, there have been three summary abatement orders, two correction orders, four Certificate of Occupancy revocations and a condemnation. The interior violations have involved appliances, rodents, insects, water damage, doors, gas and electric service along with torn and unsanitary carpets. Exterior violations have included paint, siding, trim, doors, locks, windows, screens, sidewalk garbage, abandoned vehicles, furniture and mattresses. Southern Minnesota Regional Legal Services (SMRLS) helped initiate a Tenant Remedy Action (TRA) on behalf of the tenants and the court appointed an administrator for the property. The tenants, however, did not make rent payments to the administrator and the property is now in receivership and the needed repairs have gone

undone. Not surprisingly, the property taxes are also delinquent.

The level of criminal activity here has been very high for years. During our two year study period, the police responded to 55 calls involving child abuse/neglect, domestic assaults, fights, theft assault and narcotics. The FORCE unit has been active at this property having conducted "knock & talks" and executed a search warrant that yielded a large amount of illegal drugs. Besides these official actions, the police believe tenants' teen children were involved in "jumping" a local homeless man. There have been problems with pit bulls and partying on the front porch, among many other nuisance activities. Taken as a whole, this building is just a bad scene. It is eye-sore and a dangerous building occupied by a criminal element and their children. Because of their behavior, and possibly also because of their race, they are not welcome in the neighborhood. The local neighborhood development corporation has considered buying the building for either rehabilitation or demolition. However, repairs would be too expensive, as would paying for the cost to relocate the current tenants so the building could be demolished.

The owner is inexperienced and in "over-his-head" with this building. His attempts to manage this building has been an abysmal failure. He has been totally ineffective in dealing with the property and his tenants. He did not even evict the tenant who was the source of the drugs found by the police in a drug raid. The owner claims to be recovering from an injury and unable to handle the property. He just seems to just want out from under this building and has recently disappeared and cannot be found. While his disappearance may be a good thing in the long run, it makes the resolution of the problems at this property, in the near term, almost impossible.

*As a post script, this property became a registered vacant building in August of 2001. At that time, calls for police*

### Table 16. Interior Systems and Utilities Problems

| Code Violation | Residential | | | Total |
|---|---|---|---|---|
| | 1-2 Unit | 3+ Unit | Commercial | |
| *Properties in Group (N = )* | 19 | 9 | 4 | 32 |
| Heat/Furnace | 2  *(10.5%)* | 4  *(44.4%)* | 2  *(50.0%)* | 8  *(25.0%)* |
| Electricity | 4  *(21.1%)* | 3  *(33.3%)* | 1  *(25.0%)* | 8  *(25.0%)* |
| Water Shutoff/Malfunction | 4  *(21.1%)* | 0  *(0.0%)* | 1  *(25.0%)* | 5  *(15.6%)* |
| Gas | 1  *(15.8%)* | 1  *(11.1%)* | 0  *(0.0%)* | 2  *(6.3%)* |
| Refrigerator | 1  *(15.8%)* | 1  *(11.1%)* | 0  *(0.0%)* | 2  *(6.3%)* |
| Water Heater | 0  *(0.0%)* | 1  *(11.1%)* | 0  *(0.0%)* | 1  *(3.1%)* |
| Stove | 1  *(15.8%)* | 0  *(0.0%)* | 0  *(0.0%)* | 1  *(3.1%)* |
| **Interior Systems Problems Total** | **8**  *(42.1%)* | **9**  *(100.0%)* | **2**  *(50.0%)* | **19**  *(59.4%)* |

Approximately forty percent of our properties experienced some type of health-related code violation. Both rodent or insect infestation and garbage build-up inside of the house or building occurred in one in five of our case studies. Overcrowding was cited only in five of the thirteen case properties covered by the City's Certificate of Occupancy program.

### Table 17. Interior Public Health Problems

| Code Violation | Residential | | | Total |
|---|---|---|---|---|
| | 1-2 Unit | 3+ Unit | Commercial | |
| *Properties in Group (N = )* | 19 | 9 | 4 | 32 |
| Rodents/Insect Infestation | 1  *(5.6%)* | 6  *(66.7%)* | 0  *(0.0%)* | 7  *(21.9%)* |
| Garbage Build-up | 3  *(15.8%)* | 2  *(22.2%)* | 2  *(50.0%)* | 7  *(21.9%)* |
| Overcrowding | 0  *(0.0%)* | 4  *(44.4%)* | 1  *(25.0%)* | 5  *(15.6%)* |
| Smoke Detectors: missing/malfunctioning | 2  *(10.5%)* | 2  *(22.2%)* | 0  *(0.0%)* | 4  *(12.5%)* |
| **Public Health Problems Total** | **3**  *(15.8%)* | **7**  *(77.8%)* | **3**  *(75.0%)* | **13**  *(40.6%)* |