# Case Study:  Empty Promise

- Owner Occupied Duplex Built in 1889.
- MV: $53,900, MV per Unit: $26,950.
- City Taxes: $319
- Cost for Annual Calls to City: $8,062
- Problems: Code Violations, Vacant Building, Drug Sales/Use, Squatting.

"Empty Promise" is an old upper-lower duplex near I-94 in a historic area.  This duplex has been vacant since March 2000 when the City condemned and ordered it vacant.  Prior to that, the house was owner occupied.  For a short while, after it was vacated, it was illegally occupied by squatters who used this as a home and base for selling crack and methamphetamine.  This building is in bad condition and is considered a blight on the neighborhood.  The owner, reported by neighbors to be a "hop-head" has admitted to selling crack and is otherwise seen as an oddball.  He rented the other unit to friends who were similarly afflicted.  He was in the process of buying this duplex on a contract for deed from a man who owns one of the other cases in this study.  So it seems that getting the owner occupant out of the building through the condemnation helped, but did not entirely solve the problems.  The property has been a problem for a long time with code violations and high levels of criminal activity going back many years.  This remains, as characterized by one inspector, a filthy and worn-out building.

Maintenance of this building during our study— and clearly a long time before that— has been disgraceful.  The water, gas and electric have all been shut-off at one time or another during 1999 and 2000.  Occupants have thrown everything imaginable in the yard resulting in eight summary or vehicle abatement orders

during the study period.  The City has written five Code Enforcement tags during this time.  The first three tags were disposed of by the court with a $200 fine with an additional $700 suspended if there were no further same or similar violations.  The final two tags were disposed of by the court with more $200 fines and suspended $700 fines.  There is no indication, however, the initial $700 fine suspended was imposed, although the court disposed of two more "same or similar" violations within only a month.  It would appear the court was "only kidding" about that part of the initial sentence.

The police have also been busy at this building.  They responded to calls for police assistance at this address 72 times in only two years.  These calls involved many narcotics matters along with a dose of domestic assaults and other crimes such as theft, fraud and auto theft.  The police sent "excessive consumption of police services letters" and conducted "knock & talks" at this address.  Animal Control was frequently called to this property during 1999 to deal with dog problems.

In summary, this property was owned by a well-known slum lord who sold it to a drug addict on a contract for deed— possibly in the expectation he would get the property back when the buyer failed to meet the terms of the contract for deed.  Not surprising, the property immediately became a crime scene and a blight on the neighborhood.  Also, to no one's surprise, taxes were not been paid on this property since 1998 and throughout our study period.  Like several other of our case studies, this property became vacant at the end of a downward cycle of police and code problems which ended in the duplex being used as a drug house.  The City attempted to intervene, but received only tepid support from the housing court.  Finally, the City did succeed in getting the property condemned and vacated which helped until squatters moved in and began

# Crime

In the beginning, when we were endeavored to study chronic problem properties, we thought the majority of problems we would encounter would be exterior code violations. These are the things people see and they often come to mind first when thinking about particular properties. However, while broken windows occurred at 44 percent of our properties and there was a build-up of household garbage at 63 percent, various types of crimes occurred even more frequently. For example, disorderly boys[17] were reported at 66 percent of the case studies, domestic violence was reported at 88 percent of the properties and vandalism at 56 percent. While we certainly expected some crime, the level and depth of the problems was one of our more profound findings.

In the earlier discussion of signs of disorder and incivility, the following types of behaviors and crimes were highlighted. Of those signs of disorder that occur on private property, almost all were reported in some aspect of our case studies, except pan handling and vagrancy. This is reflected in Tables 18, 19 and 20, as well as in the case studies themselves. Notably, although a few of these are violent in nature, they are, for the most part, nuisance crimes.

### Social Signs of Incivility

| | | |
|---|---|---|
| Prostitution | Sexual Harassment on the Street | Vagrancy |
| Public Drinking | Domestic Disputes that Spill into Public Space | Robbery |
| Unpredictable People | Public Insults | Loitering |
| Panhandlers | Drug Dealing *(Open Air and Drug Houses)* | Gunfire |
| Mentally Disturbed | Auto Theft | Weapons |
| Harassment/Haranguing | Arguing/Fighting Among Neighbors | Curfew Violations |
| School Disruption | Lack of Traffic Enforcement | Street Dog Fighting |
| Gang Violence | | Truancy |
| Rowdy Teens/Feral Youth — | *also known as disorderly boys by the St. Paul Police* | Gambling |

# Nuisance Crime

Nuisance crime, which is sometimes referred to as "quality of life" crime includes a wide variety of actions which are against the law. For purposes of our study, they are also those crimes which do not fit neatly into the categories of violent or property crime. Several types of nuisance crime were found in our case studies: disorderly boys (66%), narcotics/drug dealing and use (59%) and disturbances (56%), public drinking (38%). Prostitution was an issue in about one-fifth of our case studies. Interestingly, several types of nuisance crime occurred almost exclusively at one- and two-unit residents, including loud music, haranguing of passers-by, barking dogs and dog fighting. At the same time, reported disturbances seemed to be more of an issue for multi-unit residential buildings.

---

[17] Disorderly boys is a term used in the Police Department's call management system which refers to rowdy and/or disorderly youth.

# Case Study: Dirty Dealing

- Owner Occupied Single Family Home
  Built in 1887.
- MV: $56,000.
- City Taxes: $221
- Cost for Annual Calls to City: $13,131
- Problems: Gross Unsanitary
  Conditions, Occasionally Vacant,
  Criminal Nuisances, Racist Neighbors.

"Dirty Dealing" is an older single family rental house. It has been vacant for much of the time in recent years. It was vacant from 1995 to 1998 and became vacant again when condemned for lack of water and sanitation in June 2000. Ownership of the property has been unstable to say the least. It was sold in 1992, 1993, 1994, 1997 and again in 1999. The current owner was selling it on a contract for deed when it was most recently condemned. Interestingly, the last tenant somehow believed she was buying the home, on contract for deed, from the preceding contract for deed buyer. Neither the contract for deed buyer, nor the tenant, are currently in the ownership picture with the property having reverted to the recorded owner. The most recent tenant was a mother and her two teenage daughters. The mother is a suspected prostitute who brought drug users and sellers into the home on a regular basis.

Maintenance of the property has been abysmal, and problems with garbage build-up and sanitation have plagued its interior. FORCE unit officers indicated in interviews that conditions in the house were some of the worse they had seen— unattended children were left in filth, including dog feces, with little or no food in the house. City officials issued six summary abatements, three correction orders and two citations in the months proceeding the condemnation for lack of

water and gross unsanitary conditions. The exterior of the property has had garbage, mattresses, furniture and appliances causing numerous code violations. The City also charged/billed the occupants for excessive use of Code Enforcement services.

The police have also been busy at this property. During our study period, the police were called to this address 150 times, in spite of the property being officially vacant for six months of this period. There was no significant criminal activity in 2001 and very few calls for police service. For a single family dwelling, this high call level during our study period is a little short of astonishing. It means, for example, the police came to this home an average of twice each week the eighteen months it was occupied. Police responded to calls involving noise, vandalism, detox, narcotics, burglary, domestic violence, fights, dangerous conditions and disturbances. Police informants were offered drugs at this location and the FORCE unit raided the house. They have, not surprisingly, received notice of excess consumption of police services. The fact the home was condemned and officially vacant did not entirely stop the criminal activity. It continued to be used as a crack house by squatters and other illegal occupants. The number of police calls diminished, but the police continued to respond to criminal activity at this address, albeit at a lesser level than when it was occupied.

The behavior of a neighbor further complicates the situation at this address. She is thought by staff to be a mentally ill individual who is overly sensitive and racist. She reportedly has an avowed hatred of black people and was determined to force them out of the neighborhood. She is known to complain constantly and tends to take things too far. The fact that the owners do not seem to care much about the property makes this situation worse. They have not responded to letters from the district council regarding problems at the property, and seem profoundly disinterested in rehabilitating or even maintaining this property. At

**Table 18. Nuisance Crimes**

| Violation | Residential | | | Total |
|---|---|---|---|---|
| | 1-2 Unit | 3+ Unit | Commercial | |
| *Properties in Group (N =  )* | 19 | 9 | 4 | 32 |
| Disorderly Boys | 10  *(52.6%)* | 8  *(88.9%)* | 3  *(75.0%)* | **21**  *(65.6%)* |
| Narcotics/Drugs | 9  *(47.4%)* | 7  *(77.8%)* | 3  *(75.0%)* | **19**  *(59.4%)* |
| Disturbances | 10  *(52.6%)* | 6  *(88.9%)* | 2  *(50.0%)* | **18**  *(56.3%)* |
| Public Drinking | 4  *(21.1%)* | 5  *(55.6%)* | 3  *(75.0%)* | **12**  *(37.5%)* |
| Prostitution | 4  *(21.1%)* | 2  *(22.2%)* | 1  *(25.0%)* | **7**  *(21.9%)* |
| Loud Music | 4  *(21.1%)* | 1  *(11.1%)* | 0  *(0.0%)* | **5**  *(15.6%)* |
| Haranguing of Passers by | 3  *(15.8%)* | 0  *(0.0%)* | 0  *(0.0%)* | **3**  *(9.4%)* |
| Dog Fighting | 2  *(10.5%)* | 0  *(0.0%)* | 0  *(0.0%)* | **2**  *(6.3%)* |
| Barking Dog Problems | 2  *(10.5%)* | 0  *(0.0%)* | 0  *(0.0%)* | **2**  *(6.3%)* |
| **Nuisance Crime Total** | **18**  *(94.7%)* | **8**  *(88.9%)* | **3**  *(75.0%)* | **29**  *(90.6%)* |

# Property Crime

Property-related crimes were only slightly less common in our case studies than nuisance or violent crime. Of the problems discussed in the research as social incivilities, only auto theft is considered a property crime. In terms of the physical incivilities, vandalism is discussed. The most common property crimes reported for our case studies were vandalism (56%), theft (50%), burglary (47%) and auto theft (41%). There were also several cases of arson and dangerous conditions reported to police, however not at the same properties.

