The PP2000 approach was to call selected property owners in for a meeting with Code Enforcement officials. At these meetings they told the owners the City was "fed up" with their irresponsible behavior and intended to do something about it. It was believed these meetings were successful in convincing some property owners to "clean up their act" or to "get out of the business" by selling their Saint Paul properties. In cases where these owners were unresponsive to City coercion, Code Enforcement activities were "stepped-up" for their properties. It is widely believed by the Code Enforcement officials involved in PP2000 that they were effective in dealing with many of these problem owners. No data was collected regarding PP2000, so assessing the effectiveness of this effort is impossible. No matter whether it was effective, the program just faded away. There was no formal termination of the program, it just stopped being discussed. Its proponents claimed it ended because they had successfully dealt with most of the serious offenders. Others suggest it was just another fad program that fell by the wayside when media attention moved to other areas of interest.

**Table 28. Property Interventions**

| Intervention | Residential | | Commercial | Total |
|---|---|---|---|---|
| | 1-2 Unit | 3+ Unit | | |
| Properties in Group (N = ) | 19 | 9 | 4 | 32 |
| Code Enforcement Citations | 11  (57.9%) | 4  (44.4%) | 1  (25.0%) | 16  (50.0%) |
| Average Code Enf. Citations | 1.6 | 0.7 | 0.5 | 1.2 |
| Abatements (Summary & Vehicle) | 17  (89.5%) | 5  (55.6%) | 2  (50.0%) | 24  (75.0%) |
| Average Abatements | 3.6 | 1.2 | 1.5 | 2.7 |
| Correction Notices | 13  (68.4%) | 6  (66.7%) | 3  (75.0%) | 22  (68.8%) |
| Average Correction Notices | 1.8 | 1.9 | 2.3 | 1.9 |
| Condemnations | 6  (31.6%) | 4  (44.4%) | 1  (25.0%) | 11  (34.4%) |
| Average Condemnations | 0.4 | 0.6 | 0.8 | 0.5 |
| Certificate of Occupancy Revocations | N/A | 4  (44.4%) | 2  (50.0%) | 6  (18.8%) |
| Average Enforcement Actions | 10.5 | 10.8 | 6.5 | 10.1 |
| Problem Properties Task Force | 2  (10.5%) | 5  (55.6%) | 2  (50.0%) | 9  (28.1%) |
| PP2000 Program | 4  (21.1%) | 2  (22.2%) | 0  (0.0%) | 6  (18.8%) |
| Tenant Remedy Act | 0  (0.0%) | 3  (33.3%) | N/A | 3  (9.4%) |
| Housing Court Outstanding Warrants | 8  (42.1%) | 1  (11.1%) | 0  (0.0%) | 9  (28.1%) |
| In Rental Registration Program | 3  (15.8%) | N/A | N/A | 3  (9.4%) |

# Good Neighbor Notices

Two years ago the City began experimenting with a program where inspectors train citizens to identify certain exterior code violations such as tall weeds, snow removal, trash and abandoned vehicles. Following this training, citizens would conduct exterior inspections of neighborhood properties and send or deliver form letters to property owners who may not be meeting code requirements. The program began as a pilot program in the Dayton's Bluff neighborhood and was deemed successful with about one-half of the "good neighbor" letters resulting in

corrections. Because of this perceived success, the program was expanded to three additional areas in 2001. It is unclear at this point if the program has continued to enjoy success. This program has recently been reviewed by Council Research. In any case, it is unlikely this program would be effective with chronic problem properties due to the serious and enduring exterior, interior and behavioral problems commonly found there.

# Problem Properties Task Force

The Problem Properties Task Force (PPTF) is yet another attempt by the City to address chronic problem properties. The distinguishing characteristic of the PPTF is its overt focus on coordinating the enforcement activities of all City agencies engaged in dealing with problem properties. The basic premise of this effort is that City agencies meet formally and regularly to exchange information about problem properties. To this end, a formal PPTF was created and a high-level City official was designated as the leader of the task force. It is now lead by a senior Fire Prevention Inspector.

The task force continues to meet monthly and discuss specific properties to coordinate agency enforcement efforts. Again, no data has been collected or analyzed to evaluate the effectiveness of the PPTF. The general impression of the participants is that it is a good idea and has sometimes led to more effective enforcement. The extent to which this is true has not been documented.

## Table 29. Average and Median Costs[21]

| Cost Category | Commercial | Owner Occupied | Rental | Total |
|---|---|---|---|---|
| *Properties in Group (N =)* | 4 | 11 | 17 | 32 |
| Police Cost Average | $14,918 | $5,731 | $11,807 | $10,108 |
| Police Cost Median | $10,270 | $4,680 | $9,490 | $6,630 |
| Emergency Medical Services/Fire Cost Average | $8,112 | $540 | $6,183 | $4,484 |
| Emergency Medical Services/Fire Cost Median | $1,828 | $457 | $2,742 | $1,143 |
| Code Enforcement Average | $225 | $818 | $547 | $600 |
| Code Enforcement Median | $225 | $750 | $600 | $600 |
| FORCE Arrests Costs Average | $0 | $473 | $428 | $390 |
| FORCE Buys and Surveillance Average | $163 | $502 | $535 | $477 |
| FORCE Knock and Talks Average | $65 | $154 | $130 | $130 |
| FORCE Warrants Average | $0 | $473 | $1,071 | $731 |
| Certificate of Occupancy Average | $562 | $96 | $521 | $380 |
| Animal Control Average | $38 | $382 | $132 | $206 |
| Licensing Average | $1350 | $0 | $0 | $136 |
| Zoning Average | $75 | $191 | $0 | $75 |
| Total Costs Average | $25,244 | $9,360 | $21,354 | $17,717 |
| Total Costs Median | $13,973 | $5,580 | $17,046 | $12,841 |

[21] Medians are provided only for Police, Fire and Code costs. In other categories, the medians are either zero or lack illustrative significance and, therefore, are not presented.

# OTHER CITY ENFORCEMENT AGENCIES

## Animal Control

Animal Control is the activity within the Licensing, Inspection and Environmental Protection (LIEP) responsible for the enforcement of City ordinances regarding animals. It also engages in wildlife protection activities by capturing and relocating wild animals that mistakenly venture into the City. Animal Control also handles animal licensing and is responsible for the handling of dangerous or abandoned animals. Animal Control is almost entirely complaint based. They respond to calls from citizens and other City agencies where animals are involved. While an Animal Control officer may observe and apprehend a stray or dangerous dog while on the street, the overwhelming majority of their work is in response to a call for service.

While animal problems, especially dog problems, reflect a general disregard for the peace and safety of their neighbors, animal problems are not the sole cause any of our chronic problem properties. The reason may be that Animal Control can and does directly intercede if problems persist. They issue citations for repeated failures to comply with City animal control ordinances and seize and impound dogs when warranted. There is a clear identifiable source for animal control problems and clear and direct interventions the City may use to immediately stop the nuisance. This clarity and focus make it relatively easy to effectively intervene when animal problems occur. It is much easier to stop a barking, or even dangerous, dog, than to prevent domestic abuse, drug dealing or prostitution.

Fourteen of our 32 chronic problem properties generated calls for animal control assistance during the two-year study period. Most of these calls involved dogs. An interesting exception was the alligator for which we named *Alligator Alley*. The greatest number of calls to a single property was to the *Dog House*. Not surprisingly, all of the Animal Control calls to the *Dog House* involved dogs. These included dogs running at large, dog bites, abandoned dogs, unlicenced dogs, stray dogs and dog fighting. These calls reflect two episodes involving two dogs and two dog owners. *Empty Promise* generated six calls regarding dogs to the Police Department and Animal Control. The neighbors stopped calling when Animal Control seized and impounded the dog.

The cost of respond to animal control calls at the chronic problem properties in this study does not represent a major expense for the City. At an estimated $150 per call, the 44 calls created an estimated total cost of $6,600. While this is surely a cost above that of most properties in the City, it does not constitute a major financial burden for the City. The *Dog House* was the single most expensive animal control property with nine calls for an estimated cost of $1,350. Many of the chronic problem properties, however, involved no animal control services or costs.

