**NHI** Shelterforce Online

March/April 1997

# Drug War in St. Paul
## *Tenants, Cops, and Community Organizing*

*By Edward G. Goetz and Kirby Pitman*

On the night of February 25 1995, St. Paul police and a city housing inspector arrived at the home of Louise and Carl with their guns drawn, but without a search warrant. Carl allowed them into his downstairs apartment, according to the St. Paul Tenants' Union (SPTU). The family was buying the house on a contract for deed and renting the upstairs apartment to two young men. Louise had suspected the men of dealing drugs and called the police. After one of the men threatened her at gun point, she moved out of the house with her two-year-old child. The police responded to Louise and Carl's concerns by raiding their home.

During the raid, SPTU reported, police ripped furniture, cut apart children's toys, etc. No drugs were found, but a housing inspector condemned the home and posted a vacate order. Carl was arrested and detained for a parole violation, and the home was left unsecured. The family had to move into a hotel until their money ran out. They were homeless for over two weeks and lost their jobs in the chaos. The couple was not informed of their right to appeal the condemnation and ultimately lost their home when the city proceeded with condemnation orders.

The St. Paul Police department conducted this raid under the auspices of the Focusing Our Resources on Community Empowerment (FORCE) program. While community crime prevention (CCP) programs like FORCE are often presented as a friendlier face on the nation's anti-crime obsession, CCP is frequently "community-based" in name only. Many local programs are top-down initiatives headed by police departments and government agencies and dominated by the most affluent, the more highly educated, and the property-owning population of inner-city neighborhoods. The methods of the FORCE unit show how authorities can use the term "community-based" to stretch the

boundaries of fairness and target 'the dangerous classes' – usually lower-income renters and racial minorities.

## The FORCE Unit

In 1992, St. Paul City initiated the FORCE program as a comprehensive approach to its drug problem. FORCE works by enlisting the assistance of neighborhood residents in the anti-drug effort, calling on residents to become the "eyes and the ears" of the local police department. Neighborhood residents create block watches and identify any suspicious activity, reporting their findings to the police.

## Drug Raids and Housing Condemnations

The central element of the St. Paul drug war was combining housing inspections and drug raids. A housing inspector accompanied the FORCE team on all drug raids and conducted code compliance inspections on the spot. This allowed the team to condemn a unit and force the tenants out whether or not drugs were found on the premises. Most drug raid condemnations forced the tenants to evacuate almost immediately.
The St. Paul Tenants Union (SPTU) fought the FORCE condemnations for a number of reasons. First, innocent household members, those not even suspected of illegal drug activity, were losing their homes because of the alleged behavior of the drug suspect, according to homeless shelter intake workers quoted by the St. Paul Pioneer Press.

Second, SPTU was concerned about the circumvention of tenants' rights and the denial of the constitutional right to due process. In drug raid condemnations, families were forced out of their homes usually within 24 hours. This process ignored their right to a hearing and essentially applied a punishment before a legal finding of wrongdoing had occurred. According to Charlie Hollins, vice president of the SPTU, "tenants who are evicted as a result of FORCE condemnations are not even notified of their right to appeal the condemnation. This is a right that landlords and homeowners are given." In some cases, it was clear that FORCE was not even interested in a legal finding of guilt. Arrests were made in less than 50 percent of the FORCE raids.

Third, despite the fact that most FORCE raid target users and not dealers,

according to Joan Pearson, executive director of SPTU, the program focused on punishment. There has never been a coordinated effort to link drug treatment to the FORCE activities. According to FORCE housing inspector Jim Halvorsen, "the whole philosophy behind the unit is to move [the drug problem]. What you have to understand is that I only want to move it outside the city limits. Let them go to Roseville or Maplewood [suburbs of St. Paul], I don't care, as long as it isn't in the city of St. Paul."

Fourth, these condemnations were contributing to homelessness in the city. According to the FORCE inspector's estimate, 25 percent of the properties he condemns become vacant. The November 17, 1993 St. Paul Pioneer Press reported that "'Condemnation' is more and more listed as a reason families end up in shelter. Ironically, perhaps, one reason is that city housing inspectors now accompany police on crack raids, in an effort to make neighborhoods more habitable."

Finally, SPTU had data to show that 93 percent of FORCE raids had targeted African-Americans, though they make up less than 10 percent of the city's total population. Though the program was supposed to be citywide, virtually all of the raids occurred in the heavily minority neighborhoods of Frogtown, Summit-University, and the East Side.

"The Tenants Union has heard story after story about families, including children, who are mistreated during raids," said Hollins. "We hear reports of children as young as 8 years old being handcuffed with guns pointed to their heads and being thrown to the ground where they are searched. We hear reports from a young mother who is handcuffed and not allowed to pick up her baby who is crying on the floor, frightened by 8 officers with drawn guns"

## Fighting the FORCE

SPTU attacked FORCE on three tracks. First, tenant advocates requested that the police department make public its statistics on FORCE team activities, and enlisted the aid of the City Council in making the FORCE unit respond to their requests. Second, they organized in the community around the issue of drug raid condemnations in order to get SPTU's side of the story out.

The community organizing was important because block clubs tended to support FORCE efforts. There was a sense among SPTU activists that the

cards were stacked against them; the police were pitching the program as the only way to save neighborhoods, and block club residents, desperate to preserve their communities, often agreed.

Finally, SPTU organized a legal challenge to drug raid condemnations. In the fall of 1995, SPTU prepared lawsuits to challenge the city's policy of having a housing inspector accompany the police on FORCE raids, and the lack of notice of right to appeal given to tenants whose apartments have been condemned.

Close to three years of SPTU advocacy ultimately brought changes. By late 1995, the City's health department had agreed to post a notice of tenants' rights to appeal all of the condemnations it initiates. Later, FORCE agreed to provide information on social service agencies after its drug raids. Finally, in December 1995, FORCE discontinued the practice of having the housing inspector accompany police on their raids.

