**IV. C. What are**  **(1) Corrections Orders/Correction Notices**
**(2) Work Orders**
**(3) Summary Abatement Orders**
**(4) Preauthorized Work Orders**
**(5) Emergency Abatement Procedures**

There are occasions when we will issue oral orders for minor problems. However, if this doesn't result in compliance then a tag or summary abatement will likely be the next step because you have already been put on notice.

(1)     A correction order or correction notice is different from a work order because a correction order cannot result in the city coming out and doing the work if you don't. Correction orders are issued when the problem to be addressed is not abateable under the legislative code. A correction order can result in a tag or an excessive consumption bill if non-compliance.

(2)     A work order is when the violation is abateable under the legislative code and constitutes a nuisance. The City will send a crew out to do the work for you at the end of the compliance time line if you haven't done it yourself. The city charges for this service. Work orders are most often issued at the time of re-inspection from an abatement order.

(3)     A summary abatement order is the first notice given to the property owner to abate the nuisance violation. Failure to comply will result in a work order.

(4)     A "pre-authorized work order" is when there will be no re-inspection. The city work crew is told to go to the property on the first day after the compliance period expires and do the work if it hasn't been done. Generally, a preauthorized work order is used whenever we issue summary abatements for tall grass/ weeds or snow/ice.

(5)     Emergency Abatement Procedures allow us to take immediate action when there are critically dangerous conditions on private property, which, if not abated immediately, pose a serious threat to the health, safety and well-being of the community. A list of some of these conditions appear on our time lines page where we allow zero time to comply. The property owner is given the choice to take immediate action or have the city take immediate action.

### IV. D. When Do We Give Extensions

An extension can be granted when there has been a good faith attempt to comply with the correction order, but circumstances beyond your control have kept you from completing the work. An extension may also be granted when you have made substantial progress on completing the work.

Always inform the tenant before giving any extension to a landlord on correcting deficiencies that were initiated by a tenant complaint. Keep these kind of extensions to a minimum.

Common reasons for granting an extension include:

(1)   Inability to comply due to health reasons or other family emergencies and you have a reasonable alternative plan for getting the work done.
(2)   Inability to comply due to the weather.
(3)   You've hired a contractor but the contractor has had a delay. We may give a short reasonable extension for this reason upon verification from the contractor confirming the delay.
(4)   Inability to comply due to lack of financial resources. We may give a short reasonable extension for this reason but only upon a reasonable belief that your financial situation will improve in the near future and a written agreement between the violator and inspector. A tag will be issued if non compliant at the end of the extension.

Common reasons for not granting an extension:

(1)   severity of the violation.
(2)   initial time was ample.
(3)   length of time owner knew of the violation.
(4)   history of property.
(5)   the effect on other agencies.
(6)   unlikely owner will comply even with extension.

All extensions must be in writing and the reason for the extension must appear in the "Inspector's notes" section of the inspection report.

040053

### IV. E. When Do We Deviate From These Rules

We will rarely, if ever, deviate on these rules.  Time line extensions are not considered a deviation; we will grant extensions in accordance with extensions policy.  A deviation is not tagging when these rules indicate a tag should be issued or starting with a different time line than these rules indicate.

The reason for any deviation on the time lines must be entered in the "inspector's notes" section of inspection report and reported to inspector's supervisor.

We will occasionally deviate on when we tag, when we do summary abatements and when we charge excessive consumption.  Again, the reason for any deviation must be included in "inspector's notes"and reported to supervisor.

If supervisory staff notice that we are having a significant amount of deviations, this may indicate that the rules need to be adjusted to reflect the circumstances of why we we're deviating so much.

040054

### IV. F. When Do We Do "Field Finds"

A "field find" is when the inspector comes across a code violation while he/she is on another assignment. It is impossible to write up every "field find" because we will never get to our assigned work. The amount of "field finds" we write up depends upon our work load. If we have time to write up a "field find" we will. However, we will <u>always</u> write-up field finds when it is a dangerous condition, or serious situation, or a problem property, and we will usually write up "field finds" when there is a prior history of violations.

"Field finds" are also typical when we are on an inspection and we see the very same problem next-door or near by.

Of course, when we do a "sweep" or when your neighborhood is part of a community clean-up program, then everything we find is written up.

### IV. G. When Do We Condemn A Building

Whenever a structure is deemed dangerous or unfit for human habitation, we will order the structure vacated, sometimes immediately, but usually after a short compliance period has expired and the occupants are given 1 to 30 days to find alternative shelter. Condemnation occurs when life-safety violations exist, such as fire hazards, unsanitary conditions, severe rodent and pest infestation, lack of basic facilities, faulty construction or dilapidation.

If principal violations are corrected prior to the vacation date, the order to vacate will be lifted.

If principal violations are corrected after the vacate date, once corrected the dwelling can be reoccupied.

### IV. H. When do we bring a TRA (Tenant Remedy Action) Case

A TRA may be brought in District Court in the case of landlord - tenant properties where the following conditions have been met:

1. An inspection has been made,
2. The time granted in the repair order has expired, and
3. Satisfactory repairs to remove the violations have not been made.

Another factor to look at is whether we have attempted to gain compliance through a tag. If we have tagged a property with no success, we should think about using a TRA to gain compliance. The point is that we should use TRAs to gain compliance on the properties that have caused long standing frustration to inspectors and to force landlords to make necessary repairs.