**Table 19. Property Crimes**

| Violation | Residential | | | Total |
|---|---|---|---|---|
| | 1-2 Unit | 3+ Unit | Commercial | |
| *Properties in Group (N =  )* | 19 | 9 | 4 | 32 |
| Theft | 4  *(21.1%)* | 8  *(88.9%)* | 4  *(100.0%)* | **16**  *(50.0%)* |
| Vandalism | 9  *(47.4%)* | 6  *(66.7%)* | 3  *(75.0%)* | **18**  *(56.3%)* |
| Burglary | 6  *(31.6%)* | 7  *(77.8%)* | 2  *(50.0%)* | **15**  *(46.9%)* |
| Auto Theft | 7  *(36.8%)* | 4  *(44.4%)* | 2  *(50.0%)* | **13**  *(40.6%)* |
| Dangerous Conditions | 2  *(10.5%)* | 2  *(22.2%)* | 0  *(0.0%)* | **4**  *(12.5%)* |
| Arson | 0  *(0.0%)* | 4  *(44.4%)* | 0  *(0.0%)* | **4**  *(12.5%)* |
| **Property Crime Total** | **13**  *(42.1%)* | **9**  *(100.0%)* | **4**  *(100%)* | **26**  *(81.3%)* |

## Violent Crime

Violent crime is both the most disturbing and most vexing component of our case studies. A high level of violent crime was reported for these chronic problem properties. Some form of violent crime was reported for 91 percent of our case studies in the 24 month study period. The most common type of violence reported was domestic violence (88%), followed by other violence (66%), fights (38%) and aggravated assault (34%). Also reported were weapons and missing persons in 16 percent of our cases, stalking in nine percent and robbery in six percent.

**Table 20. Violent Crime/Crimes Against Persons**

| Violation | Residential | | | Total |
| | 1-2 Unit | 3+ Unit | Commercial | |
|---|---|---|---|---|
| *Properties in Group (N = )* | 19 | 9 | 4 | 32 |
| Domestic Violence | 16  *(84.2%)* | 9  *(100.0%)* | 3  *(75.0%)* | 28  *(87.5%)* |
| Other Violence | 9  *(47.4%)* | 9  *(100.0%)* | 3  *(75.0%)* | 21  *(65.6%)* |
| Fights | 3  *(15.8%)* | 6  *(66.7%)* | 3  *(75.0%)* | 12  *(37.5%)* |
| Aggravated Assault | 5  *(26.3%)* | 4  *(44.4%)* | 2  *(50.0%)* | 11  *(34.4%)* |
| Weapons | 2  *(10.5%)* | 2  *(22.2%)* | 1  *(25.0%)* | 5  *(15.6%)* |
| Missing Persons | 3  *(15.8%)* | 1  *(11.1%)* | 1  *(25.0%)* | 5  *(15.6%)* |
| Stalking | 0  *(0.0%)* | 2  *(22.2%)* | 1  *(25.0%)* | 3  *(9.4%)* |
| Robbery | 0  *(0.0%)* | 0  *(0.0%)* | 2  *(50.0%)* | 2  *(6.3%)* |
| **Violent Crime Total** | 17  *(89.5%)* | 9  *(100.0%)* | 3  *(75.0%)* | 29  *(90.6%)* |

Given violent crime tends to be an "indoor" crime, with the notable exception of robbery, we were somewhat perplexed. The violent crime described and alluded to in the Broken Windows Theory and Incivilities Thesis, seemed to be "outdoor" crime— namely robbery, but also possibly fighting and gun play. A recent publication from the National Institute of Justice, *Disorder in Urban Neighborhoods— Does It Lead to Crime?* (2001) by Sampson and Raudenbush indicates "robbers respond to visual clues of social and physical disorder in a neighborhood. These cues may entice them to act, and this in turn undermines collective efficacy, producing a cycle of yet more disorder and ultimately more robberies."[18] However, although robbery was occasionally an issue for the case studies, far and away the most wide-spread category of violent crime we saw was domestic violence. This leads us to several possible conclusions on the Broken Windows Theory. One is that not all violent crimes are covered by the theory, only exterior violent crimes. Another is that cues in the exterior world work to encourage violence inside of residences. A third is that disorder does not promote violent crime *per se*, but that the conditions which create it, also create the violence. In other words, the underlying social conditions that create violent crime, also create social and physical disorder.

---

[18] Robert J. Sampson and Stephen W. Raudenbush. *Disorder in Urban Neighborhoods–Does It Lead to Crime? National Institute of Justice, Research in Brief.* Washington D.C.: U.S. Department of Justice, February 2001.

# How the Problems Interact

The term "disorder" is perhaps the best characterization of what is happening in our case studies. One is struck by the chaos in the surroundings and the lives of the actors involved in these chronic problem properties. Highlighted below is a "top ten" list of the problems and crimes identified in our cases. Tables 21 and 22 provide further information along these lines.

1. Domestic Violence (88%)
2. Disorderly Boys (66%) and Other Violence (66%)
3. Garbage/Trash Build-Up - Exterior (63%)
4. Narcotics/Drugs (59%)
5. Disturbances (56%) and Vandalism (56%)
6. Theft (50%)

7. Burglary (47%)
8. Windows/Screens (44%) and Junk Vehicles - Private Property (44%)
9. Tall Grass and Weeds (41%) & Auto Theft (41%)
10. Public Drinking (38%), Floor Coverings (38%) and Fights (38%)

These problems paint a picture of households where there are frequent episodes of violence, problems with drinking and drugs, and an inability to maintain control of one's person and possessions. Not surprisingly, our efforts to deal with these problems are often tailored to look specifically at the immediate problem, whether it is domestic violence, torn screens or public drinking, which is discussed in the next chapter, *Dealing with the Problems*. Indeed, government is charged with doing just that. However, in the case of chronic problem properties, government must do more than just deal with the latest problem at hand. In order to keep these problems from presenting themselves time and again, efforts need to be made to cure and prevent all of the problems.

## Table 21. Summary of Conditions

| Violations | Residential | | | Total |
|---|---|---|---|---|
| | 1-2 Unit | 3+ Unit | Commercial | |
| *Properties in Group (N = )* | 19 | 9 | 4 | 32 |
| Exterior Structural Problems | 14  *(73.7%)* | 9  *(100.0%)* | 2  *(50.0%)* | 25  *(78.1%)* |
| Garbage/Yard | 18  *(94.7%)* | 5  *(55.6%)* | 4  *(100.0%)* | 27  *(84.4%)* |
| *Exterior Problems Total* | *19  (100.0%)* | *9  (100.0%)* | *4  (100.0%)* | *32  (100.0%)* |
| Interior Structural Problems | 7  *(36.8%)* | 9  *(100.0%)* | 3  *(75.0%)* | 19  *(59.4%)* |
| Interior Systems Problems | 8  *(42.1%)* | 9  *(100.0%)* | 2  *(50.0%)* | 19  *(59.4%)* |
| Public Health Problems | 3  *(15.8%)* | 7  *(77.8%)* | 3  *(75.0%)* | 13  *(40.6%)* |
| *Interior Code Violations Total* | *12  (63.3%)* | *9  (100.0%)* | *4  (100.0%)* | *25 (78.1%)* |
| Nuisance Crime | 18  *(94.7%)* | 8  *(88.9%)* | 3  *(75.0%)* | 29  *(90.6%)* |
| Property Crime | 13  *(42.1%)* | 9  *(100.0%)* | 4  *(100%)* | 26  *(81.3%)* |
| Violent Crime | 17  *(89.5%)* | 9  *(100.0%)* | 3  *(75.0%)* | 29  *(90.6%)* |
| *Crime Total* | *19  (100.0%)* | *9  (100.0%)* | *4  (100.0%)* | *32 (100.0%)* |

## Table 22. Types of Code Violations and Crime Problems, by Case[19]

| Name | Exterior | | Interior | | | Crime | | |
|------|----------|---|----------|---|---|-------|---|---|
| | Garbage/Yard | Structure | Structure | Systems | Health | Nuisance | Property | Violent |
| Alligator Alley | ● | ● | ● | ◗ | ◗ | ◗ | ◗ | ◗ |
| Bad Boys | ◗ | ◗ | | | | ◗ | ○ | ○ |
| The Brothers Grim | ◗ | ◗ | ○ | | | ○ | ◗ | ○ |
| Career Criminals | ◗ | | | | | ○ | ◗ | ○ |
| The Case Case | ◗ | ○ | ◗ | ◗ | | ◗ | ◗ | ◗ |
| Cash Cow | | | | | ○ | ○ | ● | ● |
| Cracking-Up | ◗ | | | ○ | | ◗ | ◗ | ○ |
| Cultural Conflict | ◗ | ○ | | | | ◗ | | ◗ |
| Danger Island | | ○ | ◗ | ◗ | ○ | ◗ | ● | ◗ |
| Dirty Business | ◗ | ○ | | | | ○ | | |
| Dirty Dealing | ● | ○ | ◗ | ◗ | ◗ | ◗ | ◗ | ○ |
| Dog House | ◗ | ◗ | | ◗ | | ◗ | ◗ | ◗ |
| Double Gross | ○ | | | | | ◗ | ○ | ○ |
| Double Trouble | | ○ | ◗ | ◗ | ◗ | ◗ | ○ | ◗ |
| Down 'N Out | | ◗ | ● | | ◗ | ◗ | ◗ | ◗ |
| Empty Promise | ◗ | | ○ | ◗ | | ○ | ○ | ○ |
| Errant Investor I | ● | ◗ | ◗ | ◗ | ◗ | ○ | ◗ | ○ |
| Errant Investor II | ● | | | | | ○ | | |
| Fear Factor | ◗ | | | | | ○ | ○ | ◗ |
| Fight Club | ○ | ○ | ○ | ○ | | ◗ | ◗ | ● |
| Gangster Boyfriend | ◗ | ○ | | | | ◗ | | |
| Home Alone | ◗ | ○ | | ○ | ○ | ◗ | ◗ | ◗ |
| La Cucaracha | | ○ | ◗ | | ○ | ◗ | ◗ | ◗ |
| Misplaced | ◗ | ◗ | | ○ | | | ◗ | ◗ |
| Motel California | ○ | ○ | | | | ◗ | ◗ | ◗ |
| Nasty Four | ○ | | ◗ | | | ◗ | | ○ |
| Old and Ugly | ◗ | ◗ | | ○ | ○ | ○ | ◗ | |
| Over the Edge | ◗ | | ○ | ○ | | | ◗ | ○ |
| Overwhelmed | ◗ | | | | | ○ | ○ | ○ |
| Through the Cracks | ◗ | ○ | ○ | ◗ | | ○ | | ◗ |
| Watering Hole | ○ | | ○ | ○ | | ◗ | ◗ | ◗ |
| Weird Neighbor | ○ | ◗ | | | | | | ○ |

**KEY**

○ = 1 - 25% of code violations or crimes in this category present at this property

◗ = 26 - 75% of code violations or crimes in this category present at this property

● = 76 - 100% of code violations or crimes in this category present at this property

**Exterior Garbage/Yard Violations:** 1) Garbage/Trash Buildup; 2) Junk Vehicle; 3) Tall Grass and Weeds; 4) Furniture; 5) Mattresses; 6) Appliances