## Zoning

The City of Saint Paul, as almost all large cities, has zoning ordinances which define the types of land uses and activities permitted in each geographic area of the City. City zoning staff are charged with the mission or ensuring property owners comply with zoning ordinances. They do this by reviewing proposals for new uses and by responding to complaints regarding possible violations of the Zoning Code. Three of our chronic problems have been the subject of zoning staff inspections. *Weird Neighbor* was storing a commercial type vehicle on his residentially zoned property. Based on the presence of this vehicle, he was deemed to be in violation of the zoning code banning commercial activity in a residentially zoned neighborhood. In this case, the owner challenged this determination and was successful in achieving a court ruling determinating that he

was not in violation as he did not actually use the vehicle in question for commercial purposes. During this dispute, zoning staff conducted 11 inspections of this property for an estimated cost of $1,650.

*Misplaced* is a towing garage that burned. Subsequent to the fire and the failure of the owner to make prompt repairs, zoning staff determined this was a non-conforming use that could not continue under the zoning code. Nonetheless, the owner continued to try to operate his towing business at this location. The continued illegal use precipitated at least two visits by zoning staff for an estimated cost of $300.

*Dirty Business* is a classic example of a zoning violation. This is a single family home in a residential neighborhood where the owner decided to operate a landscaping business in their driveway and backyard. Not surprisingly, neighbors complained and zoning staff were dispatched to remedy the situation. Despite directions from zoning inspectors, the homeowner persisted in trying to operate this business which lead to more complaints and more visits from zoning staff. In total, three zoning inspections were conducted in the two year period at a cost of $300.

# Licensing

Just as a newspaper pundit said "almost everything is illegal in Minnesota." Almost everything that isn't, requires a license. Two of the businesses requiring licenses are operating a bar or a towing business. In the case of *Misplaced*, discussed in the preceding section on zoning, the owner of this towing business persisted in trying to operating this business without a licence to do so. Not surprising, this brought complaints from neighbors that brought licensing inspectors. They made ten visits to this property over two years and despite, explanations, warnings, orders and citations, never really succeeded in convincing the recalcitrant owner he could not do business without a license. These ten visits are estimated to have cost the City $1,500.

The two bars included in this study, *Fight Club* and *Watering Hole* both had serious license problems. *Fight Club* was ultimately closed because of license violations and the *Watering Hole* was sold under threat of being closed for license violations. As these two experiences suggest, revoking a bars license to operate can be a most effective way of dealing with a chronic problem property. The difficulty, however, is that it generally requires a series of serious violations for a long period of time to justify revoking a bar's license to operate. City licensing staff responded to 11 complaints at the *Watering Hole* and eight complaints at the *Fight Club* before the problems were deemed to be sufficient cause to commence license revocation proceedings. These license inspections are estimated to have cost $1,650 and $1,200 respectively. As is apparent from the cases in this study, licensing revocation can be an effective tool in seeking to eliminate chronic problem properties but it is slow and only applies to those relatively few chronic problem properties required to have licenses.

# SUMMARY

An overview of the extent and manner in which chronic problem properties use City services shows the Police Department bears the greatest burden. Within the two years of this study, the 32 chronic problem properties required 2,488 visits by Police Patrol, with an additional 121 interventions by the FORCE Unit. The Police Patrol services are estimated to have cost $323,440 or $161,720 annually. Adding to this estimate is the cost of FORCE Unit services equaling $55,315 or $27,657. This means these 32 property are costing the Police Department an estimated $189,377 each year. That equates to $5,918 spent per chronic problem property per year in police service alone.

The Fire Department expended an estimated $143,498 responding to 138 fire suppression and 176 emergency medical services calls to these 32 properties over two years. This was an average of $71,749 each year or $2,242 per year per property. In addition, fire prevention responded to 81 calls at a cost of $12,150 or $6,075 annually. On average, this represents a cost of $1,898 annually for each chronic problem property in the study.

**Table 30. Chronic Problem Properties Total Costs by Category for the Study Period**

| Cost Category | Commercial | Owner Occupied | Rental | Total |
|---|---|---|---|---|
| *Properties in Group (N =)* | 4 | 11 | 17 | 32 |
| Police Costs | $59,670 | $63,500 | $200,720 | $323,440 |
| Emergency Medical Services/Fire Cost | $32,447 | $5,941 | $105,110 | $143,498 |
| FORCE Arrests Costs | $0 | $5,200 | $7,280 | $12,480 |
| FORCE Buys and Surveillance | $650 | $5,525 | $9,100 | $15,275 |
| FORCE Knock and Talks | $260 | $1,690 | $2,210 | $4,160 |
| FORCE Warrants | $0 | $5,200 | $18,200 | $23,400 |
| Code Enforcement Costs | $900 | $9,000 | $9,300 | $19,200 |
| Certificate of Occupancy Costs | $1,200 | $1,050 | $8,850 | $12,150 |
| Animal Control Costs | $150 | $4,200 | $2,250 | $6,600 |
| Licensing Costs | $4,350 | $0 | $0 | $4,350 |
| Zoning Costs | $300 | $2,100 | $0 | $2,400 |
| **Total Costs** | $100,997 | $102,956 | $363,020 | $566,953 |

The Code Enforcement Unit of the Citizens Service Office responded to 128 calls about these properties for an estimated cost of $19,200 or $9,600 annually.   The average for the 32 properties is estimated at an annual cost of $300 per property. While this cost is notable, it pales in comparison to the costs borne by the Police and Fire Departments

The costs associated with providing animal control, zoning and licensing services for these 32 property are comparatively small. The total estimated two year cost of these services were $6,600, $2,400 and $4,350 respectively. This amounts to about $103 for animal control, $50 for zoning

and $68 for licensing per property per year. While these sums are undoubtedly higher than average for properties in the City, they are comparatively minor when compared to the almost $6,000 the Police Department and the almost $2,000 the Fire Department spends on each of these properties annually.

Curing chronic problem properties is an expensive business. Not curing chronic problem properties is more expensive. We know the 32 chronic problem properties we chose for this study have consumed, and in most cases continue to consume, an enormous amount of City resources. They generate thousands of visits each year from police officers, fire fighters, paramedics, fire inspectors, code inspectors, zoning inspectors and animal control officers. These services are expensive. The "cheapest" of these properties for the City received an annual average of $1,289 in these City services during our study period. The most expensive received an annual average of $34,534 during the same time period.. Based on our estimate there are between 220 and 284 chronic problem properties in Saint Paul and our finding the 32 properties in this study consumed in excess of $250,000 worth of City services each year, we estimate the City spends approximately $1.95 to $2.52 million each year attempting to ameliorate chronic problem properties. This cost might be acceptable if these expensive interventions were effective but we know, for the most part, they are not. At best, they keep the situations at these properties from getting completely out of control. They do not, however, resolve the underlying problems nor relieve the pain these properties cause for surrounding neighborhood.

While the direct costs to the City of attempting to deal with chronic problem properties are impressive, the indirect costs of the continuation of these problem situations are surely higher. The social costs of the violence, drug dealing, domestic abuse, public disorder and neighborhood disruption must be many times the direct service costs. The costs of emergency room visits, lost jobs, missed schooling, sickness, work absences, out-migration and reduced property values can only be imagined. Other costs that can not be quantified are the lost of the loss of peace, comfort, and freedom caused by these chronic problem properties. We know from the cases studied here these chronic problem properties often cause people to live in fear— afraid to venture out of their apartment or into their own yard. This loss of public peace can not be quantified but we all understand this is unacceptable if we are to provide citizens with the quality of life they expect in Saint Paul.

# CURING THE PROBLEMS

Curing the problems associated with these properties means moving beyond reacting to the individual symptom presenting itself, such as garbage, a broken window or disturbances. Rather, it has to do with finding out why problems remain unmitigated for so long and keep recurring even after they seem to have been handled. Part of finding these answers is to look at all of the problems, and therein may lie the answer. If there are several children, a lack of money, drug use and domestic violence, it is little wonder that replacing a window or picking up garbage crops up as a problem. In this chapter we will examine the role the various actors can play in resolving the ongoing recurring problems at these properties, and the tools they can use to assist them in this effort.

## UNABLE AND UNWILLING

Earlier in this study we established that in order for a chronic problem property to develop, the key actors must be unable or unwilling to fix the problems at these properties. It is more likely that a problem will develop if risk factors are present which predispose the property towards chronic problem development. Clearly the key to curing lies in making the key actors able and willing to fix the problems at these properties, and minimizing the risk factors for problem development.