SPTU also negotiated a working arrangement of sorts with one of the more active block clubs. SPTU got the block club to agree to contact the group about their concerns about a property before it got to the point of a drug raid and/or condemnation. At that point, SPTU would contact tenants and tell them the local community organization was targeting their house, and that they may lose their housing in the near future.

**Tenant screening**

Another initiative of the FORCE unit was to establish a tenant screening service run by the St. Paul Crime Prevention Coalition (SPCPC). Although SPCPC claimed to be a "community-based organization," the idea for the coalition came from Chief of Police William Finney. The head of the police FORCE unit was a founder of SPCPC, and a local resident employed by the police department as a block club organizer was active in the coalition.

The coalition provided landlords with sample forms for prospective tenants to fill out. The forms included questions such as "Have the police ever come to your residence?" and "Do you or have you ever had a case worker from a public housing agency or county human service agency?" Though filling out the form was "voluntary" for the apartment seeker, the form indicated "if the [prospective] applicants refuse to sign this form; the word 'refused' will be

indicated on this form and will be considered in the review of the application."
The logos of the City of St. Paul and the St. Paul Police Department adorned
the top of the form.

SPCPC took names from the daily notices of tenants involved in eviction
proceedings and added them to their problem tenants list. What SPCPC did
not list, however, were the outcomes of cases, and this put them in violation of
state law. SPTU also claimed that the screening service disseminated false and
misleading anecdotal information, failed to verify the information provided by
landlords, and did not notify tenants of their rights to see their records and
challenge information on them.

Constant pressure by SPTU finally ended the illegal and unfair practices of
SPCPC. The coalition soon lost its funding and went out of business less than
three years after it had formed.

Though largely successful in its attempts to temper the excesses of the local
"community-based" war on drugs, SPTU has had to fight the perception that
because they are interested in preserving the legal rights of tenants, they are
defending criminals and drug pushers.

At the height of the public debate in St. Paul, the police chief wrote in a letter
to the St. Paul Pioneer Press, the city's major daily newspaper: "I question the
motives of the Tenants Union. Do they stand with the honest residents who
have called on FORCE and have seen positive results, or with drug dealers
who would turn our city into a drug-infested jungle?"

In response, SPTU officials wrote: "We see a problem . . . when under the
guise of 'community empowerment,' many low-income tenants and people of
color are subject to civil rights violations that result in enormous personal and
financial losses as well as the loss of their homes."

Copyright 1997

*Edward Goetz is associate professor in the Housing Program at the
University of Minnesota. Kirby Pitman has a Masters in Public Affairs from
University of Minnesota's Humphrey Institute of Public Affairs and is now
working for the St. Paul City Council research staff. This work was done*

*while she was a student at the U. of Minn. and does not reflect the position of City Council Research.*

Back to March/April 1997 Index.

**NHI** National Housing Institute   **Sponsors** | **E-Mail** | **Home** | **Search**

**Minneapolis/St. Paul**

Annual Manual | Personals | | Ad Index | | Contact Us

Advanced Search   All of CityPages.com   ` GO `

# NEWS

Volume 17 - Issue 807 - News

How a growing number of Twin Cities neighborhoods are
driving out the poor.

## Deconcentrating Poverty and Other
## Scams

by Monika Bauerlein
May 22, 1996

Email to a Friend
Print this Article
Write a Letter
to the Editor

**Also in this
Issue**

- Losing It (Cover
  Story)

- Kangaroo Court
  (News)

- Soft Money Hardball
  (For The Record)

- Dinosaur Politics
  (For The Record)

- Fingerhut Follies
  (For The Record)

- End Notes (For The
  Record)

- More articles from
  this Issue...

040009

City Pages - Deconcentrating Poverty and Other Scams

**More News/City Beat Articles**

- Flunking the Superintendent (May 15, 1996)
- Beauty Tips for the Dead (May 8, 1996)
- Wild Thing, You Make My Heart Sing (May 1, 1996)
- Getting the Lead Out (May 1, 1996)
- Immigrant's Song (Apr 24, 1996)
- Last of the Luvernes (Apr 3, 1996)
- Hollman Lurches On (Apr 3, 1996)
- The Road Not Taken (Mar 20, 1996)

**Email Newsletter**

Stay up-to-date with City Pages. Signing up is simple, and you can opt out anytime. Give it a try...

Sign Up Now
or
See a Sample
Newsletter

Julie and Bruce Khalilzadegan bought Phalen Place in 1989. The string of eight three-story walkups sat among dozens of similar structures on a "superblock" on St. Paul's East Side. Buildings there typically face parking lots instead of streets, and most are occupied by poor families, many of them immigrants. The Khalilzadegans renovated Phalen Place with a loan from the city of St. Paul.

A few years later, the Khalilzadegans went back to government officials, this time seeking a rehab loan from the Minnesota Housing Finance Agency for a couple buying another of their buildings. The process dragged on until they arranged a meeting with the agency's top underwriter, Jack Jenkins. He told them that the MHFA was no longer interested in investing in the superblock; the agency already had too many "problem properties" on the East Side.

Jenkins, since promoted to managing director of multifamily housing, confirms that the agency has put a temporary hold on projects in the area. The Khalilzadegans found financing in the private market and filed a discrimination complaint with the federal Department of Housing and Urban Development. They haven't heard a decision.

Despite the toll that negligent and absentee landlords have admittedly taken on the area, Julie Khalilzadegan maintains that most of the area's rental housing stock is structurally sound and could be rehabbed. But she doesn't believe officials are interested in that anymore. "I can't read people's minds," she says cautiously, "but from their actions I can't help feeling that they want to get rid of these low-income tenants."

Advertisement

She's not alone in that suspicion. The area surrounding the superblock is slated for a serious makeover in the years to come; plans include a new lake, a new road, a cozy little shopping center, and demolition of some current housing stock. Details are sketchy at present, but word is that in the long run, up to 25 percent of the superblock's rental housing units could be torn down.

City Pages - Deconcentrating Poverty and Other Scams

It's part of a new consensus that seems to be emerging quietly among local policymakers. State Sen. Randy Kelly (DFL-St. Paul) generated some heat for himself this spring when a housing bill he introduced spelled out that new consensus in its preamble: "The Legislature finds that... the concentration of low-income rental housing in a few neighborhoods in the city has led to deteriorating property values and increased crime in those neighborhoods, to the detriment of their residents."