We should also use the TRA strategy as an alternative to condemnation and ordering tenants to vacate. Whenever you have a landlord-tenant property heading towards condemnation or actually condemned a TRA case will be considered.

Some of the additional criteria our office will consider in deciding whether to pursue a TRA action include the following:

- Does the property present a livability issue to the City?

- Does the condition of the property have a negative impact on the residents of the property or the neighborhood?

- Have neighbors or neighborhood groups complained about the property?

- Does the property present a health and safety issue?

- Does the owner have a history of violations, consistently fail to remedy violations, or own other problem properties in the City?

Remember there is no requirements that all of these criteria be present at any given time—only that one or more of these criteria are present and then the property can be considered and looked at more closely to determine whether a TRA is appropriate.

## V. Sanction Schedule

| HOUSING COURT SANCTION SCHEDULE | |
|---|---|
| **Offense** | **Recommended Sentence** |
| 1st Offense<br>no priors w/in 3 years<br>Compliance before arraignment | Agreement to Suspend Prosecution (ATSP)<br>$60.00 court costs<br>$40.00 prosecution surcharge |
| 1st Offense<br>no priors w/in 3 years<br>No compliance before court | ATSP<br>Comply w/in 30 days<br>$100.00 court costs<br>$100.00 surcharge |
| 1st Offense<br>no priors<br>no compliance by court ordered return date | Above ATSP vacated<br>Misdemeanor: 90 days and $1,000<br>$300.00 fine |
| 2nd Offense<br>1 prior w/in 3 years<br>Compliance before arraignment | Misdemeanor w/Stay of Imposition<br>$200.00 fine No same or similar |
| 2nd Offense w/in 3 years<br>No compliance before arraignment | Misdemeanor w/Stay of Imposition<br>Compliance w/in 30 days<br>No s/s $400.00 fine |
| 2nd Offense w/in 3 years<br>No compliance by return date | Misdemeanor 90 days and $1,000<br>$500.00 |
| 3rd Offense w/in 3 years | Misdemeanor 90 days and $1,000<br>$700.00 fine plus jail time<br>Community Impact Panel |

040058

> Neighborhood Housing and Property Improvement
> 2003 Year-End Assessment

> 61,000   single family structures in St. Paul
>               ( of which 55,000 are homesteaded)
>   4,500   duplexes (9,000 housing units)
>               ( of which 1,500 are homesteaded)
>   3,700   c/o structures (50,000 housing units)
> 69,200   residential structures in St. Paul

Part I - Performance Numbers

**CHART #1**

|  | 2002 | 2003 | % Change |
|---|---|---|---|
| Inspections | 21,168 | 24,920 | + 18% |
| Complaints Received | 9,377 | 11,312 | + 21% |
| Orders Issued | 4,168 | 5,883 | + 41% |
| Tows Ordered | 650 | 947 | + 46% |
| Tags Issued | 402 | 696 | + 73% |
| Cases Resolved | 8,528 | 9,054 | + 6% |
|  |  |  |  |
| Initial Inspections | 9,331 | 12,541 | + 34% |
| Initial Interior Inspections | 1,149 | 1,148 | + 0% |
| Initial Structural Inspections | 824 | 1,080 | + 31% |
| Field Finds | not available | 3,067 | n/a |
|  |  |  |  |
| Average Days to Close a File Folder | 55 days | 31 days | - 24 days |
| Average Number of inspections per inspector per day | 8.9 | 9.0 |  |

040059

Chart #2

## Neighborhood Housing And Property Improvement
### Productivity Chart, Month of _____



**KEY**

| | |
|---|---|
| Cases Closed | |
| Initial Exteriors | |
| Initial Interiors | |
| Field Finds | |
| Excessive Consumption | |
| Raw Value/Hrs Worked | |

This month has

_____ work days

| | Matt | Joel | Tom | Jean | Lisa | Craig | Jim | Jack | Steve | Paula | Ed | Teng | Joe |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Raw Value | | | | | | | | | | | | | |
| Raw Value Rank | | | | | | | | | | | | | |
| Sick Hours | | | | | | | | | | | | | |
| Vacation Hours | | | | | | | | | | | | | |
| No Activity Days | | | | | | | | | | | | | |
| Total Days Off | | | | | | | | | | | | | |
| OT this month | | | | | | | | | | | | | |
| OT YTD | | | | | | | | | | | | | |

040060

This is NHPI's chart to plot the productivity of each inspector on a monthly basis or year-end basis. The raw value factors in # of founded complaints investigated, # of orders issued, # of interiors X 4, # of exterior structures X 3, and # of tags X 2.

The 2003 year-end compilation provides some interesting insights:

1.   The original theory was that the number of inspections is not the best measure of an inspector's performance – getting compliance with an inspection is really our goal. Thus the "raw value" measure. Now, with one year of measuring behind us, perhaps the best productivity measures are cases closed and field finds.

2.   The band width between the highest inspector to lowest inspector is greatest in the field find category, ranging from a high of 553 to a low of 116. Initial interiors also has a wide band width ranging from 115 to 64. Initial exteriors had a band width ranging from 1268 to 856. Cases closed ranged from 1125 to 739. Raw value ranged from 17 to 9 with a median of 12 ½ .

3.   Finally, some additional interesting statistics to compare from year to year:

     A.   The average number field finds per day per inspector is 1.2.

     B.   The department wide average number initial interiors per month is 102.

     C.   The total founded complaints investigated in 2003 was 9,406 and the percentage of complaints unfounded or gone on arrival is 17%.