**Exterior Structural Violations:** 1) Windows/Screens; 2) Door Locks: broken/missing; 3) Paint: bad condition; 4) Siding: bad condition; 5) Roof/Fascia/ Soffits: holes/ leaking; 6) Outbuildings: poor condition; 7) Walls: holes, bad condition; 8) Stair Condition

**Interior Structural Violations:** 1) Other (Often Floor Coverings); 2) Doors: Missing, Bad Condition; 3) Holes in Walls; 4) Water Damage; 5) Stairs: Broken, Bad Condition

**Interior Systems Violations:** 1) Heat/ Furnace; 2) Electricity; 3) Water Shutoff/Malfunction; 4) Gas; 5) Refrigerator; 6) Stove; 7) Water Heater

**Interior Health Violations:** 1) Garbage Build-up; 2) Rodents/Insect Infestation; 3) Overcrowding; 4) Smoke Detectors: missing/malfunctioning

**Nuisance Crimes:** 1) Disorderly Boys; 2) Narcotics/Drugs; 3) Disturbances; 4) Public Drinking; 5) Prostitution; 6) Loud Music; 7) Haranguing of Passers by; 8) Barking Dog Problems; 9) Dog Fighting

**Property Crimes:** 1) Vandalism; 2) Theft; 3) Burglary ; 4) Auto Theft; 5) Dangerous Conditions; 6) Arson

**Violent Crimes:** 1) Domestic Violence; 2) Other Violence; 3) Child Abuse/Neglect; 4) Fights; 5) Aggravated Assault; 6) Weapons; 7) Missing Persons; 8) Stalking; 9) Robbery

[19] This table indicates the variety of problems experienced in each category presented, not the severity of problems. For example, there are six exterior garbage/yard problems that may have occurred during the two-year study period. If three of the six occurred at this property, the ◗ indicates this.

# DEALING WITH THE PROBLEMS

The City of Saint Paul, as all cities, exists to protect the health, welfare and safety of those who live here.  The City accomplishes this purpose by providing a rich array of tax and fee supported services designed to ensure that its citizens have an environment in which they can be healthy, safe and pursue happiness.  The City is quite successful at achieving this purpose as evidenced by the increasing number of people who choose to live here and by its successes as compared to other cities.  The City does, however, not always succeed in providing the desired environment.  Crimes continue to be committed, people continue to become ill and various sorts of unpleasantness continue to detract from the quality of life in Saint Paul.  Since life is not perfect, we learn to accept, and even expect, some violations of official laws, rules and regulations.  Since it seems almost anything can be against the law, we want enforcement officers to exercise a great deal of discretion about when and how they enforce laws.  We recognize people need a little space and are generally quite accepting of occasional behavior outside the formal rules.  For example, hardly anyone in Minnesota obeys speed limits all the time, yet we expect only the most flagrant violators to be officially sanctioned.

The same is true of property Code Enforcement.  There are few properties in Saint Paul where a determined inspector could not find a violation of some City ordinance.  Yet they actually cite relatively few property owners for violations and even these properties are seldom cited for every possible violation.  The way one inspector put it is "one beer can in a yard is not a problem, 50 beer cans may be a problem, but 500 beer cans in a yard is totally unacceptable."  Mitigation is not about achieving perfection.  Rather, it is about achieving a level of compliance acceptable to the community without incurring undue costs or impinging too much on peoples right to live their lives with a reasonable degree of freedom.

While residents of Saint Paul may violate community behavioral norms from time to time, most behave as expected most of the time.  The favorable influences of social norms, religious beliefs, moral fiber and/or fear of legal consequences work for most people.  Even when citizens stray into unacceptable behavior, most respond positively to the application of internal or external pressures.  The overwhelming majority of Saint Paulites either comply with community norms or are easily corrected when they go astray.  For most, a word from a neighbor, a complaint from a family member, counseling from a religious leader, a visit from a police officer or the ongoing guidance of their conscience is sufficient to get them back on the right track.  Unfortunately, not all respond to such influences.  Continuing refusal to comply with community norms regarding acceptable behavior and/or property maintenance often manifests itself as a chronic problem property.

Failure to follow community norms is not a new phenomenon. The City has had more than 150 years of experience in dealing with such problems.  This century and one-half of experience has resulted in a "pretty good" set of tools for the City to use to deal with such problems.  For misbehavior the police often respond and "advise" the apparent offender to "straighten up" or, on occasion, arrest someone.  For failure to maintain property, City officials may apply a variety of sanctions ranging from "verbal orders" to condemnations, emergency abatements and criminal citations.  In this chapter we will examine the interventions used, largely without success, on 32 chronic problem properties we have selected for in-depth study.  To help understanding, it is useful to distinguish among the City agencies empowered to take corrective action with respect to chronic problem properties.  We will also address the City resources expended on these properties and the cost of these interventions.

# Case Study:  Double Trouble

- Rental Duplex Built in 1885.
- MV: $49,700; MV per Unit: $24,850.
- City Taxes: $298
- Cost for Annual Calls to City: $8,523
- Problems: Exploitive Landlord, Criminal Behavior of Unscreened Tenants, Exterior Code Violations.

"Double Trouble" is a very old— well over one hundred years— side-by-side duplex in an enclave of a pleasant old neighborhood which is checkered with problem and chronic problem properties. It has been for many years within the control of a landlord whom City staff consider to be the quintessential "slumlord." He is notorious among City inspectors for being a lazy, cheap owner who makes undeserved profit by exploiting tenants who are unable to find or afford proper housing. He rents to tenants who he knows cannot afford to stay, and who are subsequently evicted due to nonpayment of rent. The landlord, of course, keeps their various deposits and then re-rents the property to yet another unfortunate family. He deals with the lowest end of the economic ladder by providing temporary housing and cycling tenants through the "revolving doors" of this duplex. This is only one of many properties managed by the owner and his family.

Not surprisingly, some of these unscreened tenants bring serious behavioral problems to this address. A neighborhood organizer said that some of the tenants who have come and gone were criminal and definitely neighborhood problems, while others were "good people who have had a rough life." The police are frequently called to deal with just about every type of minor, and sometimes more serious, crimes. There are narcotics, domestic assaults, fights, runaway children and more. The police cope by writing reports, investigating, giving advice and sometimes arresting or transporting to detox centers. The flow of criminal activity is largely unaffected as each set of bad tenants is replaced with another. The community organizer for the areas summed it up by saying, "you name it - it has happened here." Most of the tenants in this property are seen as "sad sacks" who have no idea how to cope with their children and their miserable economic situation.

Maintenance of this building is abysmal. There have been problems with the furnace, walls and doors, along with exterior garbage and interior pest infestations. The owner will not fix anything— unless forced to by the City and then makes only minimal repairs. In all, during the 24 month study period, this property was the subject of four correctional notices, two zoning citations, one summary abatement and one condemnation.

There seems little hope for this situation. The tenants bring serious behavioral problems and have few life skills. The owner depends upon this incompetence and cycles tenants through these units year after year. The neighbors call the police and complain to the district council which "watches" the situation and tries to facilitate official City intervention. The City acts by making Code Enforcement visits and even condemning the building as unfit for human habitation. The owner resists and the situation continues largely unabated. This property has been in PP2000, the Rental Registration program, the Good Neighbor Program, monitored by the Problem Properties Task Force and been in almost every other program the City has developed to deal with chronic problem properties

# POLICE DEPARTMENT

The Police Department is responsible for dealing with those who violate laws and City ordinances. Patrol officers do the bulk of the day-to-day enforcement of laws and the preservation of the peace. Patrol officers are usually the first responders to calls for police service and usually determine how to deal with the situation when they arrive on the scene. They often have a wide range of discretion in selecting the appropriate police response and are expected to exercise judgement in selecting responses. Sometimes they will apprehend and arrest alleged offenders or they may decide that no police action is required and simply leave the scene. Patrol officers operate largely on a complaint basis. Mostly, calls are received from citizens in the emergency communications center and patrol officers are dispatched by radio to respond to specific complaints or requests for service. Patrol officers may, on occasion, engage in systematic enforcement, particularly during a special initiative such as Heavy Enforcement Activity for Thirty Days (HEAT) but most of their time and energy is dedicated to responding to calls.

## Patrol

The police primarily respond to concerns regarding inappropriate behavior. Sometimes these misbehaviors are serious criminal matters but, more often, they are less serious, but troublesome, disturbances of the public peace. The Police have authority to deal with property maintenance issues but generally leave such matters to other City agencies. The Chief of Police has recently increased the Department's focus on property maintenance issues but these concerns remain peripheral to most law enforcement officers. Behavioral issues are, and have always been, central to the mission of the Police Department.

The Police Department responds to about 250,000 calls for service each year. Most of the time the action taken is to "advise" real or suspected offenders to "straighten up" and/or to advise crime victims how to respond to real or imagined threats to their safety or comfort. Sometimes they write official reports and sometimes they take alleged offenders into police custody. Police responses to crime are "time-tested"and work most of the time. There are, however, situations where traditional police responses do not work. When criminals do not respond well to traditional police tactics, the department sometimes establishes special units to address the problem. This is why most larger police departments have developed special units to deal with vice, homicide, traffic enforcement and drug trafficking. Few, if any, police departments have developed special units dedicated to chronic problem properties. The FORCE unit does target specific properties because of suspected drug dealing. This sometimes correlates with the presence of other crimes but, for the most part, the impact of FORCE unit activities on non-drug related crimes is incidental, not purposeful.