On the surface making someone, some group of people or some agency able and willing to engage and fix a problem or problems seems like a relatively straight-forward proposition. If they are unable, then they need the resources and where-with-all to deal with the problem. If they are unwilling, then rewards and punishments can be put into place to persuade them of the error of their ways. As simple as this seems, figuring out whether it is the actors' inability or their unwillingness that is preventing them from fixing the problems on the property is difficult. If that is figured out, the next step is to choose the correct tool(s) to enable or persuade them to take action.

A case-in-point comes from the stories of *Errant Investor*. Here was a property owner who, at one point, owned nearly thirty properties in a several block area that were not problem or chronic problem properties.[22] However, as the owner fell into drug addiction, the problems at these properties were not resolved when they surfaced. Surprisingly, not all of his properties became problems, although many of them did. A review of calls for police and code enforcement services shows a distinct point in time when some of his properties began to slip. As the addiction deepened, he became much more disconnected from the neighborhood, and networks of people with whom he had interacted. He also began to sell off some of the properties to finance his drug usage. Clearly, this property owner was both unable and unwilling to deal with problems as they arose. In the end, it was a combination of incentives and punitive measures which brought these properties back into control.

---

[22] Owners who own multiple properties are not necessarily problematic. But as this case demonstrates, if the owner "goes bad" the impact is broad, and in a small area such as this, deep.

# ACTOR INTERVENTIONS

Each of the case studies presents a story of a chronic problem property. In these stories, presumably, lies some explanation for the choices people and organizations have made. It is evident from the 32 case studies that each suggests its own, idiosyncratic set of solutions. The cure for the chronic problems has to do with changing the motivations of the actors involved, and in some cases, providing them with the new or improved tools for dealing with chronic problem properties. Using our current tools, we seem to have a 63 percent likelihood these chronic problem properties will show up again, as was demonstrated in Table 8. Indeed, 63 percent of the case studies would have been defined as chronic problem properties in the five years preceding our study period.

It has generally been our contention that owners are ultimately responsible for the physical problems a property experiences, and occupants are generally responsible for behavior and crime problems. Government, of course, is charged with making and enforcing the laws that govern these actions. The following sections will address these groups and tools, with an eye toward suggesting possible improvements. Possible improvements relate to the role local government can play. However, it should be noted that all levels of government, neighborhood organizations, neighbors and individuals have options for improving the way they deal with chronic problem properties.

## Government

The term government, as it has been used in this report, covers a broad array of functions and services. These include law and code enforcement agencies, the courts, elected officials and service providing agencies. Given the broad definition we are using, it is clear that the public sector has the potential to interact with chronic problem properties at many levels and at many different points in time. Therefore, there are many approaches and tools different parts of government have the opportunity to use. We will discuss these as existing tools and approaches which may be improved. In this discussion we will present ideas that seemed logical based on the case studies, but there are, no doubt, additional improvements which could be made. We will then discuss new tools and approaches which may be developed.

### Improvement of Existing Tools and Approaches

#### Knowing About the Problems

The first, and perhaps the most important, thing government needs to do with respect to chronic problem properties is to become aware of them. If a complaint-based method of law or code enforcement is being used, then government relies primarily upon occupants and neighbors to alert it about problems. This also holds true for the periodic-systematic approach, in that problems occur between regularly scheduled inspections, and government needs to become aware of those as well. The health and vitality of the household and neighborhood likely play a role in how occupants and neighbors relate to government and its ability to help them address the problems in their areas. As discussed earlier, a neighborhood or individual may be fatigued from having dealt with similar problems for so long, or they may be afraid of retaliation. In the case of *Errant Investor II*, an eleven p.m. shooting on a front porch elicited only one call from a neighbor. There are likely many cases of domestic violence where the victims do not alert police. Also, there are many tenants who fear losing their housing if they complain about conditions. Additionally, there are some who have

# Case Study:  Double Gross

- Rental Duplex Built in 1903.
- MV: $33,800; MV per Unit: $16,900.
- City Taxes: $123
- Cost for Annual Calls to City: $6,534.
- Problems: Incapacitated Slum Lord, Narcotics, Disturbances, Domestics.

"Double Gross" has a long and colorful history as a problem property. It is an older, extremely low-value duplex in an area with a large Hmong population. This property is located in a poorer neighborhood, but not a "bad" area except for this property and the house adjacent to it. Double Gross has been the scene of major problems for at least the past six years. The significant problems seem to have come in waves cresting in 1995, 1998, and in 2001. In the years preceding our study period, the FORCE unit raided the property on four different occasions. These raids were provoked because of drug dealing and pitbull (dog) fighting. Both the upstairs unit and the downstairs were condemned in 1998 because of gross unsanitary conditions, including excess animal waste in the upper unit— no doubt connected to the resident fighting pitbulls. More recently, the property was condemned because of a gas and electricity shut-off for nonpayment of utilities and meter tampering.

In 1999 and 2000, the police were called to this address 40 times. These calls involved narcotics, disturbances, disorderly boys, domestic assault, vandalism, fraud and animals. Many were prompted by illegal business often transacted on the front porch. In 2001, police visited the duplex 60 times (a 94% increase over 2000), mostly for narcotics and domestic assault. Other police visits involved burglary, "other sex offenses," the execution of search warrants, warrant arrests, violations of court orders, and "other violations." Some of these reports may indicate that someone on parole or probation was either living there, or a frequent visitor.

The owner of this property is a notorious slum landlord who owns 16 other one- and two- unit buildings in older, poorer inner-ring neighborhoods in Saint Paul, including the aforementioned problem property adjacent to Double Gross. He is variously described as a drunk, stupid or just incompetent. He also appears to be exploitative of some of his tenants and is recalcitrant about completing order to repairs in a timely fashion. He claims not to understand why the City is picking on him and sometimes calls City staff for help in managing his properties, specifically looking for City staff to condemn units so that he is not bothered with an eviction process. Since the owner chooses not to manage his properties, he seems to think City staff should do it for him. Repeated efforts to educate him in property management have failed despite the best efforts of City staff and Saint Paul Association of Responsible Landlords (SPARL).

Despite his apparent limitations, he seems to have a gift for acquiring property and making money in the process. He is, for example, credited with buying a property in the morning and reselling it in the

had a bad experience with government and are hesitant to bring forward their concerns. For example, a particularly serious set of tenant concerns was called in to the City about *Through the Cracks*. In this case, there was mis-communication within the department and the complaints were not investigated. It is hard to imagine this tenant will turn to the City regarding similar concerns in the future. At a very basic level, government needs to invite the participation of the community by encouraging communication on chronic problems properties.

## Citations, Prosecution and Housing Court

In the area of Code Enforcement, we found there was a distinct tendency of inspectors to turn to using the "tool" of abatement as a first or second resort in dealing with chronic problem properties, rather than the issuance of correction orders alone. This response by staff in the field is reflective of their experience working with given properties, people and situations. Issuance of abatement orders is, in their experience, more likely to rectify the problem situation quickly. No doubt, this is connected to the fact that once an abatement order is issued, owners have a given amount of time to clean up the problem situation before government moves in to clean it up for them— and assess the cost to their taxes.

Experience has taught inspectors (and in some cases police officers) that using a citation yields little, by way of results, in fixing problem situations. Table 27 provides information on citation activity for our 32 case studies during the 24-month study period. It shows a pattern of the court system not taking seriously the chronic problems at these properties and the adverse affects these problems have had on their neighborhoods. This may be reasonable, in the sense that the typical approach of government interventions is to look at the individual violation at hand, rather than the entire situation. Additionally, enforcement officers consider citations a tool of last resort, rather than one which is commonly used when approaching code violation situations. However, the courts tend to view citations as the beginning of their experience with a particular property or owner.

The court system is uniquely positioned to consider situations broadly, and in the context of their history. They must also be presented appropriate information about the entirety of enforcement, and possibly service-providing, agencies' experience with a property. An excellent example of the court using its "bird's eye view" to deal with a chronic problem property found in the case studies, *Errant Investor I and II*. Here the courts specifically took into account the role the drug use of the property owner played in the deterioration of his many property holdings. The court did this by staying imposition of some of the penalties, if the owner were to undergo a chemical evaluation. However, the fine levels and jail time ultimately imposed seem pale in comparison with the devastating effect his properties had on the neighborhood.