The language, as critics noted, doesn't refer to run-down problem properties, but *low-income rental housing*, period. By way of remedying this new form of blight, the bill would have all but prohibited new low-income housing construction in "concentrated" areas like the superblock. It also slated $5 million in state money for "acquiring, demolishing, and removing multiple-unit residential rental property."

Kelly didn't return phone calls for this story; the bill's author in the House, state Rep. Andy Dawkins (DFL-St. Paul), says Kelly told him he wrote the bill because, after years of watching the neighborhood try to "refortify, or regentrify, or whatever you want to call it," he found out that a complex for low-income elderly Native Americans was set to be built right across the street from the superblock. "He blew up at that point in time," Dawkins says. The preamble language was eventually deleted in committee, along with most of the bill's other provisions.

The general principle, though, is alive and well. Policy types call it "deconcentration of poverty," and its flagship is the *Hollman* decree--the 1995 discrimination lawsuit settlement that will remove at least 330 public-housing units from north Minneapolis. And other examples are popping up with increasing frequency. There's Concord Square Apartments, a 138-unit complex inhabited mostly by Hispanic families on St. Paul's West Side. HUD, which ended up owning the building after a mortgage default, is offering to sell it to the city of St. Paul, which presumably would recruit a private developer. Both the neighborhood group and the city have indicated that one, and perhaps two, of the complex's five buildings should be torn down under any rehab plan. At the other end of the Twin Cities, Brooklyn Park this spring won tax-increment financing authority from the Legislature for an ambitious project that could include removal of up to 500 low-income apartments--most of them worn at the edges but structurally sound.

Besides their implications for low-income tenants, the four projects have a few hallmarks in common. All of them proclaim lofty goals--rebuilding neighborhoods, creating green space, and fostering "diversity in housing types and housing ownership options." There's talk of turning small apartments into larger ones, and of creating jobs and shopping centers. Dotted with phrases like "defensible space," "neighborhood signature amenities," and "urban villages," all the plans bear the imprint of the so-called "New Urbanism" movement.

None of the four plans, however, contains convincing mechanisms to assure that the low-income housing

CASE 0:05-cv-00461-MJD-SER   Document 231-41   Filed 08/23/08   Page 11 of 29

City Pages - Deconcentrating Poverty and Other Scams

that's torn down will ever be replaced--and this in a metro area where, according to HUD data, poor people are already shut out of the housing market at strikingly high rates. Only *Hollman* features any discussion of replacement, but under its terms new units don't have to be developed until 2001, and some "replacement housing" will likely consist of rental vouchers that area landlords are not obliged to accept.

Until recently none of this would have been possible. For years, Minneapolis and St. Paul were required to provide one new low-income housing unit for each one they demolished, a provision enacted after the development boom took out huge numbers of cheap apartments in both downtowns. Neither city ever fully complied, and the requirement was repealed in 1994. That repeal, say tenant advocates, seems to have sparked a new demolition frenzy, this time dressed up with a more elaborate and civically responsible rationale.

Caty Royce, an organizer with the tenant-advocacy group Community Stabilization Project (CSP), says there was a telling moment when legislators debated Kelly's bill in committee. Someone asked, she recalls, where tenants displaced from the buildings he was offering $5 million to demolish should go instead. "And then someone else said, 'Don't you remember, we passed a law that's building housing for them in the suburbs?' And that was the end of it."

That was a reference to the Metropolitan Livable Communities Act, legislation that grew out of research by state Rep. Myron Orfield (DFL-Mpls.) into how some parts of the metro area were getting government subsidies, new jobs, and high-priced housing while others were left in the dust. Orfield's pitch revolved around getting wealthy suburbs to "do their share" by taking down barriers to low-income housing and passing on some of their property tax dollars to the rest of the metro. His legislation never made it. But another bill--an all-carrot, no-stick version of the same principle--eventually passed in 1994. It contained no mandates about low-income suburban housing, but held out the prospect of Met Council grants to suburbs who agreed to build some.

Land prices, tax structures, and public sentiment all militate against serious efforts to build affordable housing in the suburbs--unless the definition of "affordable" is reworked. According to current Met Council guidelines, an affordable house can cost up to $115,000; apartments qualify if the rent is no more than $682. Suburbs can create housing for people making up to $43,000 (for homeowners) or $27,000 (for renters), and still be counted as making a good-faith effort under the Livable Communities Act. If developments stay near the upper end of that range, as first indications suggest, suburban housing will be easier to find for folks at the unstable margins of the middle class--recent college grads, divorcees, the downsized--but remain out of reach for the sort of people displaced from neighborhoods like Phalen.

Which is, suspects Ed McDonald, exactly what lawmakers had in mind. "If they're tearing [housing] down over here, and not rebuilding it over there, where are people supposed to end up? In temporary shelters? Leaving the metro area? If that's what they want, maybe they should come right out and say that."

McDonald is among a growing number of advocates who have begun discussing deconcentration as the potential target of an anti-discrimination campaign. Already there are organizations agitating against particular projects: In Phalen, the CSP demands that the neighborhood's entire plan be put on hold. But that, says Paul Gilliland, is unlikely. The co-chair of the task force that came up with the plan, he says CSP came to the process late and its rigid stance against demolition is unrealistic. "When people go, heck, your neighborhood is going to have all the below-the-wind, bottom-of-the-line housing, and it's going to stay there--well, we don't agree with that. The community has nothing against low-income housing, but we want it to be decent. We want to make it a better place for low-income people."