Page 3

Chart #3

| 2003 Comparison Statistics | Saint Paul | Minneapolis | Milwaukee | Baltimore | Memphis |
|---|---|---|---|---|---|
| Population* | 287,151 | 382,618 | 596,974 | 651,154 | 650,100 |
| Housing Units* | 115,713 | 168,606 | 249,255 | 300,477 | 271,522 |
| Inspectors* | 11 | | | | |
| Inspections* (Per Day Average) | 9 | | | | |
| Initial Interior to Exterior Ratio | 1:9 | | | | |
| Inspection to Reinspection Ratio | 15/7 | | | | |
| Inspector Absenteeism* | 3.4% | | | | |
| Cost Charts (With In/Out List) | See Part 7 | | | | |
| Best Practices | | | | | |

*How did we get our numbers?  See below

**Population** _____ Information Provided Courtesy of US Census 2000

**Housing Units** _____ Information Provided Courtesy of US Census 2000

**Inspectors** _____ 10 Area Inspectors and 1 Problem Property Inspector
*Does not include (a) Police Force (b) Vacant Buildings (c) Truth In Sale of Housing (d) Rental Registration (e) Supervisors and (f) Support Staff - Clerical and Administrative*

**Inspections** _____ Inspections per day is calculated by taking the total number of inspections and dividing by the number of days worked and then dividing that amount by the number of inspectors.

**Absenteeism** _____ Absenteeism is calculated by taking the total number of work days and multiplying by the number of inspectors and then comparing that number with the total days absent for sickness (Not including vacation or extended leaves).

040062

Part 2 - Sweeps

A complaint-based system is not adequate to meet the twin goals of cleaning up the city and preserving our housing stock. Thus, each inspector regularly patrols their area for field finds and we conduct pro-active sweeps.

In 2003 we conducted 14 sweeps - 10% of the City - the most ever in a single year.

In 2004 we plan to do 20 sweeps - covering 10,000 residences.

In September, 2002 we conducted the first prototype sweep that became the model for all future sweeps:

- 26 blocks
- 480 residences
- 144 residences in violation pre-sweep
➡ Flyer delivered door-to-door
➡ Annual Neighborhood Clean-Up Day
➡ Sweep Day
- 85 residences in violation on sweep day*
- 29 residences in violation 2 months later
- 37 residences in violation 10 months later*

The last sweep in 2003 was October 28:

- 24 blocks
- 480 residences
- 74 residences in violation on sweep day

In 2003 we also did a "tows sweep" with the Police Department:

- Patrol identified and red-tagged 177 vehicles in apparent violation in the North End, along West 7th and on the West Side.
- Code enforcement had 28 towed, found 78 cleared by owner and 40 to be in compliance, had 18 incorrect addresses and issued 13 vehicle abatement orders.

---

*footnote: This proved success of prototype: 59 properties took advantage of clean-up day and cleaned-up before sweep day. And using                    kept the area from re-deteriorating. If a swept area can be kept clean using the Good Neighbor Program, eventually we won't need to sweep 10% of the city each year.

040063

<u>Part 3 - Problem Property Unit</u>

The Problem Property Unit is effective and functioning well with 2 inspectors, 2 police officers and a city attorney.

→   The City Council report on chronic problem properties estimated there are 300 problem properties in St. Paul. (600 is more likely.)  The council report estimated the city spends $2.5 million per year responding to problem property complaints, so closing down problem properties is very efficient expenditure of money.

040064

January 1, 2003 - December 31, 2003

275 Files Opened,
207 of which have been closed:
    119 due to owner compliance*
    35 due to condemnation
    11 due to change in ownership
    9 due to civil court action (TRA's)
    7 due to criminal charges
    7 due to landlord evictions
    2 due to city initiated evictions
    16 due to being unsubstantiated
69 Still open/active

2002 Problem Properties carried over into 2003

41 Carried over from 2002
35 2002 files closed in 2003
    21 due to owner compliance*
    6 due to condemnation
    5 due to civil court actions (TRA's)
    2 due to landlord evictions
    1 due to change in ownership
6 Still open/active

2003 Vehicles Sweep done by the Problem Property Unit

177 Vehicle Inspections
    28 towed
    40 compliant
    13 vehicle orders sent
    18 on street/other disposition

| Problem Property End of the Year Report Totals | |
| --- | --- |
| Files opened or carried over | 493 |
| Files closed in 2003 | 419 |
| Still Active | 75 |

Law Suits: 2002 and 2003

    14 Tenant Remedies Actions (TRA's) filed and settled
    2 TRA's pending
    2 Drug-House Evictions
    3 MSA 617.80 Nuisance Abatement Letters
    21 Total

*footnote: Includes compliance with code orders and compliance with administrator meetings.

040065

Part 4 -Rental Registration

The City Council report on chronic problem properties said that the Rental Registration Program was a program in name only and will remain so "until the Administration takes this ordinance seriously". This has now happened.