**Table 23.  Police Calls for Service Load Change, 1999, 2000 and 2001**

| Name | 1999 Calls | 2000 Calls | 2001 Calls | Actual Change 1999-2000 (% Change) | | Actual Change 2000-2001 (% Change) | |
|---|---|---|---|---|---|---|---|
| Alligator Alley | 74 | 72 | 75 | -2 | (-3%) | 3 | (4%) |
| Bad Boys | 59 | 22 | 37 | -37 | (-63%) | 15 | (68%) |
| The Brothers Grim | 21 | 25 | 31 | 4 | (19%) | 6 | (24%) |
| Career Criminals | 17 | 29 | 11 | 12 | (71%) | -18 | (-62%) |
| The Case Case | 57 | 57 | 71 | 0 | 0 | 14 | (25%) |
| Cash Cow | 147 | 60 | 111 | -87 | (-59%) | 51 | (85%) |
| Cracking-Up | 14 | 150 | 112 | 136 | (971%) | -38 | (-25%) |
| Cultural Conflict | 26 | 46 | 56 | 20 | (77%) | 10 | (22%) |
| Danger Island | 76 | 138 | 95 | 62 | (82%) | -43 | (-31%) |
| Dirty Business | 2 | 7 | 0 | 5 | (250%) | -7 | (-100%) |
| Dirty Dealing | 81 | 69 | 3 | -12 | (-15%) | -66 | (-96%) |
| Dog House | 5 | 9 | 12 | 4 | (80%) | 3 | (33%) |
| Double Gross | 10 | 29 | 60 | 19 | (109%) | 31 | (107%) |
| Double Trouble | 53 | 45 | 29 | -8 | (-15%) | -16 | (-36%) |
| Down 'N Out | 50 | 41 | 35 | -9 | (-18%) | -6 | (-15%) |
| Empty Promise | 48 | 34 | 0 | -14 | (-29%) | -34 | (-100%) |
| Errant Investor I | 22 | 8 | 1 | -14 | (-64%) | -7 | (-88%) |
| Errant Investor II | 6 | 12 | 10 | 6 | (100%) | -2 | (-17%) |
| Fear Factor | 5 | 8 | 14 | 3 | (60%) | 6 | (75%) |
| Fight Club | 54 | 58 | 23 | 4 | (7%) | -35 | (-60%) |
| Gangster Boyfriend | 0 | 24 | 2 | 24 | (-) | -22 | (-92%) |
| Home Alone | 9 | 8 | 6 | -1 | (-11%) | -2 | (-25%) |
| La Cucaracha | 92 | 94 | 54 | 2 | (2%) | -40 | (-43%) |
| Misplaced | 5 | 0 | 2 | -5 | (-100%) | 2 | (-) |
| Motel California | 149 | 147 | 157 | -2 | (-1%) | 10 | (7%) |
| Nasty Four | 20 | 27 | 45 | 7 | (35%) | 18 | (67%) |
| Old and Ugly | 27 | 27 | 18 | 0 | 0 | -9 | (-33%) |
| Over the Edge | 7 | 14 | 4 | 7 | (100%) | -10 | (-71%) |
| Overwhelmed | 15 | 21 | 15 | 6 | (40%) | -6 | (-29%) |
| Through the Cracks | 8 | 7 | 4 | -1 | (-13%) | -3 | (-43%) |
| Watering Hole | 32 | 42 | 50 | 10 | (32%) | 8 | (19%) |
| Weird Neighbor | 2 | 2 | 13 | 0 | 0 | 11 | (550%) |

Evaluating the effectiveness of police activities by looking only at chronic problem properties is unfair and circular. It is illogical to purposely select properties because they have been resistant to official interventions and then assess the effectiveness of such interventions based on these properties. We are not, therefore, intending to suggest police interventions are not generally effective. We are only intending to examine a small number of properties in Saint Paul that seemingly do not respond to police, and other, interventions to better understand the effect of these resistant properties on the City and, perhaps, to stimulate some new thinking about how to deal with these persistent community irritants.

## Police Patrol Services

In beginning to think about the relationship between calls for police service and our 32 chronic problem properties, it is illustrative to first recognize the sheer volume of calls for police service emanating from or about these addresses. As shown in Table 1, these 32 properties generated 2,488 calls for police service in only 24 months. This averages more than 100 calls per month for the sample group of properties or an average of 3.24 police calls for service per month for each property. On average, the police were called to each of these properties almost once every week for an ongoing period of two years.

While looking at the average number of police calls for service for this group of chronic problem properties is useful, it does somewhat obscure the truly extraordinary number of calls for police service at some properties. As shown in Table 1, the number of calls for police service ranged from a low of four *(Weird Neighbor)* to a high of 296 *(Motel California)*. To get a sense of how often police have responded to calls at *Motel California*, 296 calls over a period of two years, or 104 weeks means the police were called to this property an average of almost three times (2.9) every week for two years. Besides *Motel California*, there are seven other properties in our group that averaged more than one police call each week for two years. These properties are *Fight Club, The Case Case, Cracking-Up, Alligator Alley, Dirty Dealing, La Cucaracha, Danger Island and Cash Cow.* As might be expected, most of these properties are multi-unit buildings housing many occupants or they are bars. While this may help, at least partially, explain the unusually high number of police calls, there are many other buildings in Saint Paul, with even more residents, which do not experience these levels of service. Another factor that may help explain the seeming inefficacy of these repeated police interventions is the mobile population served by some of these buildings. It may be that police are successfully dealing with one troublesome resident only to have them replaced by another bad actor. Again, however, other buildings also serve mobile populations and do so without becoming chronic problem properties. These high numbers of police calls for service seem to have more to do with the management, or lack of management, than with the type of building or the mobility of tenants.

There is also something to be learned by considering the properties in our group that experienced very few police calls for service. These properties, such as *Weird Neighbor, Misplaced* and *Dirty Business* are chronic problems almost solely because of property maintenance issues. They have had few dealings with the police because the police seldom deal directly with property maintenance issues, especially, if there is no associated criminal behavior. These properties are, however, heavy consumers of City property maintenance enforcement activities as will be apparent when these activities are considered later in this report. An important thing to remember is that some properties are problems mostly because of the misbehavior of occupants, some properties are chronic problems mostly because of property maintenance issues and some, in fact many, are chronic problem properties for both reasons.

**Table 24.  Police Calls for Service: Dispositions During Study Period (1999-2000)**

| Name | Action Taken on Property | | | % Calls Officer Action Taken on Property[**] | Total |
|------|---------|----------|-------|------|-------|
|  | Advised | Reports[*] | Detox |  |  |
| Alligator Alley | 66 | 29 (20 %) | 2 | 66 % | 146 |
| Bad Boys | 25 | 28 (35 %) | 0 | 65 % | 81 |
| Brothers Grim | 17 | 12 (26 %) | 0 | 63 % | 46 |
| Career Criminals | 22 | 16 (35 %) | 0 | 83 % | 46 |
| The Case Case | 53 | 32 (28 %) | 1 | 75 % | 114 |
| Cash Cow | 98 | 60 (29 %) | 0 | 76 % | 207 |
| Cracking-Up | 87 | 31 (19 %) | 0 | 72 % | 164 |
| Cultural Conflict | 35 | 5 (7 %) | 0 | 55 % | 73 |
| Danger Island | 107 | 52 (24 %) | 0 | 74 % | 214 |
| Dirty Business | 6 | 2 (22 %) | 0 | 89 % | 9 |
| Dirty Dealing | 53 | 20 (13 %) | 2 | 50 % | 150 |
| Dog House | 5 | 3 (30 %) | 0 | 80 % | 10 |
| Double Gross | 23 | 7 (18 %) | 0 | 75 % | 40 |
| Double Trouble | 49 | 20 (24 %) | 1 | 50 % | 83 |
| Down 'N Out | 51 | 16 (18 %) | 4 | 78 % | 91 |
| Empty Promise | 22 | 21 (29 %) | 0 | 60 % | 72 |
| Errant Investor I | 19 | 4 (13 %) | 0 | 77 % | 30 |
| Errant Investor II | 5 | 7 (39%) | 0 | 67 % | 18 |
| Fear Factor | 7 | 0 (0 %) | 0 | 54 % | 13 |
| Fight Club | 46 | 28 (26 %) | 3 | 70 % | 110 |
| Gangster Boyfriend | 9 | 3 (13 %) | 0 | 50 % | 24 |
| Home Alone | 7 | 4 (24 %) | 0 | 65 % | 17 |
| La Cucaracha | 73 | 52 (28 %) | 3 | 69 % | 185 |
| Misplaced | 1 | 3 (60 %) | 0 | 80 % | 5 |
| Motel California | 138 | 70 (24 %) | 11 | 74 % | 296 |
| Nasty Four | 25 | 9 (19 %) | 0 | 72 % | 47 |
| Old and Ugly | 24 | 18 (33 %) | 1 | 78 % | 55 |
| Over the Edge | 9 | 7 (33 %) | 0 | 76 % | 21 |
| Overwhelmed | 9 | 14 (39 %) | 0 | 64 % | 36 |
| Through the Cracks | 6 | 5 (33 %) | 0 | 73 % | 15 |
| Watering Hole | 20 | 32 (43 %) | 1 | 71 % | 75 |
| Weird Neighbor | 1 | 3 (75 %) | 0 | 100 % | 4 |

[*] "Reports" as a category is used when a report is written, and it does not preclude arrest, or citation as an outcome. The percent of reports may be used as a "proxy" for the seriousness of the incidents.

[**] There were several categories of call outcomes not included in the table as "officer action on property:" Traffic (TRF), Gone on Arrival (GOA), Duplicate (DUP), Canceled (CAN), Previously Canceled (PCN), Unfounded (UNF), Service Not Required (SNR).

## Cost of Police Patrol Services

As explained in the methods section, we estimate it costs the City an average of $130 for Police Patrol to respond to a call for service. Based on this estimate, it cost the City $323,440 to respond to calls from our 32 properties during the two years being studied. This translates to $161,720 per year for these properties. Dividing these estimated annual costs by the 32 properties studies yields an average annual cost of $5,054 per property.

The properties requiring above average levels of Police Patrol services yields some astonishing costs. For example, the *Motel California* with 296 calls during the two-year study period yields an estimated two-year cost of $38,480 or $19,240 annually. The estimated annual costs for other high consumers of Police Patrol services are *Fight Club* ($5,395), *Case Case* ($7,410), *Cracking-Up* ($10,660), *Alligator Alley* ($9,490), *Dirty Dealing* ($9,750), *La Cucaracha* ($12,025), *Danger Island* ($13,910) and *Cash Cow* ($13,455). Bear in mind, as will be discussed later, Police Patrol costs are only one of many costs the City incurs in seeking to deal with these chronic problem properties. Also, it is important to understand, as will be elaborated on later in this report, these costs far exceed any tax revenues generated by these chronic problem properties. For example, the *Motel California*, in the year 2000, paid $3,028 in municipal taxes to the City of Saint Paul while costing the City of Saint Paul more than six times ($19,240) that amount in Police Patrol costs alone.

# FORCE Unit

The FORCE unit is dedicated to combating street-level drug dealing. This unit of about 25 officers has developed its own repertoire of tools for pursuing its mission. They focus on particular properties and use confidential informants, surveillance, "knock & talks" and search warrants to detect and interdict street level drug dealing. They also seek to coordinate with other police and non-police enforcement agencies to prevent the creation and continuation of drug dealing locations. This unit generally undertakes investigations of particular individuals or locations based on information from sources suggesting ongoing drug related criminal activity. While the FORCE Unit does receive and respond to complaints, their basic method of operation is investigative rather than complaint-based.

## FORCE Unit Services

An examination of the FORCE unit's activities related to our sample of chronic problem properties illuminates the high correlation between street-level drug trafficking and chronic problem properties. Twenty-two of the 32 properties in this study received the attention of the FORCE unit within the two-year study period.