The situation in *Empty Promise* is typical of the frustration with the citation process. Here code inspectors had conducted eight summary abatements (clearing the exterior of the property from "everything imaginable" and some vehicles) and written five citations. The police had also been very active at this property, with 72 calls for service in a 15-month time period. They responded to many concerns, but almost all rooted to drug use and suspected drug dealing. In December of 1999, several Code Enforcement tags were disposed of with a $700 fine— $500 of which was suspended if there were no same or similar violations. In January of 2000 the other citations received an identical disposition— with apparent disregard for imposing the previously suspended fine. Additionally, it is not clear whether negotiated "agreements to suspend prosecution" if there are no same or similar offenses are revisited to determine if there have been no same or similar offenses.

# Case Study:  Dirty Business

- Owner Occupied Single Family Home Built in 1912.
- MV: $104,200.
- City Taxes: $361
- Cost for Annual Calls to City: $1,939
- Problems: Landscaping Materials, Trash, Dog.

"Dirty Business" is a nice home in a nice neighborhood. The current owners, a family with children, have homesteaded the property for more than 20 years. The City has been trying to address the problems in this property's yard for years. During our study period, the property owner has had interactions with Code Enforcement, License Inspection and Environmental Protection [LIEP], Animal Control and the Police.

The basic problem is that the primary owner is trying to run a landscaping business out of her home. Consequently, there are recurring complaints from neighbors about storing landscaping materials in the driveway and yard. In response to these complaints the City has ordered cleanups of garbage, trash, landscaping materials and wood. The City has, at one time or another, used virtually every one of its enforcement tools to address the exterior code and zoning violations. It has issued correction orders, conducted summary abatements, issued citations and sent notices of zoning code violations. Most recently, the owner was fined $400 for exterior code violations. On several occasions Animal Control has also had to cite the owner for dog leash law violations and failure to cleanup dog feces. The owner finally bought a dog license, but violations continue on a regular basis. The property continues to have some sanitary problems and the City may again need to cleanup the property.

The neighbors have been sensitive with this woman. She suffers from depression, seems unable to work from time to time, and reports she has been in treatment. Neighbors have periodically tried to help and also asked a priest to intervene. She seems to have little outside support to help her run her business in accordance with property and zoning codes that apply to residential areas. The City's interventions are

Finally, another additional frustrating aspect of using citations to deal with code violations is that in many cases defendants do not appear in court. This results in the issuance of a warrant for failure to appear. Four months following the conclusion of our study period, in April of 2000, six of the seventeen case studies which had received citations continued to have outstanding warrants for failure to appear.

In summary, these concerns speak to the initial preparation of citations, the context in which citations are presented to the court, the seriousness with which the court views these code violations and follow up on citations which have been brought forward—including pursuing warrants for failure to appear. Each aspect of this process should be reviewed for improvement to better deal with the problems presented by chronic problem properties. It may be the City should pursue "presumptive penalties" for violations of these codes (as are used for license violations), that the process and reasoning for using citations be changed, or that the current processed used by Housing Court need to be evaluated. All of these ideas, and more from the actors involved, should be considered to improve the effectiveness of government's use of citations in handling chronic problem properties.

## Improvement Using New Tools and Approaches

### Knowledge in the Field & Referrals

In most cases, if there has been no complaint on housing or building conditions, the first government staff to become aware of those and other problems are paramedics and police officers. In both cases, they have been summoned to the property to handle a particular crisis. However, in the process they often see other problems. These front line staff need to be aware of the dynamics of chronic problem properties, and the process for communicating information they come across needs to be simple and effective. For example, a police officer sent to a property to investigate a domestic violence situation who observes housing conditions that clearly violate codes, should be encouraged to pass this information on to inspection staff— without spending an inordinate amount of time filling out forms and dealing with bureaucracy. This communication may take the form of a simple "check-off" on the standard reports used. Additionally, photos could be taken if the situation permits.

### Information Systems

A possibility that could be used on its own, or in conjunction with case management, is the "flagging" of chronic problem properties in the City's information systems. This would be initiated at the department level using a pre-determined definition of chronic problem property. Code Enforcement may wish to flag, as chronic problem properties, all properties which have required five or more inspector visits in the past year. A similar system is used by the FORCE Unit in the Police Department, where suspected drug-dealing properties are flagged and when patrol officers are dispatched on calls for service, reports are mandatory. The same type of system could be used on a city-wide basis, and would provide all staff with better information to deal with the problems they are confronting at these properties.

# Case Study:  Overwhelmed

- Owner Occupied Single Family Home
- Built in 1919.
- M.V.: $68,900.
- City Taxes: $234
- Cost for Annual Calls to City: $2,790
- Problems:  Garbage, Abusive Boyfriend, Disorderly Boys.

"Overwhelmed" is a nice 1920's Cape Cod style house in a pleasant neighborhood.  A nonprofit developer recently rehabilitated this property.  A woman owns it and lives there with her two older boys and a younger girl.  She works full-time in a third shift job to support her family and battles a chronic illness.  A boyfriend sometimes lives there when he is not either in prison or with another girlfriend.  He is currently in prison.

This property has a long and colorful history as a problem property.  Problems go back until at least 1994 involving both property maintenance and criminal behaviors.  This property always comes up in neighborhood meetings as a problem.

The owner is a poor housekeeper, and while the City has not conducted an inspection of the interior of the home, it is reported by a neighborhood police officer to be a mess and the upstairs bathroom has been called a "disaster."  The exterior has received considerable City attention.  The City has issued orders to clean up garbage, vehicle parts, a bathtub and weeds.  In all, the City has conducted five summary abatements during the study period and issued one citation in April 2001.

The boyfriend and the two boys are sources of ongoing criminal activity requiring continuing police interventions.  During our study period, the police responded to 36 calls at this address.  These calls involved child abuse, child neglect, disturbances, domestic assault, theft, auto theft, vandalism, burglary and dangerous conditions.  The boyfriend is trouble.  He is known to be involved in auto theft and is a drug user.  When he is in residence, he assaults the mother and, perhaps, the children as well.  Ironically, while he abuses the family he also seems to create some level of discipline as the yard is kept clean and the boys are more under control.  In essence, when the boyfriend is there, the exterior is neat.  However, on the interior there is violence and intimidation.  When the boyfriend is not there, the exterior deteriorates, but the violence inside the home subsides and the boys seem to run wild.  The boys often refuse to go to school and they are an unending source of disturbances and generally terrorize the neighborhood.  The schools have been ineffective in dealing with this truancy.  However, given that police calls dropped off during the school year, some neighborhood benefit from the school is obvious.  By way of follow-up, a similar pattern of calls for police service continued through 2001.

The police have attempted to intervene in this situation and have organized meetings with the woman and the neighbors.  These interventions have been largely ineffective because of distrust and frustration from both sides.  Things may have improved somewhat after these interventions only to return, after a while, to prior problems.

The core of this problem property seems to be the mother who is simply overwhelmed.  Because of her work schedule, occasionally incapacitating illness, out-of-control children and an abusive partner, she finds it difficult to cope.  She is said by staff who have worked with her, to see herself as a victim and is ashamed of her situation, but seems powerless to do anything to help herself.  She has financial problems and may also have alcohol problems of her own.  She needs personal, financial and mental health counseling, plus personal and financial assistance.  No one seems willing or able to effectively intervene.  The scope of the family problems are so broad and deep that nothing short of a full-scale, long-term social service intervention has any hope of addressing these problems.  No one seems willing to take on this challenge.

### Cross-Departmental Case Management

Communication on issues concerning specific chronic problem properties across different agencies within local government tends to be spotty. Part of this is likely due to the fact that a chronic problem property for one agency may not be one for another. Currently, the main mechanism the City has for communicating on these properties is the Problem Properties Task Force. In order to solidify communication procedures, two ideas present themselves. First, a "case manager" system could be developed where there is one central person responsible for tracking problems on particular properties. This manager would be responsible for "flagging" the property for all staff who interact with it, as well as working with the owner and other involved parties on plans to resolve the problems. This person could also be responsible for gathering appropriate background information for prosecutors and the courts to be used in the pursuing citations.

### Change in Focus

One particular feature of case management that deserves further discussion is how government approaches its work. The majority of situations enforcement and service providing agencies are faced with respond well to standard intervention tools, such as citations, abatements and arrests. However, as we have discussed, the case of chronic problem properties is different and they require a more "in-depth" approach that takes into account the many problems occurring at the property. This change is approach represents a fundamental change in focus from "dealing with" or "handling" the problems— to solving them. Whether this change should be made exclusively using a case management system, or across all staff groups, we cannot say.

### Knock and Talks

Another activity which could be undertaken using a comprehensive "listing" of the City's interactions with a chronic problem property is the equivalent of a "knock and talk." Here City staff would meet with the relevant owners and occupants to discuss the magnitude of the problems the City is observing, the costs of responding to these problems, and possible ways to resolve some of the problems.