Maisie Johnson says she's heard that talk too many times. A board member at CSP, she lived in the Summit-University neighborhood in the 1970s, when it was undergoing the last great wave of "revitalization." The program involved city-sponsored rehab, demolition, and new construction; in the long run many people couldn't afford the refurbished apartments and homes, and others were squeezed out as values rose and property taxes increased. "We had a meeting with [then-mayor] George Latimer," Johnson remembers. "We said, 'You know, maybe you're just trying to get the people of color out of here.' He said--and I guess I had to give him credit for honesty--he said: 'It has nothing to do with color. It has to do with money. And it just so happens that people of color don't have enough of it.' We didn't have no comeback for that." CP

## About Monika Bauerlein

### From the Archive

- Heads in the Sandbox (For The Record - May 15, 1996)
- End Note (For The Record - May 15, 1996)
- Consider a HUD Home (For The Record - May 8, 1996)
- Alliant Takes Heat on Mines (For The Record - May 1, 1996)
- Essential Services: Pay as You Go? (For The Record - May 1, 1996)
- End Note (For The Record - Apr 24, 1996)
- The Place Where They Have To Take You In Days and nights on the front line at

Minnesota's busiest emergency room. (Cover Story - Apr 17, 1996)

- It Sticks and Sticks (For The Record - Apr 17, 1996)
- More articles from the Monika Bauerlein Archive...

## What do you think?

- E-MAIL this story to a friend (or a foe!)
- PRINT this story in a more printer-friendly format
- WRITE a letter to our editor
- READ letters to our editor

## City Pages E-Mail Newsletter

Stay up-to-date with *City Pages*. Signing up is simple, and you can opt out anytime.
Give it a try...

- SIGN UP NOW
- SEE A SAMPLE

## City Pages Blogs

### Recently Updated Blogs

1. The Plotter
   6/15 8:59 AM
2. Culture To Go
   6/14 4:06 PM
3. Complicated Fun
   6/14 3:10 PM

# Strategies in Dealing with Problem Properties in Dayton's Bluff East Side COPC DISCLAIMER

Neighborhood Planning for Community Revitalization (NPCR) supported the work of the author of this report but has not reviewed it for publication. The content is solely the responsibility of the author and is not necessarily endorsed by NPCR.

NPCR is coordinated by the Center for Urban and Regional Affairs at the University of Minnesota. NPCR is supported by grants from the US Department of Education Urban Community Service Program, The McKnight Foundation and The Minneapolis Foundation. St. Paul projects are funded in part by the St. Paul Initiatives Support Corporation (LISC), The St. Paul Foundation, and St. Paul Companies.

NPCR
330 Hubert H. Humphrey Center
301-19th Avenue South
Minneapolis, MN 55455
Phone: 612-625-1020
e-mail: npcr@freenet.msp.mn.us
website: http://tcfreenet.org/org/npcr

Prepared by: Gonzalo Villares

Research Assistants
Neighborhood Planning for Community Revitalization
Center for Urban and Regional Affairs
University of Minnesota
Minneapolis, MN

June, 1999

Document COPC012

## Table of Contents

040010

Strategies in dealing with problem properties in East Saint Paul

Executive Summary
Background
Defining "Problem Property"
Other Definitions of "Problem Property"
The Approach of Dayton's Bluff Community Council to "Problem Properties"
Members of the PACT Committee
Collecting Information
Strategies Used by PACT in Order to Find Solutions to "Problem Properties"
References

# Executive Summary

The purpose of this report is to describe various strategies utilized when dealing with the issue of problem properties. These strategies are derived from the work done by Dayton's Bluff Community Council. This neighborhood organization created the People Aligning Communities Together (PACT) committee, which is comprised of homeowners, landlords, tenants and members of different organizations. The main focus of the PACT committee is to find solutions to problem properties in the Dayton's Bluff neighborhood. Even though the strategies described in this report are used by this specific community organization, many can be transferred to other city neighborhoods. This report also contains background on other programs that different neighborhoods have developed to confront this same issue. In addition, it includes some of the existing data resources that are useful when dealing with this problem.

# Background

? According to a report done by the St. Paul City Council Research Center, "[t]here are approximately 150-250 chronic problem properties in Saint Paul at any given time. A sample of problem properties indicated that 44% were single family houses, 37% were duplexes, an 19% were apartment buildings with three or more units." (Saint Paul 1).

? The conditions of the housing stock are a major concern for Dayton's Bluff Community Council. A large number of properties in the area date back to the late 19th century. These properties represent a priceless historical heritage, but in order to be kept in good condition, they need periodical maintenance work done on them. This is not an easy task in a neighborhood like Dayton's Bluff which has, as most inner city communities, suffered a process of disinvestment over the last five decades.

? The concentration of poverty in the area worsens the situation. According to the 1990 Census of Population and Housing, the median household income in Planning District 4, where Dayton's Bluff is located, is $23,659. The median household income for the state of Minnesota in the year the census was realized was $40,991.

Strategies in dealing with problem properties in East Saint Paul

? The Exterior Conditions Survey, carried out by Dayton's Bluff Task Force Members and other supporting neighborhood organizations in 1996, states that "[s]ix to ten buildings require some degree of repair work to return the buildings to sound condition. Compared to building conditions in 1988...in the aggregate the condition of the housing stock has deteriorated further...Concentrations of deficient housing identified in the 1988 survey remain, particularly in the oldest neighborhoods in the north and west areas of Dayton's Bluff" (Dayton's Bluff 1).

? The poor physical conditions of a large portion of the housing market, added to social problems that are building-based (e.g., drug trafficking), motivated the Community Council to form the PACT committee as a way to attack the issue of problem properties.

## Defining "Problem Property"

There is not one single definition of what a problem property is. Different programs that deal with this issue have defined the term "problem property" in ways that were related to the goals they were pursuing and the methodology they were using. In the case of Dayton's Bluff Community Council, the meaning of "problem property" was left open to be defined by the members of the PACT committee. There were not any predetermined characteristics that a property had to meet in order to be considered a "problem property". Because of that, community members were able to bring properties to the table that they considered "problematic" for a wide range of reasons. The problems that pertained to that property were then described by the community member and the committee would decide together whether the property should or should not be included on a *problem property* list.