Similarly, the excessive consumption ordinance is now being enforced for the first time.
See                                and see how we're enforcing the Rental Registration and Excessive Consumption ordinances.

| Chart 5 - Dramatic progress of rental registrations |
| --- |

| Yr 2001: | Single Family Properties | 1,675 | paid | $ | 38,060 |
| | Duplex Properties | 1,657 | paid | $ | 64,558 |
| | Total | 3,332 | | $ | 102,618 |
| Yr 2002: | Single Family Properties | 1,746 | paid | $ | 39,641 |
| | Duplex Properties | 1,695 | paid | $ | 67,221 |
| | Total | 3,441 | | $ | 106,862 |
| Yr 2003 | Single Family Properties | 2,486 | paid | $ | 59,986 |
| | Duplex Properties | 2,381 | paid | $ | 99,594 |
| | Total | 4,867 | | $ | 159,580 |
| Yr 2004 | GOALS: | 100% compliance means 4,000 properties still need to register | | | |
| | | $180,000 in council-adopted budget needs to be achieved | | | |

040066

PART 5 -Truth-In-Sale-of-Housing

The Truth-in-Sale-of-Housing Program (TISH)) needs more evaluation. Perhaps the ordinance should be amended to require repair-on-sale for life threatening, serious structural deficiencies. This would conform with some neighboring jurisdictions. (The ordinance change could allow the buyer to do the work before re-occupancy.)

In its present form the program has the following defects:

(1) Like it's sister program, Rental Registration, there is only voluntary compliance, and we know were not at 100 percent participation.

(2) Again, like it's sister program, there is no efficient or effective way to monitor compliance - checking the want ads, driving around looking for "for sale" signs, etc.- the realtors will not allow us access to MLS listings.

(3) The value to the home buyer or the city needs to be analyzed. How many times does a TISH evaluation result in an unsophisticated home-buyer being protected from an inflated selling price? From unknown deficiencies? (The standard practice for competent attorneys is to advise a home buyer to get their own expert inspection). We could do a post card survey to learn more.

(4) The possibility for a conflict of interest needs to be explored. Do evaluators rely on realtors for referrals. What affect if any, would this have on evaluations?

Further There is a state law change effective January 1, 2003 which requires seller disclosure of all known deficiencies or seller provision of a TISH report to the buyer. What affect does this law change have on our program? I believe most sellers will choose to provide the report rather than make the disclosure.

Proposal: Perhaps Council Research should pull 10% of evaluations for study.

040067

Part 6 - Vacant Building

In 2002 Year-End Report we recommended increasing the Vacant Building fee to pay more of the costs of the program. The City Council did raise the fee from $200 to $250 effective February 1, 2004, but this will still not adequately cover the program costs.

In 2003 the city collected $39,000 in fees but the program cost $291,139.

Chart 6 - 2003 Statistical Report for Vacant Buildings

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | 2003 Totals | 2002 Totals |
|---|---|---|---|---|---|---|
| New Vacant Building Identified | 56 | 55 | 85 | 65 | 261 | 254 |
| Buildings Monitored (active files) | 361 | 357 | 383 | 383 | -- | -- |
| Building Files Closed | 48 | 59 | 59 | 65 | 231 | 302 |
| Buildings Razed by City | 1 | 1 | 3 | 3 | 8 | 20 |
| Buildings Razed by Owner | 4 | 10 | 9 | 8 | 31 | 21 |
| Buildings Rehabed/Occupied | 43 | 48 | 47 | 54 | 192 | 236 |
| Buildings Brought before Council | 7 | 3 | 6 | 1 | 17 | 30 |
| "Orders to Abates" Issued | 5 | 9 | 2 | 7 | 23 | 27 |

040068

Chart 7



Page 11

Chart 8 - Cost per inspection



Notes                                                    ..

.. Cost Per Inspection Includes Initials and Re-Inspections

.. Total Cost Per Inspection is $1,421 K over 26,343 visits

.."Comm.' → Communications Budget

.."Transport' → Costs of Gas, Mileage, and Vehicle Lease

040070

Part 8 - 2003 Accomplishments/2004 Goals

|  | 2003 Accomplishments | 2004 Goals |
|---|---|---|

1.  Strategic plan written and implemented.................... A. Finish cost comparisons with other jurisdictions
    ☞Written by "Kitchen Cabinet"
    ☞Informed by Council Chronic Problem Prop. Rpt.

2.  Rules & Procedures established................................ B. Shorten turn-around on alley trash clean-up
    ☞Achieving stepped-up consistent enforcement
    ☞Cited as "Best Practice" by Legislative Auditor

3.  "Sweeps" built into routine operations...................... C. Keep up sweeps success
    D. Expand "Good Neighbor" program

4.  Excessive Consumption billing established............. E. Raise $200,000 from excessive consumers, rather
    then taxpayers as a whole

5.  Rental Registration deficiencies remedied
    by council action........................................................ F. Increase registrations to bring in $200,000

6.  Problem Property Unit established........................... H. Make every neighborhood safe and livable

7.  $200,000 Housing Improvement
    Revolving Fund Grant.............................................. I. Get the $200,000 out the door

8.  Brochure published................................................... J. Develop cable TV ad
    ➜ with "Resources " List        K. Increase translation services

9.  Web site re-built........................................................ L. On line customer satisfaction survey
    ➜ "How to Guide"
    ➜ Citizen access to track complaints..................... M. On-line complaint submissions

10. Computerization/Technology
    improvements started
    ➜Mobil units being tested..................................... N. Every inspector gets mobil unit
    O. Decrease inspector paperwork
    P. Increase time inspecting

11. Regular training regimen......................................... Q. Higher inspection standards institutionalized
    Employee manual written

12. Productivity Increases/........................................... R. 4 fold increase in interior inspections
    Accountability Enhancements
    ☞Performance measurement tool developed........ S. Performance measurement tool for clerical