The most common FORCE tactics with these properties were to conduct surveillance and attempt to "make drug buys." This was done with 15 of our sample properties during 1999 and 2000. These activities resulted in the execution of 11 search warrants being served by the FORCE Unit. These search warrants resulted in 13 persons being arrested. It is important to understand the execution of search warrants by the FORCE Unit is not at all as benign as it may sound. The execution of these warrants often involves the forced entry of highly trained and heavily armed police officers into the premise. These are very aggressive and dangerous operations involving

# Case Study:  La Cucaracha

- 24 Unit Rental built in 1971.
- MV: $1,107,800, MV per unit: $39,564.
- City Taxes: $4,245
- Cost for Annual Calls to City: $19,696
- Problems: Cockroaches, Criminal Activity, Prostitution, Drugs.

"La Cucaracha" is a relatively new and somewhat isolated 24-unit apartment building in a larger complex. It is located in a very diverse, but stable neighborhood. The tenants are predominately elderly women and low income families, some of whom do not speak English. However, there are also a few tenants with reported serious mental illness, those with criminal histories, and those who have criminal companions staying frequently at the building. The diversity of tenants has presented a variety of types of problems for the on-site management of the building, as well as its occupants.

On visiting the building in the daylight, one is immediately aware of the many unsupervised children running around the parking lot and other common areas of the building, which creates a sense of overcrowding and disorder. Other problems are not as apparent on the surface. For instance, this building has repeatedly had problems with cockroach infestations which inspectors attribute to the poor housekeeping skills of some of the tenants.

One informant advised that the building used to be horrible years ago, and maybe getting bad again with drugs, guns and fearful residents. There is, indeed, a lot of police activity with this building involving drinking, fights, theft, assault, arson, burglary, fraud, weapons and narcotics. Staff have also reported evidence of prostitution in the parking lot. During our study period alone, the police have been called to this building 185 times.* The greatest number of these calls have been to the common areas of the building, but several units have accounted for more than 20 police calls each. As an illustration, there was a case where a mentally ill woman was plagued by the real disturbances made by a drug dealer in the unit above hers. Unfortunately, after the drug dealer vacated, the woman continued her constant calling of the police—not understanding that the bad tenant had actually moved. The new tenant was a young law-abiding woman who then had to put up with yelling and a broom handle tapping on her floor whenever she walked from one room to another. In another case, one unit in the building was condemned as the result of arson damage caused by a tenant. Notably, there were also seven police calls to this building during our study period on vandalism— three instances in general areas of the building and four in specific units. Nearly all of these resulted in police reports being written.

Not surprisingly, the Fire Department has frequently been called to this address. In only two years, there have been 13 fire runs and eight Emergency Medical Service calls. These are extraordinary service demands for a building of this size. Not all the building's code violations are severe or dramatic. Rather, the primary issue at this property are the behavioral problems caused by residents and their guests.

high levels of planning and coordination. They often yield illegal weapons and significant qualities of illegal drugs. They are also very expensive operations involving many officers, squads and special tactical weapons.

When FORCE officers do not have sufficient cause to obtain a search warrant, they frequently conduct "knock & talks" with the residents of suspect properties. This occurred with 14 of the study properties. These visits usually involve two officers going to the premise and explaining their concerns and suspicions to the residents. They then strongly suggest they refrain from any further illegal behavior. Somewhat surprisingly, these "knock & talks" are often quite effective. They sometimes lead residents to stop drug dealing, at least for a while. Other times, the residents will allow officers to enter the premise without a warrant and, on occasion, the officers observe evidence of illegal behavior which can then be used to make an arrest or to obtain a search warrant. As is apparent from the numbers, the same property may experience both a "knock & talk" and warrant searches at different times. Most commonly, officers will conduct a "knock & talk" if initial surveillance does not justify the execution of a search warrant in the hopes the apparent problems will resolve themselves. When "knock and talks" do not work and the problems persist, the police may continue to obtain sufficient additional evidence to justify a search warrant.

**Table 25. FORCE Interventions**

| Intervention | Residential | | Commercial | Total |
| | 1-2 Unit | 3+ Unit | | |
|---|---|---|---|---|
| Properties in Group (N = ) | 19 | 9 | 4 | 32 |
| FORCE: buys/surveillance | 10  *(52.6%)* | 4  *(44.4%)* | 1  *(25.0%)* | 15  *(46.9%)* |
| Average FORCE: buys/surv | 1.3 | 2.2 | 0.5 | 1.5 |
| FORCE Knock n' Talks | 6  *(31.6%)* | 7  *(77.8%)* | 1  *(25.0%)* | 14  *(43.8%)* |
| Average FORCE K n' Talks | 0.9 | 1.4 | 0.5 | 1.0 |
| FORCE Arrests | 8  *(42.1%)* | 5  *(55.6%)* | 0  *(0.0%)* | 13  *(40.6%)* |
| Average FORCE Arrests $(\bar{x})$[1] | 0.7 | 1.1 | 0 | 0.8 |
| FORCE Warrants | 8  *(42.1%)* | 3  *(33.3%)* | 0  *(0.0%)* | 11  *(34.4%)* |
| Warrant Arrests (Patrol) | 3  *(15.8%)* | 1  *(11.1%)* | 1  *(25.0%)* | 5  *(15.6%)* |

# Cost of FORCE Unit Services

Given the work force required, the special skills involved, the need for special equipment and the cost of informants; the FORCE Unit is an expensive activity dedicated to an especially difficult problem. There is little doubt that attempting to interdict street-level drug trafficking is an expensive undertaking. This may be a necessary public investment to preserve order and livability in Saint Paul given the enormous social cost of unrestrained drug-dealing. Given the complexity of FORCE Unit operations, creating reliable cost estimates is difficult. Our methods for reaching the estimates used in this section are explained in the "Methods Section" beginning on page 13. These estimates are admittedly conservative. The true costs are almost surely higher than our estimates.

# Case Study:  Dog House

- Owner Occupied Duplex Built in 1889.
- MV: $46,600, MV per Unit: $23,300.
- City Taxes: $176
- Cost for Annual Calls to City: $2,387
- Problems: Dog Fighting, Garbage, Drugs, Prostitution.

The "Dog House" is a very old, low-value central City duplex. One unit is an owner-occupied homestead with the other unit being rented. Both the owner and the tenants have been sources of continuing problems. There are a steady steam of problems at this address with peaks during the summer months.

Since this is an owner-occupied building, the City has no information about the condition of the interior of the building, not having been given permission to inspect it. The exterior has, however, been the source of several problems. There have been many orders to remove garbage from the yard. Tags have been written for failure to maintain the garage and there is still an outstanding warrant for failure to appear on one of these tags. The property was condemned in one instance because electrical service was shut-off due to failure to pay a bill of more than $3,000. The condemnation was lifted when they paid the bill with County assistance.

Dogs are the major source of problems at this address. It appears the tenant's son likes to conduct dog fights with pit bulls. These dog fights have taken place in the basement of the building, so it is apparent the owner is aware of this illegal activity and has not intervened. It is unclear if the owner is an active or passive participant in this dog fighting activity, but it is obvious he knows it goes on in the basement. There have been many Animal Control calls to this address and subsequent Humane Society involvement. This dog fighting is known to have occurred from 1998 through 2000. In 1999, Animal Control impounded a dog from this address after the people moved (temporarily) to Saint Louis and abandoned it. The tenant's son has been tagged for many dog related offenses such as dog fighting, running-at-large, no license and no shots. The tenant was finally cited in 2000 with running-at-large, no rabies shots and no dog licence, and she currently owes $400 in fines.

The tenants, and perhaps the owner, are believed to be involved in other behavioral problems such as drug-dealing and prostitution. The tenant's daughter is thought to engage in prostitution and her boyfriend reportedly deals drugs from the house, possibly in her absence. The property was raided by FORCE in 1997 and again in 1998. Despite the long history of problems at this property, there are few police calls to this address in recent years. Since criminal activity continues, it may be the neighbors have come to accept

*La Cucaracha* was under FORCE Unit surveillance seven times and experienced six "knock & talks" and two FORCE Unit arrests during our two-year study period. The total estimated cost of surveillance of this property was $1,950 or almost $1,000 a year. The cost of six "knock & talks" at $200 each is an additional $1,200. This yields a total cost of $3,150 or about $1,575 annually for "knock & talks" and surveillance. Also, the two arrests made by the FORCE Unit at this address cost an estimated $914 each for a total of $1,828. Totaling the cost of FORCE Unit activities at these property results in a total cost of $4,978 or an average of $2,489 annually.

*Dirty Dealing* was also under surveillance by the FORCE Unit seven times during the study period for an estimated cost of $1,950. In addition, the FORCE Unit conducted two "knock & talks" plus one warrant service and an arrest. They yield an estimated $400 for "knock & talks," $1,950 for surveillance, $914 for an arrest and $2,127 to serve a warrant. This yields a total estimated cost of $5,391 or an average of $2,695 annually. The *Brothers Grim* is yet another example of a drug dealing location with considerable FORCE Unit costs. Within only two years the FORCE Unit had it under surveillance four times, conducted four "knock & talks" and made three arrests. These activities cost the City at least $1,300, $800 and $2,742, respectively for a total cost of $4,842 or an average of $2,421 annually. These are only some examples of how much it costs the City to attempt to deal with the drug-dealing within some chronic problem properties. For our sample of 32 chronic problem properties, we estimate that the total FORCE cost was $55,300 during the two-yea study period.

## Table 26. Properties Requiring Interventions

| City Department/Agency | Residential | | | Total |
|---|---|---|---|---|
| | 1-2 Unit | 3+ Unit | Commercial | |
| *Properties in Group (N = )* | 19 | 9 | 4 | 32 |
| Certificate of Occupancy ( C of O) Program | *N/A* | 9  *(100.0%)* | 3  *(75.0%)* | 12  *(37.5%)* |
| Per Unit Average | *N/A* | 0.6 | 0.02 | 0.3 |
| Code Enforcement | 19  *(100.0%)* | 5  *(55.6%)* | 3  *(75.0%)* | 27  *(84.4%)* |
| Per Unit Average | 4.0 | 0.4 | .002 | 2.5 |
| Police | 19  *(100.0%)* | 9  *(100.0%)* | 4  *(100.0%)* | 32  *(100%)* |
| Per Unit Average ($\bar{x}$) Per Unit Median | 35.8 24.0 | 8.9 7.0 | 0.6 0.0 | 24.0 10.6 |
| Fire | 6  *(31.6%)* | 8  *(88.9%)* | 3  *(50.0%)* | 17  *(53.1%)* |
| Per Unit Average | 0.3 | 0.5 | 0.06 | 0.4 |
| Emergency Medical Services (EMS) | 10  *(52.6%)* | 7  *(77.8%)* | 4  *(100.0%)* | 21  *(65.6%)* |
| Per Unit Average | 0.9 | 0.8 | 0.06 | 0.8 |
| Licensing | 0  *(0.0%)* | 0  *(0.0%)* | 3  *(75.0%)* | 3  *(9.4%)* |
| Zoning | 2  *(10.5%)* | 0  *(0.0%)* | 1  *(25.0%)* | 3  *(9.4%)* |
| Animal Control | 0  *(0.0%)* | 5  *(55.6%)* | 1  *(25.0%)* | 6  *(18.8%)* |

# Case Study: Misplaced

- Towing Service *(inoperative)*.
- MV: $20,500.
- City Taxes: $144
- Cost for Annual Calls to City: $1,982
- Problems: Exterior Mess, Vacant Building Resulting from Fire, Junk Vehicles

"Misplaced" is an old gas station converted into a towing service and garage. Fire seriously damaged the building in June 1999 and it has been a registered vacant building since that time. The owner has continued to try to operate a business there and sometimes tows vehicles and stores them in the lot adjoining the damaged building. The building is in an historic preservation district and has been designated by the Historic Preservation Commission as a significant site. The site is polluted and is a "dirty business" with an excessive number of cars associated with it, often occupying local streets. While perhaps not the most desirable neighbor, there were no special problems with the property until the fire.