### City-Initiated Interior Improvements Using TRAs

The City almost never conducts abatements to improve, and bring into code compliance, the interior of a property. The exception to this is that the City sometimes removes interior garbage build-up that has led to gross unsanitary conditions. Almost always, correction orders and abatement notices are geared toward the owner ensuring that conditions are in compliance with relevant codes. Several of the properties in this study had Tenant Remedy Actions (TRA) brought to fix interior code violations. State law provides that TRAs may be initiated by tenants, some community organizations (such as district councils) and the City itself. In Saint Paul, these actions are brought by tenants and community organizations, often with the assistance of Southern Minnesota Regional Legal Services (SMRLS). However, the City has not pursued this type of action. Staff for the City of Minneapolis report success in using this tool, and it merits serious consideration by the City of Saint Paul as well.

# Case Study:  Career Criminals

- Owner Occupied Single Family Home Built in 1894.
- MV: $52,500.
- City Taxes: $191
- Cost for Annual Calls to City: $4,785
- Problems: Incompetent Owner, Uncontrolled Family Members, Drugs, Prostitution.

"Career Criminals" is an older, owner-occupied single-family dwelling on a corner of a troubled neighborhood. The owner is an old man who, of late, requires a wheelchair to get around. Living with him are two nephews and several women. Most of these women are prostitutes including the owner's daughter whom one nephew reportedly pimps. During the study period, at least seven women who were arrested for prostitution-related offenses listed this property as their home address for police records. The nephews are career criminals with drug abuse problems. The nephews are involved in drugs, pimping and street crime. They are also believed to be involved with gangs. The owner claims to be unable to control what goes on in his house, but he may actually be facilitating what goes on there. His cooperation with the nephews creates a stable living situation, which is, as a police officer said "close to work." In addition, police officers who have been inside the house say the old man is a "collector" who has turned the interior into a floor-to-ceiling maze. Since this is a single family home, City inspectors have been unable to conduct an inspection of the interior, which could lead to a correction order or a condemnation.

The exterior has received the attention of City inspectors because of things in the yard. Two summary abatements have been conducted to remove propane tanks and appliances. A vehicle abatement was also done to remove an abandoned truck in the backyard.

The police had been called to this address an extraordinary 46 times during the study period, or an average of almost twice a month. These calls involved domestic assault, theft, vandalism, fraud, stolen property, auto theft, loitering, disorderly boys and warrant arrests. The FORCE unit had conducted surveillance and attempted buys of illegal drugs. Search warrants have also been served at this property resulting in the recovery of drugs and guns. Arrests were made for operating a disorderly house and possession of drug paraphernalia.

The role of the owner in these criminal activities is unclear. It is noteworthy that this property was not considered a chronic problem property before the nephews entered the scene, and the old man was more or less capable of owning and managing the house. It was only when the nephews entered the scene that his household management skills were put to the test and he failed. In any case, the neighbors are afraid of this property and the level of criminal activity in the area reportedly drops off significantly when the nephews are in jail or prison. However, on the whole, the City's efforts with this property have been largely unsuccessful in altering the behavior of these career criminals or improving the feelings of safety and security among the neighbors.

### Interior Inspection of One- and Two-Unit Rental Housing

The lack of an inspection system that allows predicable access to the interior on one- and two-unit rental dwellings continues to be a problem. Rental Registration, as has been discussed, has not facilitated inspector access to even some of the worst condition one- and two-unit rental housing in the City. This problem needs to be engaged. Policy discussions need to take place which address the need to expand City inspection powers in these cases, whether it be through a revised rental registration program, landlord licensing or a Certificate of Occupancy Program for one- and two-unit rental housing.

### Government Role in Dealing with Abandonment

There were two cases among the case studies where the properties were, for all practical purposes, abandoned by their owners, but continued to be occupied. These were *Errant Investor II* and *Old and Ugly*. In both cases, tenants were not paying rent, and problem behaviors of these occupants went largely unchecked. There seems to be no "in-between" category for ownership that acknowledges this abandonment scenario. A method of government "conservatorship" of these properties should be explored, whereby necessary repairs are made, basic services are paid for, behavior and observance of standard lease provisions is monitored, and rent is collected.

### Neighborhoods

Central to our definition of chronic problem property is the idea that the neighborhood is adversely affected by the property in question. Neighborhoods themselves are not in a position to ensure problems are addressed, as are property owners and government. However, neighborhoods are not without power in helping to cure the problems. Developing a strong sense of neighborhood cohesion and shared values/expectations plays an indirect, but overarching role in identifying and dealing with chronic problem properties. Relatedly, battling the fatigue of dealing with chronic problem properties is best shared as a neighborhood, rather than individual victimized households. City and neighborhood actions that can be taken to work towards the cure of chronic problem properties.

At another level, once a chronic problem property has "come into being" and its problems have been addressed by relevant agencies, there still remains a tear in the fabric of the neighborhood. This tear is exemplified by the boarded vacant former drug house which stands as a reminder of past troubles and a lack of reinvestment in the present. Clearly, housing rehabilitation and occasional demolition are a part of mending the fabric of the neighborhood. Beyond that, there are many cases too where the housing or business continues to be occupied. For example, in *Career Criminals*, the house is occupied and the young men are in and out of law enforcement custody. The cases of *Bad Boys* and *Overwhelmed* are similar. The experiences of these properties are that the neighborhood will continue to suffer and occasionally be traumatized. The concept of restorative justice[23] holds some promise for repairing the relationship of the neighbors to the property, its owners and occupants.

---

[23] Restorative Justice is a value-based approach to criminal justice with a balanced focus on the offender, victim and the community. Involves the creation of programs designed to serve the needs of victims by providing a holistic approach to healing the harm suffered, while offering opportunities for offenders to realize the harm they caused, apologize for the wrong, help repair the harm, and earn their way back into good standing in the community.

# Case Study: Nasty Four

- 4 Unit Rental built in 1883.
- MV: $84,000; MV per unit: $21,000.
- City Taxes: $305
- Cost for Annual Calls to City: $4,437
- Problems: Exploitive Landlord, Low Level Criminal Activity, Exterior and Interior Code Violations.

"Nasty Four" is a four-unit apartment building that was recently "deconverted" from an eight to a four-unit building. This property is located in an historic preservation district on a block known by the neighborhood to be a "problem area." It has been a problem property in its own right for at least the decade. Members of the same family have owned it. Notably, members of this family own many properties in this neighborhood and throughout the City.

Maintenance and sanitary conditions have been a continuing problem. There have been exterior violations involving siding, trim and fencing in need of repair, as well as uncollected garbage. On the interior, problems have been found with holes in the walls, mice and carpet damage. Unit one was condemned after a fire causing $15,000 in damage in February 1999. Unit four was condemned after a fire in May 2000. In all, four correction orders have been issued for garbage, the broken fence and mice. Three citations have been issued, two of which were for the broken fence and one for failure to vacate a condemned unit. The later citation resulted in a $50 fine. Inspection staff indicated they have tried both cooperation and getting tough, to little avail.

The police have been regular visitors to this address, responding to 47 calls during the two-year study period, and 45 in the one year following it. Residents of all 4 units have had at least some interactions with the police. Fifteen calls were to unit one involving vandalism, theft, landlord/neighbor situations and domestic assault. The police also conducted a "knock and talk" at unit one during which they recovered drugs and drug paraphernalia. Unit two had the least activity with just three police calls involving auto theft and domestic assault. Unit three had 15 calls about assaults, theft landlord/neighbor and domestic assault. An occupant of unit three was also arrested for driving with drugs in the vehicle. Unit four experienced 10 police calls for such offenses as assault, theft, family/children, runaway and domestic assault. The general areas of the building produced ten police calls for fights, assaults and dangerous conditions. At one point, the owners asked the police to arrest trespassers— ostensibly to discourage unsavory characters from hanging about.