This open-ended approach to the definition resulted in properties that were considered problematic for issues such as:

- Property in run down conditions (e.g. lack of paint work, filthy carpets)
- Tenants' disorderly conduct
- Drug-related activities
- Dirty yards (e.g. abandoned cars, trash)
- Drinking in public
- No shoveling
- Loose animals

This list of problems can be broken down into different categories according to the party most directly responsible for each issue. Examples of these are:

- o Tenant as the main party at fault: Disorderly conduct, drinking in public, loitering.
- o Landlord as the main party at fault: Run down properties, no shoveling, poor or no tenant screening. Problems were significantly harder to resolve in those cases of absentee landlord.
- o Tenant and landlord both at fault: Dirty yards, drug activities.

Strategies in dealing with problem properties in East Saint Paul

Determining who is mostly responsible for the existing problem is very important, especially at the stage of establishing the strategies to attack the problem. The person who is most responsible for causing the problem is also the person that should be contacted first when trying to solve it. This person's actions will directly affect the resolution of the problem.

# Other Definitions of "Problem Property"

A number of programs that deal with this issue have opted for defining "problem property" in a more systematic and objective form. The ways in which "problem property" is defined can be related to practical issues within the implementation of each program.

## *NEWS (The Neighborhood Early Warning System) in Chicago*

This program is run by the Center for Neighborhood Technology (CNT), a non-profit organization, "as part of an affirmative neighborhood information strategy to increase community access to local government information" (NEWS). NEWS also intends to monitor real estate trends and to prevent housing abandonment in Chicago's inner city neighborhoods.

This program uses seven indicators in order to determine "problem properties":

- o Code violations
- o Housing court cases
- o Water arrears
- o Current property tax delinquencies – annual sale
- o Severe property tax delinquencies – scavenger sale
- o Fire records
- o Real estate sales, buyer and assessment information

## *NKLA (Neighborhood Knowledge Los Angeles)*

This project created by the Community Building Institute (CBI) and UCLA's School of Public Policy and Social Research intends to "provide better access to public information about property deterioration and community development" (NKLA 2). The main part of NKLA is "LANews" (Los Angeles Neighborhood Early Warning System), which maintains a database with certain housing indicators that are believed to lead to nuisance properties and neighborhood decay. The indicators used in this project are the following:

- o Property tax delinquency
- o Building code violations
- o Health code violations
- o Slum Enforcement ("when buildings [in the city of Los Angeles] have serious physical problems and when normal code

Strategies in dealing with problem properties in East Saint Paul

enforcement has not worked, buildings are sometimes referred to Slum Enforcement or special taskforces") (NKLA 18)

- o Fire records
- o Environmental information

### *Saint Paul City Council Research Report on Remedies for Chronic Problem Properties*

This report states that "[a] chronic problem property is a property with which neighbors, neighborhoods and/or City have struggled over a long period of time, because of property maintenance code violations and possibly criminal activity" (Saint Paul 1). While examining the nature of chronic problem properties in Saint Paul, this report also investigates the policy options that are available to better deal with these properties. "For purposes of th[e] study a *problem property* is one which:

1. Disrupts or threatens the peace, health and safety of the community, or
2. Constitutes a nuisance or an eyesore and is dilapidated or deteriorated, or
3. Creates an attractive nuisance which is an abode for criminal activity, or
4. Is not maintained adequately and does not conform to minimum health and housing laws.

And, therefore, a chronic problem property is one which does any of these on a 'regular' basis, or repeatedly" (Saint Paul 2).

## The Approach of Dayton's Bluff Community Council to Problem Properties

At PACT's first meeting, community members unanimously agreed to focus on problem properties along Maria Avenue. This street is a main artery of the Dayton's Bluff neighborhood. Several properties were in serious need of improvement, be it for maintenance reasons or social problems. Improving the conditions of the properties along Maria Avenue was expected to trigger further improvements along the surrounding streets.

The successful example of the Lyndale Neighborhood Association (LNA) acted as a positive precedent. The Lyndale neighborhood in south Minneapolis faced similar problem property issues to those faced by Dayton's Bluff. This neighborhood tackled this problem by having periodical meetings with the goal of looking for solutions to problem properties. The owners of the problem properties, city inspectors, health agencies workers, police, and child protection workers were also participants of these meetings (Barisonzi). This program has helped to eradicate nuisance properties which in turn has resulted in an increase of real estate values and decrease of crime activities in the neighborhood.

Dayton's Bluff Community Council used many of the strategies developed by the Lyndale Neighborhood Association when creating their own program. Joe Barisonzi, executive coordinator of Lyndale Neighborhood Association, acted as a consultant to the PACT committee.

### Dynamics of the PACT Committee

Lasting for one and a half hours, once every three weeks, PACT committee meetings dedicate the majority of the time to the discussion of the housing units on the problem property list. Even though there are more potential problem properties, the committee decided to limit the number of cases on the list to four to six properties. This number is based on their estimated maximum work capacity, but it could be increased in succeeding stages.

A problem property is added to the list upon the request of a committee member or a meeting attendant. This person has to present the reasons why he/she believes the property should be included on the list. Someone must be responsible for a property in order for it to be added to the list. This person is the *contact person*; it can be anyone who has a direct relationship to the property or a personal interest in improving the conditions of the property. One of the main points behind the idea of designating a contact person is that people from the community are the ones taking responsibility to solve the problem. It is not the community organizer, nor the council member taking action, rather someone from the community. The responsibility of the contact person is to closely follow each of the steps that are taken in respect to the property. This person also has to update the committee at each meeting on the latest developments on the property.

The first step, once a property is added to the list, is to inform the property's residents and owner that PACT has labeled their property as a "problem property". The owners and tenants are then invited to participate and look for solutions in the next committee's meeting. Only if the owner and residents do not respond or do not attend the following meeting will the committee take any further steps. The goal, however, is to have owners and residents involved. In the majority of the cases, they are the ones who can directly take action to fix the problems.

Once a property is added to the list, it is necessary to clearly identify what the real problem is. In some cases, the identification of the problem can be very simple. In other cases it is not so easy, and therefore collecting information becomes very important. The main goal of clearly identifying the problem is to determine what can be fixed by the residents, what can be fixed by the owner, and what can be fixed by other parties (e.g. city government).