040071

13.    Absenteeism Reduced

14.    Employee Morale up

15.    Inspector buy-in...................................................   T.   Area maps with data on # of units, etc.
      Police Department buy-in
      City Attorney buy-in
      Court buy-in
      Neighborhood buy-in   U.   State law change to allow assessment for city
      crew painting houses and garages

      V.   Truth-in-Sale-of-Housing ordinance change

      W.   Smoke detectors ordinance change

      X.   Boulevards regularly inspected by the City for
      tall grass and weeds: this duty should be
      transferred from Public Works to NHPI

      Y.   Now that we know what we're doing, and doing
      it well, get to a new hire.

16.    Ames Elementary School adopted by NHPI

040072

> Neighborhood Housing and Property
> Improvement Year-End Assessment
> → What's our capacity
> → What's our backlog

| OPINION #1 | We are able to handle current volume for complaint-based system with "same |
| Routine Enforcement | week service" |

Part I - Performance Numbers

| CHART #1 - Before and After Dawkins Comparisons | | | |
|---|---|---|---|
| | Jan.-Mar. 2002 | Jan.-Mar. 2003 | % Increase |
| Inspections | 3,267 | 6,641 | 103% increase |
| Tows | 66 | 308 | 267% increase |
| Tags | 3 | 127 | 4133% increase |
| Cases Resolved | 146 | 209 | 43% increase |

| CHART #2 - 2003 YTD Numbers | | |
|---|---|---|
| | January-March 2003 | January-March 2002 |
| Initial Inspections | 3,695 | 1,712 |
| Initial Interior Inspections | 304 | 243 |
| Field Finds | 989 | NOT AVAILABLE |
| Orders Issued | 3,667 | 624 |
| Initial Structural Inspections | Coming soon | NOT AVAILABLE |
| Average Number Deficiencies per file folder | Coming soon | NOT AVAILABLE |
| Average Number inspections per inspector per day | 10.1 | 8.5 |
| Average Number of days from complaint to 1st inspection | Coming soon | NOT AVAILABLE |

040073

# $52 Per Inspection
### *NHPI 2002 Average Cost*



040074

OPINION #2
Pro-Active Sweeps

But a complaint based system is inadequate to reach goals of cleaning-up the city and preserving housing stock. (When we do a "sweep" we find 10 times more than what gets called-in---without even touching paint, soffits, interiors, etc.)

So we want to build 20 to 26 "sweeps" per year into our routine.

Basic Model

→ 1 sweep every two weeks
   (Or 20 between April 1 and December 1)
→ 26 square blocks per sweep
   (500 to 675 blks of the city per year or approximately 10,000 residences*)
→ 120 to 160 total hours of work per sweep

_____

*footnote: If a swept area can stay relatively clean thru routine maintenance, eventually we won't need to sweep the entire city every year.

040075

Appendix #1                    Sweep Variations on Model

1.   North End September 2002 model

      →     Flyer, clean-up, sweep

      →     480 residences
            144 pre-sweep in violation
             85 sweep day in violation (and 31 tags)
             29 two- month post-sweep in violation (and 5 tags for recidivist second offenders)

      →     personnel:   neighborhood volunteers
                         8 hours per inspector X 15 inspectors

2.   Flyer, lst code inspection, clean-up day, reinspect.

3.   "Mini-clean-ups" (4 blocks only with dumpster in middle)

4.   Boulevards sweep

5.   Tows sweep

6.   "Euclid Avenue Sweep" (Problem Property Unit)

7.   Finch's alley

8.   Weed & Seed/ECON sweep (building exteriors)

9.   "February garages sweep"

10.  "March painting sweep"

040076

| OPINION #3 | → To supplement complaint-based system, <u>we can and should increase "Good Neighbor" program</u> (where volunteers do 1st notice, reinspects, call-in violations, and inspectors put these calls on "next-day" service with tags) |
|---|---|

OPINION #4
Problem Properties

<u>The Problem Property Unit is effective and functioning well with 2 police officers and city attorney, but this could easily "snowball" (in a positive way) and efficiently deploy 2 inspectors, 3 police officers and 1 ½ city attorneys.</u>

→ The city council report on chronic problem properties estimated there are 300 problem properties in St. Paul. (600 is more likely.) The council report estimated the city spends $2.5 million per year responding to problem property complaints, so closing down problem properties is very efficient expenditure of money.

040077

**CHART #3 - Problem Property Unit Effectiveness**

> July 15 - December 31, 2002

83    Files Opened,
59    of which have been closed:
  7    due to change in ownership
  10    due to tenant eviction
  18    due to property owner cooperation
  7    due to condemnation
  2    due to court action
  15    due to other reasons

> January 1 - April 15, 2003

139    Files Opened,
41    of which have been closed:
  0    due to change in ownership
  3    due to tenant eviction
  32    due to property owner cooperation
  0    due to condemnation
  2    due to court action
  4    due to other reasons

> Law Suits: November 2002 thru April 15, 2003

4   Tenant Remedies Actions (TRA's) filed and settled
1   Tenant Remedies Actions (TRA's) in litigation
3   Tenant Remedies Actions (TRA's) presented to City Attorney for filing
15   Tenant Remedies Actions (TRA's) being drafted or investigated
2   Drug-House Evictions
1   State Nuisance Abatement 30 day letter
2   State Nuisance Abatement investigations
28   Total (This number will grow dramatically as we learn our way thru the Court System.)