During the study period, the owner has been cited for garbage, an electricity shutoff, a water shutoff, roof damage, outbuilding condition, junk vehicles and an illegal advertising sign. The City also responded with three vehicle abatements, two summary abatements and the property has been condemned three times. Finally, there have been many issues concerning it's business license, but no significant police activity.

This entire problem revolves around the owner. He is "misplaced in time and location." He is not a clean person, drinks a "fair bit" and has an old time junkyard mentality according to all of our interviews. Some people have reported that drinking may be a factor, although it is unclear whether this is significant. A female City Inspector reported that on two occasions he appeared intoxicated and invited her to go drinking with him. Not surprising, she declined. Some staff see him as a drunk who does not know what he is doing. Others believe him to be a weird character who lacks the mental capacity to run this or any other business. City staff report he drinnks and is seemingly unable to complete even the simplest tasks without near daily monitoring. He does have a son who has proposed moving his landscaping business to this location, but the neighbors find that prospect almost as unappealing.

As to the current situation, this is a transitional neighborhood and very sensitive to anything that may discourage investment in the area. The City's Department of Planning and Economic Development (PED) has tried to broker a sale of this property but could not make it work. City staff have tried just about everything with this property and have communicated

# FIRE DEPARTMENT

The Fire Department has both systematic and call-based responses to problem properties. Fire Suppression and Emergency Medical Services are usually dispatched in response to specific calls for service. The Code Enforcement activities of Fire Prevention are, however, both complaint-based and systematic. Fire Prevention is responsible for ensuring compliance with fire and property maintenance codes for residential buildings with three or more units plus commercial buildings. To fulfill this mission, Fire Prevention relies primarily on its Certificate of Occupancy program. This program requires buildings to successfully pass a fire safety and property maintenance inspection every two years. Failure to pass such inspections may lead to the revocation of the Certificate of Occupancy and, ultimately, to the closure of the building. While biennial Certificate of Occupancy inspection is the Fire Department's primary tool for ensuring compliance with property maintenance codes, Fire Prevention does respond to complaints from tenants and others who may be concerned about the safety or maintenance of a building within their area of responsibility.

## Fire Suppression and Emergency Medical Services

Fire Suppression is the function traditionally associated with fire departments. This activity, simply put, protects lives and property by extinguishing fires and providing related safety services. Emergency Medical Services provide paramedic and emergency ambulance services. While it might seem chronic problems properties would not require any special level of fire suppression or emergency medical services, this is not so. Some chronic problem properties used extraordinary levels of fire suppression and emergency medical services during the study period.

There is wide variability in the fire suppression services used by the chronic problem properties in this study. Almost half (15) of the properties experienced no fire suppression calls at all during the two years study period. Another five had only one call for fire suppression services. Eight properties had between two and five fire suppression calls. As for emergency medical services, six of the properties received emergency medical services more than ten time within two years. The extraordinary finding is that four of the properties experienced ten or more emergency medical service calls lead by *Motel California* with 31 and *Cash Cow* with 51. .

The total fire suppression costs for the 32 properties studies is estimated to be $63,066. We estimate emergency medical services costs to total $80,432. This represents a total estimated cost for Fire Department services for these 32 properties to be $143,498 or $71,749 annually.

*Cash Cow* is a 69-unit building on the East Side of Saint Paul with 51 fire suppression and 38 emergency medical service calls within only two years. This means Fire Department services were dispatched to this location an average of about once every two weeks. In seeking to understand the very high number of both fire suppression and emergency medical services calls, it is important to understand that when responding to a call for emergency medical services, the Fire Department dispatches the nearest unit. Commonly, this nearest crew is not a paramedic crew, but rather a fire crew. They also dispatch a paramedic crew. This is to ensure that response time is a fast as possible. This does, however, mean that they often dispatch two crews to a single emergency medical service call. So in this case, 38 of the 51 fire suppression responses were probably "first responses" to emergency medical service and not responses to actual fire alarms. The fact there were 13 fire suppression calls without emergency medical service calls does, however, suggest comparatively frequent fire alarms. There were clearly significant problems at this property related

# Watering Hole

- Commercial Bar Built in 1949.
- MV: $94,200.
- City Taxes: $664
- Cost for Annual Calls to City: $6,307
- Problems: License Problems, Public Drinking, Assaults, Indifferent Owners.

The "Watering Hole" is a bar with bad management, resulting in license and crime problems. It is in a mixed-use area surrounded by a few other businesses, some residential and large industrial tracts. Initially the district council did not realize this property was within their areas of responsibility. This low profile is puzzling given its long history as a problem property, except that it is physically isolated and it may not have generated a significant number of complaints to the district council from its immediate neighbors.

Licencing problems resulted from failing to pay licensing fees, and for serving alcohol and tobacco to minors. At one point, they owed $3,769 in delinquent license fees and LIEP had to initiate adverse actions to collect fees several times.

The Police have been called to this bar, on average, more than once every week for the past two years. They had dealt with all types of criminal behavior from public drinking, alarms, child abuse/neglect, disorderly boys, domestic assault, fights, theft, assault, vandalism, aggravated assault, auto theft, fraud and narcotics. The City Council closed the bar for five days in 1999 because of underage drinking and refusing admittance to police officers. Police officers were again refused admittance in 2000 resulting and another closure and a $1,000 fine.

The owners, a couple retired from traditional 9-5 jobs, do not seem to care about the problems at the bar and have occasionally been belligerent with police and City license inspectors. They often hired patrons to tend bar, but the patrons seemed more interested in drinking on the job than managing the business. Management operated under a "just let things happen" attitude and not surprisingly, things did. Toward the end of the study period, the owners had both financial and health problems. At their last appearance before the City Council they promised to sell the business. This came to pass. Unfortunately, the new owners have had a similar run of problems and the business has again been closed down the City.*

to fire safety, arson and false alarms requiring frequent responses from fire crews. The cost of these Fire Department services to *Cash Cow* are substantial. The 38 emergency medical services calls cost an estimated $17,366. Adding to this an estimated cost of $23,307 for fire suppression yields a total cost for Fire Department services of $40,673 over two years or $20,336 annually. Since the property paid only $9,145 a year in municipal taxes, it is apparent the financial drain the property creates for the City.

The *Motel California* generated 31 fire suppression responses and 30 emergency medical services. As with *Cash Cow*, these probably mostly represent two Fire Department responses to the same incident. Nonetheless, this is still a very high level of use Fire Department services. Adding together the cost of fire suppression response of $14,167 and emergency medical services of $13,710, yields a cost of Fire Department services of $27,877 for two years or an average of $13,983 annually.

# Fire Prevention - Certificate of Occupancy

The Certificate of Occupancy ( C of O) program managed by the Fire Department is a powerful weapon in the City's war against substandard buildings. Under this program, all buildings with three or more dwelling units and all commercial properties are required to acquire and maintain a C of O. For an owner to obtain a Certificate of Occupancy, Fire Department inspectors must find it to be in full compliance with State laws and City ordinances regarding fire safety and property maintenance. Inspections are conducted every two years unless complaints result in more frequent inspections. Failure to maintain a current C of O can result in a building being closed. Both the City and most building owners take this program very seriously as the lack of a Certificate of Occupancy can have serious financial consequences for the property owner if the building is ordered vacated.

Thirteen of the 32 chronic problem properties in this study are required to maintain Certificates of Occupancy. All these properties have experienced C of O inspections in recent years and six have had their Certificates of Occupancy revoked. *Misplaced, Watering Hole, Alligator Alley* and *Cash Cow* all had their Certificates of Occupancy revoked once during our two-year study period. *Old and Ugly* and *Case Case* experienced four C of O revocations each during this time.

Despite the vigor with which the Fire Department manages the C of O program, it alone is insufficient to eliminate chronic problem properties. While it seems the revocation of a Certificate of Occupancy would be a powerful tool in attempting to deal with substandard buildings, its effectiveness is limited by the Fire Department's reticence to order tenants to vacate a building because the owner does not have a current C of O. The consequences of effecting such an order can be devastating to tenants who have no where else to go. This is particularly the case with large buildings where vacation could result in the displacement of large numbers of tenants. Recalcitrant owners who are willing to challenge the Fire Department can often continue to operate their substandard building despite the Fire Department's refusal to issue a C of O. Also, as is apparent from the properties with four revocations, the owners may comply briefly only to revert to their earlier unhealthy and dangerous behavior.

Besides the regularly scheduled biennial inspections, Fire inspectors respond to complaints about safety and property maintenance in building subject to Certificate of Occupancy inspections. Not surprisingly, they have received complaints about twelve of the thirteen C of O properties in this study. The highest number of complaints came from *The Case Case* with twenty. *La Cucaracha, Motel California* and *Cash Cow* were the next highest with eleven, ten and nine, respectively.

# Case Study:
# Alligator Alley

- 30-Unit Rental Built in 1967.
- MV: $618,000, MV per unit: $20,600.
- City Taxes: $2,242
- Cost for Annual Calls to City: $13,829
- Problems: Uncooperative Landlord, Code Violations, Tenant Crime.

"Alligator Alley" is a relatively new 30-unit apartment building in a central and highly visible location within its neighborhood. It has been a problem property for many years. Records show concerns about the behavior of tenants going back 10 years or more. Maintenance of the property has also been a continuing problem with regular reoccurrences of garbage and abandoned vehicles on the outside. The interior of the building has exhibited just about every possible property code violation, resulting in the Certificate of Occupancy being revoked on two occasions during our study period. Upon one of many visits to the building, a City inspector found one unit occupied by seven pit bulls and an alligator, in addition to its human occupants.