The core problem here is the landlords are "jerks." They are very clever and wholly uncooperative with City efforts to protect the inhabitants and neighbors. They seem to have little regard for the neighbors and know how to evade the system. In one interview, it was said "they could write a book on how to exploit tenants and evade City interventions." In an example of this behavior, the landlords hired a caretaker during the study period to help to keep this and some of their other properties well-maintained. While this has been the case, we also heard reports that the caretaker acts as "muscle" to see that rent is paid on time. They are also said to rent to "bottom of the barrel" tenants and take advantage of them, often by turning over tenants while arranging to keep their security deposits and last month's rent deposits. This allows them to maximize income from an otherwise undesirable property. They, themselves, may be involved in drugs and alcohol but are said to be "too smart to get caught at it." The situation was thought to have improved recently. The landlords said they were doing more screening of their tenants and turning away the worst prospects. The near doubling in the level of police calls to this property suggests these efforts were particularly ineffective. There was, at one point, speculation that a nearby college would acquire this property with expansion plans. At this point, however, problems

Ultimately, these relationships must be restored. Almost all offenders are released and will return to the same property or area. This is the current experience of Los Angeles neighborhoods as gang members are released from prison and re-enter their neighborhoods.[24] Restorative justice for neighborhoods could involve sentencing practices that work to restore and rebuild the damaged neighborhood, or facilitated neighborhood-based mediation. Whatever the approach, attempts to mend the neighborhood when the offenders remain in the midst of those who were harmed is important for the existence of neighborhood cohesion.

## Owners

Owners are an essential component of curing chronic problem properties. Recall that the essential elements for the development of a chronic problem property are the owner and the government being unable and unwilling to solve the problems. There are a huge variety of problems the owners could be experiencing, and the solutions to these problems are also varied. If it is the case that the owner lacks the resources or ability to effectively address the problems at hand, options which empower owners and provide them with necessary resources are called for. If it is the case that the owner is unwilling to effectively address the problems, then options which provide incentives and penalties for noncompliance should come into play. Unfortunately, for chronic problem properties, owners are usually unwilling and , to some extent sometimes unable as well.

At the simplest level, is the option of bringing a new owner into play. In the *Case Case*, many believe the new owner was key to turning this complex around, and the initial reports are good. In other rental property case studies, such as *Cracking Up* and *Alligator Alley*, new owners have not brought about changes in the situations of these properties. Changes in ownership for owner-occupied properties also have the potential of changing the status of these properties from being chronic problems to good neighbors. In both cases though, it is important that the new owners are clearly aware of the history of the property and the community standards which were violated.

Direct provision of services may help some of the owners in our case studies with the problems they are experiencing. In the case of *Dirty Business*, assistance in securing an alternate site for the landscaping business would likely help. In the case of *Overwhelmed*, a broader range of services may be needed. What seems to be lacking in our service systems is the ability to provide these people with the services needed, with strings attached to ensure they are addressing the chronic problems. For example, if money is provided for removal of garbage, the rebuilding of stairs and a new roof, it seems reasonable to need assurances that the money will be spent on those items.

# SOCIAL & PERSONAL PROBLEMS

Overall, one is struck by the profound impact of social and personal problems in the lives of the owners and occupants of chronic problem properties. Issues of poverty, violence, alcohol and drug abuse are riddled throughout all of the case studies. Not surprisingly, this research process did not provide us with profound insights as to the ultimate solution of these problems. However, we will summarize some of our findings on how these factors act to make owners and occupants less able and willing to deal with the problems which confront them.

---

[24] *L.A. Gangs Are Back*, Time Magazine, August 26, 2001.

# Case Study:  Fight Club

- Commercial bar.
- Cost for Annual Calls to City: $11,500
- Problems: License Problems, Criminal Activity, Crafty Manager.

"Fight Club" was a downtown bar with a restaurant and entertainment license. It was located at street level in a large building used for residential, office, light manufacturing and retail. The surrounding buildings are primarily commercial but there are several large residential buildings in the immediate area. The residential neighbors were very fearful of this bar and its customers. In fact, several residential neighbors reported being threatened by employees and customers of the bar. This business had been a problem almost since it opened and was on the problem properties task force working list.

The Fire Department and Code Enforcement issued orders regarding maintenance for this business dealing with garbage, doors, sprinklers and blocked exits. The primary problems with this business regarded criminal activity and failure to pay applicable license fees.

This bar had been the site of serious criminal problems involving shootings, assaults and gang activities. The police responded to 112 calls during our study period. This means the police were called to this business, on average, once each week. These police calls involved narcotics, disturbances, domestic assault, fights, theft, aggravated assault, vandalism, weapons, haranguing and hassling. Eighteen of these calls involved fights, in addition to four aggravated assaults, three other assaults, domestic assaults and disturbances. Because of this high level of criminal activity, the City required metal detectors and video cameras to deter weapons and other violence. These requirements were not always met— resulting in a series of adverse actions against the liquor license. This license was actually in the name of the manager's mother as he, himself, was ineligible to apply because of his criminal background.

The manager of this bar, at best, turned a blind eye to criminal activity in the bar. At worse, he allowed and encouraged criminal activity. Certainly he catered to a bad clientele. He was also chronically late in paying his City license fees and, when he did pay them, it was always in cash. He was very sophisticated in working City license and police agencies, and seemed to know just how far he could go and yet remain out of the reach of City enforcement agencies. This ability has, however, broken down in view of a recent series

The presence of poverty, and its concentration, is a factor in many of the case studies. It is demonstrated by the high level of delinquent taxes, utility shut-offs and relatively low market values of these properties. In some cases, this poverty turns into an unlikely tool for removing, or temporarily removing, chronic problem properties from a neighborhood. For example, a utility shut-off will result in a condemnation, and orders to vacate the premises. In other cases, unpaid taxes will lead to the eventual forfeiture of the property to the state. Or the inability to keep up on payments in a contract for deed will lead to the occupants losing the property. However, these are not real solutions to the chronic problems of these properties. Utility bills are almost always paid again at some point. Tax forfeiture is a very long process, and leaves a neighborhood stuck with problems for years at a time— as is demonstrated by *The Brothers Grim* and *Old and Ugly*. In the case of properties sold on a contract for deed, if they end up being ceded back to the original owner, they are typically resold on a contract for deed under very similar circumstances. In all of these cases, poverty undoubtedly brings more problems than it solves for these properties.

Alcohol and drug abuse were strong influences on the owners and occupants in the case studies. Although we have no drug use/abuse statistics, the stories of the people involved at these properties are indicative of high levels of alcohol and drug abuse, as well as addiction. In *Down 'N Out*, it seemed the majority of people in the twenty-room building had these problems, with the building being characterized as the "first half of a half-way house," meaning it was occupied by people prior to recovery from addiction. In the *Errant Investor* stories, we saw how the property owner has ultimately lost most of his property holdings and seriously damaged the neighborhood through mismanagement and neglect related to his drug addiction. In the *Brothers Grim*, the drug abuse of the two brothers was a primary contributor to them ultimately losing their family home and hurting the neighborhood. Similarly, the drug abuse of the man living in and attempting to buy *Empty Promise* made his occupancy of the property untenable. And certainly the many times police officers were required to transport people to detox are indicative of serious problems.

Drug dealing in chronic problem properties is often connected to the drug abuse of the occupants. There also seemed to be a number of case studies in which drug dealing was reported to be a problem, but where the occupants were not reported to be using drugs in a way that led to police intervention. The Police Department had founded calls concerning drug dealing at 59 percent of the case studies. These situations varied considerably. *Errant Investor I* involved drug dealing, both open air and within the premises, with the knowledge and complicity of the property owner. *Cracking Up* was occupied by one, and sometimes two, women who likely had serious drug problems, and were believed by some to be assisting local drug dealers by allowing them to use the property. *Danger Island* is a multi-unit apartment building where it seems there is considerable drug dealing activity in the shared, general spaces of the building. This also seems to be the story with both *Alligator Alley* and *Case Case*. The fear and despair introduced into these properties and neighborhoods related to drug dealing is immeasurable.

Violence, in particular domestic violence, turned out to be nearly a hallmark of chronic problem properties. As has been stated frequently in the report, 88 percent of the properties had founded police calls for service related to domestic violence. Police were also called to two-thirds of the properties studies to handle "other violence" situations, and to 38 percent of them for fights. The sense of chaos one gets from the physical disorder pales in comparison to the social disorder associated with drug dealing and violence. Damage clearly occurs within the household where violence is present. Damage also occurs for the neighbors of these properties. One need hardly imagine that hearing, and sometimes seeing, repeated episodes of domestic violence is just as, if not more, harmful than dealing with mounds of garbage or junk vehicles on the neighbor's property.