At each PACT meeting, the contact person is in charge of an update on his/her property. After the update, the attendants discuss the next steps.

A property will be taken off the list when the committee believes that the problems have been solved. It has happened, however, that even after a property has been taken off the list, it has been put back on at a later date because problems had arose again.

## Members of the PACT Committee

The PACT committee is open to anyone who is interested in working in the issue of problem properties in Dayton's Bluff. The majority of its members are **residents of the area**. As part of the dynamics of PACT, **landlords, tenants and homeowners**, whose properties are on the problem property list, are especially encouraged to participate.

Unfortunately, not all problems have been able to be resolved by the sole presence of neighborhood residents, tenants and landlords. In many

cases, other organizations have provided their services in order to help correct the situation. A major asset of PACT has been the presence of members of different organizations that in one way or another are interested in finding solutions for the problem properties in Dayton's Bluff. Their direct involvement with the PACT committee has allowed for prompt and efficient answers to the wide range of problems presented by the properties.

In turn, the organizations that are present at the PACT meetings are able to get a first hand look at the problems that are affecting this Saint Paul community. This direct experience provides the organizations with knowledge on how to improve their strategies to better serve the needs of their clientele or constituents.

- **City of Saint Paul, Council Member**

The city council member that represents the ward of which Dayton's Bluff is part of is a member of the PACT committee. This presence is very important since it provides a good connection between the politics at the city level and the neighborhood needs. Carrying out a program that deals with the issue of problem properties in a neighborhood can be made significantly easier when the city has a sincere interest in tackling the problem.

- **City of Saint Paul, Division of Code Enforcement**

Inspectors from Code Enforcement are also part of PACT's meetings. Code Enforcement is the agency in the city of Saint Paul that is in charge of periodic building inspections. Inspections can also be done based on complaints about specific properties. Inspectors are usually assigned to certain city parts. Having a Code Enforcement inspector as part of meeting proved very useful for PACT since they are familiar with the physical conditions of each of the problem properties. They also provide updated information on the state of each property's file.

- **City of Saint Paul, Department of Planning and Economic Development (PED)**

This department deals with policies that relate to the growth of the city of Saint Paul. The provision of adequate housing is one of the main issues tackled by the PED.

The PED has helped Dayton's Bluff Neighborhood Housing Services in the process of buying properties from problematic owners.

- **Dayton's Bluff Neighborhood Housing Services (DFNHS)**

This agency works with the creation of programs that intend to improve the housing conditions in the area. Among other things, DFNHS has promoted rehabilitation programs that have improved the conditions of a significant number of properties in Dayton's Bluff.

DFNHS has played a major role in the PACT committee by buying problem properties whose owners no longer wanted to own them. These properties can then be rehabilitated and put back on the market either as single family or as multi family housing.

Strategies in dealing with problem properties in East Saint Paul

- **Focusing Our Resources on Community Empowerment (FORCE)**

FORCE, a unit within the Saint Paul Police Department, takes part in PACT's meeting. FORCE is dedicated to working with the citizens of Saint Paul to combat the problems of street level narcotics, problem properties and disruptive behavior at the neighborhood level. FORCE works with block clubs and neighborhood groups to deter and displace street dealers, crack houses and problem properties.

FORCE agents are a very important asset to the PACT committee since they have a good knowledge of which properties are the ones generating the greater demand for police intervention. Their presence at the meetings is also helpful in the sense that they advise community residents on the best ways to report suspicious activities taking place in their neighborhood.

- **Southern Minnesota Regional Legal Services**

Southern Minnesota Regional Legal Services is a law office for low-income persons and senior citizens, providing free legal help to eligible persons. Housing is one of the main areas covered by this legal office.

An attorney from this law office was present at every PACT meeting. This attorney provided the committee with answers to the many legal questions that arise when dealing with problem properties. This attorney also provided legal advising and legal representation to tenants living in problem properties.

# Collecting information

While the first step in the process -adding a property to the problem property list- may be based on perceptions, the following steps require the collection of data. Having correct and up-to-date information about each problem property is crucial in order to find efficient solutions. This report will only cover those information sources that have been most useful when dealing with problem properties.

Previous NPCR's reports have already examined the issue of housing data collection. One example is the report done by Stephanie Kellner "Accessing Housing Data in Saint Paul and Ramsey County, Minnesota".

- **IRIS (Integrated Realty Information System)**

IRIS is an online property information service. This service provides property tax records, photographs of the properties, parcel and street maps and demographic information. In the case of the Twin Cities, Ramsey County is the area with best coverage by IRIS. Tax records for this county are updated daily. Washington County and Anoka County's tax records are updated annually.

Strategies in dealing with problem properties in East Saint Paul

The program is relatively user-friendly and allows for simple queries as well as those more complex. The main benefit of IRIS is that a wide range of data items can be accessed by using this unified database.

This online database can only be accessed by those who have hired this online service. However, a one-week long free demonstration is available from the company's web-site.

Data items that can be accessed from IRIS (non exhaustive list):

  o Parcel ID number
  o Fee owner name
  o Taxpayer name
  o Taxpayer address
  o Homestead name
  o Property address
  o Tax delinquency
  o Plat name
  o Legal description
  o Market value (land and building)
  o Number of units
  o Lot's frontage and depth

IRIS Twin Cities phone number: (651) 659-9232

IRIS Twin Cities fax number: (651) 659-9219

IRIS web-site: www.remapcorp.com

• **Saint Paul Police Department, FORCE Unit**

The FORCE Unit provides information related to calls for police service. The information can be property based (police calls related to one specific property) or block/intersection based (police calls related to one specific block or street intersection).

In the case of a small number of files, FORCE faxes them. For larger files it is possible to arrange FORCE to deliver the data in computer disks.

FORCE Unit phone number: (651) 292-3712

http://www.npcr.org/copc/reports/copc12/copc12.html

1/28/05

Strategies in dealing with problem properties in East Saint Paul

*FORCE Unit fax number: (651) 774-3510*

- **Saint Paul Water Utility**

Updated information on water service records can be obtained from this office (e.g. water shut-offs). Various problem property warning systems (e.g. NEWS Neighborhood Early Warning System in Chicago and "Predicting Housing Abandonment in Minneapolis' Central Neighborhood. Creating an Early Warning System" by Lori Mardock) use water arrears as one of the main risk indicators. Running water is such a basic need that the non-payment of this service would indicate an advanced stage of carelessness towards the property.