040078

OPINION #5
Rental Registration

The City Council report on chronic problem properties said that the Rental Registration Program was a program in name only and will remain so "until the Administration takes this ordinance seriously". This has now happened. The Director of Code Enforcement can declare the property a nuisance and revoke the registration. Renting without being registered is a misdemeanor.

Similarly, the excessive consumption ordinance is now being enforced for the first time.

We do know that approximately 25% of property owners required to be registered are not registered. We have to develop an effective way to increase registration compliance (beyond combing the want ads for rentals and comparing to registration lists).

040079

**OPINION #6**
**TISH Program**

The Truth-in-Sale-of-Housing Program (TISH)) needs more evaluation. Perhaps the ordinance should be amended to require repair-on-sale for life threatening, serious structural deficiencies. This would conform with some neighboring jurisdictions. (The ordinance change could allow the buyer to do the work before re-occupancy.)

In its present form the program has the following defects:

(1) Like it's sister program, Rental Registration, there is only voluntary compliance, and we know were not at 100 percent participation.

(2) Again, like it's sister program, there is no efficient or effective way to monitor compliance - checking the want ads, driving around looking for "for sale" signs, etc.- the realtors will not allow us access to MLS listings.

(3) The value to the home buyer or the city needs to be analyzed. How many times does a TISH evaluation result in an unsophisticated home-buyer being protected from an inflated selling price? From unknown deficiencies? (The standard practice for competent attorneys is to advise a home buyer to get their own expert inspection). We could do a post card survey to learn more.

(4) The possibility for a conflict of interest needs to be explored. Do evaluators rely on realtors for referrals. What affect if any, would this have on evaluations?

Further There is a state law change effective January 1, 2003 which requires seller disclosure of all known deficiencies or seller provision of a TISH report to the buyer. What affect does this law change have on our program? I believe most sellers will choose to provide the report rather than make the disclosure.

Proposal: Perhaps Council Research should pull 10% of evaluations for study.

040080

OPINION #7
Vacant Buildings Program

The Vacant Buildings Program is efficient and effective but it should pay for itself more than it currently does. In 2002 YTD the city collected $39,600 in fees but the program cost $278,000. The current $200 flat fee system was set in 1991 and, at a minimum, the $200 amount should be adjusted to reflect current costs.

OPINION #8
Towing Program

Towing of abandoned or illegal vehicles has become an efficient, effective clean-up activity, with a quicker response time between tagging and towing; but on any given day there remain 100's of vehicles that need to be tagged or towed.

OPINION #9
Right of Way Program

Boulevards should be regularly inspected by the City for tall grass and weeds, but this duty should be transferred from Public Works to Neighborhood Housing and Property Improvement.

040081

NEIGHBORHOOD HOUSING AND PROPERTY IMPROVEMENT
2004 YEAR-END ASSESSMENT

| | |
|---|---|
| 61,000 | single family structures in St. Paul ( of which 55,000 are homesteaded) |
| 4,500 | duplexes (9,000 housing units) ( of which 1,500 are homesteaded) |
| 3,700 | c/o structures (50,000 housing units) |
| 69,200 | residential structures in St. Paul |

Part I - Performance Numbers

| CHART #1 | | | |
|---|---|---|---|
| | 2002 | 2003 | 2004 |
| Inspections | 23,083 | 28,653 | 34,048 |
| Complaints Received | 9,377 | 11,312 | 14,431 |
| Founded Complaints/Folders Opened | 7,910 | 10,009 | 11,541 |
| Orders Issued | 4,168 | 5,883 | 11,640 |
| Tows Ordered | 650 | 947 | 1,625 |
| Tags Issued | 402 | 696 | 145 |
| Cases Resolved | 8,528 | 9,054 | 12,318 |
| | | | |
| Initial Exterior Inspections | 9,331 | 12,541 | 16,978 |
| Initial Interior Inspections | 1,149 | 1,148 | 1,148 |
| Initial Structural Inspections | 824 | 1,080 | 1,728 |
| Field Finds | not available | 3,067 | 3,327 |
| Total Number of Deficiencies Called | 29,636 | 43,695 | 49,860 |
| | | | |
| Average Days to Close a File Folder | 55 days | 31 days | 45 days |
| Average Number of Inspectors | 11 | 11 | 12.5 |
| Average Number of inspections per inspector per day | 8.9 | 9.0 | 10.9 |

1 of 20

040082



040083

The previous page is NHPI's chart to plot productivity of each inspector on a monthly or year-end basis. The theory is that the number of inspections should not be the only measure of an inspector.

Analyzing this chart and comparing it to past years provides insights and suggests where improvements might be made in '05.

1.   The largest band-widths are for excessive consumption bills, field finds and structures called. The inspectors at the high end might be enlisted to help or advise low-enders. Comparing year-to-year, inspector rankings amongst themselves remain remarkably consistent, even as department-wide productivity increases (see Chart 1). For example, in 2003 the raw value median was 12.5 but in 2004 this rose to 14.5, although it was pretty much the same inspectors above or below the median.

2.   Department-wide the average number of field finds per day per inspector rose only slightly from 1.20 to 1.24. This was disappointing and we need to understand why. In the first half of '04 we had driven the number up to 1.33 (which was much better).

3.   The average number of interior inspections per month in '03 was 102 and 82 in '04. This is another disappointing figure that needs to be understood. (Although we shouldn't lose sight of the most salient statistic for 2004 which was the two-fold increase in over-all productivity from 2002.)