Behavior problems are evident. The police are called to this property on a regular basis to deal with misbehavior principally emanating from five living units and the parking lot. The behavioral problems, such a domestic assault, runaways, disorderly boys, theft and other minor crimes, are symptomatic of troubled family situations. The parking lot has been the source of many police responses for largely minor offenses. There have, however, been allegations of prostitution and drug dealing in the parking lot. The general situation is that a few tenants regularly engage in minor criminal behavior that scares and intimidates the other residents and neighbors. The police response

to most calls has been to advise with few reports being written. During our study period, 3 units and the general area of the building generated 55 percent of the calls to the building, while 11 of the units generated no calls whatsoever. In the year following our study period, a similar level of calls for police service came in to the City.

Some of the occupants, but certainly not all, are not fulfilling their responsibility to behave in a responsible and law-abiding manner. This continuing misbehavior poisons the living environment for most of the residents who do not cause problems. These neighbors have attempted to respond to these problems by calling the police and even considering a tenant's remedy action to seek court assistance with building maintenance. These efforts have been largely unsuccessful. While the police have responded to literally hundreds of calls to this building, they have not affected the continuing misbehavior of some tenants. Similarly, the occupants' effort to initiate a tenant's remedy action failed due to the complications in trying to invoke this unwieldy remedy.

There is little evidence that the owners and managers of this property are interested in fulfilling their obligations to their law-abiding tenants and neighbors. The owners have been uncooperative with City inspectors and have refused to make needed repairs or have made them in a substandard fashion. The City has inspected this property frequently and issued many correction orders which have, for the most part, been ignored by the owners. This led the City not only to revoke the Certificate of Occupancy, but to issue a citation when occupancy continued despite the revocation. However, when brought before a judge, the matter was disposed of with a $100 fine and a brief lecture.

As may be the genesis of chronic problem properties, all of the responsible parties have been unable or unwilling to fulfill their responsibilities. The tenants continue to misbehave, tenants' organization is lacking or ineffective, the police mostly advise, the landlord poorly manages the property and City inspectors issue

The high number of repeat inspections required in response to the high number of complaints from these properties greatly impacts the Fire Department's costs in administering this program. It is also further evidence of the resistance of some property owners to maintaining their properties in a safe and healthy manner.

We estimate that the cost is about $150 per call. Of the 13 properties studied, subject to Certificate of Occupancy requirements, twelve were the subject of complaints to Fire Prevention during our two year period. A total of 77 additional inspections were required for a total estimated cost of $12,150. This is an average of $1,000 for each property or $500 annually. These calls were not, however, distributed evenly among the subject properties. While most had more than one, the *Case Case* was the leader with 20 inspections in two years. Also in the double digits were the *La Cucaracha* and the *Motel California* with 11 and 10 respectively. The cost of these additional inspections is notable but not extremely high. For the worst offender, the *Case Case* we estimate the additional cost to be about $3,000. For the other two high cost properties the costs were $1,650 and $1,500 each. For all twelve of the properties, we estimate the additional cost to be about $12,150. This is a significant sum but it pales in comparison to the cost of Police Patrol, Fire Suppression and Fire Emergency Medical Services costs.

# CITIZEN SERVICES OFFICE

The enforcement of the City Code of Ordinances dealing with building maintenance is divided between two agencies based on the type of property. Regulations regarding the maintenance of one and two unit residential buildings are enforced by the Code Enforcement Division in the Office of Citizens Services. The Fire Prevention Unit of the Fire Department enforces regulations regarding the maintenance of multi-unit buildings and commercial establishments. The inspectors in these units are empowered to use wide array of sanctions in seeking to achieve compliance with property maintenance codes. Most of these tools are available to all inspectors, except the Certificate of Occupancy Revocation which applies only to multi-unit and commercial buildings.

## Correction Notices

Correction notices are used to inform property owners they may be violating a provision of the property maintenance code and instructing them to correct the violation by a specified time. This is the most frequently used enforcement tool and is effective most of the time. Generally, property owners will make the required correction within the specified time and, upon confirmation, the inspector will close the matter. Correction notices are often written but may also be verbal. In either case, correction notices are subject to appeal to the City Council but, in practice, relatively few are appealed and even fewer appeals are sustained. The correction notice is used frequently because it is relatively easy, inexpensive and usually effective. It also has the virtue of being more like a reminder than an official sanction.

Interestingly, despite their popularity with inspectors as a response to code violations, correction notices were not often used with our group of chronic problem properties. Only four properties received five or more correction notices: *La Cucaracha (7), The Watering Hole (5) and Dog House (6) and Dirty Business (5)*. Ten of our 32 properties received no correction notices at all during a two-year period. Since these properties are all notorious with neighbors and enforcement agents, it is most likely that inspectors are electing to bypass correction notices and immediately invoke more aggressive sanctions. Analysis of these more serious sanctions in subsequent sections will support this contention.

# Case Study:  Bad Boys

- Owner Occupied Single Family Home Built in 1925.
- MV: $69,300.
- City Taxes: $251.
- Cost for Annual Calls to City: $7,288
- Problems: Noise, Disturbances, Out of Control Boys, Weapons, Intimidation.

"Bad Boys" is a cute bungalow style single family home. Two women own this home, one of whom has two teenage boys. One of the boys is her son and the other a nephew. They pay the taxes and the home, at least on the exterior, is in reasonably good shape. Correction orders have been issued for relatively minor violations involving paint, doors, windows, house numbers and garbage. The owners have responded to the orders promptly. A summary abatement order was issued for a junk vehicle, in addition to a garbage abatement, but both were taken care of before the City needed to take further action.

Because of misbehavior by the two teenage boys, the police have been called to this address an amazing 81 times during the two years studied. Occasionally they have responded to several calls within a few hours. The greatest majority of the calls have been about noise and disturbances. Initially, the responding officers simply advised the occupants and left. This changed, however, after a gun incident in the property's front yard. From that point forward, most of the calls resulted in reports being written and, in a few cases, arrests being made. Police calls later involved — besides the noise and disturbances — weapons, vandalism, disorderly boys, hassling neighbors and

haranguing neighbors. There were also arrests made for auto theft and assault. The FORCE unit conducted, or rather attempted to conduct, several "knock and talks" at this address. Once they did have a conversation with one of the boys in the yard. On other occasions the occupants were uncooperative. There have also been a number of extraordinary incidents involving neighbors. Once one of the boys was involved hit and run in front of the house and on another occasion they discharged weapons in a neighbor's backyard. The neighbors are afraid and intimidated by the family.

The mother was unwilling to cooperate with the police and very defensive of the boys. She and the boys, are said to be very streetwise and know how and when to exercise their rights to thwart City interventions aimed at cooperation. The boys are known to be gang members and the mother is seemingly supportive of this affiliation and is absent from the home much of the time.

The City even took the extraordinary step of having the City Attorney meet with the owners but this was futile. The City also attempted to apply its ordinance regarding excessive consumption of police services, but this was also ineffective. This failure lead to revisions in the ordinance but this did not happen quickly enough to address this situation.

This case clearly illustrates the limitations of City interventions in the face of sophisticated and resistant property owners. To this day the City has never succeeded in entering the interior of the home and all of its other efforts have been largely ineffective. It seems the only real hope of resolving this situation under current law is to incarcerate these bad boys.

## Abatements

Abatement orders are used to correct public nuisances. An abatement order directs the owner of a property to correct a nuisance situation and advises that failure to act promptly may result in the City taking corrective action and assessing the cost of such action to the property owner. Abatements are a more aggressive action by inspectors because they not only advise of a problem in need of correction, as do good neighbor letters and correction notices, they also contain the threat of City action if the property owner fails to eliminate the nuisance. There are three types of abatements used by inspectors. Summary abatements are used when they expect the correction to cost less than $3,000. Enforcement officials may undertake summary abatements upon proper notification and after an opportunity to correct is given to the property owner. Substantial abatements are used for corrections anticipated to cost more than $3,000. Substantial abatements require prior approval by the City Council. Exceptions to notification and approval processes can be made in emergency situations, but emergency abatements are subject to appeal by the City Council.

As might be expected with chronic problem properties, abatements are more frequently used than the more benign correction notices. Twenty-four of our 32 properties have experienced at least one abatement during the study period and some have had many. *Errant Investor I* had twelve abatements within two years and *Empty Promise* and *Errant Investor II* had eight and seven, respectively. Several properties had five or six abatements. As a group, our 32 properties experienced 85 abatements in 24 months. This is an average of more than 3.5 abatements each month for our 32 properties. Another way of looking at this is to see this as an average of more than 2.6 abatements per property within two years or more than 1.3 abatements per year for each property.

While it appears abatements are the response of choice for City inspectors when dealing with chronic problem properties, it is useful to carefully examine the cases with very high numbers of summary abatements. *Errant Investor I* and *Errant Investor II* were both in the hands of a completely irresponsible owner. The owner was drug addicted, unresponsive and difficult to find. Likewise, *Empty Promise* was a vacant duplex owned by a crack addict and frequented by drug dealers and drug users. Clearly, inspectors concluded correction orders were a waste of time with such owners and elected to conduct an abatement whenever problems got out of hand.

## Orders to Remove or Repair

The City is responsible for eliminating public nuisances. When the City determines a structure constitutes a public nuisance, it may order the structure to be repaired or removed within a specified time. If the owner fails to make the necessary repairs or otherwise remove the nuisance condition, the City may remove the structure through a substantial abatement process. Under this process, upon approval of the City Council and the Mayor, the City removes the nuisance and assesses the cost of this demolition to the effected property. This process is mostly used for vacant buildings in a serious state of disrepair. None of the properties in our case study have been ordered to be removed or repaired by the City through this process. The City typically invokes this authority about 30 or 40 times each year. The City actually razes about 10 to 15 such buildings each year. Since the cost of these substantial abatements are assessed to the property, the City often recovers the cost when the property is sold. However, when the property goes "tax forfeit" the City likely does not recover its costs.