# Case Study:  Case Case

- 12 Unit Rental in a 4 Building Complex
- MV: $ 200,875;  MV per Unit: $ 16,740
- City Taxes: $708
- Cost for Annual Calls to City: $15,179
- Problems: Exterior Violations, Criminal Activity, Domestic Abuse, Unresponsive Owner.

"The Case Case" is a 12-unit apartment building and is one building in a four-building complex. It is neither the best nor the worse of the four buildings. This apartment complex is in a fairly nice neighborhood made up of primarily single-family homes near an elementary school on a block of generally good buildings. The owner of this building owns three of the four buildings in this complex and has an attorney manage the buildings. There is no on-site caretaker although the condition of the owner's 36 units seems to justify such a service. This landlord owns other buildings in Saint Paul and manages them in what City staff generally considered to be a peculiar manner. He seems to reflexively resist City efforts to address problems in his buildings for reasons known only by him.

In recent years there have been some violations of City building maintenance codes. In the interior there have been problems with heat, locks, doors, carpeting and screens. Exterior violations have involved such things as paint, lack of ground cover and abandoned vehicles. The owner's failure to respond to City correction notices has lead to the Certificate of Occupancy being revoked twice, once in 1999 and again in 2000. The building also experienced an arson fire. The reluctance of the owner to make prompt repairs from this fire damage has caused great frustration among some tenants. There is a general feeling of the building being overcrowded with little space within which to live.

The behavioral problems in this building are considerable. The police have been called to this building 114 times during our study period. These calls have involved quite serious matters such as drug dealing, prostitution, burglary, fights, narcotics and the reported murder of a drug dealer in front of the building. Forty-three calls have been to the common areas of the building such as halls, entrances and the parking lot. Notably, all drug and narcotic-related calls have been to the general areas of the building. Three units account for another 44 calls with one unit responsible for 28 calls. The calls to individual units are largely for domestic assault along with other family and child-related matters. The FORCE Unit has also visited this building in 1997 and again in 1999. Blatant drug activities, along with physical intimidation, have kept many tenants in a state of anxiety regarding their personal safety. Some forty-six percent of the building's units are responsible for generating zero to three calls for police service each. This crowded building is clearly occupied by some who do the crime and others who are intimidated by them. In response to the extraordinary demand for police services, the City sent two "excessive consumption of police services" letters to the owner. It is not apparent if these letters, or anything else the City has attempted, have resulted in any improvement in this unhappy situation. Indeed, police calls in 2001 were 25 percent greater than had been experienced in either year of the study period.

Six months following the completion of our study period, all four of the buildings in this complex were sold to a new owner who has installed a caretaker. It remains to be seen if this ownership and management change will result in safer, healthier living spaces for the tenants and a better neighborhood generally.

# CONCLUSION

Almost everyone, at one point or another, has had experience with chronic problem properties. They are occasionally on the evening news, as was the case with the McGuckin family of Sandpoint, Idaho in the early summer of 2001. This family was living in a remote cabin with few resources and the father had died earlier in the spring from multiple sclerosis and starvation. After the mother was removed from the home for felony child neglect, the children, aged 8 to 16 holed themselves up in the cabin with the many family dogs— fearful of all outsiders, as their (probably mentally ill) mother had been. The property was poorly maintained, with a build-up of household garbage and dog feces inside.

Not all chronic problem properties receive such wide media coverage— in fact, the vast majority do not. However, the McGuckin family situation, of which most of us became aware, bore some of the hallmarks of the chronic problem properties we have studied. These include the loss of control of one's surroundings which is exemplified by the gross unsanitary conditions, an owner who is both unwilling and unable to deal with the problems, as well as the predisposing and complicating factors of poverty and poorly constructed housing.

Chronic problem properties are *chronic* because of the number and complexity of the problems concentrated in the property. These problems can be lumped into the broad categories of social and physical disorder which have an adverse affect on the surrounding area. These problems range from the domestic violence we saw all too often, to drug dealing to junk vehicles, appliances and mattresses. The over-riding themes are these are cases where people have loss control of themselves— with drugs, anger, violent acts and victimization by violence. They have also lost control of their surroundings— with poor or little maintenance of the household, doors and windows often being broken allowing intrusion, auto theft, theft and burglary predominating.

Chronic problem properties, in some form or another, seem almost a given as a part of the human condition. There will always be some level of deviance— those who do not share and will not abide by the expectations, values and laws of society at large. But in urban areas, the impact of these deviant actions is too broad and deep to allow them to go unchecked. It is incumbent upon society to minimize and eliminate the chronic problems of these properties whenever possible— not only to decrease the vast amount of resources the public spends handling these problems, but to improve the general health, safety and welfare of the city. The challenge lies with individuals, community organizations and government to make owners and government itself able and willing to engage, resolve and cure these problems. Preventing the creation of more chronic problem properties is the next challenge. If chronic problem properties never "come into being," they will not harm the community. The rewards of engaging these challenges lie in the improved quality of living residents and visitors alike will enjoy.

Saint Paul is a typical city. While remarkable in many respects, it is no more predisposed to develop chronic problem properties than most cities. City of Saint Paul analysis of the 2000 Census Supplementary Survey indicates that Saint Paul is perhaps the "ultimate middle class city." This is based on income levels, poverty rates, unemployment rates and housing affordablility— both rental and owner-occupied. Saint Paul also ranks very high in retaining and attracting middle class. Yet Saint Paul has chronic problem properties, not to the extent of some cities, but certainly its fair share. The question that now faces the City is: with what we know now, can we meaningfully lower the number and severity of chronic problem properties in Saint Paul?

# APPENDIX A: CHRONIC PROBLEM PROPERTY CASE STUDY REFERENCE LIST

| Name | Property Information | City Services Information | Problems Experienced | Page # |
|------|---------------------|--------------------------|---------------------|--------|
| Alligator Alley | 30 -Unit Rental Built in 1967 MV:[1] $618,000 MV per unit: $20,600 | City Taxes: $2,242 Cost for Annual Calls to City: $13,829 | Uncooperative Landlord, Code Violations, Tenant Crime | page 78 |
| Bad Boys | Owner Occupied Single Family Home Built in 1925 MV: $69,300 | City Taxes: $251 Cost for Annual Calls to City: $7,288 | Noise, Disturbances, Out of Control Boys, Weapons, Intimidation | page 80 |
| Brothers Grim | Owner Occupied Single Family Home Built in 1924 MV: $119,000 | City Taxes: $471 Cost for Annual Calls to City: $5,891 | Drug-Addicted Brothers, Garbage, Sewer Line Break in Basement | page 18 |
| Career Criminals | Owner Occupied Single Family Home Built in 1894 MV: $52,500 | City Taxes: $191 Cost for Annual Calls to City: $4,785 | Incompetent Owner, Uncontrolled Family Members, Drugs, Prostitution | page 100 |
| Casa Case | 12 Unit Rental in a 4 Building Complex MV: $ 200,875 MV per unit: $ 16,740 | City Taxes: $708 Cost for Annual Calls to City: $15,179 | Exterior Violations, Criminal Activity, Domestic Abuse, Unresponsive Owner | page 106 |
| Cash Cow | 69 Unit Rental Built in 1971 MV: $1,260,000 MV per Unit: $18,261 | City Taxes: $4,573 Cost for Annual Calls to City: $34,821 | Incompetent Managers, Criminal Activity, Code Violations | page 22 |
| Cracking-Up | Rental Duplex Built in 1893 MV: $59,000 MV per Unit: $29,500 | City Taxes: $214 Cost for Annual Calls to City: $13,294 | Slumlords, Criminal Activity, Drug Dealing, Prostitution | page 26 |
| Cultural Conflict | Rental Duplex Built in 1883 MV: $42,100 MV per unit: $21,050 | City Taxes: $249 Cost for Annual Calls to City: $7,709 | Poor Management, Exterior Violations, Large Outdoor Parties, Cultural Differences | page 42 |
| Danger Island | 11 Unit Rental Built in 1960 MV: $273,600 MV per Unit: $24,873 | City Taxes: $993 Cost for Annual Calls to City: $23,289 | Inexperienced Owner, Code Violations, Property Isolation, High Tenant Criminality: Drugs, Violence | page 84 |
| Dirty Business | Owner Occupied Single Family Home Built in 1912 MV: $104,200 | City Taxes: $361 Cost for Annual Calls to City: $1,939 | Landscaping Materials, Trash, Dog | page 96 |
| Dirty Dealing | Owner Occupied Single Family Home Built in 1887 MV: $56,000 | City Taxes: $221 Cost for Annual Calls to City: $13,131 | Gross Unsanitary Conditions, Occasionally Vacant, Criminal Nuisances, Racist Neighbors | page 58 |
| Dog House | Owner Occupied Duplex Built in 1889 MV: $46,600 MV per Unit: $23,300 | City Taxes: $176 Cost for Annual Calls to City: $2,387 | Dog Fighting, Garbage, Drugs, Prostitution | page 72 |
| Double Trouble | Rental Duplex Built in 1885 MV: $49,700 MV per Unit: $24,850 | City Taxes: $298 Cost for Annual Calls to City: $8,523 | Exploitive Landlord, Criminal Behavior of Unscreened Tenants, Exterior Code Violations | page 64 |
| Double Gross | Rental Duplex Built in 1903 MV: $33,800 MV per Unit: $16,900 | City Taxes: $123 Cost for Annual Calls to City: $6,534 | Incapacitated Slum Lord, Narcotics, Disturbances, Domestics | page 94 |
| Down 'N Out | 20 Unit Rental Built in 1867 MV: $121,300 MV per Unit: $6,065 | City Taxes: $440 Cost for Annual Calls to City: $11,017 | Tenant Behavioral Problems, Drinking, Disorderly Boys, Intolerant Neighbors | page 44 |
| Empty Promise | Owner Occupied Duplex Built 1889 MV: $53,900 MV per Unit: $26,950 | City Taxes: $319 Cost for Annual Calls to City: $8,062 | Code Violations, Vacant Building, Drug Sales/Use, Squatting | page 56 |
| Errant Investor 1 | Rental Duplex Built in 1893 MV: $$53,600 MV per Unit: $26,800 | City Taxes: $219 Cost for Annual Calls to City: $2,985 | Absent Drug-Addicted Landlord, Drug Dealing, Intimidation, Later a Vacant Property | page 28 |