Information such as the property's parcel ID number, plat name and legal description are usually requested by this office in order to obtain the data.

*Saint Paul Water Utility phone number: (651) 266-6350*

*Saint Paul Water Utility fax number: (651) 292-7537*

- **City of Saint Paul, Division of Code Enforcement**

Complaint files of each property are available from this office. Complaints in these files refer to the properties' physical conditions (e.g. debris in yard, mice infestation, need of paint). It is also possible to find out whether a property has an open file or not; an open file indicates that the inspector understands that the stated problem is not yet resolved.

*Code Enforcement phone number: (651) 266-8440*

*Code Enforcement fax number: (651) 266-8426*

- **Photographs**

Taking pictures is especially important during the documenting stage and it is a very useful addition to the data collected. They are also useful in clearly illustrating a property's problems to the committee members.

# Strategies Used by PACT in Order to Find Solutions to Problem Properties

Given the wide range of problem types presented by the different problem properties, there was a need for an equally wide range of answers. The strategies can come from any of the committee members that find possible solutions to the problems.

Strategies in dealing with problem properties in East Saint Paul

As it was already mentioned, the first step after a property is added to the problem property list is to invite the landlord/owner and tenants to participate in the following PACT meeting. In the case that they are not willing to participate nor work towards finding solutions to the problem, then the committee moves on to different strategies.

Strategies such as Rent Escrow and Tenants Remedy Action are used only in those cases when negotiations between tenants and landlords have not been successful. It is cheaper and more effective to have repair issues resolved between the tenant and the landlord before resorting to legal procedures.

The strategies that are discussed in this report do not intend to cover all the existing strategies when dealing with problem properties. This is merely a list of the strategies that have been used by PACT since the committee was started. Even though most strategies could be transferred to other neighborhoods dealing with similar problems, some of the strategies are specific to the Dayton's Bluff case.

## *Strategies to help prevent problem properties*

### • Canvassing the neighborhood

PACT used canvassing as a way to inform the residents about the existence, goals and activities of the committee. Before each meeting, passing out flyers in the neighborhood would take place as a way to invite residents to participate and also to keep them informed about the latest news on PACT. Resident participation is seen as a crucial element in order for the program to succeed, therefore is necessary to establish an effective communication link between the committee and the residents.

### • Canvassing a particular property

This strategy was used as a way to get tenants from specific buildings involved. It was mainly used in the case of multi-family buildings that were on the problem property list. Since the participation of the tenants that live in problem properties is so important in the search for solutions, PACT members would go door to door informing residents about the committee's activities and also inviting them to participate.

### • Stricter tenant screening

A number of properties have a long history of problem tenants. In such a tight housing market as the one today, landlords should have no problem in finding good tenants for their properties. Even if the property has to sit empty for some time, it would be more economical for a landlord to rent to good tenants rather than renting to people who will later be a cause of concern for the landlord and the neighborhood.

### • D.O.G.S. (Drugs Out! Get Straight!)

D.O.G.S. is neighborhood patrol that pursues three main goals:

Strategies in dealing with problem properties in East Saint Paul

- o Interacting with residents in the neighborhood.
- o Reporting and documenting on criminal activity.
- o Interacting with other agencies such as FORCE and Code Enforcement.

Even though D.O.G.S' main objective is not to tackle the problem property issue, the group can be a main asset in identifying problematic properties in the neighborhood. It can also play a major role in discouraging illegal activities such as street level drug trafficking. D.O.G.S. sends a clear message that there are people who care about the neighborhood and are working to improve the living conditions.

- • **Tenants "get-togethers"**

A tenant get-together is any kind of activity, usually organized by the landlord, which creates a chance for tenants to meet each other. One of the most common obstacles when trying to solve problems in multi-family buildings is the fact that tenants do not know the people who live in their own building. Often, there are not many opportunities in which tenants can get to know their neighbors. Landlords sponsor these activities as an effort to improve the livability of the buildings.

- • **Private security guards**

As a way to improve the security of the neighborhood, landlords pooled resources in order to pay for private security guards. Similar experiences in other neighborhoods have shown that incidents such as drug trafficking and loitering decrease with the presence of private guards. It is also expected that by increasing security, the perception of the neighborhood would also improve.

## *Strategies to deal with existing problem properties*

- • **Call FORCE Unit**

FORCE keeps a list of problem properties to which they pay special attention. FORCE does not recognize a property as problematic unless it is on their problem property list. One of the factors that FORCE takes into consideration when adding a property to their list is the number of calls for police service, related to that property. Neighbors of a property in which suspicious activities take place can improve police surveillance of that property by reporting it to FORCE. Many people, however, feel somewhat doubtful about calling the police to report suspicious activities. FORCE agents present at PACT meetings instructed and encouraged residents to call the police when they witness illegal activities. Another advantage of this strategy is the fact that the number of police agents assigned to an area can be raised when there is an increment in the number of calls for police service to that area.

FORCE "maintains an organized/formalized relationship between Public Health, Fire Prevention, and the Police Department" (Saint Paul 17). This net of relationships, added to their work with block clubs and neighborhood groups, helps FORCE address the issue of problem properties in a quite effective way.

- **Call Code Enforcement**

This strategy pursues the goal of alerting the appropriate City agencies about the problems that a property has. As part of their rights, tenants living in housing with code violations that are not being corrected by the landlord can call a housing, health, energy, or fire inspector. Tenants, however, are not the only ones who can make these phone calls; residents living near problem properties can also call in order to complain about the conditions of those properties. The Office of Citizen Services, or an enforcement department, are the ones that usually receive this type of call. According to the "Study of Remedies for Chronic Problem Properties" done by the Saint Paul City Council Research Center, "[o]f the estimated 40,000 calls Citizen Services receives annually, there are approximately 25,000 calls for service, more than half of which (14,000-15,000) are housing and nuisance code-related" (14).