4.   In 2003 the total founded complaints investigated was 10,009 and the percent of complaints unfounded or "gone-on-arrival" was 17%. In 2004 these numbers were 14,280 and 16%.

.

040084

Chart #3

| 2004 Comparison Statistics | Saint Paul | Minneapolis | Milwaukee | Baltimore | Memphis |
|---|---|---|---|---|---|
| Population* | 287,151 | 382,618 | 596,974 | 651,154 | 650,100 |
| Housing Units* | 115,713 | 168,606 | 249,255 | 300,477 | 271,511 |
| Inspectors* | 12.5 | | | | |
| Inspections* (Per Day Average) | 10.9 | | | | |
| Initial Exterior to Interior Ratio | 16 to 1 | | | | |
| Reinspection to Inspection Ratio | 17 to 11 | | | | |
| Inspector Absenteeism* | 4.3** | | | | |
| Cost Charts (With In/Out List) | See Part IX | | | | |
| Best Practices | | | | | |

*How did we get our numbers?  See below
** In 2002 absenteeism was 8% and in 2003 it was 3.4%

| | |
|---|---|
| **Population** | Information Provided Courtesy of US Census 2000 |
| **Housing Units** | Information Provided Courtesy of US Census 2000 |
| **Inspectors** | 11½ Area Inspectors and 1 Problem Property Inspector *Does not include (a) Police Force (b) Vacant Buildings (c) Truth in Sale of Housing (d) Rental Registration (e) Supervisors and (f) Support Staff - Clerical and Administrative* |
| **Inspections** | Inspections per day is calculated by taking the total number of inspections and dividing by the number of days worked and then dividing that amount by the number of inspectors. |
| **Absenteeism** | Absenteeism is calculated by taking the total number of work days and multiplying by the number of inspectors and then comparing that number with the total days absent for sickness (Not including vacation or extended leaves). |

040085

Part II - Moving from a mostly Complaint-Based System to a more pro-active Patrol System
[click here for how to get a sweep of your neighborhood.]

A complaint-based system is not adequate to meet the twin goals of cleaning up the city and preserving our housing stock. Thus, each inspector regularly patrols their area for field finds and we conduct pro-active sweeps.

In 2004 we conducted 16 sweeps - 33% of the City - the most ever in a single year. (See page after next for map)

In 2003 we did 14 sweeps - covering 10% of the City.

Prior to 2003 we generally did only 1 or 2 sweeps per year. In September, 2002 we conducted the first prototype sweep that became the model for all future sweeps:

- 26 blocks
- 480 residences
- 144 residences in violation pre-sweep
→ Flyer delivered door-to-door
→ Annual Neighborhood Clean-Up Day
→ Sweep Day
- 85 residences in violation on sweep day*
- 29 residences in violation 2 months later
- 37 residences in violation 10 months later*

There are obvious benefits to being pro-active: a cleaner city, less blight, greater safety (broken windows theory), increased property values, preservation of affordable housing, etc., but it also reduces the possibility for one group to manipulate the system against another - every property gets an inspection in a sweep, not just the called-in ones.

No code enforcement program can be universal - 24/7 on every violation at every property - there's just not enough resources; moreover, in most cities a balance has to be struck between aggressive enforcement to preserve livability and over-zealous enforcement potentially leading to wholesale abandonment of properties in the inner-city.

In St. Paul the balance has been struck this way: Because we achieved efficiencies in certain parts of our operation, we were able to become more pro-active without increased resources. We did not do a new hire but we did transfer two inspectors and certain functions from one department to another. In 2004, the City's 22 inspectors went on 16 "sweeps" (approximately 30 square blocks per sweep) and did a larger number of "field finds," without creating a backlog because voluntary compliance was up and the number of properties needing reinspection was down.

[continued on next page]

---

*footnote: This proved success of prototype: 59 properties took advantage of clean-up day and cleaned-up before sweep day. And using Good Neighbor Program kept the area from re-deteriorating. If a swept area can be kept clean using the Good Neighbor Program, eventually we won't need to sweep 33% of the city each year.

040086

Voluntary compliance was up for a number of reasons, chiefly because instituting an excessive consumption fee system (which can be assessed to property taxes) created an incentive to comply, thus freeing-up inspectors to be more pro-active.

In addition to doing "sweeps," inspectors were pro-active in other ways too. We heightened inspection standards: writing-up every violation at the property, not just what was called-in; writing-up all the near-by same or worse properties, not just the property that was called-in (i.e., "field finds"); and a user-friendly system was instituted to report alley trash violations whether by an inspector out of their area or any observer. Finally, every inspector has to spend part of the week actively patrolling their area for violations, not just responding to complaints.

This move to being more pro-active is reflected in the over-all productivity of the department (See Chart #1 comparing '02 to '04 statistics.) To quote Mayor Kelly from his budget address: "Rethinking how we do the job has made a significant difference in our neighborhood housing and property improvement department. Code enforcement efforts have yielded twice as much work accomplished compared to two years ago, with less staff and less money, largely because inspector productivity has more to do with attitude, technique and cooperation than with budgeted dollars."

040087

# 2004 Code Enforcement Sweeps



**Legend**

— SweepStreets

- - - SP_MajorStreets

SP_Water

SP_Border

The yellow highlighted areas are where code enforcement did sweeps in 2004, approximately 632 city blocks.
In addition, inspectors individually surveyed 437 blocks.
Taken together this represents approximately 33% of the city.