**Table 27. Citation Summary Table for Code Enforcement (CE), Certificate of Occupancy ( C of O) Program and Animal Control (AC)**

| Code Name | Tag Disposition |
|---|---|
| Alligator Alley | C of O tag: ATSP,[20] $100 |
| Dirty Dealing | CE tags in September 2000 for violation of minimum property standards (both exterior and interior-sanitation):warrant for failure to appear. |
| Dirty Business | CE tag in July 1999 for violation of minimum property standards (exterior): warrant for failure to appear, $100 bail.<br>CE tag in March 2000 for violation of minimum property standards (exterior): found guilty, $400 fine. |
| Dog House | CE tag in November 1999 for violation of minimum property standards (garbage): warrant for failure to appear.<br>CE tag in February 2000 for violation of minimum property standards (garage door): warrant for failure to appear.<br>AC tags in July 2000 (running at large, no dog shots, dog fighting, no dog license): found guilty, $400. |
| Empty Promise | 1) CE tag in December 1999 for violation of minimum property standards: pled guilty. $700 fine, with $200 payable and $500 suspended if there are no same or similar offenses.<br>2) CE tag in January 2000 for violation of minimum property standards and illegal parked abandoned vehicle: pled guilty. $700 fine, with $200 payable and $500 suspended if there are no same or similar offenses. |
| Errant Investor 1 | CE tag for violation of minimum property standards: negotiated agreement on this and other tags to pay minimal fine, serve 2 days in jail (of 20) if chemical evaluation sought and properties sold. |
| Gangster Boyfriend | AC tag for dog running at large and no licence or shots. |
| Home Alone | CE tag in June 2000 for violation of minimum property standards. |
| Nasty Four | C of O tag in June 1999 for nuisance conditions: dismissed and retagged new owner. |
| Old and Ugly | C of O tag in July 1999: warrant for failure to appear, $100 bail.<br>C of O tag in October 2000: warrant for failure to appear, |
| Over the Edge | C of O tag in December 2000 for faulty/missing smoke detectors: ATSP,[19] $75. |
| Overwhelmed | CE tag in April 2000 for violation of minimum property standards: warrant for failure to appear and $200 bail set. In October 2000 cleared warrant. |
| The Brothers Grim | CE tag in July 1999 for violation of minimum property standards: warrant for failure to appear and $200 bail set.<br>CE tag in May 2000 for violation of minimum property standards: warrant for failure to appear. |
| The Case Case | C of O tag in September 2000: pled guilty. $100. |
| Through the Cracks | CE tag in January 1999 for violation of minimum property standards (exterior): warrant for failure to appear, $50 bail. |
| Watering Hole | 2 liquor law compliance check failures during study period; first resulting in $500 fine and the second a $1,000 fine. |
| Weird Neighbor | CE tag in September 1999 for nuisance conditions: 3 court appearances resulting in court order to complete work in 6 months.<br>CE tag in September 2000 for nuisance conditions: warrant for failure to appear, $500 bail set.<br>CE tag in November 2000 for violation of minimum property standards (exterior structural conditions): warrant for failure to appear and $200 bail set. |

---

[20] ATSP is an agreement to suspend prosecution, where the City and responsible party agree there will be no prosecution of the violation for one year, if there are no same or similar offenses, there is compliance with the relevant code and the responsible party pays court costs.

# Citations and Housing Court

Criminal citations or "tags" were not often used for our group of chronic problem properties. Only 38 tags were issued to these 32 properties over a two-year period. This is only slightly more than an average of one tag each over two years. They are even more infrequent when it is realized six were issued to *Weird Neighbor* and five to *Empty Promise*. Excepting the eleven tags for these two properties, only 27 tags were issued to the other 30 properties over two years.

The multiple tags to *Weird Neighbor* were the result of the owner-occupant's recurring challenges to the inspector's orders. Once he fought a City order to remove a vehicle and won. In other cases he resisted inspector orders to complete home repairs and clean his yard. It is clear that multiple tags were issued not because of the particularly severe nature of the violations, but rather because the owner continued to challenge the inspector's determinations. The many tags for *Empty Promise* resulted from the owner's absolute refusal to respond to inspector's orders. Interestingly, even given the problems with this property, the judge, upon the first conviction, only fined the owner $700 and suspended $500 if there were no same or similar violations in the future. There were, of course, similar violations the following year for which the judge again sentenced the offending owner to $700 with $500 suspended. It seems the earlier suspended sentence was forgotten as the previously suspended $500 was not ordered to be paid.

Because of the time and difficulty involved in prosecuting tags and the generally unsatisfactory results, from the inspectors perspective, tags are seldom used and housing court is generally avoided even with the serious chronic problem properties selected for this study. Unless prosecution can be speeded up and the sanctions selected by the judges become more severe, tags are unlikely to be a major Code Enforcement tool.

# Condemnations

Both Fire Prevention and Code Enforcement inspectors have the authority to condemn a property as unfit for human habitation and order it vacated until needed repairs are made or essential services restored. The most common causes for condemnations are loss of electrical, gas, water or sewer service. Buildings can also be condemned based on gross unsanitary conditions or unsafe conditions caused by fire, high winds or other forces. When a building is condemned, occupants must vacate the property. It cannot be re-inhabited until inspected and approved by the appropriate City officials. Condemnations are also sometimes used as a sanction of last resort when owners refuse to correct serious threats to the inhabitants' safety. Inspectors are loath to issue condemnations because it means occupants must vacate and often have no where else to live. Inspectors are very reluctant to make people homeless.

Nonetheless, eleven of our 32 properties were condemned at some point during the study period and three were condemned more than once. *Misplaced* was condemned three times and *Double Gross* and *Nasty Four* were each condemned twice. *Misplaced* is a commercial towing service which was fire damaged. Condemnation of this property did not displace any residents. The owner did, however, continue to try to use the property for business despite it having been determined by Fire Prevention to be unsafe. The repeated condemnations were required because the owner seemed to refuse to "get the message" he could not continue to do business at this location. As the names would suggest, *Double•Gross* and *Nasty Four* are residential properties where the owner did not maintain the properties to a level that they were fit to live in.

# Case Study: Danger Island

- 11 Unit Rental Built in 1960.
- MV: $273,600; MV per Unit: $24,873.
- City Taxes: $993
- Cost for Annual Calls to City: $23,289
- Problems: Inexperienced Owner, Code Violations, property isolation, high tenant criminality: drugs, violence.

"Danger Island" is an eleven-unit apartment built in 1961. This apartment building is in a remarkably isolated location. It is surrounded by a bridge, railroad tracks and open space to the extent that there are no immediate neighbors at all. The lack of neighbors probably accounts for the fact that neither the City Council Ward Office nor the District Council were aware the building was in their area of responsibility. Police and Fire Prevention are, however, very aware of the problems at this building.

The current owner purchased this building, along with about ten others, in 1999. He apparently had no prior experience in the residential property management business which seems to have contributed to the problems here. Most of the buildings he purchased were distressed when he bought them and remain so. While the owner has been generally cooperative with City officials, his properties are suffering from poor management. Almost half these properties have some level of tax delinquencies and most have problems with bad tenants.

This apartment building has experienced numerous interior and exterior code violations. Such problems as water damage, overcrowding, broken smoke detectors, holes in walls and heat/furnace problems have been cited by inspectors. Similarly, they have noted exterior violations for such things as garbage, walls, paint and retaining walls. The owner has; however, responded to all these problems when cited and has maintained a Certificate of Occupancy since acquiring the building. During the study period, the owner hired a caretaker for the property, but an inspector noted the odor of marijuana emanating from his doorway.

The compelling problem at this property is that the tenants behave terribly. Drug dealing and violence are the order of the day. Police have been called to this address 213 times during the study period. They have confronted drug users, violent altercations and other criminal behavior at an astonishing level. They have dealt with narcotics, fights, assaults, vandalism, fraud, arson, auto theft, burglary, stalking and other offenses.[*] The FORCE Unit has raided the building twice yielding guns and drugs on both occasions. Tenants deal drugs, fight and engage in all sorts of criminal activity on an amazing scale. When evicted they are simply replaced with others who are similarly predisposed and the problems continue. In some cases, where drug dealers have been evicted, their girlfriends often remain behind and provide return shelter as soon as the heat is off. More than 50 of the police calls have been to general areas rather than specific units. Most of the drug dealing activity seems to be in the building's common areas along with fights and other disturbances. Much of the violence, however, goes on within the individual units. Every unit, except one, had calls for domestic violence. Some units had as many as twenty to thirty police calls in only two years. The high was 33 calls with other units having 29 and 23 calls each. Mental health issues are also apparent in at least one unit with the police needing to transport a disturbed resident to mental health facilities.

Despite the very high level of police activity at this address, other City staff are largely oblivious to the problems at this address. Even City building inspectors were largely unaware of the behavioral problems that plague this building. They see the owner as a generally cooperative person who just does not know how to manage residential rental property. The police, however, see this as a hotbed of criminal activity. The lack of immediate neighbors seems to prevent this property from coming onto the radar screen for either the Councilmember or the District Council. It is obvious improved communication among City agencies is needed if the causes of these problems are ever to be resolved.

It is informative to note that although they issued orders of condemnation for eleven of our 32 properties, no one was ever actually forced to vacate. Every time, the placard was lifted before anyone actually had to move out. This is not always the case as there are instances where vacations do occur. Condemnation orders usually result in corrections being made, at least to the extent that occupants are not forced to evacuate the premise. Whether this is because owners make needed corrections or inspectors relent, when faced with actually making occupants homeless, it is difficult to know. It is the case, however, that condemnation orders do have a way of getting owners attention. The prospect of being forced out of their home or losing the income from tenants can be a very effective enforcement tool when nothing else seems to work. It is not, however, very effective with large apartment buildings as owners know that the City is loath to make large numbers of people evacuate.

# Rental Registration

Rental Registration is a City program requiring properties with one or two rental units to register with the City. It does not, however, apply to homesteaded properties or three or more unit buildings included in the Certificate of Occupancy program. Registration requires basic ownership information and the payment of an annual registration fee. The ordinance provides for the denial, or revocation, of a rental registration certificate when owners are observed violating City rules and regulations regarding the management of their properties. The ordinance also gives City officials expanded access to inspect these properties when violations of City codes are found or suspected.

There have been several attempts to implement parts of this ordinance. These attempts have been rather half-hearted and generally ineffective. It is clear the Administration, during the study period, had little interest in enforcing the requirements of this ordinance or in using the powers granted to them thereunder. For example, the fact only three of the eight chronic problem properties in this study, that should be registered were actually registered, despite their notorious histories. Notably, there have been no appeals to the legislative hearing officer nor any criminal prosecutions under this ordinance. Presently the City has a Rental Registration Program in name only, and until the Administration decides to take this ordinance seriously, the powers granted to enforcement agents under this ordinance will remain largely unused and, therefore, ineffective.

# Problem Properties 2000

"Problem Properties 2000" was an initiative launched in the year 2000 largely in response to a series of newspaper articles raising questions about the efficacy of City Code Enforcement activities. The idea behind this program was there were thought to be a few property owners who owned many problem properties and Code Enforcement officials should identify these owners and given them special attention. This initiative began by identifying some problem owners through a process Code Enforcement officials have been consistently unwilling to document or even describe. The general sense was they knew who to include and establishing explicit criteria might not always select the "right" property owners. It was also apparently feared that documenting the selection criteria might provide a basis for those selected for special attention to challenge their inclusion. Since the selection criteria were unknown and undocumented, there could be no basis for challenge. While there can be questions raised regarding the appropriateness of such an approach by a government agency, it worked to the extent that no one successfully challenged their inclusion. Code Enforcement officials consistently denied they were "targeting" selected owners although the fact they were seemed obvious.