[1] MV is the market value for the property used by Ramsey County.

| Name | Property Information | City Services Information | Problems Experienced | Page # |
|---|---|---|---|---|
| Errant Investor II | Rental Duplex built in 1884 MV: $39,100 MV per unit: $19,550 | City Taxes: $163 Cost for Annual Calls to City: $1,695 | Absent Drug-Addicted Landlord, Garbage, Vehicles, Occasional Criminal Activity | page 30 |
| Fear Factor | Owner Occupied Single Family Home Built in 1909 MV: $53,100 | City Taxes: $193 Cost for Annual Calls to City: $1,289 | Garbage, Drugs, Intimidation | page 50 |
| Fight Club | Commercial bar | Cost for Annual Calls to City: $11,500 | License Problems, Criminal Activity, Crafty Manager | page 104 |
| Gangster Boyfriend | Single Family Rental built in 1888 MV: $42,300 | City Taxes: $150 Cost for Annual Calls to City: $2,845 | Criminal Companion, Disorderly Boys, Drugs, Probable Child and Animal Neglect | page 32 |
| Home Alone | Owner Occupied Duplex Built in 1906 MV: $83,800 MV per Unit: $41,900 | City Taxes: $454 Cost for Annual Calls to City: $1,709 | Tall Weeds, Domestic Violence, Child Protection | page 40 |
| La Cucaracha | 24 Unit Rental built in 1971  MV: $1,107,800 MV per unit: $39,564 | City Taxes: $4,245 Cost for Annual Calls to City: $19,696 | Cockroaches, Criminal Activity, Prostitution, Drugs | page 70 |
| Misplaced | Towing Service (inoperative) MV: $20,500 | City Taxes: $144 Cost for Annual Calls to City: $1,982 | Exterior Mess, Vacant Building Resulting from Fire, Junk Vehicles | page 74 |
| Motel California | Commercial Motel MV: $303,400 MV per Room: $2,408 | City Taxes: $3,028 Cost for Annual Calls to City: $34,534 | Uncaring and Possibly Corrupt Management, Code Violations, Crime | page 20 |
| Nasty Four | 4 Unit Rental built in 1883 MV: $84,000 MV per unit: $21,000 | City Taxes: $305 Cost for Annual Calls to City: $4,437 | Exploitive Landlord, Low Level Criminal Activity, Exterior and Interior Code Violations | page 102 |
| Old and Ugly | 4 Unit Rental Built in 1888 MV: $54,000 MV per Unit: $13,500 | City Taxes: $470 Cost for Annual Calls to City: $9,575 | Absent Landlord, Drugs, Interior and Exterior Violations, TRA | page 54 |
| Over the Edge | 3 Unit Rental Built in 1891 MV: $56,000 MV per Unit: $18,667 | City Taxes: $305 Cost for Annual Calls to City: $4,437 | Baby Death, Narcotics, Doors and Locks, Trash, Possible Racism | page 34 |
| Overwhelmed | Owner Occupied Single Family Home Built in 1919 MV: $68,900 | City Taxes: $234 Cost for Annual Calls to City: $2,790 | Garbage, Abusive Boyfriend, Disorderly Boys | page 98 |
| Through the Cracks | Rental Duplex built in 1889 MV: $49,500 MV per unit: $24,750 | City Taxes: $180 Cost for Annual Calls to City: $6,307 | Revolving Bad Tenants, Tenant Intimidation of Neighbors, Garbage, City Dropped Ball | page 38 |
| Watering Hole | Commercial Bar Built in 1949 MV: $94,200 | City Taxes: $664 Cost for Annual Calls to City: $6,307 | License Problems, Public Drinking, Assaults, Indifferent Owners | page 76 |
| Weird Neighbor | Owner Occupied Single Family Built in 1920 MV: $101,800 | City Taxes: $395 Cost for Annual Calls to City: $2,210 | Long Term Incomplete Exterior Project, Commercial Vehicle Storage. | page 52 |

# APPENDIX B: BIBLIOGRPAHY AND REFERENCES

### JOURNALS

Dubin, Robin. "Maintenance Decisions of Absentee Landlords under Uncertainty." Journal of Housing Economics 7 (1998): 144-164.

Ellen, Ingrid Gould, and Margery Austin Turner. "Does Neighborhood Matter? Assessing Recent Evidence." Housing Policy Debate 8.4 (1997): 833-866.

Goetze, Rolf, and Kent W. Colton. "The Dynamics of Neighborhoods: A Fresh Approach to Understanding Housing and Neighborhood Change." Journal of the American Planning Association 46 (1980).

Greenberg, Michael R. "Improving Neighborhood Quality: A Hierarchy of Needs." Housing Policy Debate 10.3 (1999): 601-620.

Grogger, Jeff, and M. Stephen Weatherford. "Crime, Policing and the Perception of Neighborhood Safety." Political Geography 14.6/7 (1995): 521-541.

Kutty, Nandinee. "A Dynamic Model of Landlord Reinvestment Behavior." Journal of Urban Economics 37 (1995): 212-237.

Labott, Elise. "Slum Offensive: After Years of Inaction, Governments are Starting to Crack Down on Blighted Property Again." Governing July 2000.

Megbolugbe, Isaac F., and Marja C. Hoek-Smit, Peter D. Linneman. "Understanding Neighbourhood Dynamics: A Review of the Contributions of William G. Grigsby." Urban Studies 33.10 (1996): 1779-1795.

Perkins, Douglas D., and Ralph B. Taylor. "Ecological Assessments of Community Disorder: Their Relationship to Fear of Crime and Theoretical Implications." American Journal of Community Psychology 24.1 (1996): 63-107.

Saez, David. "Discerning Where They Are: Understanding Current Housing Trends and Related Internal Processes of Six Minneapolis Neighborhood Organizations." Conducted on behalf of the Minneapolis Neighborhood Early Warning System. December 2000.

Smith, Steven Rathgeb. "Partnerships, Community Building, and Local Government." National Civic Review 86.2 (1997): 167-174.

Taylor, Ralph B., et. al. "Street Blocks with More Nonresidential Land Use Have More Physical Deterioration: Evidence from Baltimore and Philadelphia." Urban Affairs Review 31.1 (1995): 120-136.

Temkin, Kenneth and William M. Rohe. "Social Capital and Neighborhood Stability: An Empirical Investigation" Housing Policy Debate 9.1 (1998): 61-86.

Vidal, Avis C. "Reintegrating Disadvantaged Communities into the Fabric of Urban Life: The Role of Community Development." Housing Policy Debate 6.1 (1995): 169-230.

Wilson, James Q., and George L. Kelling. "The Police and Neighborhood Safety: Broken Windows."