The city must verify that complaints received are actual code violations, which in almost all cases requires an inspection. Response time to individual complaints varies based on the enforcement department's current work load and the type of complaint. For example, a life-safety complaint, such as 'no heat' will under almost all circumstances elicit a same-day response from the enforcement department. Other complaints are generally handled in two to three working days, although for less serious issues, such as 'tall grass and weeds,' there may be up to five day response time. (Saint Paul 14)

Options available to City agencies once complaints are confirmed by inspectors

- Warning

" ...[T]he least forceful option available, but in some cases it is sufficient to get code compliance. Owners are warned of violations in about 5% of cases" (Saint Paul 20).

- Correction Notice

"A correction notice is normally issued when a code violation is found. The property in violation of the code will then be reinspected to determine if the violation was corrected. If the violation has not been corrected, the inspector may issue a citation to the property owner." (Saint Paul 20).

- Summary Abatement

This process is used "to eliminate public health and safety nuisances such as tall grass and noxious weeds, unshoveled snow on public sidewalks, abandoned motor vehicles, broken sewer lines, dilapidated garages, etc...[T]he owner must clean-up or fix the code violation within a specified number of days or the City will abate the violation...The summary abatement process is very effective for quick removal of nuisances, but it does very little to prevent or discourage future violations" (Saint Paul 20).

- Citation

Strategies in dealing with problem properties in East Saint Paul

Citations are usually used after other enforcement tools have failed. "Most citations are based on violations of the building, housing and zoning chapters of the Legislative Code" (Saint Paul 21)

- Condemnation

This enforcement tool is used when inspectors find housing violations such as lack of basic facilities (e.g heat, water), or severe rodent infestation that would make the housing unit unsuitable for human habitation. Once a residential unit has been condemned or declared as unfit for human habitation, it has to be vacated by the specified date (Saint Paul 22).

Possible results after the use of code enforcement tools

- Ramsey County Housing Court

This court is in charge of dealing with cases of housing code violations, as well as tenant/landlord disputes and evictions through unlawful detainer process.

  o Revocation of Certificate of Occupancy

"If a building is required to have a Certificate of Occupancy (C of O), and is found to be repeatedly or consistently in violation of the applicable sections of the Legislative code, the Fire Marshall may revoke the building's C of O. Because a building covered by the C of O requirement must have one in order to habitated, such a revocation would close a building for use" (Saint Paul 25).

- Case Managing/Ongoing Monitoring

This program is run by Public Health and its goal is to "proactively address problematic properties...through a coordinated program of enforcement with the Police Department, other agencies and neighborhood associations. The inspector works closely with the owner and, if applicable, the tenants, in order to bring the property into compliance with the City's property maintenance codes" (Saint Paul 25).

- Problem Remains

According to the City of Saint Paul Council Research report, there are cases in which a property remains a problem even after code enforcement tools have been used. In those cases the property "remain[s] in 'the system' until the violation is corrected" (Saint Paul 26). In other cases, the code violation is fixed and after a certain amount of time the same or similar code violations are present once again.

- **Send letter with signatures to attorneys dealing with code violation cases**

As an example of this strategy, a letter with signatures from residents and property owners was sent to the City Attorney who was dealing with a problem property case (the City Attorney at the Housing Court is in charge of prosecuting Housing Code violations). The letter informed the attorney about PACT's activities and goals. Residents signed the letter requesting the attorney to prosecute the owner of the property so that he would understand that there are penalties for mismanaging a property in the way he did. A letter with signatures also shows the City Attorney that the residents do care about their neighborhood and that they would not tolerate landlords that do not take care of their properties.

- **Dayton's Bluff Neighborhood Housing Services (DBNHS) intervention**

This organization's mission is to improve the existing housing stock, encourage reinvestment, and increase the awareness of a better neighborhood through the combined efforts of residents, financial institutions, businesses, government and the insurance industry. DBNHS has been involved in the process of buying properties that have a history of being problematic in the neighborhood in order to rehabilitate and sell them through homeownership programs.

- **Rent Escrow**

"Tenants may place rent in an escrow account when a landlord will not correct housing violations. Under the Rent Escrow Law, tenants can pay their rent to the court rather than to the landlord, and ask the court to order the landlord to make repairs." (Minnesota Attorney 13). The landlord does not have access to the rent money until the repairs are made. Legal Aid attorneys can help tenants living in problem properties to start escrows in cases that are fitting.

- **Tenants Remedy Action**

When emergency housing services are affected because of property owner's negligence, a judge can appoint an administrator to run the property. (For a more detailed definition, see *Landlords and Tenants: Rights and Responsibilities*, Office of the Minnesota Attorney General Hubert Humphrey III). The court administrator makes the repairs that are needed using money from one of several sources: URAP funds, mortgages taken out on the property by the court administrator, or rental income generated by the property. PACT used this strategy in collaboration with Legal Aid attorneys that represented the tenants. The strategy was used as a way to improve the housing conditions in properties whose owners did not provide the required upkeep.

# References

Barisonzi, Joe. Personal Interview. 12 Jan. 1999

Dayton's Bluff Task Force Members. 1996 Dayton's Bluff Exterior Conditions Survey. Saint Paul, 1996.

Strategies in dealing with problem properties in East Saint Paul

IRIS (Integrated Realty Information System). Available: http://www.remapcorp.com

Kellner, Stephanie. Accesing Housing Data in Saint Paul and Ramsey County, Minnesota. Minneapolis: NPCR University of Minnesota, 1997.

Minnesota Attorney General. Landlords and Tenants: Rights and Responsibilities. Saint Paul, 1997.

NKLA (Neighborhood Knowledge Los Angeles). Getting the Most Out of NKLA. Available: http://nkla.sppsr.ucla.edu/

NEWS (Neighborhood Early Warning System). Available: http://www.cnt.org/news/

Saint Paul City Council. City Council Research Center. A Study of Remedies for Chronic Problem Properties. Saint Paul, 1995.