Map Generated by Office of Technology, Enterprise Services
Steven Lorbach, GIS Coordinator

040083

Chart 4A

Our backlog did not increase even as the number of inspections, orders, field finds, sweeps and folders went up.

|  | July 8 | October 8 | January 5, 2005 |
|---|---|---|---|
| # Complaints we were over 5 days late in responding to | 103 | 105 | 35 |
| # Folders we were over two weeks late in doing rechecks for | 706 | 748 | 717 |

Chart 4B

One reason we didn't get further behind is because we became more efficient.  In 2004 there were less properties requiring three or more reinspections before closing, and more that closed on 2 or less reinspections.

|  | 2003 | 2004 |
|---|---|---|
| # Folders closed on 1st reinspection | 4942 | 5941 |
| # Folders closed on 2nd reinspection | 1855 | 1909 |
| # Folders closed after 3 or more reinspections | 1578 | 1343 |

040089

## Part III - Excessive Consumption Billing

By December 31, 2004 excessive consumption billings totaled $140,475 and easily met the projected $92,000 contained in the 2004 adopted budget. $50,000 of the $140,475 came to Neighborhood Housing and Property Improvement as part of its General Fund allotment and $90,475 will stay in the City's General Fund, once it's fully collected.

In the 4th Quarter of 2004 an average work day at Neighborhood Housing and Property Improvement saw $936 go in the mail as excessive consumption bills. This projects to $234,000 in 2005. The reason we did not average $936 per day thru-out 2004 is that the ordinance went into effect January 1, and it took a good part of the year to do initial correction orders before we could go on reinspections where there might be non-compliance.

The 2005 adopted budget projects $180,000 in excessive consumption revenue and we are on target for meeting that goal. For 2005 all of the $180,000 is to come to Neighborhood Housing and Property Improvement as part of its General Fund allotment. The $180,000 was constructed using a $700 per work day average.

The only disappointing statistic is the amount voluntarily paid versus the amount that will have to be collected by way of assessment. As of December 31, 2004 only $31,600 had been voluntarily paid. Of the $108,875 still to be collected, approximately 40% will be "in the bank" by the May 15, 2005 property tax collection and the remaining 60% won't be collected until the 2006 assessment. Keep in mind that by May 15, 2006, and every year thereafter, the full amount billed (currently projected at $180,000 per year) will be "in the bank".

### CHART 5 - 2004 Excessive Consumption Billings

| | |
|---|---:|
| Number of property owners billed | 1,304 |
| Number in Rental Registration | (22%) 280 |
| Number of properties owner occupied | 1,024 |
| | 1,304 |
| Total dollars billed | $ 140,475 |
| January 1 to July 1 | 42,875 |
| 3rd Quarter | 42,375 |
| 4th Quarter | 55,225 |
| | $ 140,475 |
| Average amount billed per work day | |
| 1st Quarter | $ 120 |
| 2nd Quarter | $ 552 |
| 3rd Quarter | $ 811 |
| 4th Quarter | $ 936 |
| Amount voluntarily paid | $ 31,600 |
| Amount sent to assessment | 86,500 |
| Amount not yet 90 days in arrears | 22,375 |
| | $ 140,475 |
| Number of Rental Registration owners paid | (Vol. pay rate - 62%)  163 |
| Number of Rental Registration owners sent to assessment | 100 |
| Number of Rental Registration owners not yet 90 days in arrears | 17 |
| Number of Owner Occupied paid | (Vol. pay rate - 27 %) 239 |
| Number of Owner Occupied sent to assessment | 646 |
| Number of Owner Occupied not yet 90 days in arrears | 139 |
| Number of property owners billed only $50 | 901 |
| Average amount billed per property owner | $90.68 |
| Number of property owners billed $50.00 for 3rd founded violation in 12 months | 38 |
| Number of property owners billed $75.00 for 4th founded violation in 12 months | 11 |
| Number of property owners billed $150.00 for 5th or more violation in 12 months | 4 |

## Part IV - Problem Property Unit

040090

The 2002 City Council report on chronic problem properties estimated there are 300 problem properties in St. Paul. The council report estimated the city spends $2.5 million per year responding to problem property complaints, so closing down problem properties is very efficient expenditure of money.

## Problem Property Report

| January 1, 2004 - December 31, 2004 |

_177_  Files Opened
_147_  Of which have been closed:
  _75_  Owner compliance
  _20_  Condemnation/Vacant Buildings
  _5_  Rental Revocations
  _7_  TRA's
  _11_  Evictions (Landlord or City Attorney Office)
  _2_  New Owner
  _6_  Directors Meeting
  _4_  617.80 Nuisance Abatement Order
  _17_  Unsubstantiated
_30_  Still open/active

| 2003 Problem Properties carried over into 2004 |

_69_  Carried over from 2003
_65_  2003 files closed in 2004:
  _39_  Owner compliance
  _12_  Condemnations/Vacant Building
  _1_  Criminal Charges
  _1_  Evictions (Landlord or City Attorney Office)
  _3_  New Owner
  _1_  617.80 Nuisance Abatement Order
  _8_  Unsubstantiated
_4_  Still Open

| **Problem Property End of the Year Report Totals** |
|---|
| Files opened or carried over | 246 |
| Files closed in 2004 | 212 |
| Still Active | 34 |